UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

───────────────────────────────

JAMES BELLAMY,

                        Plaintiff,

                                             9:21-cv-00251
v.                                          (DNH/TWD)

DR. CARL KOENIGSMANN, et al.,

                         Defendants.

───────────────────────────────

APPEARANCES:                      OF COUNSEL:

JAMES BELLAMY
Plaintiff, Pro Se
17-A-2901
Shawangunk Correctional Facility[1]
P.O. Box 700
Wallkill, NY 12589

HON. LETITIA JAMES                STEVE NGUYEN, ESQ.
New York State Attorney General      Ass't Attorney General
Attorneys for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**REPORT-RECOMMENDATION AND ORDER**</u>

## I.    INTRODUCTION

      This matter has been referred for a report and recommendation by the Honorable David

N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

*Pro se* plaintiff James Bellamy ("Plaintiff"), an inmate in the custody of the New York State

---

[1]  Although Plaintiff's address on file is Shawangunk Correctional Facility, it appears Plaintiff
(DIN 17-A-2901) is currently incarcerated at Elmira Correctional Facility.  *See*
https://nysdoccslookup.doccs.ny.gov/ (last visited May 22, 2023).

Department of Corrections and Community Supervision ("DOCCS"), brings this action against

defendants Dr. Carl Koenigsmann, Nurse Practitioner Susan Devlin-Varin, Dr. Vonda Johnson,

Audiologist John Serhan, Director of Diversity Management Michael Washington, and DOCCS

(together, "Defendants"), alleging Eighth Amendment deliberate medical indifference claims

pursuant to 42 U.S.C. § 1983, and violations of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101 et seq.  (*See* Dkt. Nos. 15, 16.)  Presently before the Court is Defendants'

unopposed motion for summary judgment.  (Dkt. No. 35.)  For the reasons that follow, the Court

recommends granting the motion.

## II.    PROCEDURAL HISTORY

On July 31, 2020, Plaintiff filed a complaint in the U.S. District Court for the Western

District of York ("WDNY") complaining that his constitutional rights and rights under the ADA

and other statutes were violated at the Downstate, Clinton, Great Meadow, and Attica

Correctional Facilities ("Downstate", "Great Meadow", "Clinton", and "Attica" respectively).

(Dkt. No. 1.)  At that time, Plaintiff was incarcerated at Attica.  *See id*. at 2.[2]

On March 3, 2021, WDNY District Judge Charles Siragusa granted Plaintiff's application

to proceed *in forma pauperis* and reviewed the sufficiency of Plaintiff's complaint pursuant to 28

U.S.C. §§ 1915e and 1915A (the "WDNY Order").  (Dkt. No. 11.)  As relevant here, Plaintiff's

claims regarding Clinton and Great Meadow were severed and transferred to this District.  *Id*. at

9-10, 15, 17.  The WDNY Order also transferred those claims arising at Downstate to the

Southern District of New York ("SDNY").  *Id*. at 17.

[2]  Page citations herein are those assigned by the Court's electronic filing system, CM/ECF. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

Because the WDNY Order did not analyze the sufficiency of the claims arising in this District, upon receipt of the action, this Court screened the complaint and accepted Plaintiff's complaint in part.  (Dkt. No. 13.)  Thereafter, on May 28, 2021, Plaintiff filed an amended complaint.  (Dkt. No. 15.)  On July 1, 2021, this Court reviewed the sufficiency of the amended complaint and accepted it only to the extent it asserted (1) Eighth Amendment deliberate medical indifference claims against Koenigsmann, Devlin-Varin, Johnson, and Serhan; and (2) ADA claims against DOCCS, Washington, Serhan.[3]  (Dkt. No. 16 at 10.)  On September 2, 2021, Defendants answered the amended complaint.  (Dkt. No. 25.)

On August 30, 2022, Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 35.)  The Court issued a notice setting Plaintiff's response time and warned him of the consequences of failing to respond to the motion.  (Dkt. No. 36.)  Plaintiff has neither responded to the motion nor requested an extension of time to file a response.

## III.    STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v. Gourd*, 467 F.3d 263, 272-73

---

[3]  Plaintiff's ADA claims asserted against defendant Great Meadow Superintendent John Doe also survived initial review, and Plaintiff was directed to take reasonable steps to ascertain through discovery the identity of that individual.  (Dkt. No. 16 at 6.)  "Upon learning of defendant John Doe's identity, [P]laintiff shall amend the operative pleading to properly name him as a party.  Failure to ascertain the identity of the John Doe so as to permit timely service of process will result in the dismissal of all claims asserted against that individual."  *Id*.  To date, defendant Great Meadow Superintendent John Doe has not been identified.

(2d Cir. 2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff. At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is

proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). "A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist[.]" *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

Additionally, Local Rule 56.1(b) requires the party opposing summary judgment to "file a separate Response to the Statement of Material Facts." L.R. 56.1(b). The response must "mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs." *Id*. Importantly, "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id*.

In this action, Plaintiff was sent a specific warning by Defendants and the Court of the consequences of failing to respond to the motion:

> **WARNING:** If you do not submit a proper response to the defendants' statement of material facts, **the Court may deem you to have admitted the defendants' factual statements.** If you do not submit copies of record evidence in support of your denials, **the Court may deem defendants' factual statements to be true.** If you do not submit a proper response memorandum of law, the Court may deem you to have conceded the defendants' arguments. If you do not respond to this motion properly (or at all), summary judgment may be entered against you, meaning that **SOME OR ALL OF YOUR CLAIMS MAY BE DISMISSED.**

(Dkt. Nos. 35, 36.) Accordingly, the facts set forth in Defendants' statement pursuant to L.R. 56.1 (Dkt. No. 35-7) that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's verified amended complaint and sworn testimony will be

accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3

(N.D.N.Y. Oct. 29, 2014) (finding allegations in the plaintiff's verified complaint sufficient to

controvert facts in statement of material facts on motion for summary judgment); *Douglas v.*

*Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013)

("Because Plaintiff has failed to raise any question of material fact, the Court will accept the

facts as set forth in Defendants' Statement of Facts . . . supplemented by Plaintiff's verified

complaint . . . as true.").

## IV.    BACKGROUND[4]

Plaintiff claims that before entering DOCCS' custody and while confined at Rikers Island

Correctional Facility ("Rikers Island"), he was diagnosed with "serious" hearing loss and, on

February 22, 2017, was provided a single hearing aid for his left ear. (Dkt. No. 15 at 4-5; Dkt.

No. 15-2 at 8-10.)

### A.    Defendants DOCCS and Washington

Plaintiff entered DOCCS' custody on July 14, 2017, and was initially housed at

Downstate. (Dkt. No. 35-7 at ¶ 9.) He asserts ADA claims against DOCCS and Washington, the

Director of Diversity Management and ADA Coordinator. *Id*. at ¶ 7. Specifically, Plaintiff

contends both defendants should have placed him in a specialized facility for his hearing

condition. *Id*.

---

[4]  The facts are drawn from Plaintiff's verified amended complaint and attached exhibits (Dkt.
Nos. 15, 15-2), Plaintiff's deposition testimony (Dkt. No. 35-6), Defendants' Local Rule 56.1
statement of material facts (Dkt. No. 35-7), and the affidavits and exhibits submitted by
Defendants in support of their motion (Dkt. Nos. 35-1 through 35-5). The facts are construed in
the light most favorable to Plaintiff as the non-moving party. *Wandering Dago, Inc. v. Destito*,
879 F.3d 20, 30 (2d Cir. 2018).

In August 2017, during a medical interview at Downstate, Plaintiff presented with a "prominent hearing deficit." *Id.* at ¶ 10. Accordingly, he was scheduled for an audiology consult. *Id.* Serhan, a licensed audiologist, examined Plaintiff on August 16, 2017, and determined Plaintiff's hearing loss was "non-significant" (HL30).[5] *Id.* at ¶ 11. Among other things, Serhan observed Plaintiff's ears were "clear" and described Plaintiff's communication, speech, and language as "normal." (Dkt. No. 15-2 at 2.) The consultation report was marked "FOHL"[6] and "malingering." *Id.* Plaintiff alleges prior to this examination, he was classified as HL20, but Serhan "disregarded" his medical condition and "relisted [him] as HL30." (Dkt. No. 15 at 4-5.)

On August 18, 2017, ADA Coordinator Washington received a letter from Plaintiff. (Dkt. No. 35-7 at ¶ 12.) Plaintiff stated he was "deaf in [his] right ear" and "hard of hearing in [his] left ear" and asked to transfer to a facility that could "accommodate [his] disability." *Id.* Upon review of Plaintiff's medical records, including Serhan's audiology report that classified Plaintiff's hearing loss as "non-significant" (HL30), and based upon DOCCS Directive No. 2612,[7] Washington determined Plaintiff was not entitled to a transfer and was appropriately housed. *Id.* at ¶¶ 13-15. Accordingly, Washington advised Plaintiff to seek accommodations at the facility-level. *Id.* at ¶ 15. Washington received no further correspondence from Plaintiff. *Id.* at ¶ 16.

---

[5] There are three levels of designation for hearing loss for inmates in DOCCS' custody, including (1) HL10 Hearing Loss/Deaf; (2) HL20 Hearing Loss/Hard of Hearing; and (3) HL30 Hearing Loss/Non-Significant. (*See* Dkt. No. 16 at 4 n.3.)

[6] Serhan uses the acronym "FOHL" in his practice to "denote allegedly functional, but non-observable hearing loss." (Dkt. No. 35-5 at ¶ 22.)

[7] DOCCS Directive No. 2612, Section XI(A), states transfers were for incarcerated individuals who are "deaf (HL10), hard of hearing (HL20), legally blind (B240), or severely visually impaired (V230)." (Dkt. No. 15-2 at 49).

In December 2017, Plaintiff was transferred from Downstate to Clinton. *Id*. at ¶ 19. During the transfer, prison officials lost Plaintiff's hearing aid. (Dkt. No. 15 at 5-6.)

### B.    Defendants Devlin-Varin and Johnson

Plaintiff asserts Eighth Amendment medical indifference claims against Devlin-Varin, a nurse practitioner at Clinton, and Johnson, a clinical physician at Clinton. (Dkt. No. 15 at 29.) On January 12, 2018, Devlin-Varin examined Plaintiff, who complained of a lost hearing aid among other things. (Dkt. No. 35-7 at ¶ 20.) She reviewed Plaintiff's medical records, which noted Plaintiff had an audiology consult with Serhan in August 2017.[8] *Id*. at ¶ 21. She deferred to Serhan's findings and "non-significant" (HL30) assessment and scheduled Plaintiff for another audiology consult. *Id*. at ¶ 22-23. Sometime later, Johnson reviewed Devlin-Varin's consultation referral. *Id*. at ¶ 24. Johnson was not present during the January 12, 2018, examination nor did Johnson have any further interactions with Plaintiff. *Id*.

Devlin-Varin examined Plaintiff again on June 21, 2018. *Id*. at ¶ 25. At that time, however, Plaintiff had not yet received his audiology consult. As a result, Devlin-Varin again deferred to Serhan's 2017 audiology report. *Id*. She had no further examinations with Plaintiff concerning his hearing condition. *Id*. at ¶ 26.

### C.    Defendant Koenigsmann

Plaintiff claims Koenigsmann "denied" him a replacement hearing aid and was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. (Dkt. No. 15 at 30; Dkt. No. 16 at 10; Dkt. No. 35-7 at ¶ 27. ) At all times relevant, Koenigsmann

---

[8]  Devlin-Varin noted Serhan's consultation report was marked "FOHL" and, based upon her prior experience with Serhan, "FOHL" described patients without observable hearing loss. (Dkt. No. 35-2 at ¶ 16; *accord* Dkt. No. 35-2 at ¶ 16.)

was a licensed physician and served as the Deputy Commissioner and Chief Medical Officer for DOCCS. (Dkt. No. 35-7 at ¶ 28.)

Plaintiff alleges he wrote a letter to Koenigsmann on July 9, 2018. (Dkt. No. 15 at 5; Dkt. No. 15-2 at 19-21.) Among other things, Plaintiff complained that because of the inaccurate hearing test conducted by Serhan in August 2017, he was being denied "reasonable accommodations" and a replacement hearing aid at Clinton. (Dkt. No. 15-2 at 19-21.) Koenigsmann, however, neither reviewed nor responded to that correspondence. (Dkt. No. 35-7 at ¶ 30.) Nor did Koenigsmann ever speak to Plaintiff about his medical conditions. *Id*. Rather, Plaintiff's letter would have been routed to a Regional Health Service Administrator, who would review the correspondence, investigate any complaints, draft a response, and take corrective actions as needed. *Id*. at ¶ 31.

On August 28, 2018, Plaintiff was transferred from Clinton to Great Meadow. (Dkt. No. 35-2 at 16.)

### D.     Defendant Serhan

Plaintiff asserts Eighth Amendment deliberate medical indifference and ADA claims against Serhan. (Dkt. No. 16 at 10.) Both claims pertain to Serhan's assessment of his hearing loss around October 2018, while incarcerated at Great Meadow.[9] *Id*.

On October 12, 2018, Serhan examined Plaintiff at Great Meadow. (Dkt. No. 35-7 at ¶ 36.) To evaluate Plaintiff's hearing loss, Serhan assessed his communication skills, administered a Pure Tone Audiometry, and conducted a physical examination. *Id*. at ¶ 37. First, Serhan

---

[9] As discussed above, Plaintiff also takes issue with Serhan's assessment of his hearing loss in August 2017, while incarcerated at Downstate. (Dkt. No. 15 at 4-5; Dkt. No. 15-2 12-13.) However, all of Plaintiff's claims arising out of incidents that occurred or treatment Plaintiff received while he was confined at Downstate were transferred to the SDNY pursuant to the WDNY Order. (Dkt. No. 11 at 17; *see also* Dkt. No. 16 at 10.)

determined Plaintiff had "normal hearing communication." *Id*. at ¶ 38. He observed Plaintiff

could understand speech without visual cues and that Plaintiff had no speech or language

impairments, conditions typically associated with significant hearing loss. *Id*. Second, Serhan

tested Plaintiff's subjective hearing via a Pure Tone Audiometry. *Id*. at ¶ 39. Serhan

determined, however, that Plaintiff gave unreliable responses. *Id*. at ¶ 40. For example, despite

his normal communication ability, Plaintiff tested as though he were deaf in both ears. *Id*. In

Serhan's experience, Plaintiff's presentation was untenable: even individuals with mild to

moderate hearing loss presented with at least some communication impairment. *Id*. at ¶ 41.

Accordingly, Serhan did not rely upon Plaintiff's audiometry results. *Id*. Third, Serhan

examined Plaintiff's ears using an otoscope. *Id*. at ¶ 42. As Plaintiff's eardrums adequately

reflected light and his ear canals were clear, Serhan determined Plaintiff's ears were normal. *Id*.

at ¶ 43. Based upon his findings, Serhan classified Plaintiff's hearing loss as "non-significant"

(HL30) and concluded hearing aids were not warranted. *Id*. at ¶ 44.

## V.    DISCUSSION

Plaintiff advances Eighth Amendment medical indifference claims against Koenigsmann,

Devlin-Varin, Johnson, and Serhan; and claims pursuant to the ADA against DOCCS,

Washington, and Serhan. (Dkt. No. 16 at 10.) Defendants argue Plaintiff's claims are meritless

and fail as a matter of law. (Dkt. No. 35-8 at 6-17.) Alternatively, Defendants assert

Koenigsmann, Devlin-Varin, Johnson, and Serhan are entitled to qualified immunity. *Id*. at 17-

18. Plaintiff has not responded to the motion.

### A.    Eighth Amendment Medical Indifference Claims

Claims that prison officials have intentionally disregarded an inmate's medical needs fall

under the umbrella of protection from the imposition of cruel and unusual punishment afforded

by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. at 104). This standard contains objective and subjective components. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).

"First, the alleged deprivation must be, in objective terms, sufficiently serious." *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted). Determining whether a deprivation qualifies as objectively serious entails two inquiries: (1) "whether the prisoner was actually deprived of adequate medical care" and (2) "whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

"Second, the defendant must act with a sufficiently culpable state of mind," *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted). That is, the plaintiff must demonstrate the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 832, 844 (1994); *see also Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (With respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'"). "Deliberate indifference is a mental state equivalent to subjective recklessness." *Salahuddin*, 467 F.3d at 279 (internal citation omitted). "[R]ecklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent." *Id*.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d

303, 311 (S.D.N.Y. 2001).  Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates.  *Id*. (citations omitted).  An inmate does not have the right to treatment of his choice.  *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment.  *Sonds*, 151 F. Supp. 2d at 312 (citation omitted).  Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate.  *Id*.  Thus, any claims of malpractice, negligence, or disagreement with treatment are not actionable under Section 1983.

In addition, as with any Section 1983 claim, a defendant must be personally involved in an alleged constitutional violation in order to be held liable.  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).

### 1.    Objective Element

Plaintiff fails to establish the first requirement under the objective prong—that he was actually deprived of adequate medical care at Clinton or Great Meadow.[10]  The record demonstrates Plaintiff was examined by Devlin-Varin on January 12, 2018, where he complained of hearing issues and a lost hearing aid.  (Dkt. No. 35-2 at ¶¶ 3-4, 10-13.)  Devlin-Varin reviewed and deferred to Serhan's audiology report from August 2017, which diagnosed Plaintiff with non-significant hearing loss (HL30) based upon his normal communication, speech, and language ability.  *Id*. at ¶ 14.  That report also was marked "FOHL" and referenced "malingering" behavior.  *Id*. at ¶ 16.  Nevertheless, in light of Plaintiff's complaints, she

---

[10]  As noted, all of Plaintiff's claims arising out of incidents that occurred or treatment Plaintiff received while he was confined at Downstate were transferred to the SDNY by the WDNY Order.  (Dkt. No. 11 at 17; Dkt. No. 16 at 2, 10.)

requested a "re-evaluation for placement and classification." (Dkt. No. 35-2 at 12.) Johnson reviewed the consultation referral from January 2018. (Dkt. No. 35-3 at ¶ 13.)

Plaintiff was examined by Devlin-Varin again on June 21, 2018. (Dkt. No. 35-2 at ¶ 20.) Among other things, Plaintiff requested a hearing aid. *Id*. As before, she deferred to the 2017 audiology report as Plaintiff had not yet received his updated audiology consult. *Id*. at ¶ 22. Thereafter, in August 2018, Plaintiff was transferred to Great Meadow *Id*. at ¶ 24.

On October 12, 2018, Serhan met with Plaintiff at Great Meadow to assess his alleged hearing loss. (Dkt. No. 35-5 at ¶ 11.) As detailed above, Serhan's audiological findings were based upon a comprehensive three-part test. *Id*. at ¶ 12. Serhan classified Plaintiff as HL30, indicating "non-significant" hearing loss. *Id*. at ¶ 21. Moreover, given Plaintiff's normal communication skills, unreliable audiometry results, and lack of ear trauma, Serhan determined hearing aids were not warranted. *Id*. at ¶ 23.

Accordingly, Plaintiff has not established as a matter of law that he was deprived of adequate medical care at Clinton or Great Meadow. "Since the Court has found that Plaintiff has not been deprived of adequate medical care, there is no need to determine whether the alleged deprivation of medical care was sufficiently serious." *Redd v. Garell*, No. 18 CIV. 09436, 2023 WL 2712373, at *11 (S.D.N.Y. Mar. 30, 2023). Thus, Koenigsmann, Devlin-Varin, Johnson, and Serhan are entitled to summary judgment on this basis.

In any event, there is no factual dispute regarding the seriousness of Plaintiff's condition. To be sure, the "loss of hearing can form the basis of a constitutional claim because the ability to hear is a basic human need affecting daily activity and sufficiently serious to warrant treatment by physicians." *Fate v. Petranker*, No. 19-CV-05519, 2022 WL 2672317, at *5 (S.D.N.Y. July 8, 2022) (citations and internal quotation marks omitted). "However, a plaintiff's hearing loss

that is mild or not significant, does not rise to the level of a 'serous medical need' triggering constitutional protections." *Id*. (citations omitted). Here, the record establishes that at all times relevant to this action, Plaintiff's hearing loss was classified as "non-significant" (HL30) and hearing aids were not warranted. (Dkt. No. 35-7 at ¶ 44.) *See, e.g.*, *King v. Shinder*, No. 16-CV-06315, 2020 WL 4750294, at *7 (S.D.N.Y. Aug. 17, 2020) (finding claim based on denial of a hearing aid to a plaintiff with HL30 non-significant hearing loss failed at the summary judgment stage because the plaintiff's medical condition was simply not sufficiently serious). Plaintiff's bare assertion that he needs a hearing aid fails to raise a genuine issue of material fact where it is undisputed that his hearing loss was insignificant.[11] Overall, the record reflects Plaintiff was provided with adequate medical services.

### 2. Subjective Element

Plaintiff also fails to establish Koenigsmann, Devlin-Varin, Johnson, and Serhan acted with a sufficiently culpable state of mind. Although Plaintiff obviously disagrees with the medical care he received at Clinton and Great Meadow, disagreements are insufficient to establish deliberate indifference. *See Shomo v. N.Y.S. Dep't of Corr. Servs.*, No. 9:04-CV-0910, 2007 WL 2580509, at *12 (N.D.N.Y. Sept. 4, 2007) (holding that a prisoner's disagreement with a DOCCS employee regarding the treatment that he should properly receive is insufficient to

---

[11] Plaintiff appears to argue that because he was previously diagnosed with "serious" hearing loss and prescribed a hearing aid, he was entitled to accommodations and a hearing aid moving forward. As discussed, the record establishes Serhan exercised his medical judgment to determine Plaintiff's alleged hearing loss was non-significant and hearing aids were not warranted. *See, e.g.*, *McKenna v. Wright*, No. 01 Civ. 6571, 2002 WL 338375, at *8 (S.D.N.Y. Mar. 4, 2002) ("The mere fact that the defendant physicians may have made a different medical decision with respect to [the plaintiff's] treatment than that purportedly recommended by [a previous physician] does not indicate that they acted for culpable reasons."); *see also Douglas v. Stanwick*, 93 F. Supp. 2d 320, 325 (W.D.N.Y. 2000) ("Not every physician will treat every ailment in exactly the same manner. That does not mean that one of the physicians must be acting with deliberate indifference to the patient's needs.").

state a claim under the Eighth Amendment" (footnote omitted)).  Even if the medical decisions at issue caused Plaintiff unintended harm, which the Court seriously doubts, negligence is not actionable under Section 1983.  *See Ahlers v. Kaskiw*, No. 12-CV-501 (GLS/ATB), 2014 WL 4184752, at *7 (N.D.N.Y. Aug. 21, 2014) ("[N]egligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference.") (citing *Farmer*, 511 U.S. at 835); *Chance*, 143 F.3d at 703 ("[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.") (citing *Estelle*, 429 U.S. at 105-06).  Thus, Plaintiff also fails to satisfy the subjective prong of the deliberate indifference test and summary judgment is also warranted on this basis.

### 3.    Personal Involvement

Johnson and Koenigsmann are entitled to summary judgment for lack of personal involvement.  (Dkt. No. 35-8 at 11-12.)  The undisputed record evidence demonstrates neither Johnson nor Koenigsmann personally treated Plaintiff or had any contact whatsoever with him.  Instead, Johnson only reviewed Devlin-Varin's request for an audiology consult based upon her position at Clinton.  Such review, in a supervisory capacity, is insufficient to establish her personal involvement.[12]  *See Tangreti*, 983 F.3d at 618.  Although Plaintiff wrote a letter to

---

[12]  To the extent Plaintiff attributes any delay in the scheduling the audiology consult to Johnson, she would still be entitled to summary judgment.  "[A] delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces a conscious disregard of a substantial risk of serious harm."  *Pabon v. Wright*, No. 99-CV-2196, 2004 WL 628784, at *8 (S.D.N.Y. Mar. 29, 2004) (citation and quotation marks omitted), *aff'd*, 459 F.3d 241 (2d Cir. 2006).  That is, "denying or delaying needed treatment for a serious medical condition constitutes deliberate indifference for Eighth Amendment purposes only if," for example, the "official[ ] delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for several days, or delayed major surgery."  *Myrie v. Calvo*, 615 F. Supp. 2d 246, 248 (S.D.N.Y. 2009) (citation omitted).  The record is devoid of any such evidence.  Indeed, Serhan evaluated Plaintiff on October 12, 2018.  *See Perez v. Hawk*, 302 F. Supp. 2d 9 21 (E.D.N.Y. 2004) (treatment of a plaintiff's medical conditional generally defeats a claim of deliberate indifference).

Koenigsmann, the record demonstrates Koenigsmann neither reviewed nor responded to

Plaintiff's July 2018 letter.  Instead, the letter would have been routed to the Regional Health

Services Administrator, who would review and respond accordingly.  (Dkt. No. 35-7 at ¶ 31.)

Thus, neither Johnson's review of the audiology consult referral nor Plaintiff's letter addressed to

Koenigsmann demonstrate the requisite personal involvement for an Eighth Amendment

deliberate indifference claim and summary judgment is warranted on this basis.  *See, e.g.*,

*DeMeo v. Koenigsmann*, No. 11 CIV. 7099, 2015 WL 1283660, at *16 (S.D.N.Y. Mar. 20, 2015)

(letters mailed to Dr. Koenigsmann do not satisfy the requirement of personal involvement where

the letters were referred to a subordinate who responded to the inmate).  Inasmuch as Plaintiff

cannot establish Johnson and Koenigsmann were personally involved, they are entitled to

summary judgment for lack of personal involvement.  (Dkt. No. 35-8 at 11-12.)

For these reasons, the Court recommends granting Defendants' motion with regard to

Plaintiff's Eighth Amendment deliberate medical indifference claims against Koenigsmann,

Devlin-Varin, Johnson, and Serhan.[13]

## B.    ADA Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity."  42 U.S.C. § 12132.  To establish a claim under Title II of the ADA, the plaintiff must

demonstrate: (1) he is a qualified individual with a disability; (2) the defendants are subject to the

ADA; and (3) he was denied the opportunity to participate in or benefit from the defendants'

---

[13]  The Court finds it unnecessary to address Defendants' alternative qualified immunity
argument.  (Dkt. No. 35-8 at 17-18.)

services, programs, or activities, or was otherwise discriminated against because of his disability. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). Additionally, in order to recover damages under Title II the ADA, the plaintiff must show the discrimination was intentional. *Butchino v. City of Plattsburg*, No. 8:20-cv-796 (MAD/CFH), 2022 WL 137721, at *9 (N.D.N.Y. Jan. 14, 2022) (citing *Vassenelli v. State Univ. of N.Y.*, 2018 WL 1406629, at *3 (N.D.N.Y. Mar. 19, 2018)).

In this action, Plaintiff alleges he is hearing impaired and argues DOCCS and Washington should have placed him in a specialized facility for his hearing condition. (Dkt. No. 35-7 at ¶ 7.) He also contends Serhan should have classified him as "hard of hearing" (HL20) and provided hearing aids. *Id.* at ¶¶ 32-33. Defendants argue Plaintiff's ADA claims asserted against DOCCS, Washington, and Serhan fail as a matter of law. (Dkt. No. 35-8 at 12-17.[14]) The Court agrees.[15]

### 1.    Qualified Individual

"[T]o establish the existence of a disability, a plaintiff must demonstrate that he or she suffers from a physical or mental impairment that 'substantially limits one or more major life activities[.]'" *Wega v. Ctr. for Disability Rts.*, No. 06-CV-6375, 2009 WL 3199684, at *7 (W.D.N.Y. Sept. 30, 2009) (quoting 42 U.S.C. § 12102(2)(A)), *aff'd*, 395 F. App'x 782 (2d Cir. 2010) (summary order). "[M]ajor life activities include, but are not limited to, caring for oneself,

---

[14]  The "public entity" element does not appear to be in dispute. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998) (stating that the "plain text of Title II of the ADA unambiguously extends to state prison inmates"). In their memorandum of law, Defendants only address the first and third elements. (Dkt. No. 35-8 at 12-17.)

[15]  Further, insofar as Plaintiff is suing Washington and Serhan in their individual capacities, Title II of the ADA does not allow individual capacity suits—either for damages or injunctive relief—against state officials. *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).

performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).  "The mere presence of a medical condition does not establish that a plaintiff is disabled."  *O'Donnell v. King B 100, LLC*, No. 14-CV-1345 (TJM), 2016 WL 7742779, *9 (N.D.N.Y. May 3, 2016) (citations omitted).

Here, the uncontroverted facts demonstrate that while in DOCCS' custody, Plaintiff's hearing loss was assessed as "non-significant" (HL30) and, therefore, Plaintiff fails to establish the "physical impairment" required under the first prong of the ADA test.  (Dkt. No. 35-7 at ¶¶ 11, 44.)  Relevant to this action and as detailed above, Plaintiff's hearing was tested by Serhan in August 2017 and retested by Serhan in October 2018.  *Id.*  Both times, Plaintiff was assessed with "non-significant" hearing loss (HL30).  *Id.*  Upon physical examination, Plaintiff's ears were also "normal" and "clear."  *Id.* at ¶ 43.  Moreover, while hearing loss is a major life activity, 42 U.S.C. § 12102(2)(A), Plaintiff has not shown that he has been limited by it.  For example, during his 2018 examination, Serhan determined Plaintiff had "normal hearing communication." (Dkt. No. 35-7 at ¶ 38.)  During the exam, Plaintiff could understand speech without visual cues.  *Id.*  Additionally, Plaintiff did not demonstrate any speech or language impairments, conditions typically associated with significant hearing loss.  *Id.*  As Defendants further point out, Plaintiff could adequately hear and answer questions at his 2022 deposition. (Dkt. No. 35-8 at 15; Dkt. No. 35-6.)  Thus, even if Plaintiff had some difficulty hearing, Plaintiff has not demonstrated that his hearing loss "substantially limits" a major life activity as required by the ADA.  *See Williams v. Barometre*, No. 20-CV-7644, 2022 WL 903068, at *16 (S.D.N.Y. Mar. 28, 2022).  Having failed to demonstrate the first element of a claim under Title II of the ADA, Plaintiff's ADA claims fails as a matter of law.

### 2.    Discrimination

In any event, Defendants next contend Plaintiff cannot show DOCCS, Washington, or Serhan excluded him from participating in, or denied him the benefit of, any services or programming, or was otherwise discriminated against *because* of his disability.  (Dkt. No. 35-8 at 16-17.)  The Court agrees.

"Courts 'routinely dismiss ADA suits [brought] by disabled inmates that . . . do not allege that the inmate was treated differently because of his or her disability.'"  *Benyi v. New York*, No. 20-CV-1463, 2021 WL 1406649, at *13 (N.D.N.Y. Mar. 23, 2021) (quoting *Elbert v. N.Y.S. Dep't of Corr. Servs.*, 751 F. Supp.2d 590, 595 (S.D.N.Y. 2010)).  "[A] defendant does not violate the ADA by merely "deny[ing] an inmate's request for reasonable accommodations because of a reason other than his disability."  *Espinal v. N.Y. State Dep't of Corr. Servs.*, No. 06-CV-0596, 2009 WL 799951, at *6 (N.D.N.Y. Mar. 24, 2009).  Here, Plaintiff fails to demonstrate a causal connection between his alleged disability and his alleged denial of access to DOCCS' services, programs, or activities.  Rather, as discussed herein, the record demonstrates Plaintiff did not receive his requested accommodations based on the determination that they were not needed.  (Dkt. No. 35-8 at 16.)  *See, e.g.*, *Schnauder v. Gibens*, 649 F. App'x 8, 11 (2d Cir. 2017) (dismissing an ADA claim after not finding the plaintiff's disability to be the reason for a denial of medical services); *Blandon v. Aitchison*, No. 17-CV-0065, 2019 WL 1206370, at *11 (S.D.N.Y. Mar. 14, 2019) (dismissing an ADA claim after not finding the plaintiff's disability to be the reason for his mistreatment); *Alster v. Goord*, 745 F. Supp. 2d 317, 340 (S.D.N.Y. 2010) (same).  Further, there is no record evidence the alleged violations were motivated by discriminatory animus or ill will.  *Id.*  (Dkt. No. 35-8 at 16.)

For these reasons, the Court recommends granting Defendants' motion with regard to Plaintiff's ADA claims against DOCCS, Washington, or Serhan.

## VI.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 35) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's ADA claims asserted against defendant Great Meadow Correctional Facility Superintendent John Doe be **DISMISSED** and that the Clerk be directed to **TERMINATE** that defendant from this action;[16]

**RECOMMENDED** that the Clerk be directed to enter judgment in Defendants' favor and close this case; and it is further

**ORDERED** that Plaintiff must file a notice of change of address within **fourteen (14) days** and he must continue to submit any address changes to the Court as long as his action is pending; his failure to do so may result in the dismissal of this action for failure to prosecute and failure to follow Court orders and directives;[17] and it is further

---

[16]  *See* Dkt. No. 16 at 11 (Plaintiff shall take reasonable steps through discovery to ascertain the identity of defendant Great Meadow Correctional Facility Superintendent John Doe, against whom one of plaintiff's ADA claims as asserted.  **Plaintiff's failure to timely serve that defendant will result in dismissal of the claim asserted against that individual and termination of that defendant from the action**[.]") (emphasis in original).

[17]  Under this Court's rules, an unrepresented litigant is under a duty to inform the Court of any address changes in writing.  L.R. 10.1(c)(2).  Specifically, Plaintiff was ordered to "**promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so may result in the dismissal of this action.**"  (Dkt. No. 13 at 20.) Plaintiff demonstrated that he understood this requirement and its importance when he updated his address with the Court on January 7, 2022, and June 23, 2022.  (*See* Dkt. Nos. 28, 32.)

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009); and it is further

**ORDERED** that the Clerk serve a one-time **COURTESY COPY** of this Report-Recommendation and Order, unpublished decisions, and a change of address form on Plaintiff at **Elmira Correctional Facility**, as well as serving Plaintiff at the address on the docket.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[18]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated: May 22, 2023
       Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[18]  If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date of the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Yellow Flag - Negative Treatment
Distinguished by  McDonald v. Zerniak,  N.D.N.Y.,  November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

## Attorneys and Law Firms

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State
Attorney General, The Capitol, Keith J. Starlin, AAG, of
Counsel, Albany, NY, for Defendant.

## ORDER

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge
Hummel's October 9, 2014 Report–Recommendation and
Order, *see* Dkt. No. 81, and Plaintiff's objections thereto, *see*
Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in
the custody of the New York Department of Corrections and
Community Supervision, commenced this action pursuant
to 42 U.S.C. § 1983. In his original complaint, Plaintiff
asserted claims against Brian Fischer, Lucien J. LeClaire,
Patricia LeConey, Carol Woughter, and John and Jane Does.
Defendants moved for summary judgment. *See* Dkt. No.
49. By Report–Recommendation and Order dated July 6,
2012, Magistrate Judge Homer recommended that this Court
dismiss all claims against the named individuals and direct
Plaintiff to join Harold Call as a Defendant. *See* Dkt. No.

55. This Court accepted the Report and Recommendation and
Order in its entirety and directed Plaintiff to file an amended
complaint to "include only one cause of action a procedural
due process claim in connection with his disciplinary hearing
and one Defendant hearing officer Call ." *See* Dkt. No. 58 at
4–5.

Plaintiff thereafter filed his amended complaint and requested
compensatory and punitive damages. *See* Dkt. No. 64,
Amended Complaint at 4. In this amended complaint, Plaintiff
alleged that Defendant violated his constitutional rights under
the First, Eighth and Fourteenth Amendments. *See* Dkt. No.
64, Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. *See* Dkt. No. 74. In a Report–Recommendation
and Order dated October 9, 2014, Magistrate Judge Hummel
recommended that this Court grant Defendant's motion in
part and deny his motion in part. *See* Dkt. No. 81 at
33. Plaintiff filed objections to Magistrate Judge Hummel's
recommendations. *See* Dkt. No. 83.

Where a party makes specific objections to portions of a
magistrate judge's report and recommendation, the court
conducts a *de novo* review of those recommendations. *See*
*Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781,
\*2 (N.D.N.Y. Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)
(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes no
objections or makes only conclusory or general objections,
however, the court reviews the report and recommendation
for "clear error" only. *See Salmini v. Astrue,* 3:06–CV–
458, 2009 WL 1794741, \*1 (N.D.N.Y. June 23, 2009)
(quotation omitted). After conducting the appropriate review,
a district court may decide to accept, reject, or modify those
recommendations. *See Linares v. Mahunik,* No. 9:05–CV–
625, 2009 WL 3165660, \*10 (N.D.N.Y. Sept. 29, 2009)
(quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general
or conclusory, given his *pro se* status, the Court has conducted
a *de novo* review of Magistrate Judge Hummel's Report–
Recommendation and Order. Having completed its review,
the Court hereby

**\*2 ORDERS** that Magistrate Judge Hummel's October 9,
2014 Report–Recommendation and Order is **ACCEPTED
in its entirety** for the reasons stated therein; and the Court
further

Case 9:21-cv-00251-DNH-TWD    Document 37    Filed 05/22/23    Page 23 of 229
McAllister v. Call, Not Reported in F.Supp.3d (2014)
2014 WL 5475293

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), [2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants

were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing—and one Defendant —hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

[2] McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

## I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly

Case 9:21-cv-00251-DNH-TWD   Document 37   Filed 05/22/23   Page 24 of 229

supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU"). [3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15 [4] (unauthorized exchange) and 180.17 (unauthorized assistance). [5] *Id.;* Am. Compl. ¶ 7.

[3]   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

[4]   Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

[5]   Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses,

documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4**   McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A, at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion [6]

[6]    All unpublished decisions referenced herein are appended to this report and recommendation.

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias

against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

[7] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside

of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvement with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of misconduct in the Tier III hearing and imposed SHU time.

He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464,

at *9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search

of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

**\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses

his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

## F. **Fourteenth Amendment**

### 1. **Due Process**

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

### a. **Denial of Liberty Interest**

 *\*10* In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining

atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-five days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship when confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days as atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal

property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

*11  Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

#### b. Procedural Due Process

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

##### i. **Notice**

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the

documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

### ii. Hearing Officer Bias/Pre-determination of Guilt

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at \*11 (N.D .N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \* 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at \*8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–

626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at \* 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at \*2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

### iii. Failure to Investigate

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present

testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, *5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

 **\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in

this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide "some evidence" of guilt where there was no independent

examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

 **\*15**  The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at \*3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at \*4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based upon some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17,

McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

 **\*16**  Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at \*12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–

111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ...."); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. Equal Protection

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

 *17  To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at *12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. **Qualified Immunity**

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

 **\*18**  First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon—the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at *3 (2d Cir.1996)* (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony

and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

### IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

 **\*19**  1. **GRANTED** insofar as:

   a. dismissing plaintiff's First Amendment claims;

   b. dismissing plaintiff's Eighth Amendment claims;

   c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

   d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

   a. plaintiff's Fourteenth Amendment procedural due process claims;

   b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

**McAllister v. Calf, Not Reported in F.Supp.3d (2014)**

2014 WL 5475293

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5437617
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DOUGLAS, Sr., Plaintiff,

v.

PERRARA, Corrr. Officer, Great Meadow C.F.;
Lawrence, Corr. Officer, Great Meadow C.F.;
Whittier, Corr. Officer, Great Meadow C.F.; Mulligan,
Corr. Officer, Great Meadow C.F.; Deluca, Corr.
Sergeant, Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Colleen D. Galligan, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by David Douglas, Sr., ("Plaintiff") against the
six above-captioned New York State correctional employees,
are the following: (1) Defendants' motion for partial summary
judgment (requesting the dismissal of Plaintiff's claims
against Defendant Russell, and his claims against the
remaining Defendants in their official capacities); and (2)
United States Magistrate Judge Randolph F. Treece's Report–
Recommendation recommending that Defendants' motion be
granted. (Dkt.Nos.70, 80.) Neither party filed an objection
to the Report–Recommendation, and the deadline by which
to do so has expired. (*See generally* Docket Sheet.) After
carefully reviewing the relevant filings in this action, the
Court can find no clear error in the Report–Recommendation:
Magistrate Judge Treece employed the proper standards,
accurately recited the facts, and reasonably applied the law
to those facts. As a result, the Court accepts and adopts the

Report–Recommendation for the reasons stated therein. (Dkt.
No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–
Recommendation (Dkt. No. 80) is ***ACCEPTED*** and
***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary
judgment (Dkt. No. 70) is ***GRANTED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** from
this action: (a) all claims asserted against Defendant Russell,
and (b) all claims asserted against Defendants in their official
capacities only. The Clerk is directed to terminate Defendant
Russell from this action; and it is further

**ORDERED** that the following claims ***REMAIN PENDING***
in this action: (a) Plaintiff's claim that Defendants Whittier,
Mulligan, Perrara and/or Lawrence subjected him to
inadequate prison conditions by depriving him of meals for
approximately five consecutive days in December 2009, in
violation of the Eighth Amendment; (b) Plaintiff's claim
that Defendants Whittier, Mulligan, Perrara and Lawrence
used excessive force against him, and that Defendant Deluca
failed to protect him from the use of that excessive force,
in violation of the Eighth Amendment and New York State
common law; and (c) Plaintiff's claim that Defendant Deluca
was deliberately indifferent to Plaintiff's serious medical
needs (following the assaults) in violation of the Eighth
Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the
Plaintiff for purposes of trial only; any appeal shall remain
the responsibility of the plaintiff alone unless a motion for
appointment of counsel for an appeal is granted; and it is
further

**ORDERED** that upon assignment of Pro Bono Counsel, a
final pretrial conference with counsel will be scheduled in
this action before the undersigned, at which time the Court
will schedule a jury trial for Plaintiff's remaining claims as set
forth above against Defendants Whittier, Mulligan, Perrara,
Lawrence and DeLuca. Counsel are directed to appear at the
final pretrial conference with settlement authority from the
parties.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2** *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell [1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

[1] Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

### I. DISCUSSION

### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v.*

*Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here

2013 WL 5437617

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

**B. Personal Involvement**

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8. [2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of using excessive physical force against him and denying him medical attention.

[2]    Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how

his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

**\*4** With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated

in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

[3]   The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

**\*5**  Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion, he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

### C. Eleventh Amendment

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995)

(citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

 **\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5437617

                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2712373
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lorenzo REDD, Plaintiff,

v.

P. Charles GARELL, M.D.; Wainwright, M.D.; Remer, M.D.; Westchester Medical Center; Dr. Razia K. Ferdous, Facility Health Services Director; Sonji Henton, Deputy Superintendent of Health Services; Dr. Carl J. Koenigsmann, Deputy Commissioner and Chief Medical Officer; and Thomas Gudewicz, Nurse, Defendants.

18 Civ. 09436 (JCM)
|
Signed March 30, 2023

**Attorneys and Law Firms**

Lorenzo Redd, Uniondale, NY, Pro Se.

Craig Matthew Cepler, James Robert Denlea, John Lawrence Leifert, Denlea & Carton LLP, White Plains, NY, for Defendant P. Charles Garell, M.D.

William Harold Bave, Wilson, Bave, Conboy, Cozza and Couzens, White Plains, NY, for Defendants Wainwright, M.D., Remer, M.D., Westchester Medical Center.

**OPINION AND ORDER**

JUDITH C. McCARTHY, United States Magistrate Judge

**\*1** Plaintiff Lorenzo Redd ("Plaintiff"), proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Defendants Dr. P. Charles Garell; Dr. John Wainwright; Dr. Justin Remer; and the Westchester Medical Center ("WMC"), (collectively, "Defendants"). (Docket Nos. 2, 36). Defendants [1] have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). (Docket Nos. 123, 130). The motions are unopposed. For the reasons set forth herein, the Court grants Defendants' motions. [2]

[1]     Defendant Dr. Garell is represented by separate counsel and filed his own summary judgment motion. (Docket No. 130).

[2]     This action is before this Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket No. 82).

**I. BACKGROUND**

**A. Procedural Background**

On October 15, 2018, Plaintiff commenced this action against Defendants Dr. Garell, Dr. Wainwright, Dr. Remer and WMC. (Docket No. 2). On March 27, 2019, Plaintiff filed an amended complaint adding Defendants Dr. Razia K. Ferdous, Sonji Henton, Dr. Carl Koenigsmann and Thomas Gudewicz (collectively, "State Defendants"). (Docket No. 36). Construing the amended complaint liberally, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs, and that Defendants Henton and WMC retaliated against him in violation of the First Amendment. (Docket No. 36 at 3–16). The State Defendants moved to dismiss, which was granted on March 11, 2020. (Docket No. 65). Plaintiff's claims that Defendants Dr. Garell, Dr. Wainwright, Dr. Remer and WMC were deliberately indifferent to his serious medical needs and that WMC retaliated against him remain.

Presently before the Court are Defendants' motions for summary judgment. (Docket Nos. 123, 130). Defendant Dr. Garell's summary judgment motion was accompanied by a memorandum of law, (Docket No. 124); a statement of facts pursuant to Local Civil Rule 56.1, (Docket No. 125); and a declaration, with exhibits annexed thereto, (Docket No. 126). Defendants Dr. Wainwright, Dr. Remer and WMC's (collectively, "WMC Defendants") motion for summary judgment was accompanied by a memorandum of law, (Docket No. 136); a statement of facts pursuant to Local Civil Rule 56.1, (Docket No. 132); and a declaration attaching twenty-one exhibits, (Docket No. 137). Both motions included the required notice to *pro se* litigants opposing a motion for summary judgment, explaining the possible effect of a motion for summary judgment on Plaintiff's claims and highlighting Rule 56 and Local Civil Rule 56.1. (Docket Nos. 129, 133). Defendant Dr. Garell's notice included a copy of Rule 56 and Local Civil Rule 56.1. [3] Both notices warned Plaintiff that a failure to respond could result in the Court accepting Defendants' facts as true and dismissing Plaintiff's complaint. (*Id.*). The notices further advised that, according to Rule 56, Plaintiff "must submit evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising specific facts" in support of his claim. (*Id.*).

2023 WL 2712373

3
    Defendant WMC's notice states that a full copy of Rule 56 is attached, but it is unclear whether a copy of both Rule 56 and Local Rule 56.2 were actually attached when it was served on Plaintiff, as required by Local Civil Rule 56.2. However, there is no prejudice to Plaintiff because copies of both rules were served on Plaintiff as attachments to Defendant Dr. Garell's notice. (See Docket Nos. 129, 131, 133, 135).

  **\*2**  Although Plaintiff did not respond to Defendants' summary judgment motions, there is no indication that he did not receive such motions. Defendants filed Affidavits of Service indicating that the motions were served on Plaintiff at the address he provided the Court on December 15, 2021. (Docket Nos. 120, 131, 134, 135). In addition, since Plaintiff failed to respond by the deadline, the Court issued an order on July 8, 2022, stating that "[i]f Plaintiff does not submit a response by July 22, 2022, the Court will deem this matter fully submitted and Defendants' motions unopposed." (Docket No. 138).[4] Plaintiff never responded. Moreover, the notices Defendants served on Plaintiff adequately apprised Plaintiff of the consequences of failing to respond to Defendants' motions for summary judgment. See *Johnson v. Reed*, No. 17 Civ. 8620 (NSR), 2023 WL 1868399, at \*1 n.1 (S.D.N.Y. Feb. 8, 2023).[5]

4
    The Order was mailed to two addresses associated with Plaintiff. The Order sent to the 93 Cunningham Avenue address was returned as undeliverable, but the copy sent to the address Plaintiff provided to the Court on December 15, 2021, was not returned.

5
    "In the Second Circuit, a district court cannot grant a motion for summary judgment in a case involving a *pro se* litigant unless (1) the court apprises the *pro se* litigant of the consequences of failing to respond to the motion, (2) an opposing party has already provided the *pro se* litigant with the requisite notice, or (3) it is clear that the *pro se* litigant understands the nature and consequences of summary judgment." *Johnson*, 2023 WL 1868399, at \*1 n.1 (citations and internal quotations omitted). Here, the Court and Defendants adequately apprised the *pro se* litigant of the consequences of failing to respond to Defendants' motions.

## B. Facts

The following facts are gathered from Defendants' Rule 56.1 statements, the exhibits attached to the parties' submissions, and the affidavits submitted by the parties in support of their contentions.[6] The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018). The facts set forth in the Rule 56.1 statements are not in dispute. *See* Local Civ. R. 56.1(c); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible.").

6
    All page number citations to the record refer to the ECF page number unless otherwise noted.

At all relevant times, Plaintiff was a convicted prisoner in New York State custody. (*See* Docket No. 125 ¶ 9). Plaintiff had a history of chronic back problems, for which he had received physical therapy, and was treated with medications prior to seeing Dr. Garell, a board-certified neurosurgeon, for treatment. (*Id.* ¶¶ 1, 11, 12, 13, 14, 17, 18).

### 1. Plaintiff's First Appointment with Dr. Garell – April 18, 2017

Plaintiff initially met with Dr. Garell on April 18, 2017. (*Id.* ¶ 15). At that appointment, Plaintiff presented with pain in his lower back and in both legs, with the pain in his right leg being worse. (*Id.* ¶ 16). Plaintiff had an MRI at the time that indicated he had two herniated discs. (*Id.* ¶ 19). Therefore, Dr. Garell offered to perform a transforaminal lumbar interbody fusion and explained the major risks with Plaintiff including, "infection, CSF [cerebral spinal fluid] leak, blood loss, transfusion, paralysis, etc." (*Id.* ¶ 20). Dr. Garell further testified at his deposition that, following his routine practice, he would have offered the surgery option to Plaintiff as just one of a number of medical options Plaintiff could pursue to address his condition. (Docket No. 126-1 at 14–15). Plaintiff chose to proceed with the surgery. (Docket No. 125 ¶ 21).

### 2. Plaintiff's Back Surgery – July 5, 2017

  **\*3**  On July 5, 2017, Dr. Garell performed a lumbar decompression and fusion surgery on Plaintiff at WMC. (*Id.* ¶ 22; Docket No. 126-2 at 8–10). Plaintiff was 49 years old. (Docket No. 125 ¶ 8). Prior to performing surgery, Dr. Garell

told Plaintiff about "possible alternative treatments, including medication, injection and physical therapy," as well as the risks of the procedure. (Docket Nos. 125 ¶¶ 23, 25; 126-1 at 16–17). Furthermore, "[a]ll risks, benefits, alternative[s] [were] explained to the [Plaintiff]." (Docket No. 125 ¶ 25). Plaintiff "expressed [a] clear understanding of the procedure, possible complications, risks and intended benefits." (*Id.* ¶ 26). "Consent was obtained and placed in the chart." (Docket No. 126-2 at 8).

Dr. Garell examined the equipment, including the instrument kits, that were to be used in Plaintiff's surgery, and did not recall having any issues with or complaints about them. (Docket No. 132 ¶ 13). WMC provided the equipment to the doctor, including the screws and rods to be used in Plaintiff's surgery. (Docket No. 137-14 at 142-44).

Dr. Garell testified at his deposition that he did not recall anything occurring in the surgery that he did not expect. (Docket Nos. 132 ¶ 10; 137-14 at 40–41). In addition, he had no recollection that the nursing staff did not follow his orders during the surgery. (Docket Nos. 132 ¶ 14; 137-14 at 153). Dr. Garell could not specifically recall whether he had placed the screws during the procedure, or if the resident assisting him, Dr. Jared Cooper, had done so. (Docket No. 132 ¶ 11). Dr. Garell confirmed, however, that if Dr. Cooper had placed the screws, it was under his direction and supervision, and Dr. Cooper had followed his orders during the procedure. (*Id.* ¶¶ 11, 12). During surgery, Plaintiff had hypotension and, therefore, received a blood transfusion upon completion of surgery. (Docket No. 125 ¶ 27).

Dr. Garell found that post-operation X-rays showed "good alignment and hardware placement," and Plaintiff stated that "his leg pain was 'better than pre-op.' " (*Id.* ¶ 28).

### 3. Plaintiff's First Post-Surgery Follow-up Appointment – August 7, 2017

At his first post-surgery follow-up appointment on August 7, 2017, Plaintiff reported that his leg pain was "minimal and improving." (*Id.* ¶ 29). Plaintiff also stated that he was experiencing "cracking" in his right lower back and that he had some numbness in his left great toe and calf. (*Id.* ¶ 30). Dr. Garell indicated that "there was still likely movement of Plaintiff's bones that would produce a cracking sound as they 'scarred into position.' " (*Id.* ¶ 31).

Dr. Garell testified at his deposition that although the cracking could have been related to the implants, that consideration

"was not high on [his] list of differential diagnoses," because Plaintiff had undergone surgery one month prior and had improved leg pain, and thus a cracking sound from scarring "was a more likely explanation." (Docket No. 126-1 at 20, 23–24). Dr. Garell "further recognized that the numbness in Plaintiff's toe and calf were indicative of 'settling of the nerve roots' that would resolve on its own." (Docket No. 125 ¶ 32). "Overall, [Dr.] Garell's examination [of Plaintiff] showed 'good healing and full strength,' as Plaintiff ambulated 'without difficulty.' " (*Id.* ¶ 33).

Therefore, Dr. Garell recommended that Plaintiff should "start physical therapy, wean off the soft brace he was using and follow up [with Dr. Garell] in two months." (*Id.* ¶ 34).

### 4. Plaintiff's October 30, 2017 Follow-up Appointment

At Plaintiff's next appointment with Dr. Garell on October 30, 2017, Plaintiff complained of "low back pain," but indicated that the pain in his legs was improving. (*Id.* ¶ 35). Dr. Garell noted that Plaintiff's incision was "healing well." (*Id.* ¶ 36). Dr. Garell further observed that Plaintiff's range of motion was "decreased in both flexion and extension as compared to what [Dr.] Garell would have expected for a patient almost four months post-surgery." (*Id.* ¶ 37).

**\*4** Dr. Garell was concerned about Plaintiff's range of motion. (*Id.* ¶ 38). Therefore, he recommended physical therapy, "to increase [the] range of motion of the lumbar spine" and "help with [Plaintiff's] low back pain," as well as weaning Plaintiff out of the brace he was wearing over the course of four weeks. (*Id.*; Docket No. 126-1 at 31-32). Dr. Garell further recommended that X-rays be taken of Plaintiff's lumbar spine "to check [the] hardware," and that Plaintiff follow up with him in three months. (Docket No. 126-1 at 31-32).

### 5. Plaintiff's February 6, 2018 Emergency Room Visit

On February 6, 2018, Dr. Garell saw Plaintiff at the Putnam Hospital Center Emergency Room. (Docket No. 125 ¶ 39). Plaintiff reported that his lower back pain had worsened after bending and hearing a "crack" in his back. (*Id.*). Dr. Garell noted that Plaintiff ambulated on his own upon examination, had full strength in his extremities, and his incision was well healed. (Docket No. 126-2 at 3, 6). Dr. Garell had X-rays taken to "determine whether there was a hardware complication or spinal malalignment." (Docket No. 125 ¶ 40). The X-rays showed Plaintiff's spine had "good alignment and no hardware fracture or other complications." (*Id.* ¶ 41).

### 6. Plaintiff's March 27, 2018 Appointment

Dr. Garell saw Plaintiff again on March 27, 2018. (*Id.* ¶ 42). Plaintiff complained of right-sided lower back and hip pain. (*Id.* ¶ 43). Plaintiff had recently started physical therapy. (*Id.* ¶ 44). Recent X-rays showed there were "no hardware complications." (*Id.* ¶ 45). Dr. Garell noted that Plaintiff ambulated without difficulty and his spinal alignment was "good." (*Id.*). Dr. Garell recommended continued physical therapy "to address Plaintiff's range of motion and strength." (*Id.* ¶ 46). Dr. Garell also recommended that Plaintiff return for a follow-up appointment in six weeks, and to "consider consult to pain management for possible injection if pain does not improve with physical therapy." (Docket Nos. 126-1 at 41; 126-2 at 5).

### 7. Plaintiff's Last Appointment with Dr. Garell – May 1, 2018

Plaintiff saw Dr. Garell again on May 1, 2018. (Docket No. 125 ¶ 47). "At this appointment, Plaintiff demanded that his shackles and restraints be removed for the examination and the guard stand outside with the examination room door closed." (*Id.* ¶ 48). Dr. Garell refused to do this. (*Id.* ¶ 49). Thus, Plaintiff remained in restraints and the guard stayed in the doorway of the examination room as Dr. Garell performed an examination of Plaintiff, including an evaluation of the movement of Plaintiff's back and legs. (*Id.* ¶¶ 50–51). "Due to Plaintiff's demand, [Dr. Garell] was not 'comfortable' treating Plaintiff after this appointment and asked that any additional follow up [sic] appointment be handled by a different doctor." (*Id.* ¶ 52). "Plaintiff confirmed that the decision that he see a different doctor was 'mutual,' and that Plaintiff was ready to see someone new." (*Id.* ¶ 53).

### 8. Plaintiff's Appointment with Other Doctors – June 8, 2018

On June 8, 2018, Plaintiff was treated at WMC by Dr. Christian Bowers and Dr. Nathan Rawicki for complaints of continued back pain. (*Id.* ¶ 54). Dr. Bowers was an attending neurosurgeon at WMC in 2018. (Docket No. 132 ¶ 15). X-rays were taken of Plaintiff's lower back. (Docket No. 125 ¶ 55). The X-rays showed that the screws in Plaintiff's back "were 'in good positioning.' " (*Id.* ¶ 56). According to Plaintiff's medical records, the doctors also recommended continuing pain management and to follow up in two to three months for reevaluation. (Docket No. 126-4 at 4).

### 9. Plaintiff's Later Treatment

**\*5** Plaintiff returned to the WMC clinic on August 1, 2018, complaining of back pain. (Docket No. 132 ¶ 16). Plaintiff was seen by Dr. Remer and Dr. Wainwright, who referred him for physical therapy. (*Id.* ¶ 5). Plaintiff was also examined by Dr. Bowers. (*Id.* ¶ 6). Plaintiff explained to Dr. Bowers that, on July 17, 2018, he attempted to stand up and heard a crack, felt severe low back pain, and was wheelchair-bound for two to three days before returning to baseline. (Docket No. 125 ¶ 57). Dr. Bowers referred Plaintiff to the emergency room for evaluation by a spine specialist. (Docket No. 132 ¶¶ 6, 17). Dr. Chad Cole, an attending neurosurgeon at WMC, then admitted Plaintiff to the hospital for about three to four days. (*Id.* ¶¶ 7, 20). Plaintiff testified that about three hours elapsed between being seen by a doctor and being sent for X-rays and other testing at the emergency room. (Docket No. 137-11 at 6–7).

X-rays and an MRI were then taken of Plaintiff's lower back in the WMC emergency room. (*Id.* at 1). Thereafter, Dr. Bowers discovered a "hardware issue," (Docket No. 125 ¶ 58), namely, one of the surgical screws implanted in Plaintiff's back during the surgery had broken, (Docket No. 128-1 at 5–6). Dr. Bowers and Dr. Cole offered Plaintiff another spinal surgery, which Plaintiff declined. (Docket No. 132 ¶¶ 3, 8, 18).

## C. Expert Opinions

### 1. Defendant Dr. Garell's Expert — Dr. Jack Stern

Dr. Jack Stern, a board-certified neurosurgeon licensed to practice medicine in several states, including New York, submitted an expert report in support of Dr. Garell's motion for summary judgment. (Docket Nos. 128 ¶¶ 1, 2; 128-1). Dr. Stern stated that he "[is] fully familiar with the standard of care applicable to [Plaintiff's treatment]." (Docket No. 128-1 at 2). Dr. Stern is qualified to issue an expert opinion in this case, having been qualified as an expert in the past and having performed "[p]robably at least 500" lumbar fusion surgeries of the type performed on Plaintiff. (Docket Nos. 126-7 at 4; 128-1). Dr. Stern reviewed medical records and imaging from WMC, Dr. Garell and the New York State Department of Correctional Services, as well as Plaintiff's amended complaint, Plaintiff's responses to Dr. Garell's interrogatories, and the deposition transcripts of Plaintiff, Dr. Garell, Dr. Bowers, Nurse Valerie Monroe, Orrin Daw and Daniel Robinson. (Docket No. 128-1 at 2).

Dr. Stern opined with "a reasonable degree of medical certainty," and based on his "knowledge and experience in the field of Neurological Surgery," that "all of the treatment provided by Dr. Garell was within the standard of care and did not cause or contribute to any of [Plaintiff's] alleged injuries." (*Id.* at 2, 6). Dr. Stern also noted that "all providers agree (as do the imaging studies) that the screw was not broken until after [Plaintiff] stopped treating with Dr. Garell." (*Id.* at 5). Further, Dr. Stern concluded that "Dr. Garell timely and properly considered whether a hardware problem was the cause of [Plaintiff's] complaints" even in the face of alternative reasons for the complaints. (*Id.*). Additionally, Dr. Stern noted that Plaintiff's loss of blood during the surgery, which led to his post-operative care in the ICU, was a "known risk for any surgical procedure" and that "there is simply no basis to claim that it occurred due to any negligence." (*Id.* at 4). Her further opined that the blood loss "caused no harm to [P]laintiff, as it was timely recognized and addressed." (*Id.*).

Dr. Stern concluded that Plaintiff's restraints did not impede Dr. Garell's examination and that the doctor-patient relationship between Dr. Garell and Plaintiff ended properly and mutually. (*Id.* at 6). Dr. Stern also stated that Dr. Garell had acted appropriately in his final appointment with Plaintiff when: (1) he would have asked a guard to remove Plaintiff's restraints if necessary; (2) nothing urgent needed to be addressed at the appointment; (3) he was reasonably uncomfortable with removing Plaintiff's restraints and examining him without a guard present and the examination room door closed when Plaintiff "was a convicted criminal, a large man, and was described in other records as uncooperative;" and (4) when Plaintiff had no urgent condition that worsened due to anything that was done or not done during the visit. (*Id.*).

 *6  Additionally, Dr. Stern asserted that any contention that a lack of expiration date on the screws used in Plaintiff's operation indicates negligence is a "red herring." (*Id.* at 4–5). Certain medical hardware bears expiration dates, which refer to the effective sterilization of the devices, and which thereby help to prevent infection. (*Id.* at 5). These expiration dates have no bearing on the integrity of the hardware. (*Id.*). Moreover, not all medical hardware has an expiration date. (*Id.*). In fact, the screws used in Plaintiff's surgery, Dr. Stern noted, are within this class of hardware that lacks expiration dates and are sterilized at the hospital. (*Id.*).

Dr. Stern further opined that "[s]urgical hardware can break, even in the absence of medical negligence" and that the broken screw "[was] no indication of any negligence." (*Id.*). The breaking of the screw "[did] not in any way suggest that the screw itself was faulty, should not have been used, or that it was implanted improperly." (*Id.*). Further, "there is no medical basis to claim that the broken screw caused or contributed to any of [P]laintiff's complaints." (*Id.*). This is because Plaintiff's complaints of pain predated the broken screw and "there is no reason to believe that the [Plaintiff's] bones failed to fuse before the screw broke, in which case, the screw would only be the cause of symptoms if it was compressing a nerve, and there is no evidence of this." (*Id.*). Also, once the broken screw was discovered, Plaintiff was offered surgery but declined it. (*Id.*). Moreover, there "is no reason to believe that [Plaintiff] would have agreed to surgery had it been offered earlier," or "that this surgery would resolve the complaints that pre-dated the screw fracture." (*Id.*).

## 2. WMC Defendants' Expert — Dr. Saran Rosner

Dr. Saran Rosner was retained as an expert for the WMC Defendants. (Docket No. 137-17 at 14, 27, 32). Dr. Rosner testified that he had been practicing medicine in New York since 1984 and that he had practiced at WMC at various times prior to 2010. (*Id.* at 15–20). Dr. Rosner also noted that he had performed about 20 to 25 lumbar fusion surgeries in the past five years. (*Id.* at 20–23). The doctor clarified, however, that his specialty does not involve the implantation of instrumentation in a patient. (*Id.* at 21). Dr. Rosner reviewed the transcripts of Dr. Garell's and Dr. Bowers' depositions, as well as medical records pertaining to Plaintiff from WMC. (*Id.* at 28–36, 74–75). His review did not include the transcript of Plaintiff's deposition but did include Plaintiff's bill of particulars, which contained Plaintiff's claims. (*Id.* at 39–40). Dr. Rosner also spoke with industry representatives from companies that manufacture instrumentation similar to that used in Plaintiff's back surgery about whether or not those devices had expiration dates. (*Id.* at 37–38).

Ultimately, Dr. Rosner opined that between June 2018 and September 2018, neither WMC's, nor Dr. Remer's or Dr. Wainwright's treatment fell below or departed from the applicable standard of medical care. (*Id.* at 68–69, 75). Dr. Rosner further opined that neither Dr. Garell nor Dr. Bowers had exhibited deliberate indifference or a conscious disregard of Plaintiff's medical needs during Plaintiff's surgery or postoperative clinic visit. (*Id.* at 75; Docket No. 132 ¶ 25). Dr. Rosner also concluded that "[t]he care and treatment provided

by [WMC] was at all times appropriate." (Docket No. 137-17 at 75).

Dr. Rosner opined that the standard of care does not "require a spine surgeon to specifically warn a patient in advance of surgery of the risk of broken screws." (*Id.* at 110). He also stated that Plaintiff's surgery was performed without significant complications. (*Id.* at 42). Dr. Rosner further explained that the surgical screws used in Plaintiff's surgery do not have expiration dates. (*Id.* at 50). According to Dr. Rosner, there is also no evidence in Plaintiff's medical chart that the screws used in the operation were defective, nor does the appearance of the screws in the X-ray show any issue. (*Id.* at 50–59). Further, Dr. Rosner also confirmed that "a surgical screw may break in the absence of medical negligence," and finding a broken surgical screw by itself does not provide "any indication that there had been medical negligence." (*Id.* at 109–10).

**\*7** Regarding Plaintiff's blood loss during surgery, Dr. Rosner opined that, although it is "not routine" for a patient to lose 1,000 milliliters of blood during surgery, this can occur in the absence of medical negligence, and in his expert opinion there was no deviation from the standard of care here. (Docket No. 137-17 at 42–46, 75, 106). He further stated that patients going to the ICU for treatment following surgery is "not routine," but was also "not infrequent." (*Id.* at 48). Finally, Dr. Rosner stated that the approximately three-hour period of time between Plaintiff's admission to WMC on August 1, 2018, and his trip to the emergency room on that day did not constitute a delay. (*Id.* at 69–70).

## II. LEGAL STANDARDS

### A. Summary Judgment Standard

Under Rule 56, the moving party bears the burden of demonstrating that it is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to a material fact "exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). " 'A fact is material if it might affect the outcome of the suit under the governing law.' " *Casalino v. N.Y. State*

*Catholic Health Plan, Inc.*, No. 09 Civ. 2583 (LAP), 2012 WL 1079943, at \*6 (S.D.N.Y. Mar. 30, 2012) (quoting *Lindsay v. Ass'n of Prof'l Flight Attendants*, 581 F.3d 47, 50 (2d Cir. 2009)). [7]

[7]  If Petitioner does not have access to cases cited herein that are available only by electronic database, then he may request copies from Defendants' counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the pro se litigant with copies of such unpublished cases and other authorities as are cited in a decision of the Court and were not previously cited by any party.").

In reviewing a motion for summary judgment, the Court should only consider "evidence that would be admissible at trial." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.* 164 F.3d 736, 746 (2d Cir. 1998). In addition, the Court "must draw all reasonable inferences in favor of the [non-moving] party" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). That said, the Court may not weigh the evidence or determine the truth of the matter, but rather conducts "the threshold inquiry of determining whether there is the need for a trial ...." *Anderson*, 477 U.S. at 250.

The moving party bears the initial burden of "demonstrating the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). If the moving party meets this initial burden, the burden then shifts to the non-moving party to "present evidence sufficient to satisfy every element of the claim." *Id.* "The non-moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial,' " *id.* (quoting *Celotex*, 477 U.S. at 324), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, as the Second Circuit has held:

> to show a genuine dispute, the nonmoving party must provide hard evidence, from which a reasonable inference in [its] favor may be drawn. Conclusory allegations, conjecture, and speculation, as well as the existence of a mere scintilla of

2023 WL 2712373

evidence in support of the [nonmoving party's] position, are insufficient to create a genuinely disputed fact.

**\*8** *Hayes v. Dahlke*, 976 F.3d 259, 267–68 (2d Cir. 2020) (internal citations and quotations omitted; alterations in original); *see also Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (noting that a nonmoving party on summary judgment " 'may not rely on conclusory allegations or unsubstantiated speculation.' ") (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Further, if the non-moving party fails to establish the existence of an essential element of the case on which it bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

Parties moving for and opposing summary judgment in the Southern District of New York must also submit short and concise statements of facts, supported by evidence that would be admissible at trial. Local Civ. R. 56.1. The opposing party must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of the motion. Local Civ. R. 56.1(c); *T.Y.*, 584 F.3d at 418 ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."). However, uncontested facts cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement; the Court is free to disregard the assertion in the absence of citations or where the cited materials do not support the factual assertions in the statements. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001). The Court therefore has discretion "to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement." *Id.* (quoting *Monahan v. N.Y.C. Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000)); *see also* Fed. R. Civ. P. 56(c)(3). Nevertheless, the Court is "not required to consider what the parties fail to point out." *Monahan*, 214 F.3d at 292 (quoting *Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978)). Additionally, when Defendants seek summary judgment against a *pro se* litigant, the Court must afford "special solicitude" to the non-movant. *See, e.g.*, *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006); *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir.1994) (holding district court "should have afforded [*pro se* litigants] special solicitude before granting [a] motion for summary judgment").

## B. Deliberate Indifference

Plaintiff was a "convicted and sentenced prisoner" at the time of the misconduct he alleges, therefore, the Court must analyze his claims of deliberate indifference under the Eighth Amendment. [8] (Docket No. 36 at 2); *see King v. Falco*, 16-CV-6315 (VB), 2018 WL 6510809, at \*7 (S.D.N.Y. Dec. 11, 2018). The Eighth Amendment "imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, 844 (1994)). "[N]ot every lapse in medical care is a constitutional wrong." *Id.* "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (alteration in original). A plaintiff may prevail on a deliberate indifference claim by satisfying a two-prong test. *Sutton v. Rodriguez*, 18-CV-01042 (PMH), 2020 WL 5504312, at \*4 (S.D.N.Y. Sept. 8, 2020). This test has an objective prong and a subjective — *mens rea* — prong. *See id.* at \*4–\*5; *see also Salahuddin*, 467 F.3d at 279–80.

[8]   Although Plaintiff "asserts deliberate indifference claims under both the Eighth and Fourteenth Amendments," (Docket No. 36 at 16), the Court will only analyze this claim under the Eighth Amendment because the Fourteenth Amendment does not apply here. The Fourteenth Amendment only applies to a pre-trial detainee's claim for deliberate indifference to serious medical needs. *See Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017).

**\*9** The objective prong requires that that "the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Id.* at 279 (quoting *Farmer*, 511 U.S. at 834). "To determine whether the deprivation was sufficiently serious, a court must first ascertain whether 'the prisoner was actually deprived of adequate medical care,' keeping in mind that 'the prison official's duty is only to provide reasonable care.' " *Williams v. Smith*, No. 02 Civ. 4558 (DLC), 2009 WL 2431948, at \*7 (S.D.N.Y. Aug. 10, 2009) (quoting *Salahuddin*, 467 F.3d at 279). Second, a court must determine whether "the alleged deprivation of adequate medical care [was] 'sufficiently serious.' " *Spavone v. N.Y.S. Dept. of Corr. Serv.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin*, 467 F.3d at 279). The inquiry into whether the inadequacy of medical care is sufficiently serious "requires the [C]ourt to examine how the offending conduct is inadequate and

what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. This inquiry "contemplates 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)).

"If a plaintiff alleges that he received no medical care for his medical condition, 'courts examine whether the inmate's medical condition is sufficiently serious.' " *Crichlow v. Doccs*, 18-CV-3222, 2022 WL 6167135, at *10 (S.D.N.Y. Oct. 7, 2022) (quoting *Salahuddin*, 467 F.3d at 280). However, "[i]n cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." *Salahuddin*, 467 F.3d at 280. In such cases, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant [for a court's focus] for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003). Thus, "[e]ven in cases where an inmate 'suffers from an admittedly serious medical condition,' if the alleged deficiencies in treatment are 'minor and inconsequential,' those lapses will not sustain an Eighth Amendment claim." *Williams*, 2009 WL 2431948, at *7 (quoting *Smith*, 316 F.3d at 186). The " 'objective component of an Eighth Amendment claim is ... [necessarily] contextual' and fact-specific ...." *Smith*, 316 F.3d at 185 (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)) (alteration in original).

The second prong—the *mens rea* component—requires Plaintiff to establish that Defendants were aware of Plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm to him. *See Salahuddin*, 467 F.3d at 280. Plaintiff must prove "that the official acted with deliberate indifference to [an] inmate['s] health. Deliberate indifference is a mental state equivalent to subjective recklessness." *Id.* (internal citation omitted). "[R]ecklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent." *Id.*

Moreover, "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance*, 143 F.3d at 703; *see also Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Hernandez v. Keane*, 341 F.3d 137,

144 (2d Cir. 2003) (showing of medical malpractice alone does not support an Eighth Amendment claim). Finally, the Court also recognizes the well-established principle that an inmate's "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. In fact, the Second Circuit has held that if "the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*

**III. DISCUSSION**

**\*10** Defendants argue that Plaintiff's claims of deliberate indifference and medical malpractice and negligence should be dismissed on summary judgment. In support of their motions, Defendants submit expert opinions. The Court has reviewed the record and finds that Dr. Stern and Dr. Rosner are both qualified experts and that their expert opinions are admissible under Federal Rule of Evidence 702. *See Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66–67 (2d Cir. 1997)) ("Evidence contained in an expert's report therefore [ ] be evaluated under Fed. R. Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion.").

**A. Plaintiff's Deliberate Indifference Claims**

Plaintiff argues that Dr. Garell was deliberately indifferent to his serious medical needs in violation of his constitutional rights. (Docket No. 36). Specifically, Plaintiff maintains that Dr. Garell denied him proper treatment by refusing to give him "a full examination many times," inserting screws into his back that were "[too] long," refusing "many times" to address his pain, and by refusing on May 1, 2018 "to tell the officer to take off the shackles and cuffs to give [him] a full mobility examination." (*Id.* at 6–7). Dr. Garell counters that his treatment of Plaintiff "was at all times appropriately directed to address Plaintiff's back and lower body pain," and "there was medical support for each step he took." (Docket No. 124 at 15). Dr. Garell's expert, Dr. Stern, agrees that Dr. Garell's treatment was appropriate. (*Id.*). Plaintiff further asserts that the WMC Defendants also failed to treat him with an appropriate standard of care in violation of his constitutional rights. (Docket No. 36). The WMC Defendants counter that the undisputed facts show that their treatment of Plaintiff did not constitute deliberate indifference, thus entitling them to summary judgment. (Docket Nos. 130, 136). Dr. Rosner, the WMC Defendants' expert, agrees that the WMC Defendants did not exhibit deliberate indifference or

conscious disregard of Plaintiff's medical needs. (*See* Docket No. 137-17).

Plaintiff fails to establish the first requirement—that he was actually deprived of adequate medical care. Plaintiff was seen by a board-certified neurosurgeon, Dr. Garell, who diagnosed his condition and provided him with a treatment plan, which included surgery. (Docket No. 125 ¶¶ 1, 15-46). It is clear from the record that Dr. Garell discussed the benefits and risks of the procedure with Plaintiff. (*Id.* ¶¶ 23-25). Moreover, Plaintiff expressed clear understanding and consented to the procedure. (*Id.* ¶ 26). "The operation [then] went as planned with nothing occurring [Dr. Garell] did not expect." (Docket No. 132 ¶ 10). Although Plaintiff suffered blood loss and was sent to the ICU after surgery, (Docket Nos. 125 ¶ 27; 126-2 at 2), Dr. Stern opined that neither the blood loss, nor Plaintiff's referral to the ICU post-surgery, establish that Dr. Garell was negligent because blood loss is a known risk in any surgical procedure, and Plaintiff's blood loss "was timely recognized and addressed." (Docket No. 128-1 at 4). Further, post-operative X-rays showed "good alignment and hardware placement." (Docket No. 125 ¶ 28).

Following Plaintiff's surgery, Plaintiff saw Dr. Garell for follow-up care five times between August 2017 and May 2018. (*See, e.g.*, Docket No. 125 ¶¶ 29, 35, 39, 42, 47). At each appointment, Dr. Garell assessed Plaintiff's recovery, as well as addressed Plaintiff's concerns, through examinations and medical tests including X-rays. (*See, e.g.*, Docket No. 125 ¶¶ 33, 34, 36, 37, 38, 39, 40, 41, 43, 44, 45, 46, 51). After reviewing Plaintiff's medical records, records from this case, and relevant testimony, Dr. Stern opined that the screws in Plaintiff's back remained intact throughout Dr. Garell's care of him, and that the medical care Dr. Garell provided Plaintiff was adequate under accepted standards of medical treatment. (Docket No. 128-1 at 2, 5). Dr. Stern specifically considered whether Dr. Garell deviated from accepted standards of care when he refused Plaintiff's request to examine him without restraints, behind closed doors and without a guard present, and concluded he did not. (*Id.* at 2, 6). Plaintiff's conclusory assertions that Dr. Garell was deliberately indifferent when he allegedly refused to give him full examinations at times, used screws that were too long, did not adequately address Plaintiff's pain, and erred in refusing to allow Plaintiff to remove his restraints during their last appointment, are not supported by the record.

**\*11** After Dr. Garell stopped treating Plaintiff, he was seen by other physicians for regular follow-up care. (*See, e.g.*,

Docket Nos. 125 ¶ 54; 132 ¶¶ 3, 5, 6, 7, 8, 16, 19, 20, 22). Subsequent X-rays revealed that a screw used in the surgery had broken. (Docket Nos. 125 ¶ 58; 128-1 at 5–6; 132 ¶ 21). Plaintiff was offered another surgery to correct this issue, which he declined. (Docket No. 132 ¶¶ 3, 4, 18). Dr. Rosner, the WMC Defendants' expert, concluded that between June 2018 and September 2018, none of the WMC Defendants' treatment of Plaintiff fell below or departed from the applicable standard of care. (Docket No. 137-17 at 68–69, 75). This includes the period in which Dr. Wainwright and Dr. Remer recommended physical therapy, Dr. Bowers referred Plaintiff to the emergency room, and the approximately three-hour waiting period Plaintiff experienced during that process. (*See id.*). Dr. Rosner explicitly opined that the three-hour lapse of time was not significant enough to constitute a departure from the standard of care to which any patient in Plaintiff's situation would be entitled. (*Id.*). Moreover, Plaintiff never specifically asserts that this alleged lapse of time exacerbated his condition. *See, e.g.*, *Liverpool v. Davis*, 442 F. Supp. 3d 714, 737 (S.D.N.Y. 2020) (granting summary judgment where plaintiff waited three hours for medical treatment but did "not allege[ ] that the delay in treatment caused his condition to worsen"). Further, both Dr. Stern and Dr. Rosner opine that the surgical screw breaking does not indicate any negligence. (Docket Nos. 128-1 at 5; 137-17 at 109–10). Accordingly, Plaintiff has not established as a matter of law that he was deprived of adequate medical care. Since the Court has found that Plaintiff has not been deprived of adequate medical care, there is no need to determine whether the alleged deprivation of medical care was sufficiently serious. *See, e.g.*, *Sutton*, 2020 WL 5504312, at \*4–\*5.

Moreover, even assuming, *arguendo*, that Plaintiff has satisfied the objective prong, he does not establish the subjective portion of the two-prong deliberate indifference test. *See id.* at \*5. Under the subjective prong, Plaintiff must demonstrate that Defendants "had a sufficiently culpable state of mind," *i.e.*, Defendants were aware of Plaintiff's serious medical needs and acted with deliberate indifference to Plaintiff's health. *Id.*; *see Salahuddin*, 467 F.3d at 280. Here, the record is devoid of any evidence establishing that Defendants "knew of and disregarded the [P]laintiff's serious medical needs." *Chance*, 143 F.3d at 703. "[T]he fact that [Plaintiff] might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.* Therefore, even assuming Plaintiff could objectively demonstrate that he was deprived of adequate medical care, there is no evidence showing that Defendants acted with the culpable state of mind necessary to find deliberate indifference. Accordingly,

Defendants are entitled to summary judgment on Plaintiff's deliberate indifference claims.

## B. Plaintiff's Medical Malpractice and Negligence Claims

Plaintiff also appears to allege in his interrogatory responses that Defendants were negligent and committed medical malpractice. (Docket Nos. 124 at 11–12; 126-6 at 4–5; 136 at 8–10). Plaintiff's specific claims against Defendants are numerous. To begin, Plaintiff's negligence and/or medical malpractice claims against Dr. Garell consist of challenges to the doctor's standard of care in: (i) overseeing Plaintiff's surgery; (ii) implanting hardware into Plaintiff that "malfunctioned or broke;" (iii) allowing Plaintiff to enter hypervolemic shock during the surgery; (iv) allegedly failing to verify that the screws and other hardware used were in working order; and (v) using screws that did not have an expiration date. (Docket No. 137-18 at 4–5). Plaintiff further asserts that Dr. Garell committed negligence and/ or medical malpractice by: (i) recommending the surgery that was performed on Plaintiff, including failing to explain alternative options and recommending the procedure that would earn the doctor the most money; (ii) allegedly "failing to review the integrity of the hardware installed in Plaintiff" during follow-up visits; and (iii) refusing to continue seeing Plaintiff as a patient. (Docket No. 126-6 at 4–5). Plaintiff alleges that Dr. Wainwright and Dr. Remer were negligent and/or committed medical malpractice when they "repeatedly denied Plaintiff's request for an [X]-ray and an MRI." (Docket No. 137-18 at 5). Additionally, Plaintiff claims that Defendant WMC was negligent and/or committed medical malpractice by providing the materials, resident surgeons and staff for Plaintiff's surgery, and by allegedly refusing to provide Plaintiff with medical attention on November 28, 2018. (Docket No. 137-18 at 4–5).

**\*12** To the extent these claims constitute a "functional amendment" to the complaint, *see E.E.O.C. v. Port Auth. of N.Y. and N.J.*, 768 F.3d 247, 252 (2d Cir. 2014) (noting that district court treated party's interrogatory responses as a "functional amendment" to its pleadings and assessing the "adequacy of [the complaint] and interrogatory responses" under relevant pleading standards); *Boisjoly v. Aaron Manor, Inc.*, No. 3:21-cv-01621 (MPS), 2022 WL 17272372, at \*4 n.3 (D. Conn. Nov. 29, 2022) (noting that the Second Circuit's decision in *E.E.O.C.* treated interrogatory responses "as a functional amendment to the complaint"), Plaintiff has failed to raise a genuine dispute of material fact that Defendants

were negligent or committed medical malpractice in their treatment of him.

"[M]edical malpractice is but a species of negligence and no rigid analytical line separates the two." *Gjini v. United States*, No. 16-CV-3707 (KMK), 2019 WL 498350, at \*9 (S.D.N.Y. Feb. 8, 2019) (quoting *Naughright v. Weiss*, 857 F. Supp. 2d 462, 474 (S.D.N.Y. 2012)). The "[c]ritical question is the nature of the duty to the plaintiff which the defendant is alleged to have breached. 'When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence.' " *La Russo v. St. George's Univ. Sch. of Med.*, 936 F. Supp. 2d 288, 304 (S.D.N.Y. 2013), *aff'd*, 747 F.3d 90 (2d Cir. 2014) (quoting *Stanley v. Lebetkin*, 507 N.Y.S.2d 468 (2d Dep't 1986))(internal citations omitted); *see also Gjini*, 2019 WL 498350, at \*8–\*12 (outlining the distinctions under New York law between claims against medical providers sounding in ordinary negligence as opposed to medical malpractice). Here, Plaintiff's negligence claim arises out of both the patient-physician relationship and is also substantially related to medical treatment, thus, it must be evaluated in the context of medical malpractice.

"In order to prove a medical malpractice claim in New York, Plaintiff must establish '(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries.' " *Moore v. Shahine*, 18 Civ. 463 (AT) (KNF), 2021 WL 827694, at \*4 (S.D.N.Y. March 4, 2021) (quoting *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016)). If a defendant accused of medical malpractice demonstrates that he "did not depart from good and accepted medical practice or that any departure did not proximately cause plaintiff's injuries" than he is *prima facie* entitled to summary judgment. *Id.* (citing *Ongley v. St. Lukes Roosevelt Hosp. Ctr.*, 725 F. App'x 44, 46 (2d Cir. 2018)). To overcome this *prima facie* entitlement to summary judgment, Plaintiff must present "expert testimony that there was a deviation from accepted standards of medical care and that such deviation was the proximate cause of the injury." *Moore v. Shahine*, No. 21-711, 2022 WL 2118945, at \*1 (2d Cir. June 13, 2022) (quoting *Hytko v. Hennessey*, 879 N.Y.S.2d 595, 598 (3d Dep't 2009)); *see also Sitts v. United States*, 811 F.2d 736, 739-40 (2d Cir. 1987) (noting that, except in rare cases, such as "where an unexplained injury has occurred to a part of the body remote from the site of the surgery," New York plaintiffs are required to introduce expert testimony to establish a *prima facie* claim

of medical malpractice); *Potter v. United States*, 17-CV-4141 (AJN), 2020 WL 2836440, at *4 (S.D.N.Y. May 30, 2020) ("[T]his is not the 'rare' medical malpractice action in which expert testimony is unnecessary to establish the elements of Plaintiff's claim, and Plaintiff does not argue that it is."). Thus, by failing to submit an expert report in support of his position, Plaintiff has failed to overcome Defendants' *prima facie* entitlement to summary judgment. *See, e.g., Potter*, 2020 WL 2836440, at *9 (" 'If a plaintiff cannot establish a prima facie case without the benefit of expert testimony, and the plaintiff is unable to procure such testimony, then summary judgment is appropriate.' ") (quoting *Zeak v. United States*, No. 11 Civ. 4253 (KPF), 2014 WL 5324319, at *11 (S.D.N.Y. Oct. 20, 2014)).

**\*13** Notwithstanding this procedural bar, the Court also determines that Plaintiff's claims that Defendants breached a duty of care are not supported by the record. Briefly, Dr. Stern's unrebutted opinions affirm that Dr. Garell's treatment of Plaintiff met the applicable medical standard of care. (Docket No. 128-1 at 2). Moreover, Dr. Stern and Dr. Rosner rebut the specific allegations that Plaintiff makes. For instance, Dr. Stern confirms that the surgical screws used in Plaintiff's operation do not bear expiration dates and that this is expected in the medical field and does not indicate that their integrity was compromised. (Docket No. 128-1 at 4–5). Further, Dr. Rosner states that Plaintiff's medical records, including X-rays of his back, showed no indication that the screws were defective. (Docket No. 137-17 at 50–59). Moreover, Dr. Stern also confirmed that a surgical screw breaking does not indicate negligence. (Docket No. 128-1 at 5). Furthermore, Dr. Rosner confirmed that the Plaintiff's going into hypovolemic shock does not mean that Dr. Garell was negligent. (Docket No. 137-17 at 106). Additionally, contrary to Plaintiff's assertion, Dr. Garell stated that the surgery he performed on Plaintiff was not the most lucrative one that he could have recommended. (Docket No. 137-14 at 135–36). [9] Further, Dr. Rosner opined that Defendants did not deviate from the appropriate standard of care, were not negligent, and did not commit medical malpractice. (Docket No. 137-17 at 68–69, 75). [10] Accordingly, Defendants are entitled to summary judgment on these claims.

[9]    Specifically, Dr. Garell stated during his deposition that the back surgery he recommended to Plaintiff was the most expensive (*i.e.* the most lucrative for the medical provider) of the reasonable options available, but that "there [were] other options that

one could consider that would make even more money." (Docket No. 137-14 at 135–36).

[10]    In reaching this conclusion, Dr. Rosner specifically considered Plaintiff's loss of an estimated 1,000 milliliters of blood during the surgery, (Docket No. 137-17 at 42), and noted that blood loss can occur in the absence of medical negligence, and in his expert opinion, there was no deviation from the applicable standard of care here, (*Id.* at 42–46, 75, 106). Dr. Stern also concluded that "there is simply no basis to claim that [Plaintiff's blood loss] occurred due to any negligence." (Docket No. 128-1 at 4).

### C. Plaintiff's First Amendment Retaliation Claim

Plaintiff asserts a First Amendment retaliation claim against WMC for "multiple reschedul[ed]" appointments. (Docket No. 36 at 9). WMC failed to address this issue in their summary judgment motion. Nevertheless, district courts "[possess] the power to grant summary judgment *sua sponte* when neither party has moved for such relief," *see, e.g., Dempsey v. Town of Brighton*, 749 F. Supp. 1215, 1220 (W.D.N.Y. 1990), *aff'd sub nom. without opinion, Curenton v. Town of Brighton*, 940 F.2d 648 (2d Cir. 1991), and it is "clear that a case does not present an issue of material fact," *Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir. 1983). A district court may exercise this power "if the losing party has been given adequate notice and opportunity to present all evidence." *Lee Loi Indus. v. Impact Brokerage Corp.*, 473 F. Supp. 2d 566, 568 (S.D.N.Y. 2007) (citing *Celotex*, 477 U.S. 317, 326). Here, Plaintiff received adequate notice and opportunity to present all his evidence in support of his First Amendment retaliation claim. *See Lee Loi Indus.*, 473 F. Supp. 2d at 568 (citing *Celotex*, 477 U.S. at 326). Defendants served their summary judgment motions on Plaintiff, as well as served the required notice. (Docket Nos. 122, 129, 133, 135). Moreover, the Court extended Plaintiff's time to respond to the summary judgment motions *sua sponte*, while warning Plaintiff that failure to respond would deem Defendants' motions unopposed. (Docket No. 138). Plaintiff had ample opportunity to respond. *See, e.g., Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Therefore, the Court will address Plaintiff's retaliation claim. "To adequately plead a First Amendment retaliation claim, a plaintiff must plausibly allege: (i) he engaged in constitutionally protected speech or conduct; (ii) a defendant took adverse action against him; and (iii) the protected activity and adverse action are causally connected." *Redd v. Garell*,

18 CV 9436 (VB), 2020 WL 1189491, at *7 (S.D.N.Y. Mar. 12, 2020) (citing Dolan v. Connolly, 794 F.3d 290, 294 (2d Cir. 2015)). "An adverse action in this context is 'conduct that would deter a similarly situated individual of ordinary firmness.' " Dinler v. City of New York, No. 04 Civ. 7921 (RJS) (JCF), 2012 WL 4513352, at *26 (S.D.N.Y. Sept. 30, 2012) (quoting Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 273 (2d Cir. 2011)). Moreover, "Courts approach prisoners' retaliation claims 'with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " Redd, 2020 WL 1189491, at *7 (quoting Dolan, 794 F.3d at 295). "Accordingly, a prisoner pursuing a retaliation claim must not rest on 'wholly conclusory' allegations, but rather must allege 'specific and detailed' supporting facts." Id. at *7 (quoting Dolan, 794 F.3d at 295).

**\*14** While the Second Circuit has stated that Section 1983 protects inmates from "otherwise routine administrative decisions [that] are made in retaliation for the exercise of constitutionally protected rights," Gill v. Mooney, 824 F.2d 192, 194 (2d Cir. 1987), Plaintiff has not set forth sufficient allegations to support a retaliation claim against WMC. Plaintiff has plainly alleged the first element of a retaliation claim because it cannot be disputed that he engaged in protected activity by filing his lawsuit. However, his retaliation claim fails on the second and third elements.

As to the second element, Plaintiff's only assertion, that the hospital *rescheduled* his November 28, 2018 appointment a number of times, without more, does not amount to a claim of an adverse action. (Docket No. 36 at 13–16); see Malsh v. Austin, 901 F. Supp. 757, 761 (S.D.N.Y. 1995) ("A rescheduled routine dental appointment is not atypical, nor did it pose a significant hardship to the [plaintiff-inmate] in relation to the ordinary incidents of prison life ...."); Rose v. Goldman, No. 02 CV 5370 (NGG) (LB), 2009 WL 4891810, at *13 (E.D.N.Y. Dec. 9, 2009), report and recommendation adopted, 2011 WL 1130214 (E.D.N.Y. Mar. 24, 2011) (inconvenient scheduling of probation appointments on Mondays and on a holiday, and refusing to reschedule an appointment to accommodate plaintiff's desire to attend a religious service "does not constitute unlawful retaliation" (internal quotations omitted)). Thus, even assuming, arguendo, that all of the facts that Plaintiff alleges regarding the rescheduling of his November 28, 2018 appointment are true, he does not establish the second element of a claim of retaliation as a matter of law.

Furthermore, Plaintiff does not assert a sufficient causal connection between the alleged adverse action and his filing of the present lawsuit, and thus, has not meet the third element. (Docket No. 36 at 13–16). Plaintiff's wholly conclusory allegations are insufficient to establish the requisite casual connection. (Id.); see, e.g., Rose, 2009 WL 4891810, at *13 ("Even if plaintiff established that defendants' actions were adverse, his retaliation claims would still fail as he has not established facts supporting an inference of a causal connection between the adverse action and the protected conduct.").

Accordingly, the Court grants Defendant WMC's summary judgment motion on Plaintiff's retaliation claim.

## IV. CONCLUSION

For the forgoing reasons, Defendants' motions for summary judgment are granted. The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Opinion and Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal.

The Clerk of the Court is respectfully requested to terminate the pending motions (Docket Nos. 123 and 130), to enter judgment for Defendants, and to mail a copy of this Opinion and Order to the pro se Plaintiff.

**All Citations**

Slip Copy, 2023 WL 2712373

---

**End of Document**      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2672317
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Forest FATE, Plaintiff,
v.
PETRANKER, Defendant.

19-CV-05519 (PMH)
|
Signed July 8, 2022

**Attorneys and Law Firms**

Forest L. Fate, Sr., Spring Valley, NY, Pro Se.

Eric Dranoff, Robert Benjamin Weissman, Saretsky Katz & Dranoff, LLP, Elmsford, NY, Jeanne Nicole Gilberg, County of Rockland, Department of Law, New City, NY, for Defendant.

## MEMORANDUM OPINION AND ORDER

PHILIP M. HALPERN, United States District Judge:

*1 Forest Fate, Sr. ("Plaintiff"), proceeding *pro se* and *in forma pauperis*, brings this action under 42 U.S.C. § 1983 against, amongst others, Jouliana Petranker ("Defendant"), the medical administrator at Rockland County Correctional Facility ("Rockland"). (Doc. 18, "Am. Compl."). [1] Plaintiff alleges that Defendant was deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments. (*See generally id.*).

[1]    Citations to the Amended Complaint correspond to the pagination generated by ECF.

Plaintiff commenced this action on June 7, 2019 with the filing of a single-page letter, which sought the Court's intervention in obtaining a hearing aid from prison officials. (Doc. 1). Plaintiff filed an Amended Complaint, the operative pleading, on August 20, 2019. (*See* Am. Compl.). Defendant, with her former co-defendants, filed an Answer on September 10, 2019. (Doc. 19). Judge Román, before whom this case proceeded prior to reassignment to this Court on April 3, 2020, granted Defendant and her former co-defendants leave to file a motion under Federal Rule of Civil Procedure 12(c) on February 12, 2020. (Doc. 45). That motion, in

which Defendant and her former co-defendants moved to dismiss all of Plaintiff's claims except for the deliberate indifference claim, was fully submitted on March 26, 2020. (Docs. 58-60). This Court, on July 6, 2020, granted the motion in its entirety, allowing only the deliberate indifference claim against Defendant to proceed into discovery. (Doc. 70).

Discovery was completed on August 5, 2021. (Doc. 76). Defendant filed a motion for summary judgment, in accordance with the briefing schedule set by the Court, on February 24, 2022. (Doc. 128; Doc. 129; Doc. 130, "Def. Br."; Doc. 131, "Def. 56.1"; Doc. 132, "Def. Decl."; Doc. 133, "Bernstein Decl."; Doc. 134, "Piacente Decl."; Doc. 135, "Weissman Decl."). Plaintiff, on March 17, 2022, requested a 90-day extension of time to file opposition to Defendant's motion. (Doc. 137). The Court granted Plaintiff's request in part and extended his time to file an opposition to April 29, 2022. (Doc. 139). Plaintiff never filed opposition papers. The Court, therefore, deems Defendant's motion for summary judgment fully submitted and unopposed as of the timely filing of Defendant's reply brief on May 13, 2022. (Doc. 142, "Reply").

Plaintiff did, however, file responses to Defendant's Rule 56.1 Statement on January 24, 2022, which the Court, in its discretion, construes as a Rule 56.1 Counterstatement even though it is unsworn and was filed prior to the filing of Defendant's motion. [2] (Doc. 119, "56.1 Cntr."). The Court, however, considers only those responses in the Counterstatement that are supported by admissible record evidence to controvert the factual statements set forth in Defendant's 56.1 Statement. Statements made by Defendant that are supported by admissible evidence and not refuted by Plaintiff are deemed admitted. *See Mirza v. Garnet Health*, No. 20-CV-00556, 2022 WL 826410, at *2 n.6 (S.D.N.Y. Mar. 17, 2022) ("[S]tatements in the 56.1 Counterstatement supported by admissible evidence and not refuted with citation to admissible evidence provided to the Court are deemed admitted."). [3]

[2]    *See Vasquez v. Yadali*, No. 16-CV-00895, 2022 WL 1597693, at *2 n.6 (S.D.N.Y. May 19, 2022) (considering the substance of the plaintiff's arguments in various filings as responses to the defendants' Rule 56.1 statement, even though the plaintiff did not submit a statement of his own); *Casanova v. Maldonado*, No. 17-CV-01466, 2021 WL 3621686, at *2 n.4 (S.D.N.Y. Aug. 16, 2021)

Fate v. Petranker, Slip Copy (2022)

2022 WL 2672317

(same, noting that "[w]hile *pro se* litigants are ... not excused from meeting the requirements of Local Rule 56.1 ... where a *pro se* plaintiff fails to submit a proper Rule 56.1 Statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (quoting *Wiggins v. Griffin*, No. 18-CV-07559, 2021 WL 706720, at *1 n.1 (S.D.N.Y. Feb. 22, 2021) (alterations in original))).

3        *See also Wilson v. Annucci*, No. 18-CV-00391, 2020 WL 1979210, at *3 (N.D.N.Y. Apr. 23, 2020) (noting that *pro se* plaintiffs opposing a motion for summary judgment are "required to submit admissible evidence"), *adopted by* 2020 WL 5229375 (N.D.N.Y. Sept. 2, 2020); Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

**\*2**  For the reasons set forth below, Defendant's motion is GRANTED.

## BACKGROUND

The Court recites the facts herein only to the extent necessary to adjudicate the extant motion and draws them from: (1) the Amended Complaint; (2) Defendants' Rule 56.1 Statement; (3) Plaintiff's Rule 56.1 Counterstatement; (4) Robert B. Weissman's Declaration, along with the exhibits annexed thereto, which includes, *inter alia*, a transcript of Plaintiff's deposition, conducted on April 26, 2021 (Doc. 135-3, "Pltf. Dep."); (5) Defendant's Declaration; (6) Dr. Jill Bernstein's Declaration; and (7) Dr. Dominick Piacente's Declaration.

Plaintiff's claims arise from the failure of Defendant to provide him—while incarcerated at Rockland—a hearing aid. (Am. Compl. at 4-5). Plaintiff was transferred to Rockland on March 14, 2019, after being held at Nash County Jail in North Carolina.[4] (Def. 56.1 ¶ 15). On August 20, 2019, Plaintiff pled guilty in New York State court, was sentenced in connection with the charges against him, and was thereafter transferred to Downstate Correctional Facility on September 12, 2019. (*Id.* ¶ 86). Plaintiff was thus a

pretrial detainee while at Rockland from March 14, 2019 to August 20, 2019 and a convicted felon at Rockland from August 20, 2019 to September 12, 2019. (*See* Def. Br. at 8-9). Defendant was, at all relevant times, the Director of Correctional Health Services at Rockland and an employee of Correct Care Solutions, the entity with which Rockland has a medical staffing contract. (Def. 56.1 ¶¶ 16, 18).

4        Apparently, Plaintiff fled New York and was found and arrested in North Carolina. (Def. 56.1 ¶¶ 10-11).

Defendant states that she "is not a treating medical provider at [Rockland] and does not have a medical degree or a nursing degree." (*Id.* ¶ 20; Petranker Decl. ¶¶ 2, 6). Plaintiff argues that he "is aware of the fact [Defendant] does not have a medical degree or nursing degree but has witnessed through direct and indirect means that [D]efendant on many occasions has acted in a role more consistent with a medical provider." (56.1 Cntr. at 2). Plaintiff, however, provides no evidentiary support for this claim and directly contradicted it in his deposition, wherein he admitted in response to Mr. Weissman's question that "[Defendant is] not a nurse or a doctor, right?" with the response: "Not that I know of, I don't know what she is, basically." (Pltf. Dep. at 84:14-17). It is, therefore, admitted that Defendant is not a treating medical provider at Rockland.

### I. Medical Care Provided at Rockland

Plaintiff first received medical care at Rockland on March 22, 2019, when Dr. Dominick Piacente ("Piacente") examined him after he had told a nurse that he had lost his hearing aids prior to being transferred to Rockland. (Def. 56.1 ¶¶ 27-29). Piacente noted that "patient is able to hear questions in normal volume ... [h]e may have a hearing deficit but it is not affecting his ADLs (activities of daily living) in this institution." (*Id.* ¶ 29; Piacente Decl. ¶ 5). Piacente also prescribed Plaintiff ear drops for purported pain in his left ear, which he refused to take. (Def. 56.1 ¶¶ 30, 56, 70). While at Rockland, Plaintiff was sent to Good Samaritan Hospital ("Good Samaritan"), where he received multiple tests for his hearing, which ultimately provided conflicting results, but the physicians concluded that the results did not warrant a hearing aid. (Def. 56.1 ¶ 46; Bernstein Decl. ¶ 18). Defendant's medical expert, Dr. Jill Bernstein ("Bernstein"), states that "patients should not be fitted with hearing aids based on test results with only poor or fair reliability results because doing so poses the risk of providing too much amplification and damaging the patient's hearing." (Bernstein Decl. ¶ 7). Piacente reviewed

the audiogram taken at Good Samaritan and "concluded that, although Plaintiff may have a hearing deficit, it was not significant enough to interfere with his [ADLs], and he did not need a hearing aid." (Def. 56.1 ¶ 54 (citing Piacente Decl. ¶¶ 5, 8, 9)). While substituting for Piacente at Rockland, Dr. Kalpana Parghi ("Parghi") also examined Plaintiff and determined that a hearing aid was not warranted. (*Id.* ¶¶ 62-64). Dr. Parghi noted in Plaintiff's medical records that "[Plaintiff] [r]equests hearing aid consult. Discussed with administrator, was denied. Patient able to hear conversation in a room but has difficulty in a noisy environment." (*Id.* ¶ 64). Plaintiff argues as to this statement that "why would the doctor discuss a medical decision with [Defendant] .... This demonstrates how [Defendant] has gone out of bounds as to her job description ... Dr. Parghi should have spoken with Dr. Piacente or another qualified provider." (56.1 Cntr. at 3-4). However, as Defendant points out, nothing in Parghi's notes indicated that Defendant made the decision to deny a hearing aid to Plaintiff, only that it was discussed. Moreover, even if Parghi consulted with Piacente—as Plaintiff argues—Piacente had already, on multiple occasions, determined that a hearing aid was unwarranted.

**\*3** Defendant, at the direction of Chief of Corrections Karl Mueller ("Mueller"), sent Plaintiff for another hearing aid evaluation on August 22, 2019 by Dr. Benjamin Stanley ("Stanley") at Cornerstone Family Medicine ("Cornerstone"). (Def. 56.1 ¶¶ 72-74). Stanley, contrary to Piacente, deemed Plaintiff's results reliable enough to warrant the fitting of a right-sided hearing aid. (*Id.* ¶ 76). Thereafter, Defendant arranged for Plaintiff to be fitted for a hearing aid and authorized payment to Cornerstone for same. (*Id.* ¶ 84). Before the hearing aid was delivered, however, Plaintiff was transferred to Downstate Correctional Facility ("Downstate") on September 12, 2019. (*Id.* ¶ 87). Dr. Bernstein's testimony on that score was that the typical delay between molding and delivering a hearing aid is two to four weeks. (Bernstein Decl. ¶ 42).

## II. Medical Care Provided After Rockland

Defendant, after Plaintiff's transfer, notified Downstate of his condition and was informed that Plaintiff would have to be re-examined at Downstate before being eligible for another fitting. (Def. 56.1 ¶¶ 88-89). Plaintiff, thereafter, was transferred to Five Points Correctional Facility ("Five Points"), and was seen on four occasions by medical providers at Downstate and Five Points. (*Id.* ¶¶ 91-100). Each of these examinations, including one examination resulting in an HL30 non-significant hearing loss diagnosis, determined that

a hearing aid was not warranted. (*Id.*). Dr. Joseph Gullo at Five Points confirmed on November 18, 2020 that Plaintiff suffered from HL30 non-significant hearing loss and again denied him a hearing aid. (*Id.* ¶¶ 100-04). Plaintiff does not dispute either diagnosis of HL30 non-significant hearing loss. (56.1 Cntr. at 29, 32). The HL30 level, according to Bernstein, is the least severe hearing loss threshold under "New York State correctional service guidelines." (Def. 56.1 ¶ 43 (citing Bernstein Decl. ¶ 11)). "HL30 non-significant hearing loss does not meet the criteria for hearing aid coverage under Medicaid guidelines." (*Id.* ¶ 44 (citing Bernstein Decl. ¶ 12)).

This litigation followed.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). " 'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at \*1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial ...." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

"It is the movant's burden to show that no genuine factual dispute exists," *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157 (1970)), and a court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 442 F. Supp. 3d at 722 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts ...." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

**\*4** Should there be no genuine issue of material fact, the movant must establish also its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when ... law supports the moving party"); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (explaining that summary judgment is appropriate when "the law so favors the moving party that entry of judgment in favor of the movant ... is proper").

The Court is, of course, mindful that "[p]ro se litigants are afforded a special solicitude," which includes reading their filings "to raise the strongest arguments they suggest." *Mortimer v. City of New York*, No. 15-CV-07186, 2018 WL 1605982, at *9 (S.D.N.Y. Mar. 29, 2018) (internal quotation marks omitted). "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff." *Adams v. George*, No. 18-CV-02630, 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8, 2020). This status does not, however, excuse a *pro se* litigant from making the showing required to defeat summary judgment; he or she must offer more than "bald assertions, completely unsupported by evidence" to overcome the motion. *Wisdom v. Loiodice*, No. 17-CV-04837, 2020 WL 4431590, at *4 (S.D.N.Y. July 31, 2020); *see also*

*Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (explaining that the mere fact that a litigant is *pro se* "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment" (internal quotation marks omitted)); *Ross v. Koenigsmann*, No. 14-CV-01321, 2017 WL 9511096, at *1 (N.D.N.Y. Aug. 16, 2017), *adopted sub nom. Ross v. Mannava*, 2017 WL 4338883 (N.D.N.Y. Sept. 29, 2017).

## ANALYSIS

Plaintiff's claims proceed under 42 U.S.C. § 1983. That statute provides, in pertinent part, that "[e]very person who, under color of any statute ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." 42 U.S.C. § 1983. "[T]his language does not create substantive rights; rather, it creates a mechanism by which individuals can vindicate the violation of rights secured elsewhere." *Santucci v. Levine*, No. 17-CV-10204, 2021 WL 76337, at *3 (S.D.N.Y. Jan. 8, 2021). Plaintiff alleges, by way of § 1983, that Defendant was deliberately indifferent to his serious medical needs.[5] The Court notes at this juncture that while a pretrial detainee's claim of medical indifference is governed by the strictures of the Fourteenth Amendment, the same claim advanced by a convicted prisoner is governed by the strictures of the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Plaintiff's claim, therefore, falls under the Fourteenth Amendment from March 14, 2019 to August 20, 2019 (i.e., while he was a pretrial detainee), and the Eighth Amendment from August 20, 2019 to September 12, 2019 (i.e., while he was a convicted prisoner).

[5]    Because Plaintiff failed to oppose Defendant's arguments on this claim, the Court could consider the claim for relief abandoned. *See Murtha v. New York State Gaming Comm'n*, No. 17-CV-10040, 2022 WL 784756, at *7 n.7 (S.D.N.Y. Mar. 15, 2022) (concluding that the plaintiff waived objection by failing to raise it in his opposition brief); *Leach v. King*, No. 16-CV-00861, 2018 WL 1514243, at *4 n.1 (D. Conn. Mar. 27, 2018) ("[B]ecause [the *pro se* plaintiff] has not addressed the merits of the arguments seeking dismissal of his claims for injunctive and declaratory relief, I can consider these claims abandoned."); *Harnage*

*v. Faneuff*, No. 15-CV-01033, 2017 WL 6629297, at *8 n.3 (D. Conn. Nov. 29, 2017) ("As the [*pro se*] plaintiff has not addressed the merits of any retaliation claim based on the rejection of his grievances without disposition, the court also could have considered this claim abandoned."); *In re UBS AG Secs. Litig.*, No. 07-CV-11225, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (recognizing that a party "concedes through silence" arguments by its opponent that it fails to address). However, in deference to the *pro se* Plaintiff and because Plaintiff did file a Rule 56.1 Counterstatement that addressed issues relevant to this claim, the Court declines to deem the claim abandoned.

 **\*5** Under either the Eighth Amendment or Fourteenth Amendment, Plaintiff must prove both an objective and subjective prong to establish a claim of deliberate indifference to serious medical needs. *See Adamson v. Miller*, 808 F. App'x. 14, 17 (2d Cir. 2020) ("To establish an Eighth Amendment violation based on inadequate medical care, a prisoner must demonstrate both an objectively serious medical deprivation and a sufficiently culpable mental state on the part of the charged official."); *King v. Shinder*, No. 16-CV-06315, 2020 WL 4750294, at *6 (S.D.N.Y. Aug. 17, 2020) ("[T]o prevail on a Fourteenth Amendment claim alleging inadequate medical care, a plaintiff must prove an objective prong and a subjective prong."). Although the analysis under the subjective prong differs between paradigms, "[f]or both the Eighth and Fourteenth Amendments, the objective prong poses the same standard." *Horace v. Gibbs*, 802 Fed. App'x 11, 14 (2d Cir. 2020). As to the objective prong, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Darnell*, 849 F.3d at 30 (internal quotation omitted).

There is no "static test" as to the objective prong of a medical indifference claim, but a medical condition can be "sufficiently serious" depending on "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Horace*, 802 Fed. App'x at 14 (citing *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (internal quotation omitted)); *see also Yancey v. Robertson*, 828 Fed. App'x 801, 803 (2d Cir. 2020) ("[T]he deprivation of medical care must be 'sufficiently serious' in the sense that 'a condition of urgency, one that may produce death,

degeneration, or extreme pain' exists." (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994))).

The loss of hearing can form the basis of a constitutional violation claim because the "ability to hear is 'a basic human need affecting daily activity and sufficiently serious to warrant treatment by physicians.' " *Rennalls v. Alfredo*, No. 12-CV-05300, 2015 WL 5730332, at *11 (S.D.N.Y. Sept. 30, 2015) (quoting *Rosales v. Fischer*, No. 07-CV-10554, 2009 WL 928260, at *12 (S.D.N.Y. Mar. 31, 2009)). However, a plaintiff's hearing loss that is mild or not significant, does not rise to the level of a "serious medical need" triggering constitutional protections. *See, e.g.*, *Chavis v. vonHagn*, No. 02-CV-00119, 2009 WL 236060, at *43 (W.D.N.Y. Jan. 30, 2009) (finding that the plaintiff failed to satisfy the objective prong because he "offer[ed] nothing more than bald, conclusory allegations that he suffered from an extremely painful ear infection and further, that the ear infection resulted in a temporary (two week) loss of hearing"); *Smith v. Masterson*, 538 F. Supp. 2d 653, 659 (S.D.N.Y. 2008) (granting summary judgment because the "record has established that Smith has normal hearing" and therefore plaintiff failed to satisfy the objective prong of a deliberate indifference claim), *aff'd*, 353 F. App'x 505 (2d Cir. 2009). Judge Sweet, in a prior case brought by Plaintiff, considered at the motion to dismiss stage whether his hearing loss was sufficiently serious and held that "[w]hile loss of hearing may be sufficiently serious, Fate has only alleged HL30 non-significant hearing loss." *Fate v. Goord*, No. 11-CV-07493, 2012 WL 3104884, at *6 (S.D.N.Y. July 31, 2012). The undisputed facts here yield the same conclusion.

There is no genuine issue of material fact as to the seriousness of Plaintiff's condition. Here, like in *King*, it is undisputed that Plaintiff suffered only from HL30 non-significant hearing loss. (56.1 Cntr. at 29, 32). This Court, in *King*, held that a claim based on denial of a hearing aid to a plaintiff with HL30 non-significant hearing loss failed at the summary judgment stage because that plaintiff's medical condition was simply not sufficiently serious. *King*, 2020 WL 4750294 at *7 ("Plaintiff does not have a serious medical need concerning his hearing and therefore no constitutional violation can lie for failure to treat Plaintiff's hearing loss." (internal quotation marks omitted)). Plaintiff's bare assertion that he needs a hearing aid fails to raise a genuine issue of material fact where it is undisputed that his hearing loss was insignificant. *See id.* at *8 ("Plaintiff's assertion that he needs a hearing aid, unsupported by evidence in the record, is insufficient to defeat summary judgment for a deliberate indifference to

medical needs claim."). Defendant is thus entitled to summary judgment on Plaintiff's claim that he was denied treatment for his hearing loss.

**\*6** Moreover, to the extent the Amended Complaint can be read to complain of a delay in medical care—at some point after Stanley prescribed Plaintiff a hearing aid—Defendant is entitled to summary judgment under the objective prong of that claim as well. Giving Plaintiff all the solicitude a *pro se* plaintiff is entitled, because Plaintiff received treatment and a prescription for a hearing aid on August 22, 2019, the analysis under the objective prong for this theory depends on whether there was an unreasonable delay or interruption in treatment. *See Boomer v. Bentivegna*, No. 19-CV-04754, 2021 WL 1163658, at \*3 (S.D.N.Y. Mar. 26, 2021) ("If, however, a plaintiff acknowledges that he received some medical care related to the underlying condition, but that the care he received was inadequate, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " (quoting *Salahuddin*, 467 F.3d at 280)). Defendant, on an unspecified day in August of 2019, received direction from Mueller to send Plaintiff for another hearing aid evaluation. (Def. 56.1 ¶¶ 72-74). Defendant complied and scheduled Plaintiff to be examined by Stanley on August 22, 2019. (*Id.* ¶ 74). Stanley prescribed a hearing aid for Plaintiff, which Defendant ordered for him. (*Id.* ¶ 84). In short, Plaintiff received medical care in the form of a hearing aid prescription, even though the HL30 level was not sufficiently serious to *entitle* him to that treatment in the first place.

It takes two to four weeks for a hearing aid to be molded and delivered, (Bernstein Decl. ¶ 12), and during that time period, Plaintiff was transferred to another facility outside Defendant's purview. (Def. 56.1 ¶¶ 86-90). The hearing aid prescription did not follow Plaintiff to the new facility. (Def. 56.1 ¶ 88). Any delay was thus not unreasonable and therefore not sufficiently serious. *See Fate*, 2012 WL 3104884 at \*6 (concluding that a "relatively modest delay in providing ... a

hearing aid" was not sufficiently serious.) Defendant is thus entitled, on the undisputed facts, to summary judgment on the objective prong for any claim based on a delay in medical treatment.

In light of the evidence produced and the absence of a genuine issue of material fact with respect to both the seriousness of Plaintiff's medical condition and to any delay in treatment, Defendant's motion for summary judgment is granted. [6]

[6]    Given the conclusions reached herein as to the objective prong, the Court need not address the subjective prong under either Amendment. *See King*, 2020 WL 4750294 at \*9 ("Because ... Plaintiff cannot satisfy the objective prong of his deliberate indifference claim ... [n]o purpose would be served by considering the remaining element of Plaintiff's claim—whether any Defendant acted intentionally or recklessly—as this analysis could not resurrect the fatal and undisputed flaw of Plaintiff's lack of serious medical condition."). The Court likewise need not and does not reach the issue of whether Defendant is entitled to qualified immunity.

## CONCLUSION

Defendant's motion for summary judgment is GRANTED and the Amended Complaint is dismissed with prejudice.

The Clerk of the Court is respectfully directed to: (i) close this case; and (ii) mail a copy of this Memorandum Opinion and Order to Plaintiff.

**All Citations**

Slip Copy, 2022 WL 2672317

---

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4750294
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

James Christopher KING, Plaintiff,

v.

Dr. SHINDER, Dr. Zachariah, Nurse Admin.
J. Petranker, and Np. E. Handler, Defendants.

16-cv-06315 (PMH)
|
Signed 08/17/2020

**Attorneys and Law Firms**

James Christopher King, Otisville, NY, pro se.

Robert Benjamin Weissman, Saretsky Katz & Dranoff, LLP,
New York, NY, for Defendant Nurse Admin. J. Petranker.

Paul Andrew Sanders, Barclay Damon LLP, Rochester, NY,
for Defendant NP. E. Handler.

Dr. Shinder, pro se.

Dr. Zachariah, pro se.

## MEMORANDUM OPINION AND ORDER

PHILIP M. HALPERN, United States District Judge:

 **\*1**  Plaintiff James Christopher King ("Plaintiff"),
proceeding *pro se* and *in forma pauperis*, brings this action
under 42 U.S.C. § 1983 alleging defendants were deliberately
indifferent to his serious medical needs in violation of his
Fourteenth Amendment rights. On December 11, 2018, the
Court (Briccetti, J.) dismissed all of Plaintiff's claims except
for Plaintiff's one remaining claim against Defendants Dr.
Shinder ("Shinder"), Dr. Zachariah ("Zachariah"), Nurse
Admin. Petranker ("Petranker"), and NP Handler ("Handler"
and collectively "Defendants") alleging that Defendants
failed to provide adequate medical treatment for, and were
deliberately indifferent to, Plaintiff's hearing loss. (Doc. 189,
Op. & Order at 25).

By motions dated January 30, and January 31, 2020,
Defendants move for summary judgment pursuant to Fed. R.
Civ. P. 56. (Docs. 215, 223). [1] On March 17, 2020, this matter
was reassigned to me. For the reasons set forth below the court

GRANTS Defendants' motions for summary judgment and
dismisses Plaintiff's claims.

[1]     While Handler moves for summary judgment (*see*
        Doc. 215) separately from Shinder, Zachariah,
        and Petranker (*see* Doc. 223), the Defendants'
        arguments and undisputed factual allegations
        largely overlap. Accordingly, the Court analyzes
        the Defendants' motions for summary judgment
        together.

## BACKGROUND

Judge Briccetti's earlier decision described the allegations
and procedural history of this case, *see* Op. & Order at 3–
9, and familiarity with it is therefore assumed. The facts,
as recited below, are taken from Defendants' Local Rule
56.1 statements, (Doc. 219, "Handler 56.1"; Doc. 230,
"Petranker 56.1"), Plaintiff's Second Amended Complaint,
(Doc. 73, "SAC"), Plaintiff's opposition brief, [2] (Doc. 236,
"Pl. Opp'n"), and the admissible evidence submitted by the
parties.

[2]     Plaintiff did not submit a Rule 56.1 statement.
        While "*pro se* litigants are [ ] not excused
        from meeting the requirements of Local Rule
        56.1 ... where a *pro se* plaintiff fails to submit
        a proper Rule 56.1 statement in opposition to
        a summary judgment motion, the Court retains
        some discretion to consider the substance of the
        plaintiff's arguments, where actually supported by
        evidentiary submissions." *Wali v. One Source Co.,*
        678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009); *see
        also Gadson v. Goord,* No. 96-CV-7544, 2000
        WL 328879, at \*3 (S.D.N.Y. Mar. 28, 2000)
        ("Plaintiff did not submit a Statement Pursuant to
        Civil Rule 56.1. Instead, he submitted 'Plaintiff's
        Opposition for Defendant's Memorandum of Law
        in Support of Motion for Summary Judgment,'
        stating his disagreement with the defendant's
        version of the facts. In light of plaintiff's *pro se*
        status, the Court will accept this memorandum
        in lieu of a Rule 56.1 Statement."). Plaintiff
        submitted opposition briefs to Defendants' motions
        for summary judgment supported by evidence
        appended thereto. *See generally* Pl. Opp'n. While
        not fully responsive to Defendants' Rule 56.1
        statements by any means, the Court will consider

the factual assertions made by Plaintiff in his two memoranda of law in opposition to Defendants' motions for summary judgment as opposition to Defendants' Rule 56.1 statements. The Court is aware that bald and conclusory factual statements contained therein do not constitute opposition to Defendants' Rule 56.1 statements. *See* Woods v. Acampora, No. 08-CV-4854, 2009 WL 1835881, at *3 (S.D.N.Y. June 24, 2009) ("[A] *pro se* party's 'bald assertion' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (quoting Odom v. Keane, 1997 WL 576088, at *3 (S.D.N.Y. Sept. 17, 1997))).

**\*2** Plaintiff was arrested on December 1, 2015 and, during the arrest, Plaintiff alleges he was punched, kicked, and tasered by numerous police officers. Petranker 56.1 ¶ 18 (Decl. of Robert B. Weissman ("Weissman Decl.") Ex. C ("Pl. Dep.") at 39:1–22). After the arrest, Plaintiff was taken to the emergency room at Good Samaritan Hospital ("GSH") where he was treated for severe pain and prescribed pain medication. Pl. Dep. at 43:13–44:7. At GSH, Plaintiff was diagnosed with a concussion, given medication to treat his pain, and told to schedule an appointment as soon as possible with neurologist Lyle James Dennis. Petranker 56.1 ¶ 21 (citing Decl. of Jill Bernstein ("Bernstein Decl.") Ex. B at 9,[3] 17). Plaintiff did not complain specifically about hearing loss to medical professionals at GSH. *Id.* ¶ 22 (citing Bernstein Decl. ¶ 10).

[3]     Page numbers for Bernstein Decl. Exs. B–F correspond to the page numbers assigned by PACER.

Plaintiff was then transported to the Rockland County Correctional Facility (the "Jail") on December 2, 2015 where he remained incarcerated until December 2, 2016. Petranker 56.1 ¶ 23 (citing SAC ¶ 228; Pl. Dep. at 103:11–14). Plaintiff was a pre-trial detainee until he was convicted on November 29, 2016. *Id.* ¶ 24 (citing Pl. Dep. at 16:21–22).

### I. Plaintiff's Medical Treatment Related to His Hearing Loss

Upon being admitted to the Jail, Plaintiff was screened and examined by two nurses. *Id.* ¶ 26. Plaintiff's intake form notes that he complained of a headache, but it does not indicate that he complained of decreased hearing. *Id.* ¶¶ 28, 31 (citing Bernstein Decl. ¶¶ 14–15; *Id.* Ex. C at 12). On December 3,

2015, Zachariah examined Plaintiff after it was reported that Plaintiff suffered a seizure and had lost consciousness. *Id.* ¶ 33 (citing Doc. 225 ("Zachariah Decl.") ¶¶ 5, 7). Zachariah referred Plaintiff to Nyack Hospital where he underwent a CT scan of his brain and was told that he "ha[s] a head injury which does not appear serious at this time" and was diagnosed with a concussion with loss of consciousness. *Id.* ¶¶ 34–36 (citing Bernstein Decl. Ex. C at 68–70); *Id.* ¶ 37 (citing Bernstein Decl. Ex. D at 10). Plaintiff's discharge notice from Nyack Hospital referred Plaintiff to Marc London, a neurologist, "for recheck and further evaluation." *Id.* ¶ 38 (citing Bernstein Decl. Ex. C at 74). After Plaintiff returned to the Jail on December 3, 2015, Zachariah noted that he would continue to monitor Plaintiff, and Jail medical staff reached out to Marc London to attempt to schedule a neurological examination. *Id.* ¶¶ 40–41 (citing Zachariah Decl. ¶¶ 9–10); *Id.* ¶ 43 (citing Bernstein Decl. Ex. C at 64).

On December 4, 2015, Plaintiff had a mental health evaluation; the evaluation sheet does not identify any complaints of hearing loss. *Id.* ¶ 45 (citing Bernstein Decl. ¶ 24).

On December 5, 2015, Plaintiff had a psychiatric assessment. *Id.* ¶ 49 (citing Zachariah Decl. ¶ 17). The examiner wrote that Plaintiff stated he has "clogs in his ear [with] earaches" and he was "[treated] for ear infection." *Id.* (citing Bernstein Decl. Ex. C at 35).

On December 7, 2015, Zachariah conducted a physical examination of Plaintiff. *Id.* ¶ 47 (citing Zachariah Decl. ¶ 18). Zachariah did not have access to the psychiatric assessment notes prior to the examination. *Id.* ¶ 48 (citing Zachariah Decl. ¶ 18). During the examination, Plaintiff did not report hearing difficulty, but Zachariah nonetheless checked Plaintiff's ears and noted that Plaintiff's "Ears: canals, drums, hearing (whispered voice)" were "normal." *Id.* ¶¶ 49, 51 (citing Bernstein Decl. C at 14). To conduct a whispered voice hearing test, Zachariah stood five feet from the patient, whispered a number, and asked Plaintiff to repeat the number. *Id.* ¶ 53 (citing Zachariah Decl. ¶ 19).

On December 10, 2015, Plaintiff submitted a Sick Call Request noting that he "can't feel [his] feet." *Id.* ¶ 61 (citing Bernstein Decl. Ex. C at 51). After the request was received, Plaintiff was notified that he should report to the Jail's medical clinic on December 14, 2020. *Id.* ¶ 64 (citing Zachariah Decl. ¶ 26). On December 14, 2015, Plaintiff did not report to the Jail's clinic and Zachariah noted "Patient refused to come to

clinic on 12/14/15." *Id.* ¶¶ 65–66 (citing Bernstein Decl. Ex. C at 51). Zachariah had no further involvement in Plaintiff's medical care. *Id.* ¶ 70 (citing Zachariah Decl. ¶ 3).

**\*3** On December 20, 2015, Plaintiff submitted a Sick Call Request noting that "Ear is hurt[ ] badle [sic]." *Id.* ¶ 71 (citing Bernstein Decl. Ex. C at 50). Nurse Emma Mahabir saw Plaintiff and noted that she "Gave 2 Tylenol" and that Plaintiff "wanted to see MD for further eval[uation]." *Id.* ¶ 72 (citing Bernstein Decl. Ex. C at 50).

On December 27, 2015, Plaintiff submitted a Sick Call Request noting "cannot hear out of my left ear. Also no feeling in my feet are [sic] my hands. Also have very bad heartburn." *Id.* ¶ 73 (citing Bernstein Decl. Ex. C at 49). Two days later, Plaintiff was examined by Dr. Costley who noted that Plaintiff complained of decreased hearing in his left ear, but that Plaintiff's eardrums appeared normal. *Id.* ¶¶ 76–78 (citing Bernstein Decl. Ex. C at 28).

On January 1, 2016, Shinder examined Plaintiff and noted that Plaintiff stated that since December 2, 2015 the hearing in his left ear had been decreasing and he had been experiencing headaches and earaches. *Id.* ¶ 81 (citing Doc. 226 "Shinder Decl." ¶ 4). After examining Plaintiff, Shinder noted that the hearing in Plaintiff's right ear was "OK," Plaintiff's ears were "OK," and concluded that Plaintiff has "questionable decreased hearing." *Id.* ¶¶ 83–85 (citing Shinder Decl. ¶ 6).

On January 10, 2016, Plaintiff submitted a Sick Call Request noting: "My ear and head is hurting really badly." *Id.* ¶ 86 (citing Bernstein Decl. Ex. C at 48). Shinder examined Plaintiff on January 12, 2016. *Id.* ¶ 88 (citing Shinder Decl. ¶ 11). During the examination, Plaintiff told Shinder he was "hearing a little better." *Id.* ¶ 90 (citing Shinder Decl. ¶ 11). Petranker was also present during Plaintiff's January 12, 2016 examination. *Id.* ¶ 113 (citing Doc. 227 ("Petranker Decl.") at 11). Plaintiff remembers Petranker stating that Plaintiff did not need to see a neurologist. Pl. Dep. 51:23–52:4. Petranker denies she made such a statement, but, in any event, Shinder believed that Plaintiff should see a neurologist and referred Plaintiff to the Westchester Medical Center clinic. Petranker 56.1 ¶¶ 114–15 (citing Petranker Decl. ¶ 11).

On January 14, 2016, Shinder examined Plaintiff again. *Id.* ¶ 94 (citing Shinder Decl. ¶ 15). During this examination, Plaintiff did not complain about his hearing. *Id.* ¶ 95 (Shinder Decl. ¶ 15).

On January 15, 2016, Plaintiff submitted a Sick Call Request noting "Head is hurt badly. Need to go outside to see outside doctor regarding this issue." *Id.* ¶ 96 (citing Bernstein Decl. Ex. C at 46). Shinder examined Plaintiff on January 19, 2016. *Id.* ¶ 99 (citing Bernstein Decl. Ex. C at 30). Plaintiff did not complain about his ears or hearing during the examination and Shinder did not make any notes related to Plaintiff's ears or his hearing. *Id.* ¶¶ 99–101 (citing Bernstein Decl. Ex. C at 30).

On January 25, 2016, and as a result of Shinder's January 10, 2016 referral, Plaintiff was examined by a neurologist at Westchester Medical Center. *Id.* ¶ 102 (citing Bernstein Decl. Ex. C at 55). Plaintiff's Westchester Medical chart does not reflect any complaints about Plaintiff's hearing and notes "[patient] deaf or difficulty hearing? No." *Id.* ¶¶ 103–05 (citing Bernstein Decl. Ex. E at 12).

On January 28, 2016, Shinder prescribed Plaintiff medication for his continuing headaches. *Id.* ¶ 108 (citing Shinder Decl. ¶ 24). Thereafter, Shinder had no further involvement in Plaintiff's medical care. *Id.* ¶ 110 (citing Shinder Decl. ¶ 26).

**\*4** On September 6, 2016, Plaintiff submitted a Sick Call Request and Plaintiff was evaluated by Handler who determined that Plaintiff had an ear infection in his right ear. Handler 56.1 ¶ 8 (citing Pl. Dep. at 98:18–100:1). Plaintiff informed Handler that he had been using a pencil and tissue paper to clean his ears and Handler advised Plaintiff not to stick foreign objects in his ear. *Id.* (citing Bernstein Decl. Ex. C at 32). Plaintiff states that he was examined by Handler "several times," but does not provide any evidence of other examinations by Handler. *See* Pl. Opp'n at 12.

On December 14, 2016, Plaintiff went for an auditory examination at Downstate Correctional Facility. Petranker 56.1 ¶ 116 (citing Bernstein Decl. Ex. F at 2). Plaintiff's right ear was assessed as possessing "mild sensorineural hearing loss" while his left ear was measured as "within normal limits." *Id.* ¶ 117 (citing Bernstein Decl ¶ 59). Plaintiff's overall hearing loss was assessed as "HL30 (hearing loss/non-significant)." *Id.* ¶ 118 (citing Bernstein Decl. Ex. F at 2).

Plaintiff was later transferred to the Adirondack Correctional Facility, and, on March 1, 2017, Plaintiff wrote a letter to Dr. Canfield regarding his hearing issues. *Id.* ¶¶ 119–20 (citing Bernstein Decl. Ex. G). Plaintiff states in the letter that he saw a doctor around February 24, 2017 and the doctor reported that Plaintiff "ha[s] a mild hearing los[s] in [his] right ear, and that [his] levels must be a little lower to receive a hearing aid."

*Id.* ¶ 121 (citing Bernstein Decl. Ex. G). Plaintiff also stated in the letter that he "can hear a person close up face to face when they talking to me, but when they are more [than] 20 feet away from me I cannot hear them at all, and when there are other people are [sic] speaking [I] cannot hear anything." Bernstein Decl. Ex. G. Plaintiff requested Dr. Canfield give him a hearing aid. *Id.*

Between August 15, 2017 and August 7, 2018, Plaintiff's hearing was tested four additional times. Petranker 56.1 ¶¶ 125–33. Test results consistently showed that Plaintiff has mild hearing loss in his right ear and that the hearing in his left ear was within normal limits. *Id.*

Based on a review of medical records related to Plaintiff's hearing, Jill Bernstein, Defendants' expert and a board-certified audiologist, found that "[a]udiological testing established that Plaintiff had insignificant hearing loss in one ear and the other [ear] was within normal limits" and that "Plaintiff did not have a significant hearing deficit requiring a hearing aid device." Bernstein Decl. ¶ 6. Bernstein concluded that "Plaintiff's hearing complaints cannot be addressed by a hearing aid." Petranker 56.1 ¶ 137 (citing Bernstein Decl. Ex. H). Bernstein found also that Plaintiff's auditory examinations "suggest[ ] there is a strong possibility that [Plaintiff] was intentionally exaggerating his hearing difficulty" and that this "may have been an attempt to display a hearing loss that meets hearing aid qualifications." Bernstein Decl. Ex. H.

## II. Plaintiff's History Filing Grievances

On December 2, 2015, the Jail provided Plaintiff with a handbook of inmate rules and regulations, which provides instructions on what procedures an inmate must follow to file a grievance. Petranker 56.1 ¶¶ 138–39 (citing Doc. 228 ("Byron Decl.") Ex. B at 20). On January 12, 2016, Plaintiff filed a grievance related to the Jail's failure to schedule an appointment for Plaintiff with a neurologist. *Id.* ¶ 142 (citing Byron Decl. Ex. A at 6 [4]). Specifically, regarding the action requested by Plaintiff, he stated "[t]o go to a neurologist[ ] so I can find out what wrong [sic] with my body." Byron Decl. Ex. A at 6. Plaintiff also stated in his grievance that he "can't hear anything in my left ear at all." Petranker 56.1 ¶ 143 (citing Byron Decl. Ex. A at 6). Lt. Byron investigated Plaintiff's grievance, and, after learning that a neurology appointment had been scheduled, Lt. Byron denied Plaintiff's grievance. *Id.* ¶¶ 145–49 (citing Byron Decl. Ex. A at 4). Plaintiff appealed the denial of the grievance. *Id.* ¶ 150 (citing Byron Decl. Ex. A at 2). Plaintiff's grievance was sustained by Chief

Anthony Volpe who stated "[t]he facility medical department scheduled an appointment for the grievant to be seen by a neurologist. The date and time of that appointment will not be given to the grievant due to security concerns." *Id.* ¶ 151 (citing Byron Decl. Ex. A at 3). Plaintiff did not thereafter indicate whether he wished to further appeal the grievance to the New York State of Corrections Citizen's Policy and Complaint Review Counsel. *Id.* ¶ 152 (citing Byron Decl. ¶ 15). As such, the grievance was deemed abandoned and marked "denied." *Id.* ¶ 153 (citing Byron Decl. ¶ 153). Plaintiff claims that the Jail "did not address all of the issues raised in Plaintiff's [January 12, 2016] grievance," but does not indicate what was not addressed. Pl. Opp'n at 6. [5]

[4]     Page numbers for Byron Decl. Ex. A correspond to the page numbers assigned by PACER.

[5]     Plaintiff has combined his two opposition briefs and exhibits into a single filing. Accordingly, the page numbers correlate to the page numbers assigned by PACER.

**\*5** Plaintiff produced to Defendants during discovery a second grievance form dated February 20, 2016. Petranker 56.1 ¶ 155 (citing Byron Decl. Ex. C). According to Defendants, the grievance form was never received by Jail staff and Defendants believe that the February 20, 2016 grievance is not genuine as it appears that the Plaintiff's inserted grievance was written over an unrelated grievance form as apparently evidenced by the faded and illegible writing of the earlier grievance. *Id.* ¶ 157 (citing Byron Decl. ¶ 19). Plaintiff states in this February 20, 2016 grievance that his "ear is hurting," that he "need[s] to see ear doctor," and that "[he] need[s] to see ear [sic] for my hearing impaired ear." Byron Decl. Ex. C. Plaintiff asserts that the February 20, 2016 grievance was properly filed and that video footage, which was allegedly requested but not disclosed in discovery, would show that the grievance was picked up by an officer collecting mail in the intake housing unit. Pl. Opp'n at 6–7.

## STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence

2020 WL 4750294

is such that a reasonable jury could return a verdict for the nonmoving party.' " *Liverpool v. Davis*, No. 17-CV-3875, 2020 WL 917294, at *4 (S.D.N.Y. Feb. 26, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). " 'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). The task is material issue spotting not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 2020 WL 917294, at * 4 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. Simply put, movant must establish that the law favors the judgment sought. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to raise an issue of material fact with respect to an essential element of her[ ] claim, the District Court properly granted summary judgment dismissing that claim.").

## ANALYSIS

**\*6** Plaintiff's sole remaining claim, brought pursuant to 42 U.S.C. § 1983, alleges that Jail officials failed to provide adequate medical care and were deliberately indifferent to Plaintiff's serious medical needs (i.e. his hearing loss). *See* Op. & Order at 25. Defendants seek summary judgment and dismissal of Plaintiff's claim because there are no factual issues in dispute and no evidence in the record that would permit a reasonable fact finder to conclude that Plaintiff can satisfy the requirements for a deliberate indifference claim under the Fourteenth Amendment. Because the Court finds that there is no genuine issue of fact in dispute regarding whether Plaintiff can satisfy the objective prong of his Fourteenth Amendment deliberate indifference claim, and the Court finds that Defendants are entitled to judgment as a matter of law, Defendants' summary judgment motions are granted.[6]

> [6]    Defendants argue also that Plaintiff failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA") and seek summary judgment on that basis. Because the Court finds that Plaintiff's Fourteenth Amendment claim fails as a matter of law, the Court does not address whether Plaintiff properly exhausted his administrative remedies under the PLRA as it is superfluous to the Court's ultimate conclusion that Plaintiff did not suffer a constitutional violation.

At the time of the alleged misconduct, Plaintiff was a pretrial detainee. Petranker 56.1 ¶ 24 (noting that Plaintiff was a pretrial detainee at the Jail from December 2, 2015 until November 29, 2016). "A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citing *Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003)). Jail officials may be found liable for violating a pretrial detainees' due process rights "if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Boomer v. Lanigan*,

No. 00-CV-5540, 2002 WL 31413804, at *6 (S.D.N.Y. Oct. 25, 2002) (quoting *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir. 1996)); *see also Adamson v. Miller,* 808 F. App'x 14, 18 (2d Cir. 2020) (holding that, to prevail on a Fourteenth Amendment deliberate indifference claim, a plaintiff must prove "(1) that the alleged deprivation [of medical treatment] 'pose[d] an unreasonable risk of serious damage to his health,' and (2) 'that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed.' " (quoting *Darnell,* 849 F.3d at 30, 35.)). Thus, to prevail on a Fourteenth Amendment claim alleging inadequate medical care, a plaintiff must prove an objective prong and a subjective prong.

As to the objective prong, a plaintiff must demonstrate that "the inadequacy in medical care is sufficiently serious." *Salahuddin,* 467 F.3d at 280. "If the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir. 2003)). While there is no "precise metric" to determine whether a prisoner's medical needs are sufficiently serious, the Second Circuit's standard "contemplates a condition of urgency that may result in degeneration or extreme pain." *Bellotto,* 248 F. App'x at 234 (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998) (internal citations omitted)). The Court, when determining whether a condition is sufficiently serious "considers all relevant facts and circumstances, including whether a reasonable doctor or patient would consider the injury worthy of treatment; the impact of the ailment upon an individual's daily activities; and, the severity and persistence of pain." *Chavis v. vonHagn,* No. 02-CV-0119, 2009 WL 236060, at *43 (W.D.N.Y. Jan. 30, 2009) (citing *Chance,* 143 F.3d at 702). If, alternatively, the plaintiff alleges that "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." *Salahuddin,* 467 F.3d at 280. For example, if "the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Id.* (quoting *Carpenter,* 316 F.3d at 185).

**\*7** Here, Plaintiff alleges that Defendants did not "timely treat[ ]" his "loss of hearing." SAC ¶¶ 1–2; *see also id.* ¶ 378 ("Plaintiff's rights were violated pursuant to the ... Fourteenth Amendment in that he was delayed and denied adequate

timely medical care."). Therefore, the Court's seriousness inquiry focuses not only on the seriousness of Plaintiff's hearing loss, but also the seriousness of any lack in treatment provided to Plaintiff.

Plaintiff's Fourteenth Amendment claim fails at the first step of this inquiry as there is no genuine material fact in dispute regarding Plaintiff's hearing ability and no evidence in the record establishing that Plaintiff's hearing loss was sufficiently serious so that the failure to treat the hearing loss rises to the level of a constitutional violation. Simply stated, Plaintiff does not have a "serious medical need" concerning his hearing and therefore no constitutional violation can lie for failure to treat Plaintiff's hearing loss. Indeed, the facts show that Plaintiff's moderate hearing loss was consistently and repeatedly treated over a two-and-a-half-year period.

The loss of hearing can form the basis of a Fourteenth Amendment due process violation claims because the "ability to hear is 'a basic human need affecting daily activity and sufficiently serious to warrant treatment by physicians.' " *Rennalls v. Alfredo,* No. 12-CV-5300, 2015 WL 5730332, at *11 (S.D.N.Y. Sept. 30, 2015) (quoting *Rosales v. Fischer,* No. 07–CV–10554, 2009 WL 928260, at *12 (S.D.N.Y. Mar. 31, 2009)). However, a plaintiff's hearing loss that is mild or not significant, does not rise to the level of a "serious medical need" and trigger constitutional protections. *See, e.g., Fate v. Goord,* No. 11-CV-7493, 2012 WL 3104884, at *6 (S.D.N.Y. July 31, 2012) (finding that "[w]hile loss of hearing may be sufficiently serious, [plaintiff] has only alleged HL30 non-significant hearing loss" and therefore plaintiff failed to satisfy objective prong of deliberate indifference test); *Smith v. Masterson,* 538 F. Supp. 2d 653, 659 (S.D.N.Y. 2008), *aff'd,* 353 F. App'x 505 (2d Cir. 2009) (granting summary judgment because the "record has established that Smith has normal hearing" and therefore plaintiff failed to satisfy the objective prong of a deliberate indifference claim); *see also Chavis,* 2009 WL 236060, at *43 (W.D.N.Y. Jan. 30, 2009) (finding Plaintiff failed to satisfy the objective prong of Fourteenth Amendment violation because "plaintiff offers nothing more than bald, conclusory allegations that he suffered from an extremely painful ear infection and further, that the ear infection resulted in a temporary (two week) loss of hearing" and granting summary judgment to defendants).

Here, there is no factual dispute regarding Plaintiff's hearing loss. The record establishes that Plaintiff's hearing loss is non-significant and cannot be aided by hearing aids. Plaintiff received an initial auditory examination at Downstate

Correctional Facility on December 14, 2016. Petranker 56.1 ¶ 116. The examination revealed that Plaintiff's right ear had "mild sensorineural hearing loss" and the hearing in Plaintiff's left ear was "within normal limits." *Id.* ¶ 117 (citing Bernstein Decl. Ex. F at 12). Overall, Plaintiff's hearing loss was classified as "HL30 (Hearing Loss/Non-Significant." *Id.* ¶ 118 (Citing Bernstein Decl. Ex. F at 1). On March 1, 2017, after Plaintiff was transferred to the Adirondack Correctional Facility, Plaintiff wrote a letter to a physician at the facility and stated that he saw a doctor "around about 2/24/17 regarding my hearing issue. The doctor explained to me that I have a mild hearing lost [sic] in my right ear, and that my levels must be a little lower to receive a hearing aid." *Id.* ¶¶ 119–21 (citing Bernstein Decl. Ex. G). On August 15, 2017, Plaintiff was examined by an audiologist at the Clinton Correctional Facility. *Id.* ¶ 125. The audiologist's report notes that the audiologist was unable to obtain a reliable audiogram, but that Plaintiff was able to communicate with the audiologist without issue and had "reliable normal hearing." *Id.* ¶¶ 125–26 (citing Bernstein Decl. Ex. F at 10). At the August 15, 2017 examination, Plaintiff's hearing continued to be classified as "HL30 (Hearing Loss/Non-Significant)." *Id.* ¶ 127 (citing Bernstein Decl. Ex. F at 13). On March 13, 2018, Plaintiff was examined by an audiologist at the Upstate University Health System. *Id.* ¶ 128. The audiologist noted that Plaintiff's speech thresholds were suggestive of mild hearing loss on the right side, and that the hearing in Plaintiff's left ear was within normal limits. *Id.* ¶ 129 (citing Bernstein Decl. Ex. F at 6–8). On May 15, 2018, an audiogram was attempted at Midstate Correctional Facility but, due to inconsistent test results, the audiologist concluded that he could not make a recommendation regarding Plaintiff's hearing. *Id.* ¶¶ 130–31 (citing Bernstein decl. Ex. F at 5). On August 7, 2018, Plaintiff again received an audiogram at Midstate Correctional Facility. *Id.* ¶ 132. Testing revealed "normal hearing sensitivity for the left ear" and "moderate[ly] decreased" hearing in the right ear. *Id.* ¶¶ 132–33 (citing Bernstein Decl. Ex. F at 3).

**\*8** Based on a review of Plaintiff's medical records, Defendants' expert, Jill Bernstein, a board-certified audiologist, concluded that "Plaintiff did not have a significant hearing deficit requiring a hearing aid device. Audiological testing established that Plaintiff had insignificant hearing loss in one ear and the other was within normal limits." Bernstein Decl. ¶ 6; *see also generally* Bernstein Decl. Ex. H.

Furthermore, it is uncontested that the degree of Plaintiff's hearing does not qualify him for New York State Medicaid hearing aid coverage and, following the State of New York Workers' Compensation Board Record of Percentage Hearing Loss calculation, Plaintiff has a 0% hearing loss in both ears. Bernstein Decl. Ex. H. Finally, during Plaintiff's July 22, 2019 deposition, Plaintiff was not wearing a hearing aid but appeared to understand the questions posed to him by opposing counsel and did not ask for any question to be repeated due to difficulty hearing. Petranker 56.1 ¶ 135 (citing Pl. Dep. at 84, 106-107).

Regarding the objective prong of the deliberate indifference test, in his opposition brief, Plaintiff primarily focuses on the various times in which he complained to prison officials that he had hearing loss. *See* Pl. Opp'n at 10–11, 31–32. Plaintiff does state that when he was first examined by an audiologist in December 2016, he "was told he had permanent hearing loss." *Id.* at 10, 31. Plaintiff does not cite to any evidence in support of this assertion. Plaintiff argues that this establishes "as a matter of law" that he "satisf[ies] the objective prong for his claim for deliberate indifference." *Id.* at 11, 32. Resolving all ambiguities and drawing all reasonable inferences in the non-movant's favor, as the Court must at the summary judgment stage, Plaintiff appears to be referring to the initial auditory examination he received on December 14, 2016 at Downstate Correctional Facility. *See* Petranker 56.1 ¶ 116. This exam revealed that Plaintiff's right ear had mild loss, Plaintiff's left ear was "within normal limits," and Plaintiff's overall hearing loss was classified as "non-significant." *Id.* ¶¶ 117–18 (citing Bernstein Decl. Ex. F at 1, 12). The record reveals that Plaintiff's ears were tested five more times between February 27, 2017 and August 7, 2018. None of these examinations indicate that Plaintiff has serious hearing loss or is in need of a hearing aid.

Plaintiff's assertion that he needs a hearing aid, unsupported by evidence in the record, is insufficient to defeat summary judgment for a deliberate indifference to medical needs claim. *See Scheckells v. Goord,* 423 F. Supp. 2d 342, 347–48 (S.D.N.Y. 2006) (holding that where evidence established that Plaintiff did not suffer from an otherwise serious medical need, "plaintiff's unsupported, layman's claim that the tests must be wrong is not sufficient to raise a material issue of fact." (citing *O'Connor v. Pierson,* 426 F.3d 187, 202 (2d Cir. 2005))); *see also Green v. Senkowski,* 100 Fed. App'x 45 (2d Cir. 2004) (finding that plaintiff's self-diagnosis unsupported by medical evidence, and contrary to the medical evidence on record, was insufficient to defeat summary

judgment in a deliberate indifference claim). A plaintiff's mere "[d]isagreement over the proper treatment does not rise to the level of a constitutional violation." *Doe v. Goord*, No. 04-CV-00570, 2006 WL 1041130, at *3 (S.D.N.Y. Apr. 18, 2006). While Plaintiff asserts that his hearing loss should have been treated differently by Jail officials, Plaintiff offers only bald, conclusory statements that the treatment he received was insufficient and offers no expert opinion to rebut the opinion of Defendants' expert that his degree of hearing loss was insufficient to require hearing aids. "[T]he fact that a prisoner might prefer a different treatment does not give rise to [a Fourteenth Amendment] violation." *Chance*, 143 F.3d at 703 (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)).

**\*9** There is simply no evidence in the record from which the Court can conclude that there is a factual dispute regarding the severity of Plaintiff's hearing loss. The record establishes that Plaintiff had mild hearing loss in his right ear and no hearing loss in his left ear. The scant documentary proof Plaintiff offers in support of his opposition to Defendants' summary judgment motions are medical records and sick call requests primarily related to medical issues and injuries unrelated the Plaintiff's alleged hearing loss. *See* Pl. Opp'n at 39–47. Plaintiff offers no evidence to rebut Defendants' assertion that his level of hearing loss is not significant enough to warrant hearing aids or additional treatment.

Plaintiff does not dispute that he received some medical care related to his hearing loss and therefore the Court considers not only the seriousness of Plaintiff's underlying medical condition but the seriousness in any delay in treating the condition. *See Salahuddin*, 467 F.3d at 280. The record reveals that the Defendants had limited involvement in Plaintiff's treatment. Zachariah treated Plaintiff on two occasions: December 3 and 7, 2015. *See* Petranker 56.1 ¶¶ 33, 47. The first time Zachariah treated Plaintiff it was because Plaintiff had lost consciousness. *Id.* ¶ 33. The second time, Zachariah conducted a physical examination during which Plaintiff did not complain about hearing difficulty, and yet, Zachariah nonetheless checked Plaintiff's ears and found them to be "normal." *Id.* ¶¶ 47–54. Shinder treated Plaintiff on four occasions: January 1, 12, 14, and 19, 2016. *Id.* ¶¶ 80, 94. During the January 1, 2016 examination, Shinder checked Plaintiff's ears and noted that they were "OK." *Id.* ¶¶ 82–83. During the January 12, 2016 examination, Plaintiff reported "that his hearing was improving but he was still having headaches." *Id.* ¶¶ 88–89. During the January 14, 2020 examination, Plaintiff did not complain about his hearing. *Id.* ¶¶ 94–95. During the January 19, 2016 examination, Plaintiff

again did not complain about his hearing. *Id.* ¶¶ 99–101. Petranker, who is not a treating medical provider at the Jail, was present for Plaintiff's January 12, 2016 examination. *Id.* ¶¶ 15, 113. During this single interaction with Plaintiff, Petranker allegedly stated that Plaintiff did not need to see a neurologist, which was overruled by Shinder, and Plaintiff was seen by a neurologist on January 15, 2016. *Id.* ¶¶ 114–15. Handler examined Plaintiff on one occasion: September 7, 2016. Handler 56.1 ¶ 8. During this examination, Handler treated Plaintiff for a right earache, diagnosed Plaintiff with a middle ear infection, and prescribed Plaintiff medication. *Id.*

Overall, Plaintiff was treated by medical professionals at the Jail or outside facilities for his reported medical conditions at least thirteen times between his admission to the Jail and his transfer to Downstate Correctional Facility. Furthermore, after Plaintiff left the Jail, he was examined by an audiologist on six separate occasions between December 14, 2016 and August 7, 2018. Plaintiff received significant, repeated, and regular medical treatment; and therefore the Court cannot conclude there was any delay—let alone serious delay—in treating Plaintiff's medical needs.

Because there is no factual dispute regarding whether Plaintiff's allegedly untreated hearing loss can be classified as a "serious medical need" and there was no delay in treating Plaintiff's hearing loss, the Court finds, as a matter of law, that Plaintiff cannot satisfy the objective prong of his deliberate indifference claim. No purpose would be served by considering the remaining element of Plaintiff's claim— whether any Defendant acted intentionally or recklessly—as this analysis could not resurrect the fatal and undisputed flaw of Plaintiff's lack of serious medical condition. Accordingly, the Court grants Defendants' motions for summary judgment.

## CONCLUSION

**\*10** Based on the foregoing, Defendants' motions for summary judgment are GRANTED.

The Clerk is respectfully instructed to terminate the pending motions (Docs. 215 and 223) and close this case.

**SO ORDERED.**

### All Citations

Slip Copy, 2020 WL 4750294

2020 WL 4750294

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2007 WL 2580509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jose J. SHOMO, Plaintiff,

v.

State of NEW YORK DEPARTMENT OF
CORRECTIONAL SERVICES; Correctional
Medical Services, Inc.; et al., Defendants.

No. 9:04–CV–0910 (LEK/GHL).
|
Sept. 4, 2007.

**Attorneys and Law Firms**

Jose J. Shomo, Alden, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, David M. Finkelstein, Esq., Assistant Attorney General, of Counsel, Albany, NY, for State Defendants.

Thuillez, Ford, Gold, Butler & Young, LLP, Debra J. Young, Esq., Kelly M. Monroe, Esq., of Counsel, Albany, NY, for Corporate Defendants.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1**  This matter comes before the Court following a Report–Recommendation filed on August 6, 2007, by the Honorable George H. Lowe, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report–Rec. (Dkt. No. 89). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by the Jose J. Shomo, which were filed on August 10, 2007. Objections (Dkt. No. 90).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record

and has determined that the Report–Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby
**ORDERED,** that the Report–Recommendation (Dkt. No. 89) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt.Nos.72, 73) is **GRANTED;** and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED IN ITS ENTIRETY, WITH PREJUDICE;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### *ORDER and REPORT–RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for the Northern District of New York. In this *pro se* civil rights action brought under 42 U.S.C. § 1983, Inmate Jose J. Shomo ("Plaintiff") alleges that, between January 4, 2001, and July 22, 2004, while he was incarcerated by the New York State Department of Correctional Services ("DOCS") —mostly at Coxsackie Correctional Facility ("Coxsackie C.F.") and Mohawk Correctional Facility ("Mohawk C.F.") —sixteen employees of DOCS ("State Defendants")[1] and four employees of Correctional Medical Services, Inc. ("Corporate Defendants")[2] were deliberately indifferent to his serious medical needs and denied him adequate accommodation for his disabilities, thus violating his rights under, *inter alia,* (1) the Eighth Amendment to the United States Constitution, (2) the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), (3) the Rehabilitative Act of 1973, 29 U.S.C. § 794 ("RA"), and (4) various federal civil rights statutes, including 42 U.S.C. § 1981. (Dkt. No. 1.) Currently before the Court are the State Defendants' motion for summary judgment (Dkt. No. 72)

2007 WL 2580509

and the Corporate Defendants' motion for summary judgment (Dkt. No. 73). For the reasons discussed below, I recommend that both motions are granted.

1      Specifically, the sixteen individual State Defendants are as follows: (1) DOCS Commissioner Glenn S. Goord; (2) DOCS Deputy Commissioner and Chief Medical Officer Lester N. Wright; (3) DOCS Deputy Commissioner Stephen M. Bernardi; (4) DOCS Americans with Disabilities Coordinator Donna M. Masterson; (5) Coxsackie C.F. Superintendent Gary H. Filion; (6) Coxsackie C.F. Deputy Superintendent of Health Services Joan Smith; (7) Mohawk C.F. Superintendent Kenneth S. Perlman; (8) Mohawk C.F. Deputy Superintendent of Health Services Joan Rosado; (9) Mohawk C.F. Chief Medical Physician Y.D. Sharma; (10) Mohawk C.F. Physician Zaki; (11) Mohawk C.F. Director of Nursing Judith Antonsen; (12) Mohawk C.F. Nurse Administrator J. Nallenbach; (13) Mohawk C.F. Registered Nurse J. Harris; (14) Mohawk C.F. Registered Nurse F. Rockhill; (15) Mohawk C.F. Occupational Therapist D. Connarton; and (16) Mohawk C.F. Dietitian C. Onley. (Dkt. No. 1).

2      Specifically, the four individual Corporate Defendants are as follows: (1) Coxsackie Regional Medical Unit Chief Physician Kirk Hochstetler; (2) Coxsackie Regional Medical Unit Nurse Practitioner Patricia Gardella; (3) Coxsackie Regional Medical Unit Director of Nursing Kathy Allen; and (4) Coxsackie Regional Medical Unit Nurse Administrator Valerie Memheart. (Dkt. No. 1.)

## I. LEGAL STANDARD

### A. Motion for Summary Judgment

**\*2** Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material[3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[4]

3      A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

4      *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).[5] The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."[6] "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[7]

5      *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87 (1986).

6      *Matsushita,* 475 U.S. at 585–86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986).

7      *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at *8 (W.D.N . Y. March 29, 2004) [internal quotations omitted] [emphasis added].

When deciding a motion for summary judgment, the facts set forth in a movant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record[8] and are not specifically controverted by the non-movant.[9] Once a movant has filed a Rule 7.1 Statement, the opposing party must file a Rule 7.1 Response.[10] This Rule 7.1 Response "shall mirror the movant's [Rule 7.1 Statement] by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."[11] A district court has no duty to perform an independent review of the record to find proof of a factual dispute.[12] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[13]

8      *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004)

Shomo v. New York Dept. of Correctional Services, Not Reported in F.Supp.2d (2007)

2007 WL 2580509

("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. American Honda Motor Co., Inc.,* 00–CV–1619, 2002 U.S. Dist. LEXIS 4386, at *2–3 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ( "A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

9      *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ).

10     *See* N.D.N.Y. L.R. 7.1(a)(3).

11     (*Id.*)

12     *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04–1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97–CV–1741, 2004 U.S. Dist. LEXIS 20746, at *12–13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04–CV–1144, 2006 U.S. Dist. LEXIS 9147, at *1–4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371–372 (N.D.N.Y.2003) (Hurd, J.).

13     *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

Here, I note that Plaintiff's Complaint is notarized and contains a verification pursuant to 28 U.S.C. § 1746. (Dkt. No. 1, Part 1, at 18.) However, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, not be conclusory. [14] An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too general. [15] Moreover, "[a]n affidavit must not present legal arguments." [16] Finally, even where an affidavit (or verified complaint) is based on personal

knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [17]

14    See Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); Patterson, 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; Applegate, 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

15    See, e.g., Bickerstaff v. Vassar Oil, 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; West–Fair Elec. Contractors v. Aetna Cas. & Sur., 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), cert. denied, 474 U.S. 829 (1985); Applegate, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

16    N.D.N.Y. L.R. 7.1(a)(2).

17    See, e.g., Jeffreys v. City of New York, 426 F.3d 549, 554–555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because

plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; Argus, Inc. v. Eastman Kodak Co., 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); Allah v. Greiner, 03–CV–3789, 2006 WL 357824, at *3–4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); Olle v. Columbia Univ., 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit's application of its Local Rule § 0.23). See, infra, note 24 of this Report–Recommendation.

### B. Revocation of Plaintiff's Special Status as Pro Se Civil Rights Litigant

*3   Imposed over the aforementioned burden-shifting framework is the generous perspective with which the Court generally views a pro se civil rights plaintiff's papers. [18] For example, where a civil rights plaintiff is proceeding pro se,

2007 WL 2580509

and the defendant has filed a dispositive motion, *generally* the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. [19] Moreover, if the non-moving party is proceeding *pro se,* he must be specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment, before those consequences may be imposed. [20] (I note that, here, Plaintiff was so advised by Defendants.) [21] Having said that, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment." [22]

[18]   *See Haines v. Kerner,* 404 U.S. 519, 520–21 (1972) (*per curiam* ) (*pro se* civil rights action); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989) (*pro se* civil rights action); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998) (*pro se* civil rights action), *aff'd in part, vacated in part on other grounds,* 205 F.3d 1324 (2d Cir.2000) (unpublished decision).

[19]   *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

[20]   *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

[21]   (Dkt. No. 72, Part 1.) Plaintiff apparently read the notice, since he subsequently requested (and was granted) two extensions of time in which to respond to Defendants' motion. (Dkt.Nos.76, 78.) Moreover, I note that Plaintiff also received such notice several months before, from the defendants in another action. *See Shomo v.. State of New York,* 04–CV–0707 (N.D.N.Y.) (LEK/DEP) (prisoner civil rights action; Plaintiff specifically advised of consequences of failing to respond to Defendants' motion for summary judgment on 10/30/06).

[22]   *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02–CV– 10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) [citations omitted], *accord, Durran v.*

*Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) [citations omitted]. For example, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S .D.N.Y. Dec. 5, 1994).

In addition, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" or status that is normally afforded *pro se* litigants. [23] Generally, the rationale for this revocation of special status (at least in the Second Circuit) is not that the *pro se* litigant should be punished but that his excessive litigiousness demonstrates his *experience,* the lack of which is the reason for conferring the special status upon *pro se* litigants in the first place. [24] Moreover, permitting experienced *pro se* litigants to retain their special status (despite their litigation experience) would tilt the scales of justice unfairly in favor of the *pro se* litigant and against his opponents. [25] As observed by Judge Irving R. Kaufman, of the Second Circuit, regarding an active *pro se* litigant nearly 45 years ago:

[23]   *Smith v. Burge,* 03–CV–0955, 2006 WL 2805242, at *3 & n. 3 (N.D.N.Y. Sept. 28, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.) [citations omitted].

[24]   *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97–CV–0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report–Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97–CV– 1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report– Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *Edwards v. Selsky,* 04–CV–1054, 2007 WL 748442, at *2–3 (N.D.N.Y. March 6, 2007) (Mordue, C.J., adopting Report–Recommendation of Lowe, M.J.); *Rolle v. Garcia,* 04–CV–0312, 2007 WL 672679, at *4 (N.D.N.Y. Feb. 28, 2007)

(Kahn, J., adopting Report–Recommendation of Lowe, M.J.); *Mora v. Bockelmann,* 03–CV–1217, 2007 WL 603410, at *4 (N.D.N.Y. Feb. 22, 2007) (Mordue, C.J., adopting Report–Recommendation of Homer, M.J.); *Brown v. Goord,* 04–CV–0785, 2007 WL 607396, at *2–3 (N.D.N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report–Recommendation of Lowe, M.J.); *Mitchell v. Harriman,* 04–CV–0937, 2007 WL 499619, at *3 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J., adopting Report–Recommendation of Homer, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 WL 951447, at *3–4 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Gill v. Pidylpchak,* 02–CV–1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, J., adopting Report–Recommendation of Treece, M.J.); *Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *2 (N.D.N.Y. Oct. 18, 2006) (Hurd, J ., adopting Report–Recommendation of Lowe, M.J.); *Gill v. Frawley,* 02–CV–1380, 2006 WL 1742738, at *3 (N.D.N.Y. June 22, 2006) (McAvoy, J., adopting Report–Recommendation of Lowe, M.J.); *Davidson v. Talbot,* 01–CV–0473, 2005 U.S. Dist. LEXIS 39576, at *20 (N.D.N.Y. March 31, 2005) (Treece, M.J.), *adopted by* 2006 U.S. Dist. LEXIS 47554 (N.D.N.Y. July 5, 2006) (Scullin, J.); *Gill v. Riddick,* 03–CV–1456, 2005 U.S. Dist. LEXIS 5394, at *7 (N.D.N.Y. March 31, 2005) (Treece, M.J.); *Yip v. Bd. of Tr. of SUNY,* 03–CV–0959, 2004 WL 2202594, at *3 (W.D.N.Y. Sept. 29, 2004); *Davidson v. Dean,* 204 F.R.D. 251, 257 & n. 5 (S.D.N.Y.2001); *Santiago v. C.O. Campisi,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000); *McGann v. U.S.,* 98–CV–2192, 1999 WL 173596, at *2 (S.D.N.Y. March 29, 1999); *Hussein v. Pitta,* 88–CV–2549, 1991 WL 221033, at *4 (S.D.N.Y. Oct. 11, 1991).

[25]    *Edwards,* 2007 WL 748442, at *2; *Sledge,* 2007 WL 951447, at *3; *see also Hussein,* 1991 WL 221033, at *4 (concluding that experienced *pro se* litigant should no longer be afforded special leniency because continuing to afford him such leniency would be unfair to "numerous attorneys," whose time and energy had already been consumed by plaintiff); Jessica Case, "Pro se Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?" 90 *Ky. L.J.* 701, 735–740 (Spring 2001) (discussing how extending special leniency

to *pro se* litigants in some circumstances "distorts the adversarial system and the role of trial judges") [citing cases]; Julie M. Bradlow, "Procedural Due Process Rights of *Pro se* Civil Litigants," 55 *U. Chi. L.Rev.* 659, 672 (Spring 1988) (discussing how "extending too much procedural leniency to a *pro se* litigant risks undermining the impartial role of the judge in the adversary system") [citations omitted].

He comes before this Court wearing the cloak of a *pro se* applicant, and seeks to extract from us the solicitude ordinarily afforded one appearing without counsel. But this should not shield him from rebuke when merited. He is an intelligent, able and sophisticated litigant, who is no stranger to this Court, having appeared frequently in his own behalf both in the District Court and the Court of Appeals. We would expect that one possessed of his background would be conscious of the outer limits of forceful advocacy and fully aware when his acts transgress those limits. Moreover, we are not to be manipulated by resourceful but meritless moves .... [which] serve only to distract us from important judicial business. [26]

[26]    *Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977) [citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring) ].

Courts relying on the "experience" rationale for revoking a *pro se* litigant's special status look at a variety of factors in assessing whether or not the *pro se* litigant is experienced. Most often, these factors include (1) the number of previous federal court actions filed, (2) the number of previous federal court appeals filed, (3) the number of previous state court actions filed, (4) the number of previous state court appeals filed, and (5) the recency or simultaneity of the actions and/or appeals. [27]

[27]    *See, e.g., Eggersdorf,* 8 F. App'x at 143; *Gummerson,* 201 F.3d at *2; *Flynn,* 32 F.3d at 31; *Frawley,* 2006 WL 1742738, at *3 & n. 2; *Talbot,* 2005 U.S. Dist. LEXIS 39576, at *18–20 & n. 10; *Riddick,* 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3; *Dean,* 204 F.R.D. at 257; *Santiago,* 91 F.Supp.2d at 670; *McGann,* 1999 WL 173596, at *2, 8–10; *McClellan,* 1996 U.S. Dist. LEXIS 8164, at *3–4 & n. 3; *Brown,* 1995 U.S. Dist. LEXIS 213, at *2 n. 1.

**\*4** There is, of course, no formula for determining "How many is too many?" However, *generally,* if a *pro se* litigant

Shomo v. New York Dept. of Correctional Services, Not Reported in F.Supp.2d (2007)

2007 WL 2580509

has filed a dozen or more actions and/or appeals before the date of the decision in question, it is quite possible that he will be deemed to be "experienced." [28] Granted, there are some cases revoking the special status of a *pro se* litigant who has filed *fewer* than a dozen cases. [29] However, there appear to be *more* cases refusing to revoke the special status of a *pro se* litigant who has filed fewer than a dozen cases. [30]

[28] *See, e.g., Eggersdorf,* 8 F. App'x at 143 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had ***twelve*** simultaneously pending lawsuits in Northern District alone); *Gummerson,* 201 F.3d at *2 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had ***twelve*** simultaneously pending lawsuits in Northern District alone); *Talbot,* 2005 U.S. Dist. LEXIS 39576, at *18–20 & n. 10 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed ***twenty*** lawsuits in Northern District alone); *Riddick,* 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed ***twenty*** lawsuits in Northern District alone). Interestingly, this *de facto* "rule of twelve" is consistent with the California Code of Civil Procedure, which declines to extend a reduction in small-claims-court filing fees to those litigants who have filed more than 12 small-claims lawsuits in the state within the previous 12 months. *See* Cal. Civ. Proc. § 116.230 (2006).

[29] *See, e.g., Santiago,* 91 F.Supp.2d at 670 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had ***ten*** lawsuits pending in Southern District); *Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *2 & n. 11 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.) (denying leniency to *pro se* civil rights inmate who had previously filed ***eight*** federal court actions or appeals); *McClellan,* 1996 U.S. Dist. LEXIS 8164, at *3–4 & n. 3 (denying leniency to *pro se* civil rights inmate based on fact that inmate had filed ***seven*** previous lawsuits against prison officials); *Brown,* 1995 U.S. Dist. LEXIS 213, at *2 n. 1 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had ***seven*** lawsuits pending in Western District).

[30] *See, e.g., McEachin v. Faruki,* 03–CV–1442, 2006 WL 721570, at *2 n. 3 (N.D.N.Y. March 20, 2006) (refusing to deny leniency to *pro se* civil rights inmate who had filed ***eleven*** other federal lawsuits since 2000); *Pritchett v. Portoundo,* 03–CV–0378, 2005 WL 2179398, at *2 n. 3 (N.D.N.Y. Sept. 9, 2005) (refusing to deny leniency to *pro se* civil rights inmate who had filed ***eight*** other federal lawsuits since 1996); *Burke v. Seitz,* 01–CV–1396, 2006 WL 383513, at *2 n. 5 (N.D.N.Y. Feb. 13, 2006) (refusing to deny leniency to *pro se* civil rights inmate who had filed ***six*** other federal lawsuits in previous nine years); *Ariola v. Onondaga County Sheriff's Dept.,* 04–CV–1262, 2007 WL 119453, at *3 (N.D.N.Y. Jan. 10, 2007) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.) (refusing to deny leniency to *pro se* civil rights inmate who had previously filed ***five*** actions or appeals in federal or state court); *Smith,* 2006 WL 2805242, at *3 & n. 4 (refusing to deny leniency to *pro se* civil rights inmate based on his filing of ***five*** other lawsuits); *Abbas v. Senkowski,* 03–CV–0476, 2005 WL 2179426, at *2 n. 4 (N.D.N.Y. Sept. 9, 2005) (continuing to afford special status to *pro se* litigant despite his litigation experience due to his having filed ***three*** other federal actions since 1997); *Loren v. Feerick,* 97–CV–3975, 1997 WL 441939, at *1 & n. 9 (S.D.N .Y. Aug. 6, 1997) (continuing to afford special status to *pro se* litigant despite his litigation experience due to his having filed ***three*** previous actions in state court regarding current matter, and two previous actions in district court regarding current matter).

One reason for this array of cases is that, in determining whether or not a *pro se* litigant is "experienced," courts sometimes consider additional factors, such as (1) the quality of the *pro se* litigant's submissions to the Court (e.g., whether they are typed, cogent, supported by applicable affidavits, exhibits, and/or memoranda of law, etc), [31] (2) whether or not the *pro se* litigant has been victorious (or partially victorious) in any of his previous actions or appeals, [32] and (3) whether or not the *pro se* litigant has received sufficient formal legal training to familiarize him with legal procedure and terminology. [33]

31    *See, e.g., Saunders,* 2006 WL 3051792, at *2
(in deciding whether *pro se* plaintiff should be
denied special solicitude, considering the fact that,
among other things, "with regard to the current
action, ... the motion papers that [p]laintiff has
submitted over the past several years have often
been fairly good—being typed, being accompanied
by affidavits, and containing legal memoranda,
exhibits, etc.").

32    *See, e.g., Saudners,* 2006 WL 3051792, at *2
(in deciding whether *pro se* plaintiff should be
denied special solicitude, considering the fact that
plaintiff had settled two of his previous six federal
court actions, receiving $25,000 in exchange for
his agreement to voluntarily dismiss the actions,
and the fact that some of plaintiff's motions in his
many actions have been granted); *Ab v. Sekendur,*
03–CV–4723, 2004 WL 2434220, at *5 (N.D.Ill.
Oct. 28, 2004) (considering, during decision of
whether *pro se* plaintiff should be denied leniency
normally afforded inexperienced *pro se* litigants,
fact that "[plaintiff's] has successfully applied for
and received ... [a] patent, and as the record
in this case indicates, he engaged in lengthy
business negotiations with Anoto and various other
corporations").

33    *See, e.g., Walker v. Suburban Hosp. Ass'n,* No.
90–1506, 1991 U.S.App. LEXIS 4049, at *3, n.
2 (4th Cir. March 13, 1991) ("Walker us not due
the lenient treatment accorded pro se litigants.
Walker has ... a law degree.... Certainly, the policies
underlying the Court's admonitions to accord pro se
litigants an understanding view of their pleadings
and conduct do not have force in this context.");
*Heimbaugh v. San Francisco,* 591 F.Supp. 1573,
1577 (N.D.Cal.1984) ("While plaintiff appears
[pro se], he is schooled in the law, having recently
completed law school .... There is every reason to
hold him to the certification he made by signing
the pleadings he has filed in this action."); *Pham
v. U.S .,* 317 F.3d 178, 186–188 (2d Cir.2003)
(relying on fact that *pro se* prisoner was "not
trained in the law," and that he was "untutored,"
when explaining reason for extending him special
solicitude under the circumstances); *Iwachiw v.
N.Y. City Bd. of Educ.,* 2007 U.S. Dist. LEXIS
8040, at *12 (E.D.N.Y. Feb. 5, 2007) ("This policy

of liberally construing pro se submissions is driven
by the understanding that implicit in the right
of self-representation is an obligation on the part
of the court to make reasonable allowances to
protect pro se litigants from inadvertent forfeiture
of important rights because of their lack of legal
training.") [internal quotation marks and citations
omitted]; *cf.* John C. Rothermich, "Ethical and
Procedural Implications of "Ghostwriting" for
*Pro Se* Litigants: Toward Increased Access to
Civil Justice," 67 *Fordham L.Rev.* 2687, 2697
(Apr.1999) (arguing that, when the papers of a *pro
se* litigant are "ghostwritten" by a legal assistant,
the "special leniency" normally afforded to *pro
se* litigants is "unwarranted") [citations omitted],
*accord, Saunders,* 2006 WL 3051792, at *2, n .15.

Here, Plaintiff has filed at least 10 other federal and state
court actions and appeals. [34] Eight of those actions or appeals
involved claims of torts or civil rights violations arising
from the conditions of his imprisonment. [35] Moreover, in
two of those actions, Plaintiff faced a motion for summary
judgment, as he does here. [36] Perhaps because of this
considerable litigation experience, Plaintiff has acquired a
familiarity with court procedures—a fact that was recently
noted by one judge. [37] For example, in the current case,
Plaintiff has demonstrated sufficient sophistication to file
a motion to proceed *in forma pauperis,* a motion for a
preliminary injunction, a motion for reconsideration, motion
to extend various discovery deadlines, a motion to compel
discovery, two motions to reopen discovery, and two motions
for extensions of time to respond to motions filed by
Defendants. [38] This familiarity with court procedures is not
surprising to me, given that Plaintiff has testified that he is a
"paralegal," and that he "teach[es][a] legal resources course
to other inmates." [39] Perhaps because of this training and
experience, Plaintiff's numerous filings in this action have
been quite good, often being typed, organized, cogent, and/or
supported by declarations. [40] As a result of Plaintiff's skills
of advocacy, the Court has granted his motion to proceed
*in forma pauperis,* his motion to extend various discovery
deadlines in the action's Pretrial Scheduling Order, his two
motions for extensions of time to respond to Defendants'
motion for summary judgment, and part of his motion to
compel discovery. [41]

34    Specifically, those federal and state court actions
and appeals are as follows: (1) *Shomo v. State*

*of New York,* 06–CV–0353 (W.D.N.Y.) (prisoner civil rights action; Order filed 11/2/06 dismissing Plaintiff's Complaint for, *inter alia,* failure to state a claim, and requiring him to file Amended Complaint; notice of interlocutory appeal filed on 11/21/06 regarding aforementioned Order); (2) *Shomo v. State of New York,* Docket No. 06–5434–PR (2d Cir.) (interlocutory appeal from dismissal of prisoner civil rights action); (3) *Shomo v. Zon,* 05–CV–10337 (S.D.N.Y.) (habeas corpus proceeding; currently pending); (4) *Shomo v. State of New York,* 04–CV–0707 (N.D.N.Y.) (LEK/DEP) (prisoner civil rights action; currently pending); (5) *Shomo v. Maher,* 04–CV–4149 (S.D.N.Y.) (habeas corpus proceeding; action dismissed, and certificate of appealability denied, on 3/31/05); (6) *Shomo v. Myers,* 03–CV–10213, 2007 U.S. Dist. LEXIS 2608 (S.D.N.Y. Jan. 10, 2007) (prisoner civil rights action; original Complaint dismissed for failure to state claim by Order filed 4/6/05 with partial leave to replead; defendants' motion for summary judgment granted on 1/10/07, and Amended Complaint dismissed; notice of appeal later filed on 1/24/07); (7) *Shomo v. City of New York,* Docket No. 07–1208–CV (2d Cir.) (appeal from dismissal of prisoner civil rights action); (8) *Shomo v. Zon,* 827 N.Y.S.2d 391 (N.Y.App.Div., 4th Dept., 2006) (Article 78 proceeding seeking review of denial of inmate grievance; proceeding transferred from N.Y. Sup. Ct ., Erie County; petition denied on 12/22/06); (9) *Shomo v. New York City D.O.C.,* Index No. 6516/1996 (N.Y. Sup.Ct., Bronx County) (action sounding in tort; currently pending); (10) *Shomo v. State of New York,* Index No.2007–013–008, Claim No. 112049 (N.Y. Ct. Cl .) (claims of negligent medical care, and cruel and unusual punishment as a result of misdiagnosed medical condition; currently pending).

35    *Id.*

36    *See Shomo v. State of New York,* 04–CV–0707 (N.D.N.Y.) (LEK/DEP) (prisoner civil rights action; defendants' motion for summary judgment filed on 10/30/06; Plaintiff responded to motion for summary judgment on 11/20/06); *Shomo v. City of New York,* 03–CV–10213 (S.D.N.Y.) (prisoner civil rights action; defendants' motion for summary

judgment filed on 10/5/06; Order filed on 1/10/07, granting motion for summary judgment).

37    *See Shomo v. State of New York,* Index No.2007–013–008, Claim No. 112049, Decision at 1 (N.Y. Ct. Cl., filed March 30, 2007) (Patti, J.) ("[Plaintiff] seems well-acquainted ... with the filing requirements of [the court] ....").

38    (Dkt.Nos.2, 4, 11, 49, 52, 69, 75, 76, 78.)

39    (Dkt. No. 72, Part 4, at 155 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition].)

40    (*See, e.g.,* Dkt. Nos. 1, 2, 3, 4, 7, 10, 11, 49, 52, 69, 75, 76, 78.)

41    (Dkt.Nos.6, 49, 66, 76, 78.)

Under the circumstances, I find that Plaintiff's special status as a *pro se* litigant should be revoked for the remainder of this action. Again, continuing to afford him such special status would be unnecessary (and unfairly prejudicial to Defendants). [42]

42    I note that it appears that, as of the current date, Plaintiff has earned two strikes for purposes of 28 U.S.C.1915's "three strikes" rule. *See Shomo v. State of New York,* 06–CV–0353 Memorandum and Order at 5–9 (W.D.N.Y., filed Nov. 2, 2006) (dismissing Plaintiff's Complaint for, *inter alia,* failure to state a claim, and requiring him to file Amended Complaint); *Shomo v. City of New York,* 03–CV–10213, 2005 WL 756834, at *7–12 (S.D.N.Y. Apr. 4, 2005) (dismissing original Complaint for failure to state claim, with partial leave to replead).

## II. ANALYSIS

**\*5** As an initial matter, Plaintiff has requested to file a sur-reply with regard to Defendants' motions. (*See* Dkt. No. 88.) The State Defendants have opposed that request. (*See* Dkt. No. 87.) In light of the Local Rule generally prohibiting the filing of sur-replies (*see* L.R. 7.1[b][1] ), the minimal value of Plaintiff's sur-reply (*see* Dkt. No. 88), and the revocation of Plaintiff's special status as a *pro se* civil rights litigant (*see, supra,* Part I.B. of this Report–Recommendation), I deny Plaintiff's request. Accordingly, I direct the Clerk's Office to strike from the docket pages 2 through 5 of Plaintiff's letter request, which attaches his proposed sur-reply. (Dkt. No. 88.)

2007 WL 2580509

**A. State Defendants' Motion for Summary Judgment**

The State Defendants argue that Plaintiff's claims against them should be dismissed for four reasons: (1) issue preclusion based on two previous court decisions regarding the claims at issue in this litigation; (2) a failure to state, or establish, a claim under the Eighth Amendment; (3) a failure to state a claim under the ADA or the RA; and (4) a failure to state a claim under the Civil Rights Act. (*See generally* Dkt. No. 72, Part 17 [State Defs.' Mem. of Law].)

**1. Issue Preclusion**

The State Defendants argue that Plaintiff is precluded, or "collaterally estopped," from re-litigating the issues on which his Complaint is based because those issues were previously litigated and decided in *Shomo v. Zon,* 827 N.Y.S.2d 391 (N.Y.App.Div., 4th Dept., 2006) and *Shomo v. Myers,* 03–CV–10213, 2007 U.S. Dist. LEXIS 2608 (S.D.N.Y. Jan. 10, 2007). [43]

[43]    (Dkt. No. 72, Part 17, at 5–13 [State Defs.' Mem. of Law].)

"Collateral estoppel, or issue preclusion, bars the relitigation of issues actually litigated and decided in the prior proceeding, as long as that determination was essential to that judgment." *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir.1995) [citations omitted]. "Four elements must be met for collateral estoppel to apply: (1) the issues of both proceedings must be identical, (2) the relevant issues were actually litigated and decided in the prior proceeding, (3) there must have been full and fair opportunity for the litigation of the issues in the prior proceeding, and (4) the issues were necessary to support a valid and final judgment on the merits." *Central Hudson,* 56 F.3d at 368 [citations and internal quotation marks omitted].

Of these four elements, the only one placed at issue by Plaintiff's response papers is the first element: whether the issues of both proceedings are identical. The State Defendants are correct when they state that (1) factual questions (and not simply questions of law) may constitute "issues" for purposes of the aforementioned collateral estoppel analysis, (2) issue preclusion may apply even though "the events involved in the two proceedings took place at different times (or the question was one of [someone's] ... condition [occurring] at different time periods)," (3) among the factors that should be considered when deciding whether two proceedings raise the same "issue" (for purposes of collateral estoppel) are whether

there is a "substantial overlap" between the evidence and/or arguments advanced in the two proceedings, and (4) the party seeking to assert collateral estoppel in a proceeding need not have been involved in the prior proceeding. [44]

[44]    (Dkt. No. 72, Part 17, at 7 [State Defs.' Mem. of Law].)

**\*6** I have carefully read the decisions in *Shomo v. Zon,* 827 N.Y.S.2d 391 (N.Y.App.Div., 4th Dept., 2006) and *Shomo v. Myers,* 03–CV–10213, 2007 U.S. Dist. LEXIS 2608 (S.D.N.Y. Jan. 10, 2007). I find that the Fourth Department's decision in *Shomo v. Zon* is simply too short to enable me to discern whether or not any of the issues presented in that proceeding are the same as any of the issues presented in the current proceeding. [45] However, the Southern District's decision in *Shomo v. Myers* is far more lengthy and helpful.

[45]    Granted, I do know what *allegations* Plaintiff was asserting in that proceeding, since the State Defendants were helpful enough to provide Plaintiff's Complaint in that proceeding. (Dkt. No. 72, Part 6 [Ex. C to Finkelstein Decl.].) However, that information would be relevant only to a Rule 12(b)(6) failure-to-state-a-claim analysis, not to a Rule 56 genuine-issue-of-material-fact analysis. What I would need to know to determine the preclusive effect of *Shomo v. Zon* on the current proceeding would be what *evidence* the Fourth Department considered in reaching its conclusion in *Shomo v. Zon.* The Fourth Department does not describe that evidence in its decision, stating only, "The evidence supports respondent's determination that petitioner's medical needs are being met, and petitioner failed to establish that respondent is deliberately indifferent to serious medical needs of petitioner." *Shomo v. Zon,* 827 N.Y.S.2d 391, 391 (N.Y.App.Div., 4th Dept., 2006).

In *Shomo v. Myers,* one of the issues was whether the chief physician at the City of New York Department of Corrections acted with the required state of mind for a deliberate indifference claim under the Eighth Amendment (i.e., criminal recklessness), between September 26, 2000 (before which any conduct was non-actionable due to the applicable statute of limitations) and December 24, 2003 (the date of filing of Plaintiff's Complaint in the action), she (1) knew, or was chargeable with knowledge, of Plaintiff's complaints that he needed assistance performing

activities of daily living due to his chronic nervous system disorder, but she (2) declined to transfer Plaintiff to a hospital facility that could provide him with such assistance, because (3) there existed both (a) medical reports and notations recommending that Plaintiff receive assistance with activities of daily living, and (b) medical reports and notations stating that Plaintiff did not require such assistance, (4) "[f]aced with a body of conflicting professional judgments, [she], in her capacity as Chief Physician, was compelled to make a professional judgment of her own," and "[s]he determined that Plaintiff was sufficiently capable of performing activities of daily living, and that transfer to a hospital facility was unnecessary." *Shomo,* 2007 U.S. Dist. LEXIS 2608, at *12–14.

This issue appears very similar to an issue in the current action: whether Defendants Sharma (Mohawk C.F. Chief Medical Physician), Zaki (Mohawk C.F. Physician), Rosado (Mohawk C.F. Deputy Superintendent of Health Services), Antonsen (Mohawk C.F. Director of Nursing), Nallenbach (Mohawk C.F. Nurse Administrator), Harris (Mohawk C.F. Registered Nurse J. Harris), Rockhill (Mohawk C.F. Registered Nurse F. Rockhill), Connarton (Mohawk C.F. Occupational Therapist D. Connarton), Smith (Coxsackie C.F. Deputy Superintendent of Health Services), and Wright (DOCS Deputy Commissioner and Chief Medical Officer) acted with the required state of mind for a deliberate indifference claim under the Eighth Amendment (i.e., criminal recklessness) when, between January 4, 2001, and July 22, 2004, they (1) knew, or were chargeable with knowledge, of Plaintiff's complaints that he needed assistance performing activities of daily living due to his chronic nervous system disorder, but (2) they declined to provide him with such assistance (either by transferring Plaintiff to another facility or otherwise), because (3) there existed both (a) medical reports and notations recommending that Plaintiff receive assistance with activities of daily living, and (b) medical reports and notations stating that Plaintiff did not require such assistance, (4) faced with a body of conflicting professional judgments, they, in their various medical capacities, were compelled to make a professional judgment of their own, and they determined that Plaintiff was sufficiently capable of performing some activities of daily living, and that assistance with further such activities (or a prison transfer) was unnecessary. (*See generally* Dkt. No. 1 [Plf.'s Compl.]; Dkt. No. 72, Part 2 [State Defs.' Rule 7.1 Statement]; Dkt. No. 79, Part 2 [Plf.'s Rule 7.1 Response].)

**\*7** If the aforementioned medical professionals (i.e., Sharma, Zaki, Rosado, Antonsen, Nallenbach, Harris, Rockhill, Connarton, Smith and Wright) did not, as a matter of law, possess the requisite state of mind, it is difficult for me to imagine circumstances under which any of the other State Defendants (i.e., Goord, Bernardi, Masterson, Filion, Perlman, Onley) could have possessed such a state of mind, given the fact that they were relying on the professional judgment of those individuals.

The only question that might give me some pause is whether the medical records considered in *Shomo v. Myers* were substantially similar to the medical records submitted by the parties on Defendants' motions in the current action. After carefully reading *Shomo v. Myers,* and carefully reviewing the medical records submitted by the parties in the current action, I find that the medical records considered in *Shomo v. Myers* were, indeed, substantially similar to the medical records submitted by the parties on Defendants' motions in the current action.

For example, in *Shomo v. Myers,* the medical records supporting Plaintiff's request for assistance with activities of daily living included the following: (1) a September 25, 1999, medical opinion of Dr. Harjinder Bhatti that Plaintiff needed such assistance; (2) an October 9, 1999, concurring opinion of Physician's Assistant Doni Pitchford. *Shomo,* 2007 U.S. Dist. LEXIS 2608, at *14. The medical records undermining Plaintiff's request for assistance with activities of daily living included the following: (1) an October 13, 1999, determination of a neurologist at Bellevue Hospital that Plaintiff was able to perform activities of daily living, and did not need assistance with such activities; and (2) the notation of prison medical staff on or about October 13, 1999, that Plaintiff was able to eat and use the toilet without assistance. *Id.* at *14–15.

Moreover, in *Shomo v. Myers,* several medical records existed that both supported and undermined Plaintiff's request for assistance with activities of daily living. *Id.* at *17–20. For example, a medical record from January 26, 2000, reflected the findings of two physicians at Bellevue Hospital that Plaintiff's "[e]lectrodiagnostic studies are consistent with the presence of left brachial plexopathy" and the possibility of "a concurrent reflex sympathetic dystrophy." *Id.* at *17–18. However, that medical record did not indicate that Plaintiff suffered from paralysis, and did not prescribe any particular mode of care for Plaintiff, returning him to the general population. *Id.* at *17–20. Similarly, reports existed from

March and April of 2000 indicating that Dr. Appel prescribed physical therapy and occupational therapy for Plaintiff, but did not prescribe that he receive any assistance with activities of daily living. *Id.* at \*20.

Here, the record on Defendants' motions for summary judgment contains approximately 1,572 pages of Plaintiff's medical records. (*See* Dkt. No. 72, Part 9 (Ex. A to Howard Decl., containing 1,523 pages of medical records) [filed under seal]; Dkt. No. 73, Parts 4–5 [Exs. E and F to Young Decl., attaching 18 pages of medical records]; Dkt. No. 79, Part 3, Exs. 27, 31, 33, 34 [Plaintiff's Response Papers, containing 31 pages of medical records].) Among these records are the following: (1) the January 26, 2000, medical record from Bellevue Hospital (which, as stated earlier, does not indicate that Plaintiff suffered from paralysis, and does not prescribe any particular mode of care for Plaintiff, returning him to the general population); and (2) the March and April 2000 reports from Dr. Appel (which, note that Plaintiff "again requests help with ADL," but, as stated earlier, do not prescribe that Plaintiff receive any assistance with activities of daily living, only physical therapy and occupational therapy). (Dkt. No. 79, Part 3, Ex. 31 [Plaintiff's Response Papers].)

**\*8**  Simply stated, I find that the issue of whether the State Defendants acted with criminal recklessness (when, faced with a body of conflicting medical reports, they decided, in their professional judgments, or in reliance on medical professionals exercising their professional judgments, that Plaintiff did not need further assistance with performing his activities of daily living) was actually litigated and decided in *Shomo v. Myers.*

Plaintiff's arguments to the contrary are not persuasive. Plaintiff argues that issue preclusion is not appropriate under the circumstances because (1) the issues addressed in *Shomo v. Zon,* 827 N.Y.S.2d 391 (N.Y.App.Div., 4th Dept., 2006) and *Shomo v. Myers,* 03–CV–10213, 2007 U.S. Dist. LEXIS 2608 (S.D.N.Y. Jan. 10, 2007) were different than the issues facing the Court in the current action, because the location and nature of the incidents giving rise to Plaintiff's claims in those actions are different than the location and nature of the incidents in the current action, (2) the ruling in *Shomo v. Myers* regarding whether Plaintiff had a *sufficiently serious medical need* for purposes of the Eighth Amendment was actually resolved in Plaintiff's favor (i.e., the Southern District found that a question of fact existed regarding whether Plaintiff was unable to perform activities of daily living to such an extent that his condition constituted a serious medical need), (3)

the ruling in *Shomo v. Myers* may not be given preclusive effect herein because that ruling was an order on a motion for summary judgment and Second Circuit Rule 0.23 states that "[r]ulings by summary order do not have preclusive effect," and (4) given the uncertainty surrounding Plaintiff's medical condition, the Court should reserve decision on Defendants' motion until Plaintiff has been evaluated by a qualified neurologist. [46]

[46]    (Dkt. No. 79, Part 1, at 4–8 [Plf.'s Mem. of Law].)

I reject Plaintiff's first argument because (1) as I stated earlier, issue preclusion may apply even though the events involved in the two proceedings took place at different times, and (2) in any event, I find that the facts giving rise to Plaintiff's deliberate indifference claim in *Shomo v. Myers* were substantially similar to the events giving rise to Plaintiff's deliberate indifference claim in the current proceeding.

I reject Plaintiff's second argument because, in the Court's resolution of the State Defendants' motion for summary judgment, it does not matter whether or not the Southern District found a question of fact with regard to whether Plaintiff had a sufficiently serious medical condition for purposes of the Eighth Amendment. This is because, for the sake of argument, I am assuming, in this Report–Recommendation, that Plaintiff's medical condition was sufficiently serious for purposes of the Eighth Amendment. *See, infra,* Part II.A.2. of this Report–Recommendation. Rather, the issue before the Court, at least with respect to the State Defendants' collateral estoppel argument, is whether or not the Southern District's ruling in *Shomo v. Myers* with regard to the defendants' state of mind (regarding that condition) should be given preclusive effect in the current proceeding (and I have found that the ruling should be given such effect).

**\*9**  I reject Plaintiff's third argument because that argument is premised on a misreading of Section 0.23 of the Local Rules of the Second Circuit. Plaintiff reads that Local Rule as referring to "summary judgment orders." In fact, that rule refers to "summary orders"—quite a different thing. *See* Local Rules of the Second Circuit § 0.23(a) ("[I]n those cases in which decision is unanimous and each judge of the panel believes that no jurisprudential purpose would be served by an opinion (i.e., a ruling having precedential effect), the ruling may be by summary order instead of by opinion."). Furthermore, the fact that the Southern District's decision

was published on Lexis and Westlaw only (rather than being published also in a federal reporter) [47] is of no consequence to the issue of whether the decision may be given preclusive effect. This is because, among other reasons, the Southern District's decision was not a "summary order," nor was it issued by the Second Circuit.

[47]   *See Shomo v. Myers,* 03–CV–10213, 2007 U.S. Dist. LEXIS 2608, 2007 WL 102108 (S.D.N.Y. Jan. 10, 2007).

Finally, I reject Plaintiff's fourth argument for a number of reasons. It is not the function of an impartial judiciary to *sua sponte* conduct discovery for a party (such as an evaluation of Plaintiff by a neurologist) in order to eliminate differences of medical opinion. If Plaintiff is requesting an Order staying the pending motions for summary judgment, and permitting limited discovery in the form of an examination of a neurologist, there is a procedure available for making such a request. *See, e.g.,* Fed.R.Civ.P. 56(f), 26(b)(1), 16(b). I will set aside the fact that Plaintiff has not even bothered to try to follow that procedure, despite his considerable litigation experience and familiarity with court procedures. The more serious defect with Plaintiff's argument is that he has not shown cause in support of such an Order. It is clear from the 1,523 pages of medical records before the Court that, since the onset of his injury in 1994, Plaintiff has been examined by several neurologists, who have formed differing opinions regarding Plaintiff's condition. I have no reason to believe that another such examination would yield a diagnosis that would somehow reconcile or eliminate the differences between these medical opinions. Nor can I imagine how such an examination would even be material to the state-of-mind issue presented by the State Defendants' motion, since the neurologist's findings would occur years after the period of time in question, i.e., January 2001 to and July 2004 (and thus could not possibly have been considered by the State Defendants' when they made their respective professional judgments). Moreover, as a practical matter, I wonder who Plaintiff proposes would pay for an "independent examination" by a "qualified neurologist," as Plaintiff requests. Succinctly stated, Plaintiff has been given sufficient opportunity to conduct discovery in this matter, as the Court implicitly ruled when it denied his request to re-open discovery on February 26, 2007. (Dkt. No. 69.) [48]

[48]   I note that, on February 9, 2007, the Court partially granted Plaintiff's request for an order compelling further discovery from Defendants. (Dkt. No. 66.)

**\*10** As a result, I recommend that the Court dismiss Plaintiff's claim against the State Defendants under the Eighth Amendment on the ground that the issue of whether the State Defendants acted with criminal recklessness (when, faced with a body of conflicting medical reports, they decided, in their professional judgments, or in reliance on medical professionals exercising their professional judgments, that Plaintiff did not need further assistance with performing his activities of daily living) was actually litigated and decided in *Shomo v. Myers,* 03–CV–10213, 2007 U.S. Dist. LEXIS 2608 (S.D.N.Y. Jan. 10, 2007).

### 2. Eighth Amendment Claim

The State Defendants next argue that Plaintiff's Eighth Amendment deliberate indifference claim fails as a matter of law because (1) Plaintiff fails to allege facts indicating, or adduce evidence establishing, that his medical condition was sufficiently serious for purposes of the Eighth Amendment, or that Defendants acted with the requisite state of mind with regard to that medical condition, (2) Plaintiff fails to allege facts indicating, or adduce evidence establishing, that Defendants Goord, Wright, Bernardi, Masterson, Filion, Perlman, Smith, Rosado, and Rockhill—all but the last of whom were all supervisory officials—were personally involved in constitutional violations alleged, (3) Plaintiff's suffering was caused not by Defendants' actions but by Plaintiff's own systematic noncompliance with the health care plan established for him by the medical staff at Walsh Regional Medical Unit, and (4) Defendants are protected by the doctrine of qualified immunity. [49]

[49]   (Dkt. No. 72, Part 17, at 13–22 [State Defs.' Mem. of Law].)

With respect to the State Defendants' first argument (regarding the seriousness of Plaintiff's medical condition and the state of mind of the State Defendants), Plaintiff responds with a series of arguments: (1) a question of fact exists regarding whether Plaintiff suffers from a sufficiently serious medical condition (i.e., paralysis), as is evident from the medical records that the State Defendants did not provide to the Court and that Plaintiff is providing to the Court at Dkt. No. 79, Part 3, at Ex. 31; (2) the State Defendants' failure to hand feed Plaintiff was not merely a "disagreement" between a patient and his doctors

but was a conscious infliction of indignation, humiliation, and, indeed, pain (due to choking, stomach pains, vomiting, and neck and back pains); (3) the conduct of Defendants Hochstetler and Gardella constituted criminal recklessness since they temporarily ordered Plaintiff's hand feeding to be discontinued after Plaintiff had an altercation with a nurse, and then they permanently discontinued that hand feeding after Plaintiff (as he puts it) "went balistic [sic] and verbally cursed Hochstetler out," demonstrating that the discontinuance of hand feeding was "payback for [Plaintiff's] abusive tongue"; (4) the conduct of Defendants Hochstetler and Gardella constituted criminal recklessness since, on October 28, 2002, they issued a "discharge summary" that was in total contradiction to a "Specialist's Report" issued by neurologist Dr. Mark P. Dentinger on October 18, 2002.[50]

[50]    (Dkt. No. 79, Part 1, at 8–15 [Plf.'s Mem. of Law]; Dkt. No. 72, Part 4, at 204 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition].)

**\*11** With respect to the State Defendants' second argument (regarding the personal involvement of various of the State Defendants), Plaintiff argues that those Defendants who were supervisory officials did not merely receive complaints from Plaintiff but responded to those complaints, explained the medical treatment provided to Plaintiff and defended DOCS, Coxsackie C.F., and/or Mohawk C.F.[51] For example, Defendants Bernardi and Smith personally investigated Plaintiff's complaints (and Defendant Bernardi promulgated DOCS Directive 2614).[52] Defendants Goord, Bernardi, Wright and Smith entered into contractual agreements with Correctional Medical Services, Inc., knowing that those contracts would violate the Eighth Amendment, the ADA, and the RA.[53] Defendant Wright personally signed letters responding to Plaintiff's complaints.[54] Defendant Filion personally investigated Plaintiff's complaints, rendering personal "findings" with regard to those complaints.[55] Defendant Perlman personally investigated Plaintiff's complaints, taking the position that it was beyond the authority of an Inmate Grievance Review committee to recommend that Plaintiff's requested accommodations be granted.[56] Defendant Masterson personally reviewed all denials of inmates' requests for reasonable accommodations —reversing, modifying or affirming those denials.[57] Finally, Defendants Rosado and Rockhill were involved in developing and implementing Plaintiff's health care plan at Walsh Regional Medical Unit.[58]

[51]    (Dkt. No. 79, Part 1, at 15–20 [Plf.'s Mem. of Law].)

[52]    (Id. at 15–16.)

[53]    (Id. at 16.)

[54]    (Id. at 17.)

[55]    (Id. at 18.)

[56]    (Id.)

[57]    (Id. at 18–19.)

[58]    (Id. at 19–20.)

With respect to the State Defendants' third argument (regarding the cause of Plaintiff's suffering), Plaintiff argues that (1) while he did refuse a few routine exams (e.g., regarding his vital signs, blood pressure, etc.), he did not refuse either of the two diagnostic neurological exams ordered for him, and (2) while he did refuse medications on a few occasions, he did so because of adverse reactions he had experienced from those medications in the past, and, in any event, those medications were not for the treatment of any pains or ailments in his arms.[59]

[59]    (Id. at 20–22.)

With respect to the State Defendants' fourth argument (regarding qualified immunity), Plaintiff argues that the record evidence demonstrates that those State Defendants who were Plaintiff's physicians were "plainly incompetent" in that they "did not know the meaning of [his] diagnos[es]" and they "did not understand the medical definition of 'paralysis' or its verios [sic] stages."[60] Plaintiff also argues that it is clear that Defendant Hochstetler was intending to cause Plaintiff pain from the fact that Defendant Hochstetler issued a "negative impact discharge summary" on October 28, 2002, despite the fact that Plaintiff had received a "favorable neurology report just weeks earlier" from Dr. Dentinger .[61]

[60]    (Id. at 23–26.)

[61]    (Id. at 26.)

I need not reach the merits of the State Defendants' second, third, and fourth arguments, because I find that their first argument has merit. Specifically, I agree with them that, even if the Court were to assume that Plaintiff's medical needs were

sufficiently serious for purposes of the Eighth Amendment, Plaintiff has failed to adduce any evidence establishing that the State Defendants acted with the requisite state of mind with regard to those medical needs. I reach this conclusion for the several reasons stated by the State Defendants in their memorandum of law. (*See* Dkt. No. 72, Part 17, at 17–19 [State Defs.' Mem. of Law].)

**\*12** A more detailed analysis of the State Defendants' argument properly begins with the recognition that the term "deliberate indifference" refers to a state of mind that is equivalent to *criminal recklessness.* [62] Mere *negligence* by a DOCS employee is not sufficient for a prisoner to state a claim under the Eighth Amendment. [63] For this reason, a prisoner's *disagreement* with a DOCS employee regarding the treatment that he should properly receive is insufficient to state a claim under the Eighth Amendment. [64] As the Second Circuit has explained,

[62] *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998).

[63] *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

[64] *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ( "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state

prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves .... The essential test is one of medical necessity and not one simply of desirability.

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

Here, Plaintiff received rather constant medical attention while at Mohawk C.F.'s Walsh Regional Medical Unit. In their Rule 7.1 Statement, the State Defendants describe this medical attention, which included the development of a health care plan for Plaintiff, and the provision of assistance with various activities of daily living. [65] These factual assertions are supported by the record citations offered by the State Defendants (as well as by other portions of the record, not cited by the State Defendants). [66] In his Rule 7.1 Response, Plaintiff fails to offer any response whatsoever with regard to these factual assertions—much less offer a response in matching numbered paragraphs, with the denials supported by a specific citation to the record where the factual issue arises, as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court. [67] Various other factual assertions by the State Defendants (regarding medical care treatment denied by Plaintiff) are either admitted by Plaintiff or not specifically denied by him in accord with Local Rule 7.1(a) (3). [68] Moreover, several record citations that Plaintiff does offer in support of his denials do not in fact support those denials . [69]

[65] (Dkt. No. 72, Part 2, ¶¶ 16–21 [State Defs.' Rule 7.1 Statement].)

[66] (*Id.*)

[67] (*See generally* Dkt. No. 79, Part 2 [Plf.'s Rule 7.1 Response].)

[68] (*Compare* Dkt. No. 72, Part 2, ¶¶ 23, 24, 28 [State Defs.' Rule 7.1 Statement] *with* Dkt. No. 79, Part 2, ¶¶ 10, 11, 14 [Plf.'s Rule 7.1 Response, admitting that (1) he routinely refused medications, physical therapy, assistance with ADLs, physical examinations, weekly assessments, and to be weighed, and (2) during the time in question, generally his weight was stable, and indeed 30

2007 WL 2580509

pounds above the ideal weight for a person of his height].)

69 (*See, e.g.,* Dkt. No. 79, Part 2, ¶ 16 [Plf.'s Rule 7.1 Response, citing to Dkt. No. 72, Part 9, at 100, which does not support Plf.'s denial of Paragraph 30 of Defendants' Rule 7.1 Statement].)

As explained above, Plaintiff was specifically advised of the potential consequences of failing to respond to the State Defendants' motion for summary judgment.[70] Moreover, his special status as a *pro se* civil rights litigant has been revoked for the remainder of this action.[71] Even if his special status had not been revoked, I would decline to exercise my discretion to *sua sponte* scour the record (beyond the review I have already performed) for evidence disputing the State Defendants' factual assertions.[72] As a result, I treat as undisputed the State Defendants' aforementioned factual assertions, namely those factual assertions contained in Paragraphs 16, 17, 18, 19, 20, 21, 23, 30 (and part of the factual assertions contained in Paragraphs 24 and 28) of their Rule 7.1 Statement. Based on these undisputed facts, I cannot imagine circumstances under which the treatment that Plaintiff received would give rise even to a claim of ordinary negligence against the State Defendants, much less a claim of deliberate indifference.

70 *See, supra,* note 21 of this Report–Recommendation.

71 *See, supra,* Part I.B. of this Report–Recommendation.

72 *See, supra,* note 12 of this Report–Recommendation.

**\*13** Although my above-stated conclusion (that the treatment Plaintiff received does not give rise to a claim of deliberate indifference against the State Defendants) needs no further support, it is further supported by the fact that, in his deposition, Plaintiff admitted that he could eat independently with the use of adaptive equipment (which was provided to him by Defendants in this action).[73] This admission is certainly consistent with the other record evidence, which indicates that Plaintiff can eat by himself (with the use of adaptive equipment) and that his weight, during the relevant time period, was generally above the "ideal" weight for a person of his height.[74] What Plaintiff complains about in this action is the indignity and discomfort of being made to eat out of a bowl "like a dog," as he puts it.[75] However, "mere

inconvenience or discomfort" while eating in prison does not state an Eighth Amendment claim of deliberate indifference. *Powell v. Kingston,* 05–CV–0112, 2005 U.S. Dist. LEXIS 5586, at \*6–7 (W.D.Wis. March 29, 2005) (prisoner made to eat meals served in bags without assistance of utensils). As is often observed by federal courts, "[t]he Constitution does not mandate comfortable prisons and conditions that are restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society." *Powell,* 2005 U.S. Dist. LEXIS 5586, at \*7 [internal quotation marks and citations omitted].

73 (Dkt. No. 72, Part 4, at 216–217 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition].)

74 (*See, e.g.,* Dkt. No. 72, Part 10, ¶ 15 [Antonsen Decl.]; Dkt. No. 72, Part 8, ¶ 18 [Howard Decl.]; Dkt. No. 72, Part 9, at 103, 109 [Ex. A to Howard Decl., attaching Plf.'s medical records] [filed under seal].)

75 (Dkt. No. 72, Part 4, at 42, 43, 46, 48, 56, 71, 197, 199, 215, 217, 218, 220 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition].)

Finally, I note that none of Plaintiff's arguments in opposition to the State Defendants' argument on this subject are persuasive or even on topic. Plaintiff's first argument (i.e., that the medical records that Plaintiff is providing to the Court at Dkt. No. 79, Part 3, at Ex. 31 create a question of fact regarding whether Plaintiff suffers from a sufficiently serious medical condition) has nothing to do with whether the State Defendants *acted with the requisite state of mind* with regard to Plaintiff's medical condition. (Nor do those 18 pages of records, in fact, establish that the State Defendants acted with such a state of mind.) Plaintiff's second argument (i.e., the State Defendants' failure to hand feed Plaintiff was not merely a "disagreement" between a patient and his doctors but was a conscious infliction of pain) is completely conclusory, unsupported by any record citations regarding any State Defendants. Finally, Plaintiff's third and fourth arguments (i.e., regarding the conduct of Defendants Hochstetler and Gardella) have to do with two *Corporate* Defendants, not any *State* Defendants.

As a result, I recommend that the Court dismiss Plaintiff's claim against the State Defendants under the Eighth Amendment on the alternative ground that Plaintiff has failed

2007 WL 2580509

to adduce facts establishing that the State Defendants acted with deliberate indifference to Plaintiff's medical needs.

### 3. Claim Under ADA and RA

The State Defendants next argue that Plaintiff fails to state a claim under the ADA and the RA, because (1) he fails to allege facts indicating, or adduce evidence establishing, that Defendants were motivated by discriminatory animus or ill will due to disability, and (2) he fails to identify programs from which he was excluded. [76]

[76]  (Dkt. No. 72, Part 17, at 22–24 [State Defs.' Mem. of Law].)

**\*14** Plaintiff responds with three arguments: (1) it is beyond question that, pursuant to the definition of "disability" in the ADA and the RA, Plaintiff had a disability under the circumstances; (2) by including a copy of Section D of DOCS Directive 2614, Plaintiff has adduced evidence of Defendants' "state of mind" in denying the assistance that Plaintiff requested, namely, their feeling that "it was too burdensome" to provide Plaintiff such assistance, and that they would rather force Plaintiff to "humiliat[e]," "belitt[le]," and "dehumaniz[e]" himself; and (3) Plaintiff has, in fact, identified which programs or services from which he was excluded, namely, the programs or services described in Paragraph 73 of his Complaint. [77]

[77]  (Dkt. No. 79, Part 1, at 27–29 [Plf.'s Mem. of Law].)

Plaintiff's first argument is either a non-sequitur or a straw man, since the State Defendants do not argue that Plaintiff did not possess a "disability" under the ADA and the RA. [78] Furthermore, I need not reach the merits of Plaintiff's third argument, because I find his second argument to be unconvincing: DOCS Directive 2614 in no way constitutes evidence of any discriminatory animus or ill will due to disability by the State Defendants. [79] First, it is not a violation of the ADA to deny an inmate's request for reasonable accommodations because of a reason *other than his disability*. [80] (For example, where an inmate alleges that he has been treated differently than other disabled inmate simply because of incompetent medical treatment, he has not stated a claim of discrimination under the ADA.) [81] Here, I can find no record evidence, or even a nonconclusory factual allegation, that Plaintiff was discriminated against

because of his disability. [82] Furthermore, it is not a violation of the ADA to deny an inmate's request for reasonable accommodations solely because of cost; indeed, in certain circumstances, the ADA expressly exempts defendants from having to make reasonable accommodations for disabled persons if it would be unduly burdensome to the defendants to make such accommodations. [83] Second, even if it were a violation of the ADA to deny an inmate's request for reasonable accommodations solely because of cost, I can find no evidence in the record that the State Defendants were denying Plaintiff's request for reasonable accommodations solely because of cost. The only record citation that Plaintiff offers for this assertion does not constitute such evidence; and, it is worth noting, that record citation actually suggests that Plaintiff, on several occasions between April 26, 2001, and May 1, 2001, refused to be treated or examined. [84] Nor does Plaintiff's conclusory argument to that effect (i.e., that Defendants were motivated by their feeling that "it was too burdensome" to provide such assistance to Plaintiff) in his opposition memorandum of law constitute such evidence.

[78]  (Dkt. No. 72, Part 17, at 22–24 [State Defs.' Mem. of Law].)

[79]  (Dkt. No. 79, Part 3, at Ex. 28 [Plf.'s Opp. to Defs.' Motion, attaching DOCS Directive 2614, which states, in pertinent part, "The Department is required to make 'reasonable accommodations' or modifications to existing policies and programs ... unless to do so would be an undue burden on the Department, cause a fundamental alteration to a program, or compromise the safety or security of the facility.... DEFINITIONS ... D. *Undue Burden:* reasonable accommodations or modifications which would result in a fundamental alteration in the nature of a program or activity or in undue financial and administrative hardship. This is a limited exception under the ADA and generally cannot be used for denying an accommodations or a modification requested for program accessibility."].)

[80]  *See* 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, *by reason of such disability,* be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.") [emphasis added]; *Gracia v. S. U.N.Y. Health Sciences Ct. of Brooklyn,* 280

F.3d 98, 112 (2d Cir.2001) ("[A] private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability."). For the sake of argument, I will assume that the ADA and RA apply to state prisons, although that fact is of some dispute in federal courts. *Compare Saunders v. Horn,* 960 F.Supp. 893, 897 (E.D.Pa.1997) ("[I]t would seem ... that both the ADA and the Rehabilitation Act apply to state and local correctional facilities.") *with Callaway v. Smith County,* 991 F.Supp. 801, 805 (E.D.Tex.1998) ("[T]he language of the Americans with Disabilities Act and the Rehabilitation Act did not make unmistakably clear that the statutes applied to state prisons."); *see also Randoll v. Rodgers,* 980 F.Supp. 1051, 1059–1060 (E.D.Mo.1997) (collecting cases).

81    *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir.1996).

82    *See Dukes v. Georgia,* 428 F.Supp.2d 1298, 1322–1324 (N.D.Ga.2006) (granting defendant's motion for summary judgment with respect to prisoner's ADA / RA claim based on defendant's alleged failure to, *inter alia,* provide plaintiff assistance with eating, because "Plaintiff has proffered no evidence to show that Defendant's actions were taken on the basis of Plaintiff's disability ....").

83    *See, e.g.,* 42 U.S.C. § 12182(2)(A)(iii) (making exception for entities that "can demonstrate that taking such steps [of accommodation] would ... result in an undue burden"); 42 U.S.C. 12111(10)(B) (articulating factors to be considered in determining whether accommodation would impose undue hardship under ADA); *EEOC v. Amego, Inc.,* 110 F.3d 135, 148 (1st Cir.1997) (entity exempted from requirements of ADA due to "undue hardship" that would occur to entity due to cost of proposed accommodation) [citing *Vande Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538, 542 [7th Cir.1995] ).

84    (*See, e.g.,* Dkt. No. 72, Part 9, at 733–734 [Ex. A to Howard Decl., attaching Plf.'s medical records] [filed under seal].)

Granted, I note that, in his deposition, Plaintiff testified that, at one point, following a complaint by a nurse's aid

that it was taking too long to hand feed Plaintiff shredded raw cabbage, Defendant Hochstetler directed his nurses to stop hand feeding Plaintiff for a couple days because doing so was too "cumbersome." [85] However, this evidence does not create a reasonable dispute of material fact with regard to the State Defendants' motion for two reasons. First, Defendant Hochstetler is not a *State* Defendant. Regardless of why Defendant Hochstetler acted, there is no evidence that any State Defendant took any adverse action against Plaintiff based on a claim of "undue burden." Second, even if Defendant Hochstetler were a *State* Defendant, this motive by Defendant Hochstetler (to take action based on burdensomeness to his medical staff) would be rendered fleeting and insignificant when compared to Plaintiff's other deposition testimony that Defendant Hochstetler was acting the way he did because (1) Plaintiff had been accused of pushing a tray onto one of the nurses, and (2) Plaintiff had become verbally abusive toward Defendant Hochstetler on two occasions, first after he placed Plaintiff on a cabbage diet, and then after he ordered his nurses to temporarily stop hand feeding Plaintiff. [86]

85    (Dkt. No. 72, Part 4, at 70–71, 83 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition, wherein Plaintiff testified, *inter alia,* "Nurse's aid ... complained about how long it was taking to feed me the shredded raw cabbage.... [Dr. Hochstetler] said, 'Well, it is too incumbersome [sic], I am not going to have nurses feed you .... Only going to be on this a couple days, we will feed you when you get off. But no, I am not going to have my nurse feed you' "].)

86    (Dkt. No. 72, Part 4, at 59, 70–71, 83, 220 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition, wherein Plaintiff testified, *inter alia,* "I was accused of pushing a tray on [sic] one of the nurses .... [Dr. Hochstetler] put me on the cabbage.... I ended up calling [Dr. Hochstetler] words I won't repeat.... I went ballistic, to my dismay. I called the man every name in the book, none of which I am going to repeat here. And so he took exception to that, and he said, 'Since you want to talk to me like that, I swear, I swear by God ... as long as you are in my facility ... my nurses will never feed you, and in fact you are going to get the bare minimum.' ... I went ballistic.... You know, I

mean, maybe I shouldn't have went [sic] ballistic, maybe I shouldn't have done what I did.”].)

**\*15** Furthermore, setting aside this summary judgment analysis (i.e., involving the consideration of record evidence), and turning to a motion-to-dismiss analysis (i.e., involving the consideration of only Plaintiff's Complaint), I find that Plaintiff has not even alleged, in his Complaint, facts indicating such discriminatory animus or ill will due to disability by the State Defendants. [87] Rather, Plaintiff alleges that Defendants' denial of Plaintiff's requests for reasonable accommodations was caused by unspecified misleading statements about Plaintiff made by unidentified “lower level [ ]” medical staff to “higher up” officials, motivated by the belief of “lower level[ ]” medical staff that Plaintiff was “a difficult patient who had to be put in his place.” [88] Thus, according to Plaintiff's own factual allegations, the only staff members who were motivated by any animus or ill will whatsoever were “lower level[ ]” staff members. This is significant because 11 of the 16 State Defendants are *supervisory* officials, [89] and thus cannot reasonably be understood to fall into the category of so-called “lower level[ ]” staff members. In any event, the animus or ill will that Plaintiff alleges was not based on Plaintiff's disability but on the “lower level[ ]” staff members' perception that Plaintiff had a “difficult” personality. It is worth noting that elsewhere in Plaintiff's Complaint he alleges that staff members perform “minor tasks” for other patients with physical disabilities, suggesting, again, that they do not harbor an animus or ill will against disabled inmates. [90]

---

[87]   (*See* Dkt. No. 1 [Plf.'s Compl.].)

[88]   (*Id.* at ¶ 73[G] [alleging, *inter alia,* “truth be told, the defendants['] denial of reasonable accommodations [is] not truly based or premised upon there being a non-verifiable medical condition ... [;] rather, defendants['s] denial is based upon the lower levels of medical staff misleading those higher up, simply because they considered plaintiff a difficult patient who had to be put in his place”].)

[89]   *See, supra,* note 1 of this Report–Recommendation.

[90]   (*Id.* at 73[C] [alleging, *inter alia,* “staff will not assist [Plaintiff] in such minor tasks as making tea, [but] sometimes they do daily for other patients

with far less physical disabilities [than] the plaintiff has ....“].)

Finally, yet another reason for concluding that Plaintiff's ADA and RA claim against the 16 individual State Defendants fail to state a claim upon which relief may be granted: “Because ... the ADA [and the RA] provide[ ] redress to disabled individuals for discrimination by a public entity, individuals may not be sued [under those statutes].” *Atkins v. County of Orange,* 251 F.Supp.2d 1225, 1233 (S.D.N.Y.2003) [citations omitted].

As a result, I recommend that the Court dismiss Plaintiff's claim against the State Defendants under the ADA and the RA on the alternative ground that Plaintiff has failed to allege facts indicating, or adduce facts establishing, that the State Defendants violated either the ADA or RA. I note that a similar conclusion (that Plaintiff's ADA and RA factual allegations fail to state a claim) was reached by the Southern District of New York in *Shomo v.. Myers,* 03–CV–10213, 2005 WL 7564834, at *6 (S.D.N.Y. Apr. 4, 2005) (“I decline to adopt the statute of limitations analysis ... for [Plaintiff's claim under the ADA and RA], ... because Shomo clearly lacks a cause of action under either statute.”).

### 4. Claim Under 42 U.S.C. § 1981

Finally, the State Defendants argue that Plaintiff fails to state a claim under 42 U.S.C. § 1981, because he fails to allege facts indicating that the State Defendants discriminated against him because of his race. [91] Plaintiff fails to respond to this argument. [92]

---

[91]   (Dkt. No. 72, Part 17, at 24 [State Defs.' Mem. of Law].)

[92]   (*See generally* Dkt. No. 79, Part 1 [Plf.'s Mem. of Law].)

**\*16** “Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown.” N.D.N.Y. L.R. 7.1(b)(3). Among the “papers” required to be filed and served by Plaintiff in response to the State Defendants' motion is a memorandum of law. [93] Because Plaintiff has, in his memorandum of law, failed to oppose the State Defendants' argument, he has

"consented" to that argument under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. [94]

[93]　　N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added].

[94]　　N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *see, e.g., Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at *27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1 [b][3] ).

Because Plaintiff has "consented" to the State Defendants' argument, the only remaining issue is whether the State Defendants' have met their burden "to demonstrate entitlement to the relief requested" through that argument. This threshold burden has appropriately been characterized as "modest." [95] This is because, as a practical matter, the burden requires only that the State Defendants present an argument that is "facially meritorious." [96] I find that the State Defendants' argument is facially meritorious. Moreover, even if I were to examine the State Defendants' argument in depth, and I were to independently scour the record for any proof of a factual dispute, I am confident that I would reach the same conclusion. The State Defendants are indeed correct that 42 U.S.C. § 1981 prohibits only discrimination that is motivated by *racial* animus, [97] and I have found no allegation

(or evidence) that adverse actions were taken against Plaintiff because of his race. [98]

[95]　　*See Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr. 24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.).
Authority exists for the similar proposition that a review of whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested dispositive motion. *See, e.g., Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N .D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

[96]　　*Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43 (N.D.N.Y. March 22, 2007) (Lowe,

M.J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at *28–29 & n. 40 (N .D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

97    The State Defendants refer to 42 U.S.C. § 1981 as "the Equal Rights Act." (Dkt. No. 72, Part 17, at 24 [State Defs.' Mem. of Law].) If that is indeed the popular name for 42 U.S.C. § 1981, I am unfamiliar with it. Rather, it appears that 42 U.S.C. § 1981—together with the various other federal statutes cited by Plaintiff in his Complaint—are popularly known as "the Civil Rights Statutes." In any event, the State Defendants are indeed correct that 42 U.S.C. § 1981 regards only discrimination *based on race.* *See* 42 U.S.C. § 1981(a) ("All persons ... shall have the same right to ... equal benefit of all laws ... as is enjoyed by white citizens ....").

98    (*See generally* Dkt. No. 1 [Plf.'s Compl.].)

As a result, I recommend that the Court dismiss Plaintiff's claim against the State Defendants under 42 U.S.C. § 1981 on the alternative ground that Plaintiff has failed to allege facts indicating that the State Defendants discriminated against him because of his race.

### 5. Claims Under 42 U.S.C. §§ 1984, 1985, 1986, and 2000d

Under the circumstances, the Court can, and should, *sua sponte* review the pleading sufficiency of Plaintiff's other civil rights claims (i.e., those claims occurring under 42 U.S.C. §§ 1984, 1985, 1986, and 2000d). (*See* Dkt. No. 1, ¶¶ 28, 78, 79 [Plf.'s Compl., citing referenced statutes].) This authority is derived from three sources: (1) 28 U.S.C. § 1915(e)(2) (B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint,

if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."; and (3) Rule 12(h)(3) of the Federal Rules of Civil Procedure, which provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." 99

99    I note that, under the circumstances, the Court would also be able to *sua sponte* address the *evidentiary* sufficiency of Plaintiff's claims under 42 U.S.C. §§ 1984, 1985, 1986, 2000d, since Plaintiff was certainly on notice that he had to come forward with all of his evidence regarding those claims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence.") [citations omitted].

*17  As for Plaintiff's attempted claim under 42 U.S.C. § 1984, "[s]ections one and two of 42 U.S.C. § 1984 were declared unconstitutional by the Supreme Court in 1998 ..., and sections three and four were repealed by Congress in 1948. Accordingly, [Plaintiff] has no viable claims under 42 U.S.C. § 1984 ...." *Dennison v. Pa. Dept. of Corr.,* 268 F.Supp.2d 387, 395, n. 3 (M .D. Pa.2003), *accord, McDuffy v. Koval,* 226 F.Supp.2d 541, 550–551 (D.Del.2002), *Bd. of Tr. Sabis Intern. Sch. v. Montgomery,* 205 F.Supp.2d 835, 853, n. 12 (S.D.Oh.2002).

As for Plaintiff's attempted claim under 42 U.S.C. § 1985, Plaintiff has alleged no facts indicating the existence of a conspiracy to interfere with his civil rights. (*See* Dkt. No. 1, ¶¶ 28, 78, 79 [Plf.'s Compl.].) Specifically, for the reasons stated in this Part of the Report–Recommendation, and for the reasons stated above in Part II.A.2.–4. of this Report–Recommendation, I find no factual allegations indicating the occurrence of any violation of the ADA, the RA, and 42 U.S.C. §§ 1981, 1983, 1984, 1986, and 2000d in which the State Defendants could have conspired (nor do I find any factual allegations indicating a conspiracy).

As for Plaintiff's attempted claim under 42 U.S.C. § 1986, Plaintiff has alleged no facts indicating that any of the State Defendants, "having knowledge that any of the wrongs conspired to be done, and mentioned in [42 U.S.C. § 1985], are about to be committed, and having power to prevent or aid

2007 WL 2580509

in preventing the commission of the same, neglects or refuses so to do." 42 U.S.C. § 1986. (*See also* Dkt. No. 1, ¶¶ 28, 78, 79 [Plf.'s Compl.].) Specifically, because I find no factual allegations indicating a violation of 42 U.S.C. § 1985, I find no factual allegations indicating that any State Defendants (1) had knowledge of a violation of 42 U.S.C. § 1985 and (2) neglected to prevent such a violation.

Finally, as for Plaintiff's attempted claim under 42 U.S.C. § 2000d, that Section, like 42 U.S.C. § 1981, prohibits only discrimination based on a person's "race, color, or national origin ." 42 U.S.C. § 2000d. Plaintiff has alleged no facts indicating discrimination on such a basis. (*See* Dkt. No. 1, ¶¶ 28, 78, 79 [Plf.'s Compl.].)

As a result, I recommend that the Court *sua sponte* dismiss Plaintiff's claim against the State Defendants under 42 U.S.C. §§ 1984, 1985, 1986 and 2000d on the ground that Plaintiff has failed to allege facts indicating that the State Defendants violated any of those statutes.

### B. Corporate Defendants' Motion for Summary Judgment

The Corporate Defendants argue that Plaintiff's claims against them should be dismissed for four reasons: (1) a failure to state, or establish, a claim under the Eighth Amendment; (2) a failure by Plaintiff to exhaust his available administrative remedies before filing this action; (3) a failure to state a claim under the ADA or the RA; and (4) a failure to state a claim under the Civil Rights Act. (*See generally* Dkt. No. 73, Part 8 [Corporate Defs.' Mem. of Law].)

#### 1. Eighth Amendment Claim

**\*18** The Corporate Defendants argue that Plaintiff's Eighth Amendment deliberate indifference claim fails as a matter of law because (1) Plaintiff fails to allege facts indicating, or adduce evidence establishing, that the Corporate Defendants acted with the requisite state of mind with regard to Plaintiff's medical condition, and (2) Plaintiff fails to allege facts indicating, or adduce evidence establishing, the personal involvement of the Corporate Defendants in the constitutional violations alleged.[100]

[100]    (Dkt. No. 73, Part 8, at 2–6 [Corporate Defs.' Mem. of Law].)

In response to the Corporate Defendants' first argument, Plaintiff argues that the conduct of Defendants Hochstetler

and Gardella constituted criminal recklessness since (1) in April of 2001, they temporarily ordered Plaintiff's hand feeding to be discontinued after Plaintiff had an altercation with a nurse, and then they permanently discontinued that hand feeding after Plaintiff (as he puts it) "went balistic [sic] and verbally cursed Hochstetler out," demonstrating that the discontinuance of hand feeding was "payback for [Plaintiff's] abusive tongue," (2) on October 28, 2002, they issued a "discharge summary" that was in total contradiction to a "Specialist's Report" issued by neurologist Dr. Dentinger on October 18, 2002.[101]

[101]    (Dkt. No. 79, Part 1, at 8–15 [Plf.'s Mem. of Law].)

The problem with Plaintiff's argument regarding Defendants Hochstetler and Gardella is that the record evidence demonstrates, at most, a mere *disagreement* between Plaintiff and Defendants Hochstetler and Gardella regarding the medical care that Plaintiff should have properly received at Coxsackie C.F.'s Regional Medical Unit, not (as Plaintiff argues) a conscious infliction of indignation, humiliation, and pain. As found by the Southern District under nearly identical circumstances in *Shomo v. Myers,* during the time in question, there existed in Plaintiff's medical records both reports that Plaintiff needed assistance with various activities of daily living (such as hand feeding), and reports that he did *not* need such assistance; and, as a result of these conflicting medical opinions, medical professionals were "compelled to make a professional judgment of [their] own." *Shomo,* 2007 U .S. Dist. LEXIS 2608, at \*12–14.

For example, on or about March 21, 2001, Dr. Murnane, a neurologist, examined Plaintiff and reported that he *"doubt[ed] strongly"* that Plaintiff had "any significant peripheral nerve lesion (either plexus or radiculopathy) as a cause of his 'paralysis .' "[102] Moreover, Plaintiff's medical records at the Coxsackie Regional Medical Unit contained several reports indicating that Plaintiff did not need to be hand fed and/or that he might be malingering. One record reported that, on or before March 26, 2001, Defendant Hochstetler had obtained from Sullivan C.F. specific details from Plaintiff's medical records there indicating that Plaintiff was generally able to eat independently, once his meals were "set up" for him.[103] Another record reported that, on March 31, 2001, at Coxsackie C.F., Plaintiff spit his foot out in a garbage can immediately after being hand fed his breakfast, and then claimed that he had vomited.[104] Other records reported that, on April 8, 2001, when medical staff prepared to assist Plaintiff with eating, he declined the bulk of the meal and,

instead, expressed an interest in filing a medical complaint against medical staff.[105]

102    (Dkt. No. 72, Part 9, at 711–12 [Ex. A to Howard Decl., attaching Plaintiff's "Progress Notes" dated 3/21/01, authored by Dr. Murnane]; *see also* Dkt. No. 72, Part 9, at 94 [Ex. A to Howard Decl., attaching Discharge Summary by Defendant Hochstetler regarding Plaintiff, dated 10/28/02, stating that "Dr. Murnane, Neurologist[,] has seen [Plaintiff], in March 2001. From his consult, Dr. Murnane says 'Given the presence of intact DTR's I *doubt strongly* any significant peripheral nerve lesion (either plexus or radiculopathy) as a cause of his 'paralysis.' On review of 2000 EMG done, I disagree with the assessment of a left brachial plexus lesion given the normal motor and sensory amplitudes .... I suspect the problem is one of the CNS either in the cervical cord or functional (psychiatric).' "] [emphasis in original]; Dkt. No. 72, Part 9, at 684 [Ex. A to Howard Decl., attaching Plaintiff's "Progress Notes" dated 3/26/01, stating, "Current exam suggests that peripheral lesion is not cause of paralysis—may be in cervical cord or functional (psychiatric)"].)

103    (Dkt. No. 1, Part 2, at 7 [Ex. 2 to Plf.'s Verified Compl., attaching memorandum from Defendant Hochstetler dated 3/26/01, summarizing information obtained from Sullivan C.F. regarding Plf.'s ability to eat independently].)

104    (Dkt. No. 72, Part 9, at 718 [Ex. A to Howard Decl., attaching Plaintiff's "Progress Notes" dated 3/31/01, stating, at end of report, "Dr. Hochstetler aware"].)

105    (Dkt. No. 72, Part 9, at 720 [Ex. A to Howard Decl., attaching Plaintiff's "Progress Notes" dated 4/8/01]; Dkt. No. 72, Part 9, at 122 [Ex. A to Howard Decl., attaching Plaintiff's "Refusal of Medical Examination and/or Treatment," dated 4/8/01, which states, "Dinner pt. refused assistance with dinner," and indicated that Plaintiff instead wanted to file a medical complaint]; *cf.* Dkt. No. 72, Part 9, at 117 [Ex. A to Howard Decl., attaching Plaintiff's "Refusal of Medical Examination and/ or Treatment," dated 3/7/01, which states that "Pt refused both breakfast and lunch trays"].)

**\*19** Relying on these reports (among other reports), Defendants Hochstetler and Gardella made the professional judgment that Plaintiff did not need assistance with certain activities of daily living, including hand feeding. Rather, their professional judgment was that Plaintiff could (and should be encouraged to) eat independently, with the use of adaptive equipment (i.e., a nonslip "scoop bowl," a nonslip "Dyson pad," and a straw), once corrections officers had "set up" his meal tray.[106] However, Plaintiff grew frustrated with this plan because he felt he was being forced to "huff and suck" down his food "like a dog," as he put it.[107] As a result, he became abusive toward the medical staff.[108] When this happened, Defendants Hochstetler and Gardella decided to stop the hand feeding that they had occasionally been providing to Plaintiff.[109]

106    (Dkt. No. 72, Part 9, at 94 [Ex. A to Howard Decl., attaching Discharge Summary by Defendant Hochstetler regarding Plaintiff, dated 10/28/02]; Dkt. No. 72, Part 9, at 80, 98, 99, 100 [Ex. A to Howard Decl., attaching Plaintiff's medical records dated 11/21/01, 3/21/01, 10/17/02 and 10/23/02, respectively]; Dkt. No. 72, Part 4, at 48, 56, 190 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition]; Dkt. No. 1, Part 2, at 7 [Ex. 2 to Plf.'s Verified Compl., attaching memorandum from Defendant Hochstetler dated 3/26/01, stating that "[i]t is standard medical practice to assist each patient in maintaining as much independence as possible."].)

107    (Dkt. No. 72, Part 4, at 42, 43, 46, 48, 56, 71, 197, 199, 215, 217, 218, 220 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition].)

108    (*See, e.g.,* Dkt. No. 72, Part 9, at 709–710 [Ex. A to Howard Decl., attaching Plaintiff's "Progress Notes" dated 3/18/01, stating, "Noon meal tray set up for patient. Patient adamantly refuses to eat unless he is fed by staff. Order from NP is for pt to feed himself. Pt is argumentative and hostile towards staff. Again, he demeans and accuses other staff members of not caring for his medical needs, calls staff members racists, bitches, etc.... Mr. Shomo will not make any attempts to help himself."] .)

109

(*Id.; see also, infra,* note 106 of this Report–Recommendation.)

For example, in late April of 2001, following an accusation that Plaintiff had pushed a tray onto one of the staff members, Defendant Hochstetler placed Plaintiff on a cabbage diet; then, following a complaint by a nurse that hand feeding Plaintiff had become too "cumbersome," Defendant Hochstetler directed his nurses to stop hand feeding Plaintiff for a couple of days; and, finally, after Plaintiff became verbally abusive toward Defendant Hochstetler, going "ballistic" on him (as Plaintiff puts it), Defendant Hochstetler decided to lengthen the term of that hand-feeding prohibition. [110]

110

(Dkt. No. 72, Part 4, at 59, 70–71, 83, 220–221 [Ex. A to Finkelstein Decl., attaching transcript of Plf.'s deposition]; Dkt. No. 72, Part 9, at 726 [Ex. A to Howard Decl., attaching Plaintiff's "Progress Notes" dated 4/21/01].)

Regardless of what prompted Defendants Hochstetler and Gardella to stop the hand feeding that they had occasionally been providing to Plaintiff between February and April of 2001, the fact remains that their medical judgment (that Plaintiff did not have to be hand fed, as a matter of medical necessity) was supported by several medical opinions. Granted, Plaintiff's position that he needed hand feeding was also supported by certain medical opinions. However, what those differing medical opinions leave us with is a disagreement regarding what medical care Plaintiff should have appropriately received. As explained above in Part II.A.2. of this Report–Recommendation, such a disagreement is not actionable under the Eighth Amendment. [111] Defendants Hochstetler and Gardella were compelled (by Plaintiff's conflicting medical records) to make a professional judgment, and they did so. If that judgment was incorrect, they may conceivably be liable for medical malpractice or negligence. But they are not liable for the sort of criminal recklessness prohibited by the Eighth Amendment. I remind Plaintiff of what the Second Circuit once observed about the level of medical care that is required by the Eighth Amendment (quoted above): "Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] ... seeks." *Dean,* 804 F.2d at 215.

111

*See, supra,* note 64 of this Report–Recommendation (citing *Chance v. Armstrong,* 143 F.3d 698, 703 [2d Cir.1998] ).

Finally, I note that Plaintiff has failed to offer any argument specifically regarding Defendants Allen and Memheart. [112] As explained above in Part II.A.4. of this Report–Recommendation, by not responding to the Corporate Defendants' argument that Plaintiff has failed to allege facts indicating, or adduce evidence establishing, that Defendants Allen and Memheart acted with the requisite state-of-mind to be liable under the Eighth Amendment, Plaintiff has "consented" to that argument. Thus, the only remaining issue is whether the Corporate Defendants' have met their modest, threshold burden "to demonstrate entitlement to the relief requested" through that argument. I find that the Corporate Defendants have met that modest, threshold burden for the reasons stated in their Memorandum of Law. [113] I would add that, even if I were to *sua sponte* scour the record for any proof of a question of fact regarding Plaintiff's claims against Defendants Allen and Memheart, I would reach the same conclusion. I note that various facts asserted by the Corporate Defendants regarding the treatment they provided to Plaintiff (and the services they were not required to provide to him) are supported by the record and are not specifically controverted by Plaintiff. [114]

112

To the extent that Plaintiff intended any of his other state-of-mind arguments to implicitly apply to Defendants Allen and Memheart, Plaintiff is advised that I have already considered, and rejected, those arguments above in Part II.A.2. of this Report–Recommendation.

113

(Dkt. No. 73, Part 8, at 2–6 [Corporate Defs.' Mem. of Law].)

114

(*Compare* Dkt. No. 73, Part 7, ¶¶ 12, 13 [Corporate Defs.' Rule 7.1 Statement] *with* Dkt. No. 79, Part 2, ¶¶ 23–32 [Plf.'s Rule 7.1 Response to Corporate Defs.' Rule 7.1 Statement, not specifically controverting Paragraphs 12 and 13 of that Rule 7.1 Statement]; *see also* Dkt. No. 79, Part 2, ¶ 28 [Plf.'s Rule 7.1 Response to Corporate Defs.' Rule 7.1 Statement, not responding to the bulk of the facts asserted in Paragraph 14 of the Corporate Defs.' Rule 7.1 Statement, and only arguing that a product catalogue shows that the bowl provided to him was not " 'specifically designed' to aid him,"

although the Corporate Defs. did not assert that fact but that the bowl was "specially shaped" and was "provided ... to assist him"]; Dkt. No. 79, Part 2, ¶ 30 [Plf.'s Rule 7.1 Response to Corporate Defs.' Rule 7.1 Statement, not specifically controverting the fact asserted in Paragraph 16 of the Corporate Defs.' Rule 7.1 Statement with a citation to record evidence, but only offering a legal argument, which is insufficient to create a question of fact].)

**\*20** As a result, I recommend that the Court dismiss Plaintiff's claim against the Corporate Defendants under the Eighth Amendment on the ground that Plaintiff has failed to adduce facts establishing that the Corporate Defendants acted with deliberate indifference to Plaintiff's medical needs. Because I find that the Corporate Defendants' first argument (i.e., regarding deliberate indifference) has merit, I need not, and do not, reach the merits of their second argument (i.e., regarding personal involvement).

### 2. Exhaustion of Administrative Remedies

Essentially, the Corporate Defendants offer a two-part argument with regard to Plaintiff's administrative remedies: (1) administrative remedies were in fact available to Plaintiff at his correctional facility, no Corporate Defendant inhibited Plaintiff's ability to utilize the prison grievance procedures in place at Plaintiff's correctional facility, and no "special circumstances" exist excusing Plaintiff's failure to exhaust his administrative remedies; and (2) Plaintiff attempted to appeal only one grievance to DOCS' Central Office Review Committee, and that grievance was rejected due to Plaintiff's failure to follow the proper procedures. [115] Generally, Plaintiff responds that he has in fact exhausted his available administrative remedies, as evidenced by the record documents attached to his Complaint. [116]

[115] (Dkt. No. 73, Part 8, at 6–9 [Corporate Defs.' Mem. of Law].)

[116] (Dkt. No. 79, Part 1, at 30 [Plf.'s Mem. of Law, citing pages 22–24, 29 and 31 of Dkt. No. 73, Part 2 (Ex. C to Young Affid.), which does not actually attach the pages but incorporates them by reference to Exhibits 8, 9, 10, 14, and 16 to Plaintiff's Complaint] .)

Because I have found that adequate grounds exist upon which to base a recommendation that the Court dismiss Plaintiff's claims against the Corporate Defendants (*see, supra* and *infra,* Parts II.B. 1., II.B.3., and II.B.4. of this Report–Recommendation), I need not, and I do not, reach the merits of this argument, other than to make the following observation. The Corporate Defendants' summary of Plaintiff's grievances appears accurate and supported by the record. (*Compare* Dkt. No. 73, Part 2, ¶¶ 18–28 [Young Affid.] *with* Dkt. No. 1, Part 2 [Exs. 1–25 to Plf.'s Compl.].) As a result, it appears from the current record that Plaintiff did not in fact exhaust his available administrative remedies with regard to his claims against the Corporate Defendants. (*See generally* Dkt. No. 1, Part 2 [Exs. 1–25 to Plf.'s Compl.].)

### 3. Claim under ADA or RA

The Corporate Defendants next argue that Plaintiff's claim under the ADA and the RA must be dismissed, because (1) individual defendants such as Defendants Hochstetler, Gardella, Allen and Memheart cannot be liable under either the ADA or the RA, (2) Plaintiff fails to allege facts indicating that the Corporate Defendants were motivated by discriminatory animus or ill will due to disability, and (3) Plaintiff fails to allege facts indicating, and/or adduce evidence establishing, that he exhausted his administrative remedies before filing his ADA and RA claim in federal court. [117]

[117] (Dkt. No. 73, Part 8, at 10–11 [Corporate Defs.' Mem. of Law] .)

Plaintiff responds to only the Corporate Defendants' *first* and *third* arguments. [118] Plaintiff fails to offer any argument regarding the Corporate Defendants' *second* argument. As explained above in Part II.A.4. of this Report–Recommendation, by not responding to the Corporate Defendants' argument that Plaintiff has failed to allege facts indicating that the Corporate Defendants were motivated by discriminatory animus or ill will due to disability, Plaintiff has "consented" to that argument. Thus, the only remaining issue is whether the Corporate Defendants' have met their modest, threshold burden "to demonstrate entitlement to the relief requested" through that argument. I find that the Corporate Defendants have met that modest, threshold burden for the reasons stated in their Memorandum of Law, [119] and for the reasons stated above in Part II.A.3. of this Report–Recommendation.

[118] (Dkt. No. 79, Part 1, at 30 [Plf.'s Mem. of Law].)

**119**    (Dkt. No. 73, Part 8, at 10–11 [Corporate Defs.' Mem. of Law] .)

**\*21**  In the alternative, I find that Plaintiff has also consented (rather expressly) to the Corporate Defendants' *first* argument (i.e., that individual defendants such as Defendants Hochstetler, Gardella, Allen and Memheart cannot be liable under either the ADA or the RA).**120** Furthermore, with regard to that argument, the Corporate Defendants have met their modest, threshold burden for the reasons stated in their Memorandum of Law.**121** *See also Atkins v. County of Orange,* 251 F.Supp.2d 1225, 1233 (S.D.N.Y.2003) ( "Because ... the ADA [and the RA] provide[ ] redress to disabled individuals for discrimination by a public entity, individuals may not be sued [under those statutes].") [citations omitted]. As a result, an additional, independent ground exists for dismissing Plaintiff's ADA and RA claim against Defendants Hochstetler, Gardella, Allen and Memheart.

**120**    (Dkt. No. 79, Part 1, at 30 [Plf.'s Mem. of Law].)

**121**    (Dkt. No. 73, Part 8, at 10 [Corporate Defs.' Mem. of Law].)

As a result, I recommend that the Court dismiss Plaintiff's claim against the Corporate Defendants under the ADA and the RA on the ground that Plaintiff has failed to allege facts indicating that the Corporate Defendants violated either the ADA or RA. I note that a similar conclusion (that Plaintiff's ADA and RA factual allegations fail to state a claim) was reached by the Southern District of New York in *Shomo v. Myers,* 03–CV–10213, 2005 WL 7564834, at \*6 (S.D . N.Y. Apr. 4, 2005) ("I decline to adopt the statute of limitations analysis ... for [Plaintiff's claim under the ADA and RA], ... because Shomo clearly lacks a cause of action under either statute.").

### 4. Claim Under 42 U.S.C. § 1981

Finally, the Corporate Defendants argue that Plaintiff's claim under 42 U.S.C. § 1981 must be dismissed because (1) Plaintiff fails to allege facts indicating that the Corporate Defendants discriminated against him because of his race, and (2) Plaintiff fails to allege facts indicating, and/or adduce evidence establishing, that he exhausted his administrative remedies before filing his Section 1981 claim in federal court.**122**

**122**    (*Id.* at 11.)

Plaintiff responds to only the Corporate Defendants' *second* argument.**123** Plaintiff fails to offer any argument regarding the Corporate Defendants' *first* argument. As explained above in Part II.A.4. of this Report–Recommendation, by not responding to the Corporate Defendants' argument that Plaintiff has failed to allege facts indicating that the Corporate Defendants discriminated against him because of his race, Plaintiff has "consented" to that argument. Thus, the only remaining issue is whether the Corporate Defendants' have met their modest, threshold burden "to demonstrate entitlement to the relief requested" through that argument. I find that the Corporate Defendants have met that modest, threshold burden for the reasons stated in their Memorandum of Law.**124**

**123**    (Dkt. No. 79, Part 1, at 30 [Plf.'s Mem. of Law].)

**124**    (Dkt. No. 73, Part 8, at 11 [Corporate Defs.' Mem. of Law].)

Moreover, even if I were to examine the Corporate Defendants' argument in depth, and I were to independently scour the record for any proof of a factual dispute, I am confident that I would reach the same conclusion. The Corporate Defendants are indeed correct that 42 U.S.C. § 1981 prohibits only discrimination that is motivated by *racial* animus,**125** and I have found no allegation that any of the Corporate Defendants took adverse actions against Plaintiff because of his race.**126**

**125**    *See* 42 U.S.C. § 1981(a) ("All persons ... shall have the same right to ... equal benefit of all laws ... as is enjoyed by white citizens ....").

**126**    (*See generally* Dkt. No. 1 [Plf.'s Compl.].)

**\*22**  As a result, I recommend that the Court dismiss Plaintiff's claim against the Corporate Defendants under 42 U.S.C. § 1981 on the ground that Plaintiff has failed to allege facts indicating that the Corporate Defendants discriminated against him because of his race.

### 5. Claims Under 42 U.S.C. §§ 1984, 1985, 1986, and 2000d

Finally, for the reasons stated above in Part II.A.5. of this Report–Recommendation, I recommend that the Court *sua sponte* dismiss Plaintiff's other civil rights claims against the

2007 WL 2580509

Corporate Defendants (i.e., those claims occurring under 42 U.S.C. §§ 1984, 1985, 1986, and 2000d) on the ground that Plaintiff has failed to allege facts indicating that the Corporate Defendants violated any of those civil rights statutes.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's request to file a sur-reply with regard to Defendants' motions for summary judgment (Dkt. No. 88) is **DENIED,** and the Clerk's Office is directed to **STRIKE** from the docket pages 2 through 5 of Plaintiff's request, which attaches his sur-reply (Dkt. No. 88); and it is further

**RECOMMENDED** that the State Defendants' motion for summary judgment (Dkt. No. 72) be **GRANTED;** and it is further

**RECOMMENDED** that the Court *sua sponte* dismiss Plaintiff's claim against the State Defendants under 42 U.S.C. §§ 1984, 1985, 1986 and 2000d on the ground that Plaintiff has failed to allege facts indicating that the State Defendants violated any of those statutes; and it is further

**RECOMMENDED** that the Corporate Defendants' motion for summary judgment (Dkt. No. 73) be **GRANTED;** and it is further

**RECOMMENDED** that the Court *sua sponte* dismiss Plaintiff's claim against the Corporate Defendants under 42 U.S.C. §§ 1984, 1985, 1986 and 2000d on the ground that Plaintiff has failed to allege facts indicating that the Corporate Defendants violated any of those statutes.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2580509

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Overruling Risk - Negative Treatment

Overruling Risk    Darnell v. Pineiro,    2nd Cir.,    February 21, 2017

2014 WL 4184752
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Karl AHLERS, Plaintiff,
v.
Richard KASKIW, Defendant.

No. 9:12–cv–501 (GLS/ATB).
|
Signed Aug. 21, 2014.

**Attorneys and Law Firms**

Karl Ahlers, pro se.

C. Harris Dague,  Ass't Att'y Gen., for the Defendant.

### *SUMMARY ORDER*

GARY L. SHARPE,  Chief Judge.

*1  Plaintiff *pro se* Karl Ahlers commenced this action against defendant Dr. Richard Kaskiw,[1] pursuant to 42 U.S.C. § 1983, alleging violations of his Fourteenth Amendment due process rights. (*See generally* Am. Compl., Dkt. No. 6.) Specifically, Ahlers, who is a civilly committed sex offender, confined at the Central New York Psychiatric Center (CNYPC), and in the custody of the New York State Office of Mental Health (OMH), alleged that, between July 2011 and September 2012, Kaskiw denied him an adequate diet and appropriate medical care. (*Id.*) In a Report–Recommendation (R & R) issued on July 9, 2014, Magistrate Judge Andrew T. Baxter recommended that Kaskiw's motion for summary judgment be granted and Ahlers' amended complaint be dismissed in its entirety. (Dkt. No. 21.) For the reasons that follow, the R & R is adopted in its entirety.

[1]    Ahlers originally named several additional defendants, all of whom have since been dismissed. (Dkt. No. 8.)

Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate

judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at *3, *5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at *4–5.

Here, neither party has filed objections to the R & R, and the court, therefore, has reviewed it for clear error. *See id.* While the thoughtful and well-reasoned R & R is free of clear error and is adopted in its entirety, the court takes this opportunity to comment on the proper legal framework for analyzing constitutional medical care claims filed by civilly committed sex offenders, which, as Judge Baxter noted, is an area of uncertainty in this District and Circuit. (Dkt. No. 21 at 6–12.) The confusion arises over whether the courts should apply the same deliberate indifference standard that is employed when such claims are raised by convicted prisoners and pretrial detainees, or whether a more plaintiff-friendly reasonable-professional judgment standard is warranted. (*Id.*)

For substantially the same reasons as articulated in the R & R, this court agrees with the majority of our sister courts, and concludes that the appropriate standard for constitutional medical claims asserted by civilly committed sex offenders is the same deliberate indifference standard that applies to convicted prisoners and pretrial detainees. (*See id.* at 8 (collecting cases).) To the extent that this court has hinted otherwise, and inadvertently contributed to the confusion, *see Treat v. Cent. N.Y. Psychiatric Ctr.,* No. 9:12–cv–602, 2013 WL 6169746, at *2 n. 4, *3 (N.D.N.Y. Nov. 20, 2013) (noting the different standards, and indicating that individuals who have been involuntarily committed may be entitled to more considerate treatment and conditions of confinement than prison inmates, but not squarely or definitively deciding the appropriate standard), the court now clarifies which standard it finds appropriate.

*2  Accordingly, having found no clear error in the R & R, the court adopts it in its entirety.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's July 9, 2014 Report–Recommendation (Dkt. No. 21) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Kaskiw's motion for summary judgment (Dkt. No. 17) is **GRANTED;** and it is further

**ORDERED** that Ahlers' amended complaint (Dkt. No. 6) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendant Kaskiw's motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt.Nos.17, 18), which plaintiff has opposed (Dkt. No. 20). This matter was referred to me for Report and Recommendation on January 31, 2014 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

Plaintiff Karl Ahlers is a civilly-committed sex offender, confined at the Central New York Psychiatric Center ("CNYPC"), in the custody of the New York State Office of Mental Health ("OMH"). Liberally construed, the amended complaint ("AC," Dkt. No. 6) alleges that, between July 2011 and September 2012, Dr. Kaskiw denied plaintiff an adequate diet and appropriate medical care, in violation of the Due Process Clause of the Fourteenth Amendment.[1] For the reasons set forth below, this court recommends that defendant's summary judgment motion be granted, and that the remaining claim set forth in plaintiff's amended complaint be dismissed.

[1]    Chief Judge Sharpe's Decision and Order dated April 19, 2013, dismissed various other claims against five additional defendants who were named in the amended complaint. (Dkt. No. 8 at 17).

### FACTS

The amended complaint alleges that, based on an improper diagnosis that plaintiff suffered from a nut allergy, he was kept on a restricted diet at CNYPC, which deprived him of certain foods that were provided to other residents. (AC ¶¶ 2–9, 26–27, 46–48). Plaintiff's requests to be taken off the restrictive diet and to be scheduled for allergy testing, to determine whether he was allergic to nuts, were denied by Dr. Kaskiw and others. (AC ¶¶ 10–18, 21, 28–35, 38). The amended complaint states that, as a result of the restricted diet, plaintiff lost an average of one pound per month since December 2010. (AC ¶¶ 45, 48). Plaintiff also alleges that the medical staff refused to continue to prescribe Lidex cream to address a persistent itchy rash on plaintiff's legs and feet. (AC ¶¶ 39, 41 & Exs. 23, 25; Pl.'s Aff. ¶¶ 40–46, Dkt. No. 20 at 4).[2]

[2]    The amended complaint also alleges that Dr. Kaskiw ignored (1) a complaint from plaintiff on March 26, 2012 "concerning pain that had developed" in his arms, legs, and abdomen (AC ¶¶ 24–25 & Ex. 15); (2) a request on July 13, 2012 concerning a prescription for an ophthalmologist which plaintiff never received (AC ¶ 40 & Ex. 24); and (3) a July 22, 2102 letter noting plaintiff's problems climbing multiple flights of stairs, and requesting an elevator pass (AC ¶ 42 & Ex. 26). Neither plaintiff's amended complaint, nor his motion papers, provide further information regarding any negative impact on plaintiff's health or well-being resulting from the alleged lack of response to these complaints; hence, they clearly do not support a constitutional claim for inadequate medical care based on the legal standards discussed below.

When plaintiff was transferred to CNYPC in May 2009, his prior medical records from other facilities contained numerous references to his nut allergies and the fact that his diet was not to include, *inter alia,* nuts and honey. (Kaskiw Aff. ¶¶ 17, 18, Dkt. No. 17–4; AG DEF–1–3, 11–12, Dkt. No. 18).[3] Based upon plaintiff's documented medical history, the CNYPC staff imposed an allergy-tailored diet plan that excluded foods to which plaintiff was allergic, including nuts and honey.[4] (Kaskiw Aff. ¶ 20, AG DEF–12, 13).

[3]   For example, an August 8, 2007 Nursing Assessment from the Manhattan Psychiatric Center noted that plaintiff had allergies to honey, rice, and nuts, which resulted in abdominal discomfort and vomiting. (AG DEF–2).

[4]   "Examples of products that might contain tree nuts include ... [h]oney ...." USDA Food Allergy Fact Sheet, http:// www.nfsmi.org/documentlibraryfiles/ PDF/20130227020259.pdf. Plaintiff's medical records also indicate that he was allergic to bee stings, which may have influenced the exclusion of honey in his restricted diet. (AG DEF–12–13, 20).

*3 On or about November 7, 2011, plaintiff attended a medical appointment with Dr. Kaskiw, during which he objected to his allergy-tailored diet plan and requested to have the plan discontinued so that he could regulate his own diet. Dr. Kaskiw advised plaintiff that eliminating his dietary restrictions was not medically appropriate, would be in violation of facility policy, and would present a danger to plaintiff. Plaintiff also requested further allergy testing, which Dr. Kaskiw refused as medically unnecessary, given plaintiff's well-documented allergy history. (Kaskiw Aff. ¶ 21; AG DEF–15).

Plaintiff thereafter made repeated complaints to Dr. Kaskiw and other OMH officials, claiming that he had no food allergies, objecting to his restricted diet, and demanding allergy testing. (AC ¶¶ 12–23, 26–38). OMH consistently responded that a change in plaintiff's dietary restrictions and re-testing for allergies were not medically indicated given his history of nut allergies. (Kaskiw Aff. ¶¶ 22–23; AG DEF 31–38).

On or about November 13, 2012, two months after plaintiff filed this lawsuit, he was given a Radioallergosorbent ("RAST") test by an outside allergy testing laboratory. The RAST test was positive for a "Class III" peanut allergy, indicating a "moderate to strong" food allergy. (Kaskiw Aff. ¶¶ 24–26; AG DEF–16–17). Based on the re-testing results, CNYPC continued plaintiff on a restrictive diet, excluding peanuts and peanut by-products. (AG DEF–28–30).

Medical records from the Manhattan Psychiatric Center indicated that, as of August 2007, plaintiff weighed 236 pounds, and that the nursing staff was tasked with educating him about the importance of better dietary choices. (AG DEF–7–8). Upon his transfer to CNYPC on May 28, 2009,

plaintiff's height was 75.5 inches and his weight was 260 pounds, placing him in the "obese" category on the American Medical Association's Body Mass Index ("BMI") scale. (Kaskiw Aff. ¶¶ 34–35 & Ex. 2). Plaintiff's weight was gradually reduced to 216 pounds ("overweight" on the BMI scale) as of September 28, 2011; to 203 pounds (still "overweight") as of September 29, 2012; and to 194 pounds (a normal and healthy weight on the BMI scale) as of December 28, 2013. (Kaskiw Aff. ¶¶ 36–38 & Ex. 2). Dr. Kaskiw observed that plaintiff's "gradual and steady" weight loss over the course of four years "placed him in a vastly improved, medically desirable, healthy place." Dr. Kaskiw concluded that "there has been no need for treatment or medical intervention to curb or other[ ]wise address [plaintiff's] weight loss or dietary restrictions." (Kaskiw Aff. ¶ 39).

Dr. Kaskiw prescribed Lidex cream to plaintiff on January 9, 2012, based on his complaints of dry, scaly skin on his ankles/feet. (Kaskiw Aff. ¶ 43; AG DEF 20–22).[5] On July 30, 2012, CNYPC medical staff examined plaintiff, following his request for Lidex cream, and found dry and itchy skin on his legs, with four to five scattered small scabs. A nurse practitioner determined that a prescription for Lidex cream was not indicated, and suggested plaintiff use an over-the-counter skin moisturizer available through the facility's commissary. (Kaskiw Aff. ¶ 44; AG DEF–23). Plaintiff was examined again on August 21, 2012 and presented with a raised rash on his arm and scabbed areas on his calves. A nurse practitioner advised plaintiff to try a lower-potency steroid cream first, instead of Lidex. (Kaskiw Aff. ¶ 45; AG DEF–24–25). Plaintiff was seen again on November 27, 2012, still complaining of dry, itchy skin and a raised rash on his legs. Plaintiff was treated by a nurse practitioner with Benadryl, Bacitracin and Lac–Hydrin. (Kaskiw Aff. ¶ 46; AG DEF–26–27).

[5]   Lidex cream is a topical steroid anti-inflammatory medication often prescribed to relieve symptoms of eczema, such as itching or skin dryness. (Kasiw Aff. ¶ 42).

### DISCUSSION

### I. Summary Judgment

*4 Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Salahuddin v. Goord, 467 F.3d 263,

272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## II. Medical Care

### A. Applicable Law

In analyzing the contours of the constitutional standard applicable to medical care claims of civilly committed sex offenders, it is helpful such discuss first the standards applied by the courts when such claims are raised by convicted prisoners and pretrial detainees. In order to state a claim for cruel and unusual punishment under the Eighth Amendment, based on constitutionally inadequate medical treatment, a sentenced prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

Constitutional medical care claims by pretrial detainees must be analyzed under the Due Process Clause of the Fourteenth Amendment because the Eighth Amendment's cruel and unusual "punishment" clause is not directly applicable to prisoners who have not been convicted. *Mayo v. County of Albany,* 357 F. App'x 339, 341 (2d Cir.2009). In 2009, the Second Circuit held that the Eighth Amendment "deliberate indifference" standard, as articulated in the Supreme Court's decision in *Farmer v. Brennan,* 511 U.S. 825 (1994)[6], should be applied to constitutional medical care claims of pretrial detainees under the Due Process clause. *Caiozzo v. Koreman,* 581 F.3d 63, 66, 72 (2d Cir.2009) ("[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment"). *Caiozzo,* following the position taken by several other circuit courts, reversed prior Second Circuit precedent which had applied a strictly objective standard in evaluating medical claims by pretrial detainees under the Due Process clause. *Mayo,* 357 F. App'x at 341; *Caiozzo v. Koreman,* 581 F.3d at 71 & n. 4.[7]

[6]   Farmer included a subjective element in the Eighth Amendment standard for deliberate indifference, requiring evidence that the defendant "disregard[ed] a risk of harm of which he [was] aware." *Caiozzo,* 581 F.3d at 65 (quoting *Farmer,* 511 U.S. at 837).

[7]   As the Second Circuit in *Caiozzo* elaborated: "[D]espite the distinct constitutional sources of the rights of pretrial detainees and convicted inmates, state jail and prison officials owe the same duty to provide the same quantum of basic human needs and humane conditions of confinement to both groups.... That pretrial detainees may have more protections or rights in general ... does not mean that they are entitled to greater protection of rights shared in common with convicted inmates.' " 581 F.3d at 71–72 (quoting *Hare v. City of Corinth, Mississippi,* 74 F.3d 633, 649 (5th Cir.1996) (en banc)).

**\*5**  Civilly committed sex offenders are neither convicted inmates, nor "pretrial detainees." However, most of the judges in the Northern District of New York who have analyzed constitutional medical care claims by civilly committed sex offenders at CNYPC have relied upon *Caiozzo* in applying the same deliberate indifference standard applied by the Second Circuit to sentenced prisoners and pretrial detainees. *See, e.g., James v. Morgan,* 9:13–CV–526 (DNH/CFH), 2014 WL

841344, at *2 (N.D.N.Y. March 4, 2014) [8]; *Ali v. Hogan,* No. 9:12–CV–0104 (DNH/RFT), 2013 WL 5466302, at *4 (N.D.N.Y. Sept. 30, 2013); *Smith v. Carey,* No. 9:10–CV–1247 (NAM/TWD), 2012 WL 6923338, at *7 (N.D.N.Y. Dec. 28, 2012) (Rep't–Rec.), *adopted,* 2013 WL 237722 (N.D.N.Y. Jan. 22, 2013); *Balkum v. Sawyer,* No. 6:06–CV–1467 (NPM), 2011 WL 5041206, at *11 (N.D.N.Y. Oct. 21, 2011); *Smith v. Hogan,* No. 9:09–CV–554 (GTS/GHL), 2011 WL 4343978, at *8 (N.D.N.Y. Aug. 1, 2011) (Rep't–Rec .), *adopted,* 2011 WL 4343809 (N.D.N.Y. Sept. 14, 2011). Some of our judges, however, have noted uncertainty as to whether a different standard for medical care claims of civilly committed persons should be applied, at least in the alternative, based on the Supreme Court's case in *Youngberg v. Romeo,* 457 U.S. 307, 321–22 (1982) and its progeny. *See, e.g., Groves v. New York,* No. 9:09–CV–412 (GLS/DEP), 2010 WL 1257858, at *6, *8 (N.D.N.Y. Mar. 1, 2010) (persons in nonpunitive detention have a right to "reasonable medical care," a standard demonstrably higher than the Eighth Amendment standard that protects prisoners-"deliberate indifference to serious medical needs") (citing *Haitian Ctrs. Council, Inc. v. Sale,* 823 F.Supp. 1028, 1043 (E.D.N.Y.1993); *Owens v. Colburn,* 860 F.Supp. 966, 974 (N.D.N.Y.1994), *aff'd,* 60 F.3d 812 (2d Cir.1995) (table)) (Rep't–Rec.), *adopted,* 2010 WL 1257942 (N.D.N.Y. Mar. 26, 2010).

[8]    "Because plaintiff was civilly committed at the time of the incident, his medical care claims are analyzed under the Due Process Clause of the Fourteenth Amendment rather than under the Eighth Amendment..... Despite this distinction, the same standard applies to Fourteenth Amendment medical care claims involving non-prisoners as to Eighth Amendment medical claims regarding prisoners." *Id.* (citing, *inter alia, Caiozzo,* 581 F.3d at 72).

*Youngberg* considered the legal standard that should be applied to assess the claim asserted on behalf of a "mentally retarded" individual, who was involuntarily committed to a state institution, and whose substantive due process rights to safe conditions of confinement, freedom from bodily restraint, and training or "habilitation" were allegedly violated. *Youngberg,* 457 U.S. at 309. The Supreme Court noted that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321–22. The Youngberg court

held that the standard articulated by Chief Judge Seitz in the lower court opinion under review

> ... affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints. He would have held that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."

**\*6**  *Id.* at 321 (quoting *Romeo v. Youngberg,* 644 F.2d 147, 178 (3d Cir.1980) (en banc) (Seitz, C.J., concurring).

It does not appear that the Supreme Court or the Second Circuit have explicitly ruled on whether *Youngberg* would require the application of a different standard for constitutional medical care claims for civilly committed persons than is now applied to sentenced prisoners and pretrial detainees. [9] There is disagreement among other courts on this question. *See, e.g., Battista v. Clarke,* 645 F.3d 449, 453 & n. 4 (1st Cir.2011) (the opinions as to whether a different, more plaintiff-friendly reasonable-professional-judgment standard applies to civilly committed individuals, based on *Youngberg v. Romeo,* are "not uniform") (collecting cases).

[9]    In *Ahlers v. Rabinowitz,* 684 F.3d 53, 61 (2d Cir.2012), the Second Circuit discussed *Youngberg* in assessing prior civil rights claims of the plaintiff in this action relating to the seizure of certain of his DVDs by officials at CNYPC:

> Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 321–22.... However, the state's interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil commitment." ... The state also has an interest in treating the civilly committed individual.... The reasonableness of the seizure in this case depends on a balance of interests: the state's interests in order, security, and treatment, and Ahlers's property interest in his discs..... In striking the appropriate balance, decisions

made by the Defendants are entitled to a " 'presumption of correctness.' "

This panel decision indicates the Second Circuit may still adhere to the general proposition that civilly committed individuals are entitled to more considerate conditions of confinement than convicted prisoners. However, it does not shed much light on the appropriate standard to apply to medical care claims of a civilly committed sex offender following the decision in *Caiozzo* that the deliberate indifference standard applies to pretrial criminal detainees.

This court is persuaded by the opinions in other circuits that *Youngberg,* when construed in light of subsequent Supreme Court cases, does not compel a different standard for medical care claims for civilly committed individuals and prisoners or pretrial detainees. *See, e.g., Scott v. Benson,* 742 F.3d 335, 339 (8th Cir.2014) (because the Supreme Court later said that *Youngberg* "did not deal with decisions to administer or withhold medical treatment[ ]," *Cruzan by Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 279–80 (1990), we apply the deliberate indifference standard from the Eighth Amendment to the medical care claims of a civilly committed plaintiff); *Hare v. City of Corinth, Miss.,* 74 F.3d 633, 646–47 (5th Cir.1996) (although *Youngberg* announced a distinct standard to be applied in measuring the state's constitutional duties to mental incompetents, the Court's later decision in *DeShaney,* called into question the constitutional significance of the *Youngberg* decision) [10] (citing *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 199–200 (1989)). *See also Serna v. Goodno,* 567 F.3d 944, 949 (8th Cir.2009) (applying the Fourth Amendment standard applicable to a pretrial detainee to a civil detainee, based on an analogy drawn by the *Youngberg,* 457 U.S. at 320–21, between pretrial detainees and civilly committed persons, as two groups that could be subjected to liberty restrictions "reasonably related to legitimate government objectives and not tantamount to punishment") [11] However, like the Fifth Circuit in *Hare,* 74 F.3d at 647, I need not resolve whether the professional judgment standard suggested by *Youngberg* has continuing vitality in the context of medical care claims, because, as discussed below, the standard is not substantially different from "deliberate indifference," and both would produce the same outcome on the facts of this case.

[10]    "*DeShaney* clarified that '[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions

of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.' 489 U.S. at 200.... In other words, *DeShaney* suggests that a State's declared intent to confine incompetents for their own benefit, as opposed to its announced purpose to punish convicted criminals, should have no bearing on the nature of the constitutional duty owed to either group.... Since the State restrains the individual liberty of both mental incompetents and convicted inmates in a like manner, the State should incur the same duties to provide for the basic human needs of both groups." *Hare,* 74 F.3d at 647. In holding that the "deliberate indifference" standard applies to claims that a pretrial detainee was deprived of basic human needs, including medical care, the Fifth Circuit also noted that subsequent Supreme Court cases such as *Farmer,* which articulated the deliberate indifference standards for prisoners, "cast doubt on the vitality of *Youngberg." Id.* As noted above, the Second Circuit in *Caiozzo* relied on *Hare* and *Farmer* in deciding to apply the deliberate indifference standard to pretrial detainees asserting medical care claims.

[11]    "The similarity in the grounds for detaining persons awaiting trial and persons determined to be sexually dangerous supports application of the analogy to pretrial detainees ...." *Serna v. Goodno,* 567 F.3d at 948.

## 1. Deliberate Indifference

The objective prong of the deliberate indifference standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining

2014 WL 4184752

when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d at 702).

 *7  The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

### 2. Professional Judgment

Chief Judge Seitz's concurring opinion in the Third Circuit elaborated on the professional judgment standard adopted, on review, by the Supreme Court in *Youngberg:*

[T]he defendants are liable if their conduct was such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of this plaintiff as to demonstrate that the defendants did not base their conduct on a professional judgment.... By "accepted professional judgment" I do not mean some standard employed by a reasonable expert or a majority of experts in the community, as state malpractice actions would require, but rather that the choice in question was not a sham or otherwise illegitimate.... The 'substantial departure from accepted professional judgment' standard effectively distinguishes between conduct that violates the minimum requirements of the Constitution and conduct, such as ordinary malpractice, that does not.

 *8  *Romeo v. Youngberg,* 316 F.3d at 178. I agree with the judges who have parsed this standard and have concluded that it is not "all that far apart" from the deliberate indifference standard articulated in *Farmer.* See, e.g., *Battista v. Clarke,* 645 F .3d at 453 ("[b]oth the *Farmer* and *Youngberg* tests leave ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources"). *See also Groves v. New York,* 2010 WL 1257858, at *6 (concluding that "[a]t a minimum, due process forbids conduct that is deliberately indifferent to one that is involuntarily committed" and focusing on the "deliberate indifference" standard in reviewing the medical care claim of the civilly-committed CNYPC sex offender).

I would respectfully disagree with the 1993 Eastern District of New York opinion in *Haitian Ctrs. Council, Inc. v. Sale,* 823 F.Supp. at 1043, and other cases to the extent they suggest that *Youngberg* imposed a "reasonable medical care" standard for civil detainees that is "demonstrably higher" than the Eighth Amendment deliberate indifference standard. [12] Such a "reasonable medical care" "is easily confused" with a negligence or medical malpractice standard that was clearly not intended by the Court in *Youngberg. Hare v. City of Corinth, Miss.,* 74 F.3d at 646.

12    *Bost v. Bockelmann,* No. 9:04–CV–246 (GLS/ DEP), 2007 WL 237320, at * 1 (N.D.N.Y. Feb. 20, 2007) distinguished *Haitian Centers* because it dealt with immigration issues and was "wholly outside the context of prisoner litigation." *Owens v. Colburn,* 860 F.Supp. at 974, a 1994 Northern District of New York case which applied the

"reasonable medical care" standard to pretrial detainees, was clearly overruled by the Second Circuit's 2009 opinion in *Caiozzo,* which held that the "deliberate indifference" standard should apply in that context.

**B. Analysis**

Pursuant to the legal analysis above, this court will evaluate plaintiff's complaints about his medical care primarily under the "deliberate indifference" standard applicable both to prisoners under the Eighth Amendment and to persons in non-punitive detention under the Due Process Clause. However, in the alternative, I will also assess how plaintiff's claims would fare under the "professional judgment" standard, to the extent that applies to civilly committed individuals.

**1. Restrictive Diet/Weight Loss**

"The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health .... While prison officials are duty bound to provide inmates with nutritionally adequate food, 'absent religious or medical [ly] peculiar circumstances, a prisoner does not have a right to a specialized diet while incarcerated[.]' " *Bost v. Bockelmann,* No. 9:04–CV–246 (GLS/DEP), 2007 WL 527320, at *10 (N.D.N.Y. Feb. 20, 2007) (citations omitted). Prison officials have the discretion to control a prisoner's diet within these constitutional constraints, and " '[p]reference for certain foods and dislike of others cannot be equated with a constitutional guarantee to a custom-tailored menu.' " *Collado v. Sposato,* No. 12–CV–2151, 2012 WL 3113837, at *4 (E.D.N.Y. July 24, 2012) (quoting *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001)). To establish a deliberate indifference claim with respect to a medically prescribed diet, " 'one must establish that there was a sufficiently serious condition that resulted from the food not being received.' " *Gaines v. Armor Health Care, Inc.,* No. 12–CV–4666, 2012 WL 5438931, at *5 (E.D.N.Y. Nov. 2, 2012) (citing, *inter alia, Evans v. Albany County Correctional Facility,* No. 9:05–CV–1400 (GTS/DEP), 2009 WL 1401645, at * 9 (N.D.N.Y. May 14, 2009)).

**\*9** As discussed above, plaintiff Ahlers was placed on a restricted diet based on nut allergies that were clearly documented in his medical records and that were eventually confirmed by independent laboratory testing, albeit after plaintiff filed this action. The only medical consequence of the restricted diet imposed on plaintiff was that, over the course of more than four years, he gradually lost 66 pounds,

going from a body weight that was classified as "obese" on the BMI scale, to a normal and healthy weight of 194 pounds. While "rapid weight loss or weight loss coupled with other conditions may present a serious medical condition[,]" [13] plaintiff's gradual transformation from obesity to a healthy body weight clearly does not satisfy the objective prong of the deliberate indifference standard. *See, e.g., Evans v. Albany County Correctional Facility,* 2009 WL 1401645, at *10 (even assuming that plaintiff lost 30 pounds and experienced dizziness and headaches over a four-month period the court concludes that there is no evidence in the record from which a reasonable fact finder could conclude that plaintiff's " 'weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation' ") (citing *Bost v. Bockelmann,* 2007 WL 527320, at *8).

[13]  *See, e.g., Anderson v. Kooi,* No. 9:07–CV–1257 (DNH/GHL), 2011 WL 1315721, at * 12 (N.D.N.Y. Jan. 24, 2011) (citing *Kaminsky v. Rosenblum,* 929 F.2d 922, 924, 926–27 (2d Cir.1991) (high blood pressure, diabetes, angina, gout and an enlarged spleen held to be serious medical needs, particularly in light of prisoner's extreme weight loss)) (Rep't Rec.), *adopted,* 2011 WL 1256942 (N.D.N.Y. Apr. 1, 2011).

The defendant and the OMH staff did not violate plaintiff's constitutional rights by imposing a diet on plaintiff that was contrary to his medical needs. Rather, they restricted plaintiff's diet in a manner that was reasonably consistent with his documented food allergies. As noted above, Dr. Kaskiw made a medical judgment that the restricted diet was medically necessary and that the resulting weight loss greatly improved plaintiff's overall health. Plaintiff's disagreement with Dr. Kaskiw's treatment decisions, even if it had some factual support (which it does not), clearly is not sufficient to create an issue of fact about whether plaintiff could establish the subjective element of the deliberate indifference standard. *See, e.g., Bost v. Bockelmann,* 2007 WL 527320, at *10 ("[to the extent that plaintiff complains about having been prescribed a high protein diet, as distinct from the high calorie intake diet which he sought in order to secure extra portions of food, the claim fails to rise to a level of constitutional significance, instead merely representing the sort of disagreement with a prescribed course of treatment that does not establish a defendant's deliberate indifference"). Even if there were occasional issues as to how plaintiff's restricted diet was implemented by food services workers

at CNYPC (who are not, in any event, defendants in this action), such arguably negligent oversight of plaintiff's food choices would not constitute deliberate indifference. *See, e.g., Evans v. Albany County Correctional Facility,* 2009 WL 1401645, at * 11 (the evidence is lacking that any prison medical personnel or food service providers were cognizant of a serious medical need on the part of the plaintiff and aware that their failure to be faithful in providing the prescribed diet would result in a substantial risk of serious harm); *Gaines v. Armor Health Care, Inc.,* 2012 WL 5438931, at *5–6.

 *10 Moreover, no reasonable fact finder could conclude that Dr. Kaskiw's medical care of plaintiff reflected such a "substantial departure from accepted professional judgment" as to make his treatment choices "a sham or otherwise illegitimate." [14] Hence, even if the "professional judgment" standard suggested by *Youngberg* applied to plaintiff's medical claims, defendant is still entitled to summary judgment.

[14]    This is part of Chief Judge Seitz's formulation of the "professional judgment" standard that was adopted by reference by the Supreme Court in *Youngberg. Romeo v. Youngberg,* 316 F.3d at 178; *Youngberg v. Romeo,* 457 U.S. at 321.

### 2. Lidex Cream

No rational fact finder could conclude, on the record in this case, that plaintiff's complaints about the treatment of his skin rash and eczema at CNYPC met either the objective or subjective prongs of the deliberate indifference test. [15] Plaintiff's skin condition is clearly not a sufficiently serious medical condition to meet the objective element of this standard. *See, e.g., Melendez v. Costello,* No. 6:12–CV–6226, 2013 WL 5937052, at *7 (W.D.N.Y. Nov. 1, 2013) ("[p]laintiff cannot establish the 'serious medical need' component of a deliberate indifference claim based on his eczema" (citing *Sledge v. Kooi,* 564 F.3d 105, 107, 108 (2d Cir.2009) ("Sledge failed to produce sufficient evidence that any one of the conditions complained of [i.e., eczema, back pain, stomach disorders, allergies, and asthma] qualified as a 'serious medical need.' ")); *Samuels v. Jackson,* 97–CV–2420, 1999 WL 92617, at *1–3 (S.D.N.Y. Feb. 22, 1999) (prisoner's "[p]apules, vesicles, pustules, burrows, and intense itching resulting in eczema" did not constitute a sufficiently "serious medical need" for purposes of Eighth Amendment). Nor, based on the authority cited above, is plaintiff's disagreement with his medical care providers about

the appropriate medication for his skin condition sufficient to create a factual issue as to whether they harbored subjective deliberate indifference to his serious medical needs. [16] To the extent that the "professional judgment" standard suggested by *Youngberg* applies to plaintiff's medical care claim, the treatment of plaintiff's skin condition with more conservative medications than the one he preferred certainly does not constitute a "substantial departure from accepted professional judgment."

[15]    Plaintiff's response to defendant Kaskiw's summary judgment motion suggests that he may dispute that his skin condition was treated at various times, albeit with medications other than those he requested. (Pl.'s Aff. ¶¶ 40–46, Dkt. No. 20 at 4 ("it took almost one full year to treat my itchy rash on both legs and feet!")). Given the affidavits submitted by defendant Kaskiw and the supporting medical records, plaintiff's unsupported suggestion that he may have not received the documented treatment for his skin condition does not create an issue of fact that would defeat the summary judgment motion. *See, e.g., Benitez v. Pecenco,* No. 92 Civ. 7670, 1995 WL 444352 at *7 n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")); *Brown v. White,* 9:08–CV–200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record). *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and

thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

16 As discussed in the factual summary above, the nurse practitioners who denied plaintiff the Lidex cream originally prescribed by Dr. Kaskiw, are not named defendants in this case. Although Dr. Kaskiw may have supervised the nurse practitioners at CNYPC, it does not appear that he was personally involved in denying Lidex cream to plaintiff, which would provide further support for granting defendant Kaskiw's motion for summary judgment with respect to this aspect of plaintiff's medical care claim. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Plaintiff alleged that Dr. Kaskiw ignored two letters that plaintiff wrote requesting treatment with Lidex cream. (AC ¶¶ 39, 41). It is well-settled that the failure of a supervisory official to respond to a letter of complaint written by an inmate is not sufficient to show personal involvement. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)

(collecting cases); *Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant Kaskiw's motion for summary judgment (Dkt. Nos.17, 18) be **GRANTED** on the grounds stated herein, and that the remaining claims in plaintiff's amended complaint be **DISMISSED** in their entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**\*11  Dated: July 9, 2014.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4184752

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1283660

2015 WL 1283660
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Frank A. DEMEO, Plaintiff,
v.
Carl J. KOENIGSMANN, MD, et al., Defendants.

No. 11 Civ. 7099(HBP).
|
Signed March 20, 2015.

*OPINION AND ORDER*

PITMAN, United States Magistrate Judge.

**I.** *Introduction*

**\*1** Frank A. DeMeo, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), proceeding *pro se,* commenced this action against Drs. Carl J. Koenigsmann, Timothy Whalen, Mervat Makram, Jonathan Holder and Frank Lancellotti pursuant to 42 U.S.C. § 1983, alleging that the defendants were deliberately indifferent to injuries to his right biceps muscle and shoulder that were sustained during his incarceration at Woodbourne Correctional Facility ("Woodbourne"). Specifically, plaintiff alleges that defendants failed to provide him with "timely and adequate medical care" in violation of the Eighth Amendment (First Amended Complaint, dated May 15, 2012, (Docket Item 45) ("Am.Compl.") ¶ 1). Plaintiff also brings state law claims of medical malpractice and negligence against the defendants (Am.Compl.¶¶ 1, 8487). Plaintiff seeks damages, as well as declaratory and injunctive relief (Am. Compl. at 20). By notice of motion dated June 2, 2014 (Docket Item 62), defendants move to dismiss plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

The parties have consented to my exercising plenary jurisdiction over this matter pursuant to 28 U.S.C. § 636(c) (Docket Item 38). For the reasons set forth below, defendants' motion to dismiss is granted in part and denied in part.

**II.** *Facts* [1]

[1] The facts set forth herein are drawn from plaintiff's First Amended Complaint, [Plaintiff's Opposition] to Defendant's Motion to Dismiss Plaintiff's Complaint—42 U.S.C. § 1983, dated July 25, 2014 (Docket Item 59) ("Pl.'s Opp.") and the exhibits attached to both submissions. I have also considered plaintiff's sur-reply (Letter of Frank A. DeMeo to the undersigned, dated August 12, 2014 (Docket Item 66)). In general, "[c]ourts in this Circuit have made clear that a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss." *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria,* 265 F.R.D. 106, 122–23 (S.D.N.Y. Jan. 26, 2010) (Leisure, D.J.) (collecting cases). However, "the policy reasons favoring liberal construction of *pro se* complaints permit a court to consider allegations of a *pro se* plaintiff in opposition papers on a motion where ... those allegations are consistent with the complaint." *Rodriguez v. McGinnis,* 1 F.Supp.2d 244, 246–47 (S.D.N.Y.1998) (Rakoff, D.J.) (adopting Report and Recommendation) (collecting cases). Thus, "[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walter v. Schult,* 717 F.3d 119, 122 n. 1 (2d Cir.2013), *citing Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering *pro se* plaintiff's affidavit in opposition to a motion to dismiss for failure to state a claim). Accordingly, in resolving defendants' motion, I have considered the factual allegations made by plaintiff in his opposition papers that are consistent with the claims made in his amended complaint.

**A.** *The Injury*

On Wednesday, October 13, 2010, while incarcerated at Woodbourne and working as a "gym porter," plaintiff was storing dumbbell weights and allegedly ruptured his right biceps muscle and tore his right rotator cuff (Am. Compl. ¶ 15; Pl.'s Opp., at 4.[2] ; *see also* Ambulatory Health Record Progress Note, annexed as Exhibit A to Am. Compl., at 1). At the time, plaintiff heard a "pop" but did not feel any pain (Am. Compl., Ex. A, at 1).

[2] Because plaintiff includes attachments with inconsistent exhibit labels and pagination, I refer

Case 9:21-cv-00251-DNH-TWD   Document 37   Filed 05/22/23   Page 107 of 229
DeMeo v. Koenigsmann, Not Reported in F.Supp.3d (2015)
2015 WL 1283660

to the page numbers assigned by the Court's ECF system for all citations to plaintiff's opposition.

Plaintiff allegedly informed Corrections Officer ("C.O.") Bivens of his injury (Am. Compl., Ex. A, at 1; Pl.'s Opp., at 4). Plaintiff claims that, at the direction of Area Sergeant Cohn, C.O. Bivens reported the injury to Nurse Baumgarten at Woodbourne's hospital; Nurse Baumgarten reportedly told C.O. Bivens not to send plaintiff to the hospital unless he was bleeding or had a compound fracture and that plaintiff should submit a sick-call request (Pl.'s Opp., at 4). Plaintiff claims that he submitted a "sick-call slip" that same day, but it was not "received" until Thursday, October 14, 2010, and he was not seen until Monday, October 18, 2010 (Pl.'s Opp., at 4).[3]

[3]   Plaintiff has also submitted his January 3, 2011 letter to Dr. Koenigsmann, the Deputy Commissioner and Chief Medical Officer of the Division of Health Services, in which he claims that after the incident on October 13, 2010, he reported the injury to C.O. Bivens, who asked if he wanted to go to emergency sick call (Pl.'s Opp., at 35). Plaintiff claimed in this letter that he declined to go to sick call because in the past Nurse Baumgarten instructed him to seek assistance only if he was bleeding or had a compound fracture (Pl.'s Opp., at 35). Instead, he stated that he "waited a day or two to see how [he] felt," experienced "discomfort" and significant loss in strength in his arm and shoulder and finally went to sick call on October 18, 2010 (Pl.'s Opp., at 35).

B. *The Diagnosis*

On October 18, 2011, plaintiff saw an unidentified nurse, Physician Assistant ("P.A.") Switz and Dr. Lancellotti at sick call (Am. Compl., at 5 & Ex. A, at 1). The nurse noted that plaintiff denied that his pain was severe, complained of a bruise on his right biceps and, stated that, at the time he sustained the injury, "[i]t felt like something separated" (Am. Compl., Ex. A, at 1). The nurse saw no "obvious deformity" but noted an ecchymosis[4] on plaintiff's right biceps that was approximately two inches in diameter (Am. Compl., Ex. A, at 1).

[4]   An ecchymosis is "a small hemorrhagic spot ... in the skin or mucous membrane forming a nonelevated, rounded or irregular, blue or purplish

patch." *Dorland's Illustrated Medical Dictionary,* (*"Dorland's"* ) at 525 (27th ed.1988).

**\*2** P.A. Switz concluded that plaintiff had a "possible proximal biceps rupture,"[5] ordered an MRI of plaintiff's right shoulder and directed plaintiff to wear a sling until the MRI results were available (Am. Compl., ¶ 17 & Ex. A, at 1). P.A. Switz also submitted a request for an MRI of the right biceps for review by Dr. Lancellotti and final approval by Dr. Makram, noting that the MRI should be conducted "soon" (Am. Compl. ¶¶ 10, 18–21, 72; Request and Report of Consultation, dated November 10, 2010, annexed as Exhibit C to Am. Compl.).

[5]   A rupture of the biceps muscle is a "forcible tearing or disruption of" the muscle tissue. *Dorland's* at 1476.

During the October 18 consultation with the medical staff, plaintiff's upper right arm was x-rayed. The x-ray revealed post-surgical[6] changes to the acromioclavicular joint[7] and humeral head[8] and degenerative glenoid humeral joint disease[9], but no acute bone injury (X–Ray Requisition and Report, dated October 18, 2010, annexed as Exhibit D to Am. Compl.).

[6]   One of plaintiff's shoulders was surgically repaired in 2003 and the other was surgically repaired in 2005 (Letter of Frank DeMeo to Dr. Rubinovich, dated June 20, 2011, annexed as Exhibit R to Am. Compl.). After dislocating his right shoulder and re-tearing his right rotator cuff, plaintiff's right shoulder was repaired again in 2007 (Am.Compl., Ex. R).

[7]   The acromioclavicular joint is the shoulder joint at which the spine of the scapula and the clavicle meet. *Dorland's* at 21.

[8]   The humeral head is where the humerus bone, the upper bone of the arm, intersects with the scapula/shoulder. *Dorland's* at 779.

[9]   Degenerative joint disease, also known as osteoarthritis, is a form of arthritis that "causes pain, swelling, and reduced motion in" joints—here, the shoulder joint. U.S. National Library of Medicine, National Institutes of Health, Medline Plus Medical Encyclopedia, "Osteoarthritis," http://

Case 9:21-cv-00251-DNH-TWD    Document 37    Filed 05/22/23    Page 108 of 229
DeMeo v. Koenigsmann, Not Reported in F.Supp.3d (2015)
2015 WL 1283660

www.nlm.nih.gov/-medlineplus/
osteoarthritis.html (last visited Feb. 10, 2015).

Plaintiff alleges that, on an unidentified date after October 18, 2010, Dr. Makram [10] denied the initial request for the MRI "based on purely financial considerations" and that an MRI was scheduled only after Dr. Lancellotti made a second request (Am. Compl. ¶ 21 & Ex. C; Pl.'s Opp., at 5).

[10]     Dr. Makram was the Facility Health Services Director at Woodbourne and was employed by DOCCS (Am.Compl.¶ 10). She was allegedly responsible for the final approval of elective procedures, distributed polices, procedures and guidelines for medical care and managed operations, reporting to Dr. Koenigsmann, the Chief Medical Officer (Am.Compl.¶ 10).

On November 15, 2010, approximately four weeks after the injury, an MRI was conducted (Am.Compl.¶ 22). It disclosed "a full thickness retracted proximal biceps tendon rupture with a large amount of surrounding fluid," "no evidence [of] muscle atrophy" or fracture, "a full thickness re-tear of the supraspin-atus tendon" [11] and "glenohumeral joint effusion" [12] (Albany Medical Center Final Report, dated November 22, 2010, annexed as Exhibit F to Am. Compl.). Plaintiff received the results on December 2, 2010, and Dr. Lancellotti scheduled a consultation with Dr. Holder, an orthopedic surgeon, on December 9, 2010 (Am.Compl.¶¶ 12, 24–25).

[11]     "The supraspinatus tendon attaches the supraspinatus muscle ... from the shoulder blade[ ] to the head of the arm bone at the shoulder joint." HealthHype.com, "Supraspinatus Tendon–Tendinitis, Tendinosis and Tear," http://www.health-hype.com/ supraspinatus-tendon-tendinitis-tendinosis-and-tear.html (last visited Feb. 10, 2015).

[12]     Glenohumeral joint effusion is the presence of fluid in the shoulder joint. *Dorland's* at 532.

Dr. Holder examined the plaintiff and reviewed his x-ray and MRI results; he noted that plaintiff had full range of motion with no restrictions in his right arm and no weakness upon abduction or flexion, although he did find a "biceps belly deformity" (Request and Report of Consultation, dated December 2, 2010, annexed as Exhibit H to Am. Compl.). Dr. Holder diagnosed plaintiff with a chronic right biceps rupture

but did not find a rotator cuff tear (Am.Compl., Ex. H). He also determined that the biceps rupture was "not surgically amenable [to] repair" (Am.Compl., Ex. H).

Plaintiff alleges that Dr. Holder explained that he could not conduct surgery because plaintiff's biceps muscle tissue was so degenerated that the tissue would shred, causing "extensive irreversible damage and loss of function to plaintiff's arm and shoulder" (Am.Compl.¶ 28). Plaintiff claims that Dr. Holder told him to expect a loss of one-third of the strength in his arm and that surgery of biceps and rotator cuff tears must be conducted within two to three weeks of injury to be effective (Am. Compl. ¶¶ 29–30; Pl.'s Opp., at 6). He also claims that Dr. Holder advised him to seek a second opinion (Am.Compl.¶ 30).

### C. *Plaintiff's Request for a Second Opinion and a Second MRI*

**\*3** On December 23, 2010, after reviewing Dr. Holder's report, Dr. Lancellotti allegedly informed plaintiff that a second opinion would not be provided and reiterated that surgery would be effective only if it was performed within two to three weeks of injury (Am. Compl. ¶ 31 & Ex. A, at 4).

On January 3, 2011, [13] plaintiff sent a letter to Dr. Koenigsmann requesting permission to seek a second opinion at his own expense (Am.Compl.¶¶ 8, 33). Plaintiff claims that he received no response and that on March 2, 2011 he sent a second letter to Dr. Koenigsmann (Am.Compl.¶¶ 34, 36).

[13]     In his opposition to the motion to dismiss, plaintiff claims he sent this letter on January 3, 2010 (Pl.'s Opp., at 6); plaintiff's alleged injury occurred in October 2010. I believe that plaintiff is referring to a letter he sent on January 3, 2011 but that he erroneously dated January 3, 2010 (*see* Pl.'s Opp., at 35–36).

Rita Grinbergs, the Regional Health Services Administrator, wrote to plaintiff on March 15, 2011, [14] stating that she had spoken with plaintiff's doctor at Woodbourne, who advised that the injury was not amenable to surgery (Letter of Rita Grinbergs to Frank DeMeo, dated March 15, 2011, annexed as Exhibit I to Am. Compl.). Grinbergs instructed plaintiff that he "must follow the procedure set forth in [Health Services Policy & Management ("HSPM") ] 7.02 'Inmate Provider of Choice' " [15] to request a second opinion and stated that it

appeared plaintiff had not yet submitted a proper request to Dr. Makram (Am.Compl., Ex. I).

14    Plaintiff refers to this letter by the date he claims that he received it, March 21, 2011, but his citation to Exhibit I of the Amended Complaint makes it clear that he is referencing the letter dated March 15, 2011 (*see, e.g.,* Am. Compl. ¶ 38).

15    HSPM 7.02 describes the procedure for requesting a consultation by a specialist at the inmate's expense and requires the inmate to submit a written request to the Facility Health Services Director, who must seek the approval of the Deputy Commissioner and/or Chief Medical Officer prior to the consultation (HSPM 7.02 annexed to Pl.'s Opp., at 39).

On March 28, 2011, plaintiff wrote to Dr. Makram formally requesting a second opinion and expressing his belief that his biceps could be repaired surgically (Letter of Frank DeMeo to Dr. Mervat Makram, dated March 28, 2011, annexed as Exhibit J to Am. Compl.). In response, Dr. Makram wrote, "This issue was discussed with you before[.] No recommendation from orthopedist for surgery" (Am.Compl., Ex. J). On March 31, 2011, plaintiff again wrote Dr. Makram to confirm that his request for a second opinion was denied (Am.Compl.¶ 41). On April 1, 2011, Dr. Makram responded that Woodbourne would follow Dr. Holder's recommendation against surgery [16] (Letter of Dr. Mervat Makram to Frank DeMeo, dated April 1, 2011, annexed as Exhibit K to Am. Compl.).

16    Dr. Makram wrote:

        After review of your medical file on 12/09/10 when you were seen by orthopedist[,] he diagnosed you [with a] "biceps rupture chronic"[;] he noted[,] "not surgically amenable at this time[.]" There was no notation of any delay in your care as the cause of not operating at this time. Please note that you injured the same shoulder back in 2007 [and it] was noted on the MRI of 11/15/10 [that you had a r]e-injury [and] re[-]tear of one of the muscles in your shoulder. Woodbourne is following the orthopedist['s] (specialist) recommendation for no surgery at this time (Am.Compl., Ex. K).

On April 11, 2011, plaintiff filed a grievance with Woodbourne's Inmate Grievance Review Committee (the "IGRC") based on the delay in diagnosis and treatment of his injuries, the permanent loss of function with respect to his arm and shoulder and the denial of permission to seek a second opinion and outside treatment (Letter of Frank DeMeo to the IGRC, dated April 11, 2011, annexed as Exhibit L–A to Am. Compl.). As a remedy, plaintiff sought permission to seek a second opinion based on a physical examination and outside treatment of his injuries (Am.Compl., Ex. L–A). On April 12, 2011, in response to plaintiff's grievance, Dr. Makram explained plaintiff's treatment history and diagnosis to the IGRC and stated that plaintiff had not requested a second opinion (Am.Compl., Ex. L–A).

On April 19, 2011, the IGRC recommended that plaintiff's request for a second opinion be granted and found that the request complied with all procedural requirements (IGRC Recommendation, dated April 19, 2011, annexed as Exhibit L–B to Am. Compl.). On May 10, 2011, plaintiff received a letter from the Inmate Grievance Program's Superintendent informing him that his request for a second opinion had been forwarded to the Regional Medical Director, Dr. Whalen (Letter of Inmate Grievance Program Superintendent to Frank DeMeo, dated May 10, 2011, annexed as Exhibit N to Am. Compl.).

**\*4** In a letter to Woodbourne's Nurse Administrator, dated May 16, 2011, plaintiff requested that she mail a copy of plaintiff's November 15, 2010 MRI results from Woodbourne to Dr. Mitchell Rubinovich, an orthopedist from whom plaintiff planned to seek a second opinion (Am. Compl. ¶ 51; Letter of Frank DeMeo to Ms. J. Barrett, dated May 16, 2011, annexed as Exhibit P to Am. Compl.).

Plaintiff alleges that on May 19, 2011 he was informed at sick call that, notwithstanding the IGRC's recommendation, Drs. Whalen and Koenigsmann denied his grievance and his request for permission to seek a second opinion (Am.Compl.¶ 48). This allegation appears to be incorrect because it is contradicted by other allegations in the complaint. The complaint goes on to allege that on June 3, 2011, Grinbergs told plaintiff's wife that plaintiff's request for a second opinion had not been denied, and on June 20, 2011, plaintiff did in fact mail his MRI results to Dr. Rubinovich for a second opinion (Am.Compl.¶¶ 50–51). Dr. Rubinovich responded on July 21, 2011, confirming that plaintiff's biceps was torn but explaining that, because the MRI did not fully depict plaintiff's shoulder, he was unable to tell whether

plaintiff had a rotator cuff tear (Letter of Dr. Rubino-vich to Frank DeMeo, dated July 21, 2011, annexed as Exhibit S to Am. Compl.). Dr. Rubinovich stated that in order to treat plaintiff he would need Dr. Holder's notes concerning plaintiff's 2007 shoulder surgery and a second MRI to better visualize the rotator cuff (Am.Compl., Ex. S). Because he lacked sufficient information, Dr. Rubinovich did not recommend a course of treatment, other than a second MRI (Am.Compl., Ex. S). Dr. Rubino-vich emphasized it was plaintiff's responsibility to organize any diagnostic testing and treatment with Woodbourne (Am.Compl., Ex. S).

Plaintiff claims that on August 15, 2011, he discussed Dr. Rubinovich's letter with Dr. Lancellotti, who, in turn, sought permission from Dr. Whalen for plaintiff to be examined by Dr. Rubinovich (Am.Compl.¶ 53). In a letter to Dr. Whalen, dated August 22, 2011, plaintiff requested permission to undergo a second MRI and a consultation with Dr. Rubinovich at his own expense (Letter of Frank DeMeo to Dr. Whalen, dated August 22, 2011, annexed as Exhibit T to Am. Compl.).

Despite the fact that plaintiff was in fact seeking a second opinion, in May 2011 he also appealed to DOCCS' Central Office Review Committee ("CORC") what he apparently believed to be the decision of Drs. Whalen and Koenigsmann denying his request for a second opinion (Appeal Statement WB–15114–11, dated May 26, 2011, annexed as Exhibit Q to Am. Compl.). On August 31, 2011, the CORC approved plaintiff's request and concluded that there was insufficient "evidence to substantiate any malfeasance by staff or that [plaintiff was] not receiving appropriate medical care" (CORC Second Medical Opinion and Treatment decision, dated August 31, 2011, annexed as Exhibit U to Am. Compl.). The CORC noted that although outside specialists may make treatment recommendations, whether and how those recommendations are implemented is determined by the Facility Health Services Director, *i.e.,* Dr. Makram (Am.Compl., Ex. U).

**\*5** In a letter dated September 2, 2011, Grinbergs, on behalf of Dr. Whalen, informed plaintiff that he should see his primary care provider, Dr. Lancellotti, to request a second MRI and that he should continue to make any requests for medical treatment through Woodbourne's sick-call procedures (Letter of Rita Grinbergs to Frank DeMeo, dated September 2, 2011, annexed as Exhibit V to Am. Compl.). Plaintiff alleges that on September 12, 2011 he was able to schedule an appointment with Dr. Lancellotti

(Am.Compl.¶ 57). On October 20, 2011, plaintiff signed a contract agreeing that if a second MRI of his right shoulder was approved, he would attend all appointments (Contract for Specialty Care Appointment, dated October 20, 2011, annexed as Exhibit W to Am. Compl.).

Plaintiff's papers do not disclose the plaintiff's condition or treatment or any further events subsequent to October 20, 2011.

### D. *Plaintiff's Claims and Defendants' Arguments*

Plaintiff asserts claims against Drs. Koenigsmann, Whalen and Makram in their individual and official capacities and against Drs. Holder and Lancellotti in their individual capacities. Plaintiff alleges that defendants (1) were deliberately indifferent to his right biceps and shoulder injuries by delaying diagnosis and treatment of his injuries and by denying his request to seek a second opinion and second MRI, (2) were negligent and (3) committed medical malpractice (Am.Compl.¶ 1). Plaintiff also alleges that Dr. Koenigsmann is liable under a theory of *respondeat superior* (Am.Compl.¶¶ 84–87). Plaintiff seeks three million dollars in compensatory damages for physical and emotional injury, a declaratory judgment that defendants violated his Eighth Amendment rights and an injunction ordering defendants "to carry out without delay adequate medical care of [plaintiff's] injuries and to not impede in any manner [plaintiff's] physicians['] provision of adequate medical care" (Am. Compl., at 20).

Defendants argue that (1) Dr. Lancellotti should be dismissed from this action because he was not served; (2) plaintiff was not denied or given untimely medical treatment; (3) plaintiff's request for permission to seek a second opinion was granted without delay; (4) "defendants are entitled to qualified immunity since defendants' conduct does not rise to the level of a violation under the Eighth Amendment of the United States Constitution"; (5) *respondeat superior* and negligence claims are not cognizable under Section 1983 and (6) "medical malpractice does not apply here because there was no conscious disregard for plaintiff's medical care" (Memorandum of Law in Support of Defendants' Motion to Dismiss, dated June 2, 2014, (Docket Item 63) ("Defs.' Mem."), at 1–2).

### III. *Analysis*

#### A. *Legal Standards*

1. *Standard Applicable to Defendants' Motion to Dismiss Pursuant to* Rule 12(b)(6)

The standards applicable to a motion to dismiss pursuant to Rule 12(b)(6) are well settled and require only brief review.

**\*6** When deciding a motion to dismiss under Rule 12(b)(6), [the court] must accept as true all well-pleaded factual allegations of the complaint and draw all inferences in favor of the pleader. *See City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986); *Mires v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (referring to "well-pleaded allegations"); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). " '[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.' " *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (*quoting Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)). The Court also may consider "matters of which judicial notice may be taken." *Leonard T. v. Israel Discount Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999) (*citing Allen v. WestPoint–Pepperill, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)). In order to avoid dismissal, a plaintiff must do more than plead mere "[c]onclusory allegations or legal conclusions masquerading as factual conclusions." *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000) (*quoting* 2 James Wm. Moore, *Moore's Federal Practice* ¶ 12.34[a] [b] (3d ed.1997)).

*Hoffenberg v. Bodell,* 01 Civ. 9729(LAP), 2002 WL 31163871 at \*3 (S.D.N.Y. Sept. 30, 2002) (Preska, D.J.); *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007); *Johnson & Johnson v. Guidant Corp.,* 525 F.Supp.2d 336, 345–46 (S.D.N.Y.2007) (Lynch, D.J.).

"[T]he tenet that a court must accept as true all the allegations contained in a complaint is inapplicable to legal conclusions," however. *Ashcroft v. Iqbal, supra,* 556 U.S. at 678; *Johnson v. Priceline.com, Inc.,* 711 F.3d 271, 275 (2d Cir.2013). As a result, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal, supra,* 556 U.S. at 679.

The Supreme Court has clarified the mode of inquiry to be used in evaluating a motion to dismiss pursuant to Rule 12(b)(6), which uses as a starting point the principle that "[a] pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a).

[I]n *Bell Atl[antic] Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Court disavowed the well-known statement in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. at 562. Instead, to survive a motion to dismiss under *Twombly,* a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

**\*7** *Talley v. Brentwood Union Free Sch. Dist.,* Civil Action No. 08–790, 2009 WL 1797627 at \*4 (E.D.N.Y. June 24, 2009).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007) (citations, internal quotation marks and alterations omitted).

In evaluating a motion under Rule 12(b)(6), the court must determine whether the plaintiff has alleged any facially plausible claims. *Fahs Constr. Grp., Inc. v. Gray,* 725 F.3d 289, 290 (2d Cir.2013) (*per curiam*), *cert. denied,* 134 S.Ct. 831, 187 L.Ed.2d 687 (2013). A claim is plausible when its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citations omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal, supra,* 556 U.S. at 678 (internal quotation marks and citation omitted). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Ashcroft v. Iqbal, supra,* 556 U.S. at 679, *quoting* Fed.R.Civ.P. 8(a)(2).

Nevertheless, where, as here, a plaintiff proceeds *pro se,* the complaint must be liberally construed to raise the strongest claims the allegations suggest. *Sykes v. Bank of Am.,* 723 F.3d 399, 403 (2d Cir.2013); *Sims v. Blot,* 534 F.3d 117, 133 (2d Cir.2008); *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006); *see also Haines v. Kerner,* 404 U.S. 519, 520–21 (1972); *Tracy v. Freshwater,* 623 F.3d 90, 100–04 (2d Cir.2010) (observing that the requirement of "special solicitude" includes liberal construction of papers, "relaxation of the limitations on the amendment of pleadings," leniency in enforcing procedural rules, and "deliberate, continuing efforts to ensure that a *pro se* litigant understands what is required of him" (citations omitted)).

### 2. *Deliberate Indifference*

Under the Eighth and the Fourteenth Amendments, the states have a limited obligation to provide medical care to sentenced prisoners. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,* 532 U.S. 424, 433–34 (2001); *Estelle v. Gamble,* 429 U.S. 97, 103–04 (1976). " '[D]eliberate indifference to [the] serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment.' " *Washington v. City of N.Y.,* 10 Civ. 389(LTS)(JLC), 2011 WL 566801 at *2 (S.D.N.Y. Feb. 15, 2011) (Swain, D.J.), *quoting Estelle v. Gamble, supra,* 429 U.S. at 104.

**\*8** Not every claim of inadequate medical treatment by a prisoner rises to the level of a constitutional violation. *Estelle v. Gamble, supra,* 429 U.S. at 105. The failure to provide medical care to a prisoner will give rise to a constitutional violation only if two elements are established:

The first requirement is objective: "the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006)

(*quoting Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care. *Id.* at 280. This means "that the charged official [must] act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result." *Id.* (emphasis added). Officials need only be aware of the risk of harm, not intend harm. *Id.* And awareness may be proven "from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970.

*Spavone v. N.Y. State Dep't of Corr. Servs.,* 719 F.3d 127, 138 (2d Cir.2013); *accord Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005). A plaintiff must establish both the objective and subjective prongs of the deliberate indifference standard in order to prevail. *See Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011).

A medical need is sufficiently serious if it is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Johnson v. Wright, supra,* 412 F.3d at 403 (internal quotation marks omitted). "Factors to consider in determining the existence of a serious medical condition include 'the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; the existence of chronic and substantial pain,' or 'the absence of adverse medical effects or demonstrable physical injury.' " *Edmonds v. Cent. N.Y. Psychiatric Ctr.,* 10 Civ. 5810(DAB)(KNF), 2011 WL 3809913 at *4 (S.D.N.Y. Aug. 25, 2011) (Batts, D.J.) (adopting Report & Recommendation) (internal footnote, citation and alterations omitted), *quoting Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) *and Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2003). "The inquiry [with respect to the objective element of a deliberate indifference claim] is 'fact-specific' and 'must be tailored to the specific circumstances of each case.' " *Thomas v.. Westchester Cnty.,* 12 Civ. 6718(CS), 2013 WL 3357171 at *4 (S.D .N.Y. July 3, 2013) (Seibel, D.J.), *quoting Smith v. Carpenter, supra,* 316 F.3d at 185; *see also Hudson v. McMillian,* 503 U.S. 1, 8 (1992) ("[t]he objective component of [a deliberate indifference] claim is ... [necessarily] contextual" and fact-specific).

Where the claim is that medical diagnosis and/or treatment has been improperly delayed, the inquiry with respect to the objective element focuses on the sequelae of the delay rather than the underlying condition itself.

2015 WL 1283660

**\*9**  [W]here, as here, a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003) (*quoting Chance v. Armstrong,* 143 F .3d 698, 702 (2d Cir.1998)) (emphases in original).

*Bilal v. White,* 494 F. App'x 143, 145 (2d Cir.2012) (summary order) (first alteration in original). "Stated differently, 'it's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [Section 1983] purposes.' " *Goris v. Breslin,* 402 F. App'x 582, 585 (2d Cir.2010) (summary order), *quoting Smith v. Carpenter, supra,* 316 F.3d at 186.

The subjective prong of a Section 1983 claim for inadequate medical care requires the plaintiff to prove that "the charged official [acted] with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). A plaintiff must show that "the prison official was aware of, and consciously disregarded, the prisoner's medical condition." *Hernandez v. Goord,* 02 Civ. 1704(DAB), 2006 WL 2109432 at \*6 (S.D.N.Y. July 28, 2006) (Batts, D.J.), *citing Chance v. Armstrong, supra,* 143 F.3d at 703. " 'Deliberate indifference is a mental state equivalent to subjective recklessness.... This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result.' " *Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir.2014) (first alteration in original), *quoting Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (*per curiam* ) (The standard is "equivalent to criminal recklessness, [where] the official knows of and disregards an excessive risk to inmate health or safety." (quotation marks omitted), *quoting Hathaway v. Coughlin, supra,* 99 F.3d at 553). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." *Salahuddin v. Goord, supra,* 467 F.3d at 280.

A constitutional violation requires "more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers,* 475 U.S. 312, 319 (1986). A Section 1983 claim does not lie for conduct that is merely negligent.

*County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998) ( "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."), *citing Daniels v. Williams,* 474 U.S. 327, 328 (1986); *accord Matican v. City of N.Y.,* 524 F.3d 151, 158 (2d Cir.2008); *Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991); *Hudak v. Miller,* 28 F.Supp.2d 827, 831 (S.D.N.Y.1998) (Sotomayor, then D.J.). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the [Constitution]." *Estelle v. Gamble, supra,* 429 U.S. at 106; *accord Hill v. Curcione, supra,* 657 F.3d at 123. In addition, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to [a constitutional] violation." *Chance v. Armstrong, supra,* 143 F.3d at 703; *accord Thompson v. Racette,* 519 F. App'x 32, 34 (2d Cir.2013) (summary order).

### B. *Analysis of Plaintiff's Claim*

#### 1. *Dismissal of Dr. Lancelotti*
**\*10**  Dr. Lancellotti was named as a defendant in plaintiff's First Amended Complaint; however, Dr. Lancellotti has never been served (Defs.' Mem., at 1 n. 2). In my June 19, 2014 Order, I directed plaintiff to serve or explain his failure to serve Dr. Lancellotti no later than July 21, 2014, warning that noncompliance would result in dismissal of the complaint against him for failure to prosecute. In a letter dated July 23, 2014, plaintiff agreed that Dr. Lancellotti should be dismissed from the action (Pl.'s Opp., at 43).

Accordingly, I dismiss all claims against Dr. Lancel—lotti.

#### 2. *Eleventh Amendment*
"The Eleventh Amendment, where applicable, deprives a federal court of jurisdiction. Thus, prior to addressing the merits of [a] case [the Court] must first determine whether Eleventh Amendment immunity bars [its] jurisdiction." *In re 995 Fifth Ave. Assocs.,* 963 F.2d 503, 506 (2d Cir.1992) (citation omitted). "The Eleventh Amendment bars the award of money damages against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); *see also McMillian v.. Monroe Cnty.,* 520 U.S. 781, 785 n. 2 (1997); *Kentucky v. Graham,* 473 U.S. 159, 165–67 & n. 19 (1985); *Edelman v. Jordan,* 415 U.S. 651, 663 (1974).

Accordingly, because Drs. Koenigsmann, Whalen and Makram are New York State officials, plaintiff's damages claims asserted against them in their official capacities are dismissed.

### 3. *Deliberate Indifference*

Plaintiff claims that defendants were deliberately indifferent because (1) defendants delayed diagnosing and treating plaintiff's torn rotator cuff and ruptured biceps muscle and (2) defendants did not timely approve plaintiff's request to seek a second opinion or conduct a second MRI.

#### a. *Delayed Diagnosis and Treatment*

Plaintiff claims that his ruptured biceps and torn rotator cuff were not timely diagnosed and treated because Dr. Makram denied Dr. Lancellotti's first MRI request and, after the second request was approved, the MRI was not conducted until more than four weeks after plaintiff was injured (Am.Compl.¶¶ 21–22). Plaintiff was not definitively diagnosed with a ruptured biceps muscle until he saw Dr. Holder more than three weeks after the MRI and more than seven weeks after the injury (Am.Compl.¶¶ 25–26). Plaintiff claims that Dr. Holder was unable to repair his ruptured biceps surgically by the time Dr. Holder saw plaintiff, because the muscle had degenerated to the point that performing surgery would have shredded the muscle, most likely causing extensive and irreversible damage and loss of function to plaintiff's arm and shoulder (Am.Compl.¶¶ 27–28, 30, 72). As a result, plaintiff claims that he expects to lose one-third of the strength in his right arm because the injuries are now irreversible and permanent (Am.Compl.¶¶ 29, 74). He also alleges that he experienced "major pain for a very long period of time without much relief" (Pl.'s Opp., at 12).

##### i. *Serious Medical Need*

**\*11** "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." *Demata v. N.Y. State Corr. Dep't of Health Servs.,* 198 F.3d 233, 1999 WL 753142 at *2 (2d Cir.1999)* (citations omitted); *accord White v. Nassau Cnty. Sheriff Dep't,* 14–CV–5203 (JS)(SIL), 2014 WL 5091793 at *3 (E.D.N.Y. Oct. 9, 2014). These categories are not exclusive.

[I]n *Brock v. Wright,* the Second Circuit held that a district court erred in ruling that only "extreme pain" or a "degenerative" condition would suffice to meet the legal standard for deliberative indifference. 315 F.3d 158, 163 (2d Cir.2003). The *Brock* court noted that "the Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death but also less serious denials which cause or perpetuate pain." *Id.* (quoting *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977)). The *Brock* court stated that an inmate is not required "to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life threatening one." *Id.*

"There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Id.* at 162. However, the Second Circuit has set forth considerations that should guide the analysis. These considerations include (1) whether a reasonable doctor or patient would perceive the medical need in question as "important or worthy of comment or treatment," (2) whether the medical condition significantly effects daily activities, and (3) "the existence of chronic and substantial pain." *See Chance v. Armstrong,* 143 F.3d 698, 702–703 (2d Cir.1998) (quoting *McGuckin v. Smith,* 974 F.2d 1050, 105960 (9th Cir.1992)).

*Sereika v. Patel,* 411 F.Supp.2d 397, 405–06 (S.D.N.Y.2006) (Marrero, D.J.).

Accepting plaintiff's allegations as true, plaintiff has alleged facts that could potentially show that the lost opportunity to repair plaintiff's muscle and the pain he experienced as a result of the alleged delay in diagnosis and treatment were objectively serious. Several cases in this District have involved similar allegations of injury based on delay, and each has found the allegations sufficient to meet the objective prong of a deliberate indifference claim. *See, e.g., Lloyd v. Lee,* 570 F.Supp.2d 556, 568 (S.D.N.Y.2008) (Chin, then D.J., now Cir. J.) (finding medical need sufficiently serious where plaintiff was denied MRI for months for rotator cuff tear and torn left shoulder tendon, resulting in degeneration, loss of mobility and extreme pain); *Sereika v. Patel, supra,* 411 F.Supp.2d at 406 (concluding that the objective prong was met by allegations of severe pain and reduced arm and shoulder mobility after eighteen-day delay of diagnosis of torn right pectoralis muscle that was no longer surgically reparable because of delay); *Benjamin v. Schwartz,* 299 F.Supp.2d 196,

200–01 (S.D.N.Y.2004) (McMahon, D.J.) (determining there was a sufficiently serious medical need where two-year delay in surgery to repair plaintiff's torn biceps muscle tendon and two other tendons resulted in muscle atrophy), aff'd, 204 F. App'x 979 (2d Cir.2006).

**\*12** Thus, plaintiff plausibly pled that his medical needs were sufficiently serious to satisfy the objective prong of a deliberate indifference claim.

### ii. Culpable State of Mind

In order to survive defendants' motion, plaintiff, must also plausibly allege facts demonstrating that "the charged official[s] act[ed] or fail[ed] to act while *actually aware* of substantial risk that serious inmate harm w[ould] result." *Salahuddin v. Goord, supra,* 467 F.3d at 280 (emphasis added); *accord Youmans v.. City of N.Y.,* 12 Civ. 4071(KMK), 2014 WL 1612997 at \*6 (S.D.N.Y. Mar. 31, 2014) (Karas, D.J.).

### A. Drs. Koenigsmann and Whalen

Plaintiff alleges that Drs. Koenigsmann and Whalen were deliberately indifferent to his serious medical needs because they (1) failed to ensure there were adequate guidelines for timely and adequate diagnosis and treatment of torn muscles and (2) failed to adequately train, manage and supervise Woodbourne's medical staff concerning the proper medical procedures (Am.Compl.¶ ¶ 59–66, 68). Plaintiff argues that the guidelines should require prompt MRI's to ensure that surgery for torn muscles occurs within two to three weeks of injury (Am.Compl.¶ 62). Oddly, defendants do not address this aspect of plaintiff's claims against Drs. Koenigsmann and Whalen and make no argument that plaintiff's complaint fails to allege that they acted with the required mental state. Defendants' motion to dismiss with respect to these claims against Drs. Koenigsmann and Whalen is, therefore, denied.

### B. Dr. Makram

Plaintiff claims that Dr. Makram was deliberately indifferent to plaintiff's serious medical needs by approving an x-ray when only an MRI would reveal a ruptured biceps and denying the initial request for plaintiff's MRI "based on purely financial considerations" (Am.Compl.¶¶ 21, 66, 71–72). Plaintiff claims that HSPM 6.4[17] required Dr. Makram to "promote constitutionally adequate health care as effectively and economically as possible"; as a result, he claims that Dr. Makram put financial considerations over

plaintiff's health, thereby denying the initial MRI request and delaying diagnosis and treatment of plaintiff's injuries (Pl.'s Opp., at 11, 37). Plaintiff argues that Dr. Makram did so even though the MRI request noted that the imaging should be performed "soon," and that she should have known that failure to treat a rotator cuff tear as an emergency could result in permanent damage (Pl.'s Opp., at 5–6, 10).

17    HSPM 6.4 describes the role of Regional Health Services Administrators who address administrative matters concerning health services within their assigned regions, assist in implementing health programs, advise on health services policies and balance budgetary concerns with prisoners' healthcare needs (Pl.'s Opp., at 37). Plaintiff has only provided the first page of the two-page policy.

Defendants argue that plaintiff's allegations are merely attacks on Dr. Makram's medical judgment as to when to schedule the MRI (Defs.' Mem., at 10, *citing Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (McMahon, D.J.)). In addition, defendants claim that plaintiff's allegations are "baseless," "speculative and conclus-ory" and that plaintiff has not alleged any facts supporting his contention that the alleged denial was financially-motivated (Defs.' Mem., at 10).

**\*13** Dr. Makram's approval of an x-ray while allegedly denying an MRI request, without more, would be a medical decision that would not meet the state of mind requirement for a deliberate indifference claim. *Estelle v. Gamble, supra,* 429 U.S. at 107 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment ... [which] does not represent cruel and unusual punishment."); *accord Joyner v. Greiner,* 195 F.Supp.2d 500, 504–05 (S.D.N.Y.2002) (McMahon, D.J.) (collecting cases).

However, I must accept as true plaintiff's claims that (1) an initial MRI request was denied by Dr. Makram, (2) the denial was financially-motivated and not based on sound medical judgment and (3) plaintiff's serious medical needs resulted from that delay. In *Chance v. Armstrong, supra,* 143 F.3d at 704, the Second Circuit addressed similar allegations of treatment decisions motivated by financial concerns:

This allegation of ulterior motives, if proven true, would show that the defendant[ ] had a culpable state of mind and that [defendant's] choice of treatment was intentionally

wrong and did not derive from sound medical judgment. It may be that [plaintiff] has no proof whatsoever of [defendant's] improper motive, and that lack of proof may become apparent at summary judgment. But even if [the court] think[s] it highly unlikely that [plaintiff] will be able to prove his allegations, that fact does not justify dismissal for failure to state a claim, for "Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989). [The court] cannot say at this stage that " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief.' " *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (*quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). Accordingly, dismissal under Rule 12(b)(6) [is] inappropriate.

*See, e.g., Jones v. Westchester Cnty. Dep't of Corr. Med. Dep't,* 557 F.Supp.2d 408, 415–16 (S.D.N.Y.2008) (McMahon, D.J.) (concluding that plaintiff's allegations that his hip surgery was cancelled and deemed non-urgent due to financial considerations must be taken as true and defendants "jumped the gun by filing a pre-answer motion to dismiss"); *Bob v. Armstrong,* No. 3:02CV1785 (RNC), 2003 WL 22682335 at *2 (D.Conn. Aug. 26, 2003) ("If financial considerations induced [defendant] to ignore a substantial risk of harm to [plaintiff], the subjective element of the deliberate indifference test may be met.").

Here, too, plaintiff's allegation that Dr. Makram denied the initial MRI request for purely financial reasons without regard to plaintiff's health or sound medical judgment, taken as true, satisfies the subjective prong at the pleading stage. Thus, defendants' motion to dismiss the deliberate indifference claim against Dr. Makram for the delay in diagnosis and treatment of plaintiff's injuries is denied.

### C. *Dr. Holder*

**\*14** Plaintiff alleges that Dr. Holder was deliberately indifferent by failing to immediately order a second MRI of plaintiff's shoulder, which was only partially visible on the initial scan, in order to diagnose the rotator cuff tear in a timely manner (Am.Compl.¶ 80). [18]

[18]    While Drs. John A. Mastrangelo and Phuong Vinh at Albany Medical Center read the initial MRI scan and saw a "[f]ull thickness re-tear of

the supraspinatus tendon which [was] partially imaged," Dr. Holder, viewing the same image, determined there was no rotator cuff tear (Am. Compl., Exs. F & H).

As discussed above, the need for and timing of diagnostic tests are ordinarily medical determinations which, by themselves, cannot sustain a deliberate indifference claim. *Hathaway v. Coughlin, supra,* 37 F.3d at 70; *Sonds v. St. Barnabas Hosp. Corr. Health Servs., supra,* 151 F.Supp.2d at 312. Plaintiff does not argue that Dr. Holder's failure to schedule a second MRI was financially-motivated or the product of any other improper motive. Moreover, any allegation that Dr. Holder was deliberately indifferent because he failed to diagnose plaintiff's shoulder injury fails as a matter of law. *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) ("a delay in treatment based on a bad diagnosis or ... a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless" does not constitute an Eighth Amendment violation); *accord Williams v. Williams,* 13 Civ. 3154(RA), 2015 WL 568842 at *6 (S.D.N.Y. Feb. 11, 2015) (Abrams, D.J.).

Thus, defendants' motion to dismiss the deliberate indifference claim against Dr. Holder for the delay in diagnosis and treatment of plaintiff's shoulder injury is granted.

### b. *Delay in Permitting a Second Opinion and a Second MRI*

Plaintiff also claims that defendants were deliberately indifferent because (1) they initially denied his request for permission to seek a second opinion and (2) after plaintiff received Dr. Rubinovich's opinion, they did not timely authorize or conduct a second MRI. Defendants claim that (1) plaintiff did ultimately receive a second opinion, (2) a second MRI was requested as Dr. Rubinovich recommended, (3) the delay in obtaining the second opinion did not cause serious injury and (4) whether to allow a prisoner to seek a second opinion is a medical decision (Defs.' Mem., at 11).

### i. *Serious Medical Need*

Plaintiff does not allege that the delay in receiving a second opinion from Dr. Rubinovich and in scheduling a second MRI of his shoulder caused an exacerbation of plaintiff's injuries. Thus, this aspect of plaintiff's claim fails to satisfy the objective prong of a deliberate indifference claim. Nevertheless, even if this delay claim satisfied the objective

Case 9:21-cv-00251-DNH-TWD    Document 37    Filed 05/22/23    Page 117 of 229
DeMeo v. Koenigsmann, Not Reported in F.Supp.3d (2015)
2015 WL 1283660

prong of a deliberate indifference claim, it fails to meet the subjective prong.

### ii. *Culpable State of Mind*
Plaintiff fails to allege that the defendants had a sufficiently culpable state of mind with respect to his claim that they improperly delayed his getting a second opinion and a second MRI.

"[C]ourts in the Second Circuit have held that failure to provide a second opinion is not generally a violation of a prisoner's Eighth Amendment rights." *Youmans v. City of N.Y., supra,* 14 F.Supp.3d at 363–64 (collecting cases). Whether and when a second opinion should be sought is a matter of opinion as to medical treatment and does not constitute deliberate indifference. *See Youmans v. City of N.Y., supra,* 14 F.Supp.3d at 364; *Wilson v. Med. Unit Officials at George R. Vierno Ctr. Jail at 09–09 Hazen St.,* No. 10–CV–1438 (ARR) (RML), 2011 WL 6780934 at *4 (E.D.N.Y. Dec. 27, 2011). Moreover, a prison doctor's disagreement with the assessment or treatment recommendation of a consulting physician is not, without more, deliberately indifferent conduct. *Williams v. Smith,* 02 Civ. 4558(DLC), 2009 WL 2431948 at *9 (S.D.N.Y. Aug. 10, 2009) (Cote, D.J.). Finally, plaintiff's claims that the delay was financially-motivated is implausible, because the requests were ultimately granted and plaintiff agreed to seek both the second opinion and the second MRI at his own expense (*See* Pl .'s Opp., at 11–12).

**\*15** Thus, defendants' motion to dismiss plaintiff's deliberate indifference claim based on the delay in seeking a second opinion and second MRI is granted.

### 4. Dr. Koenigsmann's Liability Under a Theory of *Respondeat Superior* for *His Employees' Constitutional Violations*
Plaintiff claims Dr. Koenigsmann is liable for the unconstitutional actions of his employees, namely their deliberate indifference, under a theory of *respondeat superior* (Am.Compl.¶¶ 84–87). [19] Plaintiff also claims that Dr. Koenigsmann was personally involved in the alleged constitutional violations because (1) he was made aware of the violation of plaintiff's rights through plaintiff's January 3, 2011 letter, plaintiff's CORC appeal and communications from "administrative sources"; (2) he ignored DOCCS policies, particularly HSPM 7.2 and (3) he failed to supervise subordinates (Pl.'s Opp., at 14, 38). Defendants claim Dr. Koenigsmann is not liable because he was not personally

involved, arguing that neither (1) Dr. Koenigsmann's receipt and referral of plaintiff's letters to a subordinate; (2) Dr. Koenigsmann's failure to investigate plaintiff's grievances nor (3) plaintiff's broad statements that Dr. Koenigsmann was informed of the violations are sufficient to prove personal involvement (Defs.' Mem., at 12–13; Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the First Amended Complaint, dated August 14, 2014, (Docket Item 65) ("Defs.' Reply"), at 4–6).

[19]    Plaintiff does not explicitly state whether this claim is brought pursuant to state or federal law; however, I construe the complaint broadly to assert *respondeat superior* liability under both state and federal law. I address the applicability of *respondeat superior* to plaintiff's state law claims in Part III.B.5.

A supervisor cannot be held liable under Section 1983 under the doctrine of *respondeat superior, Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 n. 58 (1978); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); personal involvement of the supervisor is required. *Leonhard v. United States,* 633 F.2d 599, 621 n. 30 (2d Cir.1980). "The personal involvement and liability of supervisory personnel is established when the supervisory official has 'actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act.' " *Rahman v. Fisher,* 607 F.Supp.2d 580, 584–85 (S.D.N.Y.2009) (Cote, D.J.), *citing Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (citation omitted), *and Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999).

For purposes of Section 1983, personal involvement can be shown by

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information

indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003), *citing Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); [20] *see Avenue v. New York,* 157 F. App'x 375, 377 (2d Cir.2005) (summary order); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Lewis v. Fisher,* 08–CV–3027 (JG)(LB), 2009 WL 689803 at *3 (E.D .N.Y. Mar. 12, 2009); *Benitez v. Locastro,* 9:04–CV–423 (NAM), 2008 WL 4767439 at *12 (N.D.N.Y. Oct. 29, 2008); *Johnson v. Wright,* 234 F.Supp.2d 352, 263 (S.D.N.Y.2002) (Gorenstein, M.J.) ("[T]he second example listed in *Colon*-permitting supervisory liability where a 'defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,'-should not be too broadly construed."); *Morris v. Eversley,* 205 F.Supp.2d 234, 241–42 (S.D.N.Y.2002) (Chin, then D.J., now Cir. J.).

[20]  The five types of personal involvement set forth in the text were first set forth in *Colon v. Coughlin, supra,* 58 F.3d at 873. In *Ashcroft v. Iqbal, supra,* 556 U.S. at 677, decided in 2009, the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the constitution." There is, therefore, some question as to whether all the types of personal involvement described in *Colon* survive *Iqbal. See generally Aguilar v. Immig. & Customs Enforcement Div.,* 811 F.Supp.2d 803, 814–15 (S.D.N.Y.2011) (Koeltl, D.J.). The Court of Appeals has acknowledged that this issue remains unresolved. *Raspardo v. Carlone,* 770 F.3d 97, 117 (2d Cir.2014), *citing Reynolds v. Barrett,* 685 F.3d 193, 205 n. 14 (2d Cir.2012).

**\*16**  Plaintiff's letters to Dr. Koenigsmann do not satisfy the requirement of personal involvement; although plaintiff sent letters to Dr. Koenigsmann on January 3, 2011 and March 2, 2011, both of those letters were referred to subordinate, Grinbergs, who responded to plaintiff herself (Am. Compl. ¶¶ 33–34, 36 and Ex. I). In addition, the mere fact that plaintiff filed a grievance of which Dr. Koenigsmann was allegedly aware through either the CORC appeal or "administrative sources" does not amount to personal involvement.

Although, as noted above, the Second Circuit has expressly held that supervisory liability can be shown by a "failure to remedy the alleged wrong after being informed through a report or appeal," *Hernandez v. Keane, supra,* 341 F.3d at 145, both the Second Circuit and numerous district courts within the Circuit have repeatedly held that "[r]eceipt of letters or grievances [, alone,] ... is insufficient to impute personal involvement." *Woods v. Goord,* 01 Civ. 3255(SAS), 2002 WL 731691 at *7 (S.D.N.Y. Apr. 23, 2002). *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.2001) (finding no personal involvement where DOCCS Commissioner referred inmate's letter to subordinate); *Yearney v. Sidorowicz,* 13 Civ. 3604(CM), 2014 WL 2616801 at *8–*9 (S.D.N.Y. June 10, 2014) (McMahon, D.J.) (concluding that Dr. Koenigsmann's delegation of inmate's letter to Grinbergs requesting an MRI, among other things, and Grinbergs' subsequent response to inmate on Dr. Koenigsmann's behalf did not amount to personal involvement); *McNair v. Kirby Forensic Psychiatric Ctr.,* 09 Civ. 6660(SAS), 2010 WL 4446772 at *13 (S.D.N.Y. Nov. 5, 2010) (Scheindlin, D.J.) ("[M]ere notification of alleged wrongdoing does not establish personal involvement under Section 1983."). "Were it otherwise, virtually every prison inmate who sues for constitutional torts by prison [officials] could name the [supervisor] as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the [supervisor] ." *Thompson v. New York,* 99 Civ. 9875(GBD)(MHD), 2001 WL 636432 at *7 (S.D.N.Y. Mar. 15, 2001) (Daniels, D.J.) (internal citations omitted).

Plaintiff also claims that Dr. Koenigsmann was personally involved because he ignored "established policy" under HSPM 7.2, which states that an inmate's request to choose a "provider-of-choice [for consultation] *may be* granted" if certain conditions are met (Pl.'s Opp., at 14, 38). Plaintiff does not allege that Dr. Koenigsmann created the policy. *Hernandez v. Keane, supra,* 341 F.3d at 145 (personal involvement imputed where supervisor "creat[ed] a policy or custom that sanctioned conduct amounting to a constitutional violation"). Moreover, plaintiff's request pursuant to HSPM 7.2 was granted.

Finally, plaintiff claims Dr. Koenigsmann was personally involved because he "failed to supervise 'subordinates' " (Pl.'s Opp., at 14). In his complaint, plaintiff alleges that Dr. Koenigsmann "failed to adequately train, manage and supervise" Dr. Whalen as Dr. Whalen developed and updated "Clinical Practice Guidelines" and provided annual reports (Am.Compl.¶ 60). Personal involvement may be imputed where a supervisor engaged in "grossly negligent supervision of subordinates who committed a violation." *Hernandez v.*

*Keane, supra,* 341 F.3d at 145. Although this aspect of the complaint may not adequately set forth a factual basis for the allegation of "grossly negligent supervision" and may not adequately allege causation, defendants do not challenge this theory of liability. I decline to address the adequacy of this aspect of the complaint *mea sponte* because plaintiff has not had an opportunity to address the issue. Thus, because plaintiff's underlying Eighth Amendment claim against Dr. Whalen survives dismissal, plaintiff's failure to train, manage and supervise claim against Dr. Koenigsmann also survives with respect to Dr. Whalen's actions.

**\*17** Thus, plaintiff's claim that Dr. Koenigsmann is liable for Dr. Whalen's alleged indifference on a theory of personal involvement for failure to train, manage and supervise survives the motion to dismiss; as for the other claims against Dr. Koenigsmann, plaintiff has failed to plead an Eighth Amendment claim under either the doctrine of *respondeat superior* or a viable theory of personal involvement, and they are dismissed.

5. *Plaintiff's State Law Claims*

Plaintiff also brings state law claims for medical malpractice and negligence against all defendants (Am.Compl.¶¶ 1, 76–84). In addition, plaintiff claims that Dr. Koenigsmann is liable on a theory of *respondeat superior* "for the individual torts and/or negligence of each and every one of his employees, committed within the scope of their employment" (Am.Compl.¶ 86). Defendants rather oddly argue that (1) a claim of negligence is not cognizable under the Eighth Amendment; (2) plaintiff has failed to allege that defendants' claims amounted to "culpable recklessness" as required to allege a claim of medical malpractice under the Eighth Amendment and (3) Dr. Koenigsmann was not personally involved as needed to impose Section 1983 liability.[21]

[21]    Defendants fail to address plaintiff's pendent state law claims as such, and address them instead as if they were brought pursuant to Section 1983 as violative of the Eighth Amendment. Plaintiff clearly states his claims of negligence and medical malpractice are New York state law claims and he seeks to hold Dr. Koenigsmann liable for both the state torts and deliberate indifference of his employees under the theory of *respondeat superior* (Am.Compl.¶¶ 1, 83, 86–87).

Defendants' arguments do not make sense and appear to confuse the bases for Section 1983 liability with the bases for common law liability. For example, although defendants are correct that negligent conduct does not give rise to an Eighth Amendment claim, state law claims are, by definition, not Eighth Amendment claims. Similarly, "culpable recklessness"[22] is not an element of a common law medical malpractice claim. *DiGeronimo v. Fuchs,* 101 A .D.3d 933, 936, 957 N.Y.S.2d 167, 170 (2d Dep't 2012) ("In order to establish the liability of a physician for medical malpractice, a plaintiff must prove that the physician deviated or departed from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries." (inner quotations omitted)).

[22]    "Culpable recklessness" appears to be a seldom used articulation for the subjective element of an Eighth Amendment deliberate indifference claim. *See Hernandez v. Keane, supra,* 341 F.3d at 144.

Nevertheless, the Court lacks subject matter jurisdiction to entertain plaintiff's common law claims against defendants.

New York Corrections Law Section 24 provides, in pertinent part:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

**\*18** Because a federal court hearing a claim under its supplemental jurisdiction sits as if it were a state court, Section 24 operates as a limit on a federal court's subject matter jurisdiction with respect to such claims. *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996). As a limit on my subject matter jurisdiction, I may (and should) raise it *mea sponte. Durant, Nichols, Houston, Hodgson & Cortese–Costa P.C. v. Dupont,* 565 F.3d 56, 62–63 (2d Cir.2009).

Section 24 does not bar Section 1983 claims against DOCCS employees. *See Haywood v. Drown,* 556 U.S. 729, 740–41 (2009). However, it does mandate that state law claims for damages for acts or omissions committed by DOCCS employees within the scope of their employment be brought exclusively in the New York Court of Claims as claims against New York State. *Baker v. Coughlin, supra,* 77 F.3d at 14–16; *accord Tavares v. New York City Health & Hosps. Corp.,* 13 Civ. 3148(PKC)(MHD), 2015 WL 158863 at *10 (S.D.N.Y. Jan. 13, 2015) (Castel, D.J.).

Thus, pursuant to Section 24, the plaintiff's common law claims against the defendants in their individual capacities are dismissed for lack of subject matter jurisdiction.

### 6. *Qualified Immunity*

Because plaintiff has failed to state claims on which relief can be granted against Dr. Holder, I need not address the defendants' argument that he is entitled to qualified immunity. *Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574 at *9 (W.D.N.Y. June 25, 2012) ("Given that no constitutional violation was found, this Court need not address defendants' alternative contention that they deserve qualified immunity for their actions."). However, because constitutional claims against Drs. Koengismann, Whalen and Makram survive dismissal, I shall address defendants' qualified immunity claims with regards to them.

Defendants claim that Drs. Koenigsmann and Whalen are entitled to qualified immunity because "their involvement was limited and associated with letters ... requesting permission to seek a second-opinion [sic]" (Defs.' Mem., at 14). However, defendants do not explain why Drs. Koenigsmann and Whalen are entitled to qualified immunity for plaintiff's claims which survive dismissal, i .e., that the doctors were deliberately indifferent in delaying diagnosis and treatment of plaintiff's injuries. Thus, defendants' motion to dismiss the claims against Drs. Koenigsmann and Makram on the ground of qualified immunity is denied.

Defendants claim that Dr. Makram is entitled to qualified immunity because she did not violate a clearly established constitutional right, and she made her decisions based on the medical evidence before her and her own medical judgment, making it "reasonable for her to believe her actions were not demonstrative [of] medical deliberate indifference" (Defs.' Mem., at 13, 15; Defs .' Reply, at 3, 4, 7–8). Plaintiff argues that Dr. Makram knew that denying the initial MRI request

was a violation of plaintiff's constitutional right (Pl.'s Opp., at 16).

> **\*19** A government agent enjoys qualified immunity when he or she performs discretionary functions if either (1) the conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that the conduct did not violate clearly established rights. A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct. The unlawfulness must be apparent.

*McCullough v. Wyandanch Union Free Sch. Dist.,* 187 F.3d 272, 278 (2d Cir.1999); *accord Coggins v. Buonora,* 776 F.3d 108, 114 (2d Cir.2015). *See Anderson v. Creighton,* 483 U.S. 635, 638–39 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Connell v. Signoracci,* 153 F.3d 74, 80 (2d Cir.1998).

It was clearly established by 2010 that the Eighth Amendment prohibited prison officials from being deliberately indifferent to an inmate's serious medical needs. *See Estelle v. Gamble, supra,* 429 U.S. at 104; *LaBounty v. Coughlin,* 137 F.3d 68, 74 (2d Cir.1998); *Wright v. Dee,* 54 F.Supp.2d 199, 204 (S.D.N.Y.1999) (Cote, D.J.); *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 185 (N.D.N.Y.1996).

Accordingly, dismissal on the basis of qualified immunity can be granted only if the conduct of Dr. Makram was objectively reasonable. An official's conduct is "objectively reasonable" if reasonable, similarly-situated officials could disagree as to its legality. *Spavone v. N.Y. State Dep't. of Corr. Servs., supra,* 719 F.3d at 135; *Danahy v. Buscaglia,* 134 F.3d 1185, 1190 (2d Cir.1998).

2015 WL 1283660

Qualified immunity issues frequently arise in connection with false arrest and similar claims involving the legality of actions by law enforcement officers. This is a subject matter with which courts are familiar. It is frequently not difficult for a court to review a set of facts and determine whether probable cause existed or whether a police officer acted reasonably in concluding that his or her actions did not violate the Constitution.

This case involves issues of medical judgment which are foreign to me. Apart from the minimal allegations by plaintiff that Dr. Makram's denial of the initial MRI was financially-motivated, there is not enough information in the record to permit me to determine whether she acted reasonably or unreasonably. Without additional information, it is impossible to determine whether other physicians of reasonable competence could disagree on her conduct. *See Walter v. Schult, supra,* 717 F.3d at 130; *Paulin v. Figlia,* 916 F.Supp.2d 524, 536–37 (S.D.N.Y.2013) (Briccetti, D.J.); *Giambalvo v. Sommer,* 10 Civ. 6774(JPO), 2012 WL 4471532 at *7 (S .D.N.Y. Sept. 19, 2012) (Oetken, D.J.); *Edmonds v. Cent. N.Y. Psychiatric Ctr., supra,* 2011 WL 3809913 at *6– *7.

**\*20** Thus, I conclude that Dr. Makram's motion to dismiss on the ground of qualified immunity is denied.

IV. *Conclusion*

Accordingly, for all the foregoing reasons, defendants' motion to dismiss this action is granted in part and denied in part.

Defendants' motion to dismiss all claims against Drs. Lancellotti and Holder is granted.

All of plaintiff's claims against Drs. Whalen and Makram are dismissed except plaintiff's deliberate indifference claims for the delay in diagnosis and treatment of plaintiff's injuries.

All of plaintiff's claims against Dr. Koenigsmann are dismissed except plaintiff's claim of deliberate indifference for: (1) the delay in diagnosis and treatment of plaintiff's injuries and (2) plaintiff's claim of liability for Dr. Whalen's deliberate indifference under a theory of personal involvement for failure to train and supervise Dr. Whalen.

All of plaintiff's state law claims for negligence, medical malpractice and claims based on the doctrine of *responde-at superior* are dismissed.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1283660

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 137721
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Zachary BUTCHINO, Plaintiff,

v.

CITY OF PLATTSBURG, Chad Welch,
Adam Wood, Joshua Pond, Kristopher
Minogue, Joel Vassar, Levi Ritter, Defendants.

8:20-cv-796 (MAD/CFH)
|
Signed 01/14/2022

**Attorneys and Law Firms**

OF COUNSEL: DOUGLAS EDWARD LIEB, ESQ.,
KAUFMAN LIEB LEBOWITZ & FRICK LLP, 10 East 40th
Street, Suite 3307, New York, New York 10016, Attorneys
for Plaintiff.

OF COUNSEL: STEPHANIE McDERMOTT, ESQ., JOHN
D. ASPLAND, ESQ., FITZGERALD MORRIS BAKER
FIRSH, P.C., 68 Warren Street, Glens Falls, New York 12801,
Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

 *1 On July 15, 2020, Plaintiff Zachary Butchino initiated
this lawsuit against Defendants Chad Welch, Adam Wood,
Joshua Pond, Kristopher Minogue, Joel Vassar, Levi
Ritter (collectively, "Defendant Officers"), and the City of
Plattsburg. See Dkt. No. 1. Plaintiff alleges excessive force
and failure to intervene claims against the Defendant Officers,
and Monell liability as well as violations of Title II of the
Americans with Disabilities Act ("ADA") and Section 504 of
the Rehabilitation Act against Defendant City. Specifically,
Plaintiff's claims arise out of the force used against him by
Defendant Officers on August 19, 2017, while in custody, in
an effort to remove his shorts as a suicide prevention measure.
Presently before the Court is Defendant's motion for summary
judgment. Dkt. No. 27.

**II. BACKGROUND**

Plaintiff Zachary Butchino enlisted in the United States Army
in 2007 and served in Afghanistan in 2009 and 2010. See Dkt.
No. 33-1 at ¶¶ 5-6. In 2013, Plaintiff was diagnosed with post-
traumatic stress disorder ("PTSD"). Id. at ¶ 124. On August
19, 2017, Plaintiff was arrested for assault by the Plattsburgh
Police Department following a night of drinking. Id. at ¶¶
122, 126. Plaintiff eventually pleaded guilty to a one-year
conditional discharge for the assault charge. Id. at ¶ 123.

Following the assault and arrest, Plaintiff arrived at the
Plattsburgh police station at approximately 3:21 a.m. Id. at ¶¶
128, 130. Plaintiff was searched for weapons and contraband,
and then placed in Cell 1. Id. at ¶ 11. Due to available
surveillance video, most events in the jail are undisputed.
From 3:54 a.m. to 4:06 a.m., while in Cell 1, Plaintiff
repeatedly requested his medication, requested a phone call,
and shook the cell door. Id. at ¶¶ 81-91. Plaintiff then began
to sing about the disturbing violence he experienced while
serving in Afghanistan, including "I killed a lot of people/
they almost killed a lot of my people/my friend in Georgia
is dead because [incomprehensible]/you should give me my
medication/to prevent me from killing more people." Id. at ¶¶
92, 95.

At 4:20 a.m., Plaintiff began to cry in his cell. Id. at ¶ 96.
At 4:41 a.m., Plaintiff removed his shorts, placed one leg of
his shorts over his head and tied the other leg of the shorts
to the cell. Id. at ¶ 96-99. Following the apparent suicide
attempt, Plaintiff refused to hand over his shorts to an officer,
and instead put them back on. Id. at ¶ 101.

Defendant Officers subsequently moved Plaintiff to Cell
4 so Defendants could more easily monitor his behavior.
Id. at ¶ 135. Throughout the transfer to Cell 4, Plaintiff
was combative and struggled with Defendant Officers. Id.
at ¶¶ 104-09. Plaintiff, once in Cell 4, still refused to
comply with an order to remove his shorts. Id. at ¶ 112.
Approximately fourteen seconds after Plaintiff was secured in
Cell 4, Defendant Welch re-opened Plaintiff's cell, brandished
a taser, and demanded Plaintiff remove his shorts. Id. at ¶¶
222-23. Plaintiff, however, attempted to hold the door closed.
Id. at ¶ 112. Defendants Welch, Wood, Pond and Minogue
then opened the door and entered the cell. Id. at ¶¶ 113-14.
Defendant Vassar stood at the back of the group outside the
door of the cell. Id. at ¶ 115. Defendant Ritter observed the

other Defendant Officers from behind a nearby desk in the booking room. *Id.* at ¶¶ 186-87.

**\*2** The next fifty-six seconds, where the four officers were in his cell, are difficult to discern on the video. Defendants Welch, Wood and Pond were all near Plaintiff's torso and face, while Defendant Minogue successfully removed Plaintiff's shorts. *Id.* at ¶ 146. At the end, Plaintiff's face was visibly bloody. *Id.* at ¶ 119. Plaintiff testified that he was punched approximately ten times and was ultimately diagnosed with a deviated septum. *Id.* at ¶¶ 25, 163. Defendant Welch, however, testified that he punched Plaintiff twice, and no other Defendant stated that they punched Plaintiff. *Id.* at ¶ 167. Additionally, it is undisputed that Defendant Wood "pulled on and squeezed" Plaintiff's genitals after Plaintiff's shorts had been removed. *Id.* at ¶ 169.

Following the incident, in a recorded conversation, Defendant Vassar told Plaintiff:

> Ultimately, we don't want anybody getting hurt. We just want you back in the cell; we want you to be safe. We want you to be able to relax if you can —and I get that being in this room is not relaxing, and I understand that— but there's no way prior to this that we could have known that that would have set off PTSD. You know what I mean? We knew of your PTSD because we were informed of that by you. But we didn't know that being in that cell was going to trigger that. OK? Once we realized that it had triggered that, because of your up-and-down-mood and an attempt to hang yourself, we knew we had to act. And that's what we did. That's what our attempt was, was to act—was actually to protect you, not to hurt you.

*Id.* at ¶ 212.

## III. DISCUSSION

### A. Standard of Review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions on its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the Court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the Court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

" 'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.' " *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Id.* (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts', ... and they may not rely on conclusory allegations or unsubstantiated speculation.' " *Id.* (quotations omitted).

### B. Excessive Force

**\*3** Plaintiff brings a Section 1983 claim for use of excessive force under the Fourteenth Amendment's Due Process Clause. "[T]he Due Process Clause protects a pretrial detainee from

the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Supreme Court has held that "pretrial detainees (unlike convicted prisoners) cannot be punished at all." *Kingsley v. Hendrickson*, 576 U.S. 389, 400, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). "An officer's actions can amount to punishment if they are taken with 'an expressed intent to punish.' " *Frost v. New York City Police Dep't*, 980 F.3d 231, 252 (2d Cir. 2020) (quoting *Bell v. Wolfish*, 441 U.S. 520, 538, 99 S.Ct. 1861, 60 L.Ed.2d 447, (1979)). Alternatively, in the absence of an expressed intent to punish, "a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398, 135 S.Ct. 2466. "[T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." *Id.* at 397, 135 S.Ct. 2466. A pretrial detainee "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97, 135 S.Ct. 2466. The "objective reasonableness" standard "turns on the facts and circumstances of each particular case." *Frost*, 980 F.3d at 252 (citing *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466).

First, Plaintiff asks this Court to infer an express intent to punish because Defendants Welch and Wood lied about their behavior in reports and internal interviews. *See* Dkt. No. 33 at 12-13. Plaintiff argues that "[i]t is eminently reasonable to infer that Welch and Wood would not have gone to such great lengths to conceal the force they used if they had used it for legitimate reasons." *Id.* at 13. Such an inference, however, does not relate to whether they acted with an express intent to punish. There is no subjective element to a Fourteenth Amendment excessive force claim. *Kingsley*, 576 U.S. at 396, 135 S.Ct. 2466. "[W]e may only infer that Defendants acted with punitive intent if the challenged conditions were not reasonably related to a legitimate goal—if [they were] arbitrary or purposeless." *Turkmen v. Hasty*, 789 F.3d 218, 238 (2d Cir. 2015), *judgment rev'd and vacated on other grounds Ziglar v. Abbasi*, ––– U.S. ––––, 137 S. Ct. 1843, 198 L.Ed.2d 290 (2017) (internal citation and quotations omitted).

Plaintiff, however, establishes a dispute of a material fact regarding whether "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396–97, 135 S.Ct. 2466. Following a suicide attempt, Defendant Officers Welch, Wood, Pond and Minogue removed Plaintiff's shorts to alleviate the suicide risk of the short's drawstring. Dkt. No. 33-1 at ¶¶ 60, 64-65. Plaintiff,

however, asserts that the "objectively unreasonable" nature of the force used demonstrates that the true purpose was to "punish and/or retaliate against him." Dkt. No. 33 at 7.

In *Kingsley*, the Supreme Court provided the following non-exhaustive factors to determine whether a defendant applied force reasonably:

> the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* The factfinder must also "take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Frost*, 980 F.3d at 252. Here, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004), the Court finds material issues of fact regarding the amount and necessity of force preclude summary judgment.

**\*4** Plaintiff was alone in a secured environment and had already been searched for weapons. Dkt. No. 33-1 at ¶ 11. Four officers entered Plaintiff's cell to remove his shorts, and two more were present immediately outside. *Id.* at ¶ 114. Although Plaintiff resisted the officers, he did not punch or strike the officers. *Id.* at ¶¶ 160-62. In his testimony, Defendant Welch identified at least two punches that he threw after Plaintiff's shorts had already been removed. Dkt. No. 27-5 at 364. And Defendant Wood testified he grabbed Plaintiff's genitals after Defendant Welch had already punched Plaintiff, and after Plaintiff's shorts had been removed. Dkt. No. 27-6 at 70.

Plaintiff repeatedly testified at his deposition that he was punched approximately ten times, although he did not count

exactly, and that Defendant Wood pulled and squeezed Plaintiff's genitals, causing immense pain. Dkt. No. 33-1 at ¶¶ 163, 166. After the incident, Plaintiff's face was covered in blood, swollen, and bruised. *Id.* at ¶ 119; Dkt. No. 42-1 at 8-11. Plaintiff was eventually diagnosed with a deviated septum. *Id.* at ¶ 25. Following the incident, Chief Ritter stated, "not all" of the force used by Defendants against Plaintiff "was justified." *Id.* at ¶ 178.

Defendants argue that Plaintiff's injuries are *de minimis*, and therefore Defendants' actions cannot be objectively unreasonable. The Second Circuit, however, has held that multiple facial bruises and a ruptured eardrum supported a Fourteenth Amendment excessive force claim. *Frost*, 980 F.3d at 254. The Court finds a deviated septum sufficiently analogous to a ruptured eardrum. Additionally, the *Frost* court weighed the ruptured eardrum despite the plaintiff's previous diagnosis of a ruptured eardrum the year prior. *Id.* Here, Defendants argue "it is unlikely that Plaintiff's deviated septum can be attributed to the incident without engaging in speculation." Dkt. No. 42 at 7. However, "absent undisputed medical evidence to the contrary—which Defendants have not offered—a reasonable jury could find that" Defendants were responsible for causing a new injury. *Frost*, 980 F.3d at 254.

Defendants further argue that the officers' safety concerns justify the amount of force used. Plaintiff had been arrested earlier that evening for assault and was singing about killing people while in his cell. Dkt. No. 33-1 at ¶¶ 92, 95, 122. Plaintiff refused the order to remove his shorts and then resisted the Defendant Officers' attempt to remove the shorts. Nonetheless, Plaintiff was alone, had already been searched, and was secured in a cell. When the strikes occurred, Plaintiff was outnumbered four to one and pinned down.

To be sure, safety concerns coupled with refused orders may justify the use of force. *See, e.g.*, *Berman v. Williams*, No. 17-CV-2757, 2019 WL 4450810, *6 (S.D.N.Y. Sept. 17, 2019) (finding use of force justified where defendant refused to remove clothing in the search intake area); *Hilson v. Maltese*, No. 9:09-CV-1373, 2012 WL 6965105, *7 (N.D.N.Y. Dec. 14, 2012), *report and recommendation adopted*, 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013) (finding force to be reasonably necessary to restore order during a strip frisk); *Allaway v. McGinnis*, 473 F. Supp. 2d 378, 382 (W.D.N.Y. 2007) (finding use of force justified where the plaintiff "charged at" officers). But here, unlike *Berman* and *Hilson*, Plaintiff had already been searched and was in a secured environment. Considering the facts in the light most favorable

to Plaintiff, the Court, therefore, finds ten punches resulting in facial bruising and a deviated septum, as well as continued force, including the grabbing of genitals after compliance had been achieved, against a detainee who had already been searched for weapons, was in a secured environment, and did not attempt to punch or kick any officers, to be objectively unreasonable.

**\*5** Defendants also argue that there is no evidence to support the personal involvement of against Defendants Minogue and Pond. [1] In *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), the Supreme Court made clear that video evidence submitted in connection with a party's summary judgment motion should be considered in determining whether material issues of fact exist. "When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380, 127 S.Ct. 1769; *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017) ("*Scott* is best understood to permit the summary adjudication of a plaintiff's civil rights claim only in those exceptional cases where the video evidence in the record is sufficient to 'blatantly contradict[ ]' one party's version of events"). Here, the video evidence conclusively establishes that Defendant Minogue did not strike Plaintiff in the face. Defendant Minogue is near Plaintiff's legs for the entire fifty-four seconds. The only other alleged injury is to Plaintiff's genitals and the parties agree that action was performed by Defendant Welch. Therefore, the excessive force claim is dismissed against Defendant Minogue. Defendant Minogue did not strike Plaintiff in the face or grab his genitals, the only injuries alleged in the complaint.

[1]    Plaintiff has agreed to voluntarily dismiss the excessive force claim against Defendant Vassar. *See* Dkt. No. 33 at 16 n.3.

The video, however, does not conclusively establish Defendant Pond's actions. It is impossible to discern the amount of force he used or any other actions taken. Accordingly, a reasonable jury could find that Defendant Pond also used excessive force against Plaintiff, including unnecessary and gratuitous punching. *See, e.g.*, *Moore v. Keller*, 498 F. Supp. 3d 335, 351 (N.D.N.Y. 2020) ("Upon review, the video does not conclusively establish much. ... Accordingly, the appropriate course of action is still to permit the jury an opportunity to resolve the competing versions of

events") (quotations omitted). Therefore, Defendant Pond's motion for summary judgment on the excessive force claim is denied.

### 1. Qualified Immunity

Defendants further assert that Defendants Wood, Welch, Pond, and Minogue are shielded from liability based on qualified immunity.

Qualified immunity is an affirmative defense and, as such, Defendants bear the burden of proving that the privilege of qualified immunity applies. See *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012). "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010) (quoting *Kelsey v. County of Schoharie*, 567 F.3d 54, 60-61 (2d Cir. 2009)). The Court is mindful that qualified immunity is " 'an entitlement not to stand trial or face the other burdens of litigation,' " and that this privilege is " 'effectively lost if a case is erroneously permitted to go to trial.' " *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

Courts engage in a two-part inquiry to determine whether the doctrine of qualified immunity bars a suit against government officials. See *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006). First, a court must consider whether the facts, construed in favor of the party asserting the injury, "demonstrate a violation of a constitutional right." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Second, a court must also determine "whether the officials' actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). Courts may exercise their discretion in deciding which prong should be considered first. See *Pearson v. Callahan*, 555 U.S. 223, 243, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

"It is well established that qualified immunity may operate as a defense to excessive force claims." *Betts v. Rodriquez*, No. 15-CV-3836, 2017 WL 2124443, *4 (S.D.N.Y. May 15, 2017). "Even if the force is objectively unreasonable, an officer may still be eligible for qualified immunity if it was objectively reasonable for the officer to believe that her action did not violate clearly established law." *Keene v. Schneider*, 350 Fed. Appx. 595, 596 (2d Cir. 2009). "The Supreme Court has made clear that officers who have used excessive force may be entitled—under the qualified immunity doctrine—to an extra layer of protection 'from the sometimes hazy border between excessive and acceptable force.' " *De Michele v. City of New York*, No. 09-CV-9334, 2012 WL 4354763, *17 (S.D.N.Y. Sept. 24, 2012) (quoting *Saucier*, 533 U.S. at 206, 121 S.Ct. 2151).

**\*6** The contested amount and necessity of force in this case makes summary judgment on qualified immunity inappropriate. See, e.g., *Kerman v. City of New York*, 261 F.3d 229, 240 (2d Cir. 2001) (holding that "summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness") (citation omitted). Construing the facts in Plaintiff's favor, Defendants struck Plaintiff in the face and grabbed his genitals after he had been restrained and stopped resisting. It is clearly established law that once "restrained by five police officers inside the familiar terrain and relative safety of a police precinct interrogation room," repeated punches may "constitute excessive force." *Gardner v. Robinson*, No. 16-CIV-1548, 2018 WL 722858, *6 (S.D.N.Y. Feb. 6, 2018); *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020) (holding that it is "clearly established by our Circuit caselaw that it is impermissible to use significant force against a restrained arrestee who is not actively resisting"). Even if Plaintiff did initially resist, it is equally well established that "gratuitous force after resistance has stopped and compliance has been secured is unreasonable." *Lee v. City of Troy*, 520 F. Supp. 3d 191, 207 (N.D.N.Y. 2021) (citing *Lennox*, 968 F.3d at 157).

Accordingly, due to the factual dispute over the level of force used by Defendants and Plaintiff's level of resistance, as well as the timing of the alleged excessive force, the Court will not grant Defendants qualified immunity.

### C. Failure to Intervene

Plaintiff alleges that Defendant Officers failed to intervene in the August 19, 2017, incident. "It is widely recognized that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.

1994)). To establish a claim of failure to intervene a plaintiff must prove:

> (1) that a constitutional violation was being committed against the plaintiff; (2) that the officer knew, or deliberately ignored, the fact that the constitutional violation was going to be, or was being, committed; (3) that the defendant had a reasonable opportunity to intervene and prevent the harm; and (4) that the defendant did not take reasonable steps to intervene.

*Curley v. Vil. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)

*Alexander v. Nolan*, No. 6:17-CV-0725, 2018 WL 6621400, *7 (N.D.N.Y. Dec. 18, 2018). The first element, as discussed above, is met. Defendant Officers argue that they did not have actual knowledge of the force being used by other officers. Indeed, each of these officers testified that they did not know what force was being used. *See* Dkt. No. 27 at 34-35. Additionally, Defendant Officers argue that they did not have a realistic opportunity to intervene given the suddenness of any force.

After review of the video, the Court disagrees. First, a reasonable jury could find that Defendants Wood, Welch, Pond, and Minogue had knowledge of the force and a reasonable opportunity to intervene. The four officers were in close proximity in the cell together for fifty-four seconds as the incident unfolded. A reasonable jury could infer knowledge of force based on the video, despite the officers' testimony. Second, Defendant Vassar, although he was standing immediately outside of the cell, testified that he watched the incident occur. Dkt. No. 27-6 at 148. And third, Defendant Ritter was behind a desk in the booking room, where Cell 4 was visible. Dkt. No. 27-5 at 135-136. Defendant Ritter testified that he watched the incident for "about 45 seconds" from behind the desk. *Id.* Because it is undisputed that each Defendant Officer watched the events transpire, a reasonable jury could infer that they had knowledge of the force being used.

"Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all

the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Defendants argue that Defendant Welch's two punches and Defendant Wood's grabbing of Plaintiff's genitals were too sudden to allow any officer an opportunity to intervene. Plaintiff, however, testified that he was punched approximately ten times over the fifty-four second incident.

**\*7** In *Figueroa v. Mazza*, the Second Circuit held that a factual dispute over the length of an excessive force incident and the amount of punches thrown precluded judgment as a matter of law for the defendants on a failure to intervene claim. 825 F.3d 89, 106-07 (2d Cir. 2016). The court concluded that the plaintiff's "failure-to-intervene claims— even assuming that the assault lasted less than twenty seconds —were for the jury to decide. ... [W]e cannot hold that the assault occurred so quickly that the defendant officers lacked time to intercede as a matter of law." *Id.* at 108. "In light of the officers' placement relative to [plaintiff], the apparent absence of any obstacles that might have hindered their ability to intercede, and the assault's stated duration, a reasonable juror could infer that defendants became, by their inaction, 'tacit collaborator[s]' in the unlawful conduct alleged."

The Court finds *Figueroa* controlling. Whether Defendant Officers had a reasonable opportunity to intervene is a question for the jury. The number of punches or the spontaneity of the force cannot be determined by the Court at this stage. *See also Ross v. Willis*, No. 16-CIV-6704, 2021 WL 3500163, *16 (S.D.N.Y. Aug. 9, 2021). Accordingly, Defendants' motion for summary judgment on the failure to intervene claim is denied. [2]

---

[2]      Defendants did not argue that qualified immunity should attach to the failure to intervene claim. In general, "[a] police officer is not entitled to qualified immunity if his failure to intervene 'permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known' and 'the failure to intercede [occurred].... under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights.' " *Tiffany v. Tartaglione*, No. 00 CIV. 2283, 2004 WL 540275, *4 (S.D.N.Y. Mar. 5, 2004) (citing *Riciutti v. New York City Transit Authority*, 941 F.2d 119, 129 (2d Cir. 1991)).

## D. *Monell* Liability

Defendants assert that they are entitled to summary judgment on Plaintiff's *Monell* claim because Plaintiff has not identified a policy or custom regarding the failure to intervene. The Court agrees.

It is well settled that "a municipality cannot be made liable [under § 1983] by application of the doctrine of *respondeat superior.*" *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quotations omitted). Rather, "[i]n order to hold the County liable under § 1983, plaintiff must put forth sufficient evidence to show that individual defendants' unconstitutional actions were taken pursuant to an official municipal policy, custom, or practice." *Thornton v. Cty. of Albany*, No. 9:14-CV-679, 2016 WL 5793714, *7 (N.D.N.Y. Oct. 4, 2016) (citing *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018). As a result, to demonstrate *Monell* liability, a plaintiff must allege a violation of constitutional rights by employees of the municipality and "(1) 'the existence of a municipal policy or custom ... that caused his injuries beyond merely employing the misbehaving officer[s]'; and (2) 'a causal connection - an affirmative link - between the policy and the deprivation of his constitutional rights.'" *Harper v. City of New York*, 424 Fed. Appx. 36, 38 (2d Cir. 2011) (quoting *Vippolis v. Vill. Of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)) (internal quotation marks omitted).

> A plaintiff may plead a municipal policy or custom by alleging: (1) a formal policy, promulgated or adopted by the entity; or, (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials that was so permanent or well settled so as to constitute a 'custom or usage,' and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials.

**\*8** *Shepherd v. Powers*, No. 11 Civ. 6860, 2012 WL 4477241, *9 (S.D.N.Y. Sept. 27, 2012) (quotation and other citation omitted).

Plaintiff seeks to demonstrate a policy or custom in two ways. First, Plaintiff seeks to proceed with a " 'paradigmatic' *Monell* claim based upon 'formal, written policy.' *Wu v. City of New York*, 934 F. Supp. 581, 591 (S.D.N.Y. 1996)." Dkt. No. 33 at 22. Plaintiff identifies the "Use of Force Policy of the Plattsburgh Police Department" as the written policy, arguing that it "did not require officers to intervene to prevent the use of unreasonable force by others. The policy does not even mention the duty to intervene." *Id.* at 22-23 (citation omitted).

A written-policy-*Monell* claim cannot be buoyed by the absence of a written policy.[3] *See Gerte v. Borough of Naugatuck*, No. 3:19-CV-1511, 2021 WL 1165362, *6 (D. Conn. Mar. 26, 2021) ("Since the absence of policy is not a policy within the meaning of this theory of liability, Plaintiff's Monell claim on the basis of a written policy fails"); *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, *5 (S.D.N.Y. Apr. 1, 2014) ("[T]he absence of a policy is not a policy and is not actionable under *Monell* ...."). Instead, a municipal policy exists when "there is a decision by an official with policymaking authority, or a formal enactment by the municipality's governing body." *Scott v. Lazure*, No. 3:19-CV-713, 2020 WL 2615502, *9 (D. Conn. May 22, 2020). Defendants' lack of a policy, therefore, cannot evince a municipal policy that there is no duty to intervene. Municipal policies, of course, cannot preemptively bar every unconstitutional action or else support *Monell* liability.

3    In their motion for summary judgment, Defendants interpret Plaintiff's *Monell* claim regarding the lack of a policy to intervene as a failure to train claim. *See* Dkt. No. 27 at 4-6; *see, e.g.*, *Finch v. City of Stamford*, No. 3:10-CV-748, 2011 WL 5245422, *4 (D. Conn. Nov. 2, 2011) ("[T]he Court cannot imagine a lack-of-policy claim under § 1983 that is not also, and more relevantly, a failure-to-train claim"). In its reply, Plaintiff, however, insists he is not bringing a failure to train claim. Dkt. No. 33 at 22-23.

Second, Plaintiff asserts that there was a custom to not intervene in excessive force cases. *See* Dkt. No. 33 at 23. Plaintiff points to the deposition of Captain Bradley Kiroy, who testified that the Plattsburgh police department has never disciplined an individual for the failure to intervene. Dkt. No. 27-6 at 289. "A municipal policy may be pronounced or tacit and reflected in either action or inaction." *Cash v. County of*

*Erie*, 654 F.3d 324, 334 (2d Cir. 2011). "In order for Plaintiff to succeed on his ... failure to discipline theor[y], there must be a pattern of similar misconduct." *Davis v. City of New York*, No. 12 CIV. 3297, 2018 WL 10070540, *6 (S.D.N.Y. Mar. 30, 2018) (citing *Connick v. Thompson*, 563 U.S. 51, 62, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)). The instances of failure to intervene must be sufficient to demonstrate that officers' failure to intervene was so pervasive that it established a "custom or policy." *Id.* at *7-8.

**\*9** Captain Kiroy testified that there had been five-to-ten excessive force incidents and that no officer was disciplined for a failure to intervene. Dkt. No. 27-6 at 281, 289. That testimony alone, however, is well short of demonstrating a pattern of failing to intervene. There is nothing in the record about the other excessive force cases—specifically, whether there was an opportunity to intervene. Perhaps there was no discipline because an officer did intervene. The Court cannot assume that every other excessive force case provided an opportunity to intervene, that an officer did not intervene, and that the department chose not to discipline an officer for a failure to intervene. Plaintiff's sole reliance on a lack of failure to intervene discipline within the city does not imply a pervasive pattern of a failure to intervene.

Plaintiff's amended complaint also brings *Monell* causes of actions regarding policies or customs of "using excessive force against arrestees and/or detainees" and "not requiring its police officers to attempt de-escalation before using force against detainees or arrestees, including with respect to persons experiencing mental health issues." Dkt. No. 17 at ¶¶ 137, 139. Defendants moved for summary judgment with respect to these claims, as well. *See* Dkt. No. 27 at 11-14. Plaintiff, however, focused his response entirely on the lack of a policy regarding the duty to intervene. *See* Dkt. No. 33 at 22-24. Because Plaintiff does not oppose Defendants' motion for summary judgment as to the additional policies, the Court finds that Plaintiff has abandoned these claims and grants Defendants' motion for summary judgment. *See Crews v. City of Ithaca*, No. 3:17-CV-213, 2021 WL 257120, *13 (N.D.N.Y. Jan. 26, 2021); *Feacher v. Intercontinental Hotels Group*, 563 F. Supp. 2d 389, 399 (N.D.N.Y. 2008); *see also Stokes v. City of New York*, No. 05-CV-007, 2007 WL 1300983, *14 (E.D.N.Y. May 3, 2007) (collecting cases).

### E. Title II ADA and Section 504 of the Rehabilitation Act

The Second Circuit has recognized that claims made under the ADA and the Rehabilitation Act are so similar that they should be analyzed together. *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 146 n.6 (2d Cir. 2002). To assert a claim under the ADA or Rehabilitation Act, a plaintiff must establish "that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities." [4] *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272-73 (2d Cir. 2003). Additionally, in order to recover damages under Title II of the ADA and the Rehabilitation Act, the plaintiff must show that the discrimination was intentional. *See, e.g.*, *Vassenelli v. State Univ. of New York*, No. 5:17-CV-00082, 2018 WL 1406629, *3 (N.D.N.Y. Mar. 19, 2018).

> [4] In addition, to recover under the Rehabilitation Act, "a plaintiff must show that the defendants receive federal funding." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

Defendants do not challenge the first prong; that Plaintiff is a qualified individual. A "disability" is defined as a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Defendants state that Plaintiff was first diagnosed with PTSD in 2013, and that PTSD is a qualifying disability under the ADA. *See* Dkt. No. 27 at 16; Dkt. No. 33-1 at ¶ 124. Defendants also do not challenge the second prong. *See* Dkt. No. 27 at 15-16 ("The City of Plattsburgh and the Plattsburgh Police Department are public entities under the ADA"). The Supreme Court has held that state prisons "fall squarely within the statutory definition of 'public entity' " in Title II of the ADA. *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998); *see also Tardif v. City of New York*, 991 F.3d 394, 404 (2d Cir. 2021) (applying Title II of the ADA to an arrestee's pre-arraignment detention).

**\*10** Under Title II of the ADA, "[a] public entity discriminates against a qualified individual with a disability when it fails to provide 'meaningful access' to its benefits, programs, or services." *Disabled in Action v. Board of Elections of New York*, 752 F.3d 189, 197 (2d Cir. 2014) (citation omitted). Defendants further state that "post-arrest detainment qualif[ies] as a service, activity or benefit of a police department." [5] Dkt. No. 27 at 17; *see Tardif*, 991 F.3d at 404. "The only reasonable interpretation of Title II is that law enforcement officers who are acting in an investigative or custodial capacity are performing 'services, programs, or

activities' within the scope of Title II." *Williams v. City of New York*, 121 F. Supp. 3d 354, 368 (S.D.N.Y. 2015).

5      Because the issue was not contested by the parties, the Court assumes that Plaintiff's detainment qualifies as a service. The Second Circuit, however, has noted that whether "a safe custodial environment" was a "benefit" that the City denied under the ADA is an open question that "has divided our sister circuits." *Tardif v. City of New York*, 991 F.3d 394, 404 n.7 (2d Cir. 2021).

Defendants, however, assert that Plaintiff cannot prove that he was "discriminated against by defendants, by reason of plaintiffs' disabilities[,]" because Defendants did not have knowledge of Plaintiff's disability. *Henrietta D.*, 331 F.3d at 272-73. Additionally, Defendants argue that Plaintiff was not discriminated against because Defendants' actions were reasonable. *See* Dkt. No. 27-3 at 16-24. And lastly, Defendants argue that Plaintiff has failed to demonstrate that the discrimination was intentional, as required for damages under the ADA and Rehabilitation Act. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009).

First, knowledge of a disability is a prerequisite to discriminating by reason of that disability. *See, e.g., Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) ("Obviously, an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability"). Defendant notes that Plaintiff did not testify that he told any officer he had PTSD before the incident, instead he stated that "I can't be confident in saying that I said something beforehand[.]" Dkt. No. 27-4 at 184. Moreover, Defendants correctly note that there is no audible part of the security videos where Plaintiff can be heard telling an officer of his PTSD diagnosis. *See* Dkt. No. 27-3 at 17.

Defendant Vassar, however, told Plaintiff that, "we knew you had PTSD because you told us." Dkt. No. 27-6 at 171. Although, Defendant Vassar also testified at his deposition that he did not recall whether Plaintiff informed any officer of his PTSD before or after the incident, the court nonetheless finds a triable issue of fact. Defendant Vassar told Plaintiff that, "once we realized that it had triggered [your PTSD] because of your up and down mood and you trying to hang yourself then we had to act." *Id.* at 176. A reasonable inference from that conversation is that the officers knew Plaintiff had PTSD prior to entering his cell. Moreover, Plaintiff was singing about his difficult experience in Afghanistan, and informed Defendant Pond he was on

Setraline, a drug to treat PTSD. Dkt. No. 33-1 at ¶ 217. Drawing all inferences in Plaintiff's favor, a jury could reasonably find that Defendants had knowledge that Plaintiff had PTSD.

Next, Defendants argue that no reasonable accommodation was available because of exigent circumstances. *See* Dkt. No. 27 at 18-20. Under Title II of the ADA, a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual "to have access to and take a meaningful part in public services." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004), *opinion corrected on other grounds*, 511 F.3d 238 (2d Cir. 2004). "Whether a disabled individual succeeds in proving discrimination under Title II of the ADA will depend on whether the officers' accommodations were reasonable under the circumstances." *Williams*, 121 F. Supp. 3d at 368. "Title II of the ADA requires police officers to provide reasonable accommodations to arrestees and that any threatening or exigent circumstances should be considered when determining the reasonableness of the proposed accommodation." *Durr v. Slator*, No. 5:20-CV-00662, 2021 WL 3930704, *17 (N.D.N.Y. Sept. 2, 2021).

**\*11** In *Durr*, this Court denied a motion to dismiss for a similar Title II ADA claim. 2021 WL 3930704, at \*18. There, the plaintiff alleged that he was "clearly exhibiting signs of an emotionally disturbed person when Defendants Slator and Silverman arrived on the scene." *Id.* "Instead of placing Plaintiff in handcuffs, informing him that he was under arrest, and subsequently kicking him in the knee," the complaint alleged, "Defendants Silverman and Slator should have used de-escalation techniques." *Id.* Despite the plaintiff "yelling in the roadway," "obstructing traffic," and "spitting toward [d]efendant Slator," the Court nonetheless found that a reasonable accommodation may exist, notwithstanding any exigent circumstance posed by the plaintiff. *Id.* at \*18-19.

In reaching that conclusion, this Court relied on *Sage v. City of Winooski*, No. 2:16-cv-116, 2017 WL 1100882 (D. Vt. Mar. 22, 2017). In *Sage*

> the defendant police officers responded to a report of a person trespassing at a local health club. *See id.* at \*1. When the officers arrived, they were informed by the health club employees that the plaintiff had left

the property at their request, but still asked the officers to serve the plaintiff with a notice of trespass. *See id.* When the officers located the plaintiff and asked to see his identification, the plaintiff responded that they should already know him as a resident of Allen House, which is a group home operated for persons with chronic and persistent serious mental illness. *See id.* When the plaintiff declined to provided identification, one of the officers asked the plaintiff if he preferred to be arrested and proceeded to open a handcuff case. *See id.* Seeing the handcuff case, the plaintiff struck the officer in the face. *See id.* When other responding officer attempted to grab the plaintiff, he was able to break away from his grasp. *See id.* At this point, the officers deployed their tasers on the plaintiff. *See id.* While the plaintiff was "flailing" on the ground, one of the officers fired his service weapon, hitting the plaintiff in the leg. *See id.*

*Durr*, 2021 WL 3930704, at \*18. The *Sage* court denied a motion to dismiss because the plaintiff became violent "only after being threatened with arrest and shown a handcuff case." *Sage*, 2017 WL 1100882, at \*4. "[M]aking all reasonable inferences in the [p]laintiff's favor, the violent behavior could arguably have been avoided if the officers had acknowledged and accommodated Mr. Sage's mental illness." *Id.*; *see also Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232-33 (9th Cir. 2014), *reversed in part on other grounds*, 575 U.S. 600, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015) (denying summary judgment against a reasonable accommodation claim where the officers could have respected plaintiff's "comfort zone," engaged in non-threatening communications and used the passage of time to defuse the situation rather than precipitating a deadly confrontation").

Here, Plaintiff was secured in a cell where he could be adequately monitored. Similar to *Sheehan* and *Sage*, Plaintiff was not violent until Defendants initiated the interaction. And similarly, Plaintiff argues that Defendants could have

accommodated his disability by allowing him to cool off before forcibly removing his shorts. Whether a reasonable accommodation was available and feasible is a question of fact for the jury. *See, e.g., Morales v. City of New York*, No. 13 Civ. 7667, 2016 WL 4718189, \*6 (S.D.N.Y. Sept. 7, 2016) (availability of accommodation was question of fact, requiring denial of summary); *Wagner v. City of New York*, No. 14 Civ. 2521, 2015 WL 5707326, \*7 (S.D.N.Y. Sept. 28, 2015) (same). With Plaintiff secured in a cell, no exigent circumstance made a reasonable accommodation impossible as a matter of law.

**\*12** Defendants argue that *Tardif v. City of New York*, compels this Court to grant summary judgment. 991 F.3d 394, 407 (2d Cir. 2021). The Court disagrees. In *Tardif*, the plaintiff, a pre-arraignment detainee, was on a strict medication schedule for epilepsy and informed an officer of her medical needs. *Id.* at 399. Although the plaintiff received her first dose, she did not receive her second dose, had a seizure, and was transported to the hospital. *Id.* The Second Circuit held that Tardif's epilepsy did not cause a deprivation of medical services, it was just the motivation for seeking out such services. *Id.* at 405. "The ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Id.* at 406 (quotation and citation omitted). The court concluded that no reasonable jury could find that "Tardif's epilepsy substantially caused the City's delay in administering medication," and therefore upheld summary judgment. *Id.* at 407.

Here, *Tardif* is not instructive. *Tardif* would preclude an ADA claim for the excessive force itself, not the failure to provide a reasonable accommodation, such as a cooling off period. The failure to provide such a reasonable accommodation is squarely cognizable under the ADA. *See e.g., Williams*, 121 F. Supp. 3d at 369 (recognizing a reasonable accommodation claim where police fail to "reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees"). Whereas the failure to provide medical care is a generalized issue that applies beyond the ambit of disability law, the failure to provide reasonable accommodation to a service or benefit—a cooling off period for an individual with PTSD—is a quintessential failure to accommodate disability claim. Plaintiff does not bring an ADA claim to remain free from excessive force, which would likely fail following *Tardif*.

Lastly, Defendants argue that there is no evidence of intentional discrimination. "The standard for intentional violations is deliberate indifference to the strong likelihood [of] a violation[.]" *Loeffler, 582 F.3d at 275* (quotation omitted). "[C]ourts in this circuit have found that plaintiffs provided sufficient evidence of deliberate indifference when they could point to training deficiencies of which municipal entities were aware and which existed with respect to populations police would necessarily encounter as they did their duties." *Felix v. City of New York*, 344 F. Supp. 3d 644, 666 (S.D.N.Y. 2018) (citing *Williams*, 121 F. Supp. at 374–75).

Plaintiff has produced sufficient evidence to create a question of fact as to whether Defendants were deliberately indifferent to the strong likelihood of a violation of the ADA and Rehabilitation Act. Defendant Ritter testified that they have no departmental policy concerning compliance with the ADA and that he could not recall any ADA-specific training. Dkt. No. 27-5 at 148. Indeed, there are no departmental policies regarding the use of force during a mental health incident. *See* Dkt. No. 33 at 30-31.

Moreover, such a training deficiency relates to a population that police would necessarily encounter as they did their duties, those with a mental disability. *See, e.g., Felix*, 344 F. Supp. 3d at 666; *Williams*, 121 F. Supp. 3d at 374–75. Defendants argue that, because of the small population size of the city of Plattsburgh, approximately 20,000, it is not "morally certain" that its police officers will encounter individuals who require reasonable accommodations for a mental disability. At the summary judgment stage, however, all inferences must be drawn in the nonmoving party's favor. A mere reference to the population of the city is insufficient to grant summary judgment and does not provide the Court with the relevant information to determine whether police officers are likely to encounter individuals with mental disabilities. The Court notes that at least one other recent incident in Plattsburgh involved the use of force and mental health. *See Passino v. City of Plattsburgh*, No. 8:17-CV-1028S, 2020 WL 509129 (N.D.N.Y. Jan. 31, 2020).

**\*13** Questions of fact exist whether Defendants' failure to accommodate Plaintiff's disability directly stems from a "deliberate indifference to the strong likelihood [of] a violation[,]" and is an intentional violation of the ADA and Rehabilitation Act. *Loeffler, 582 F.3d at 275*. Plaintiff has demonstrated that he was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities," and that the discrimination was intentional. *Henrietta D.*, 331 F.3d at 272-73. Accordingly, Defendants' motion for summary judgment is denied.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 27) is **GRANTED in part and DENIED in part**; [6] and the Court further

> [6] Defendants' motion for summary judgment is granted with respect to the excessive force claim against Defendant Minogue and *Monell* liability against Defendant City, and otherwise denied.

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 137721

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00251-DNH-TWD    Document 37    Filed 05/22/23    Page 133 of 229

Vasselli v. State University of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1406629

2018 WL 1406629
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nicholas L. VASSELLI, Plaintiff,

v.

STATE UNIVERSITY OF NEW YORK, Upstate
Medical University, Institute for Human Performance,
John Doe(s) and Jane Doe(s), Defendants.

5:17-CV-00082 (MAD/ATB)
|
Signed 03/19/2018

**Attorneys and Law Firms**

BOSMAN LAW FIRM, LLC, OF COUNSEL: AJ BOSMAN,
ESQ. 201 West Court Street, Rome, New York 13440,
Attorneys for Plaintiff.

OFFICE OF THE NEW YORK STATE ATTORNEY
GENERAL, OF COUNSEL: AIMEE M. PAQUETTE, AAG,
Syracuse Office, 615 Erie Boulevard West, Suite 102,
Syracuse, New York 13204, Attorneys for Defendants.

### MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge

### I. INTRODUCTION

**\*1** On or about January 3, 2017, Plaintiff commenced
this action in New York State Supreme Court, Onondaga
County, alleging that Defendants violated his rights under
Title II of the Americans with Disabilities Act ("ADA"),
the Rehabilitation Act ("RA"), and the New York Human
Rights Law ("NYHRL"). See Dkt. No. 1. On January 25,
2017, Defendants removed the action to this Court. See id.
In response to a motion to dismiss, Plaintiff amended his
complaint as of right on March 22, 2017. See Dkt. No. 11.

Currently before the Court is Defendants' motion to dismiss
the amended complaint pursuant to Rule 12(b)(6) of the
Federal Rules of Civil Procedure or, in the alternative, to stay
this action pending the resolution of Plaintiff's parallel action
in the New York State Court of Claims. See Dkt. No. 14.

### II. BACKGROUND

Plaintiff is a resident of the State of New York, County of
Onondaga, and suffers from a qualifying disability under the
ADA, the RA, and the NYHRL. See Dkt. No. 11 at ¶ 4.
Defendant State University of New York, Upstate Medical
University, Institute for Human Performance ("IHP") is part
of the State University of New York and maintains a place of
business at 505 Irving Avenue, Syracuse, New York. See id.
at ¶¶ 5, 7.

According to the amended complaint, the incident giving rise
to this case occurred on January 3, 2014, at approximately
10:30 a.m., at IHP. See id. at ¶ 7. Plaintiff, who is
partially paralyzed and wheelchair bound, claims that he "was
subjected to physical injury, pain and suffering as a result
of being struck in his left arm by a nonoperational door
(exiting out onto Irving Avenue) while being transported in
a wheelchair out of the Institute for Human Performance."
Id. at ¶ 8. Plaintiff alleges that this occurrence "was caused
by reason of the deliberate indifference and/or recklessness
and/or carelessness of Defendants in, inter alia, failing
to repair the entrance and exiting doors of the facility,
despite repeated verbal [warnings] and visual notice of the
malfunctioning doors by Plaintiff." Id. at ¶ 9. Plaintiff claims
that the doors, which were intended for handicap access,
were broken for approximately ten months prior to Plaintiff's
injury and IHP officials and employees "had ample notice
of the nonoperational doors, yet failed to repair and/or
provide alternative ingress or egress." Id. "In point of fact,
approximately one week prior to the incident, Plaintiff made
a complaint to 'Tim' who is the head of Physical Therapy at
IHP and he e-mailed the maintenance department regarding
the malfunctioning doors." Id. Additionally, Plaintiff claims
that, immediately following the incident, he spoke with
Charles Lester, the Building Manager at IHP, and Mr. Lester
acknowledged that the door had been " 'broken' and were
'malfunctioning' for 'approximately five months.' He stated,
among other things, that it takes a 'long time' for the State to
approve repairs." Id.

Plaintiff argues that such statements demonstrate, among
other things, knowledge and deliberate indifference.
"Defendants had knowledge that the building was accessed
by the public, including persons with special needs and/
or in need of accommodation and failed to ensure their
safety, access, and were deliberately indifferent ... in violation
of the law." Id. Plaintiff claims that, as a place of public

Vassenelli v. State University of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1406629

accommodation, Defendants were required not only to provide access to handicapped individuals, but also to ensure that their access is safe and effective. *See id.*

 **\*2** Plaintiff claims that, "[a]s a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages. Such damages and injuries include: physical injury to Plaintiff's body, in particular, his left arm; inconvenience; a worsening of his fragile physical and mental state; exacerbation of limited use of his left arm, hand and fingers; pain and suffering, including, shooting pain radiating from his left arm to his left hand and weakness in his left arm and hand and fingers; emotional distress; and loss of enjoyment of life." *Id.* at ¶ 11.

In their motion to dismiss, Defendants contend that Plaintiff's amended complaint should be dismissed because Plaintiff merely alleges that Defendants were negligent in failing to repair the door and failed to enact policies to safeguard against injuries such as the one Plaintiff suffered. *See* Dkt. No. 14-2 at 9-10. The ADA and RA, however, require Plaintiff to allege conduct that amounts to intentional discrimination. *See id.* at 10. Although Defendants acknowledge that the amended complaint now alleges that they were "deliberately indifferent," Defendants contend that this conclusory allegation is insufficient to survive a motion to dismiss. *See id.* Further, Defendants contend that, although Plaintiff does add some facts with respect to his claim that IHP employees were deliberately indifferent, Plaintiff fails to allege any facts demonstrating that a policymaker acted with ill will or personal animosity towards Plaintiff based on his disability. *See id.* at 10-11.

In the alternative, Defendant ask the Court to stay this case pending resolution of Plaintiff's case in the New York State Court of Claims. *See* Dkt. No. 14-2 at 11-17. Defendants contend that a stay is appropriate under the *Colorado River* doctrine because the state and federal proceedings are parallel and the six factors that the Court must consider weigh in favor of granting the stay. *See id.*

## III. DISCUSSION

### A. Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation

omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

### B. Individual Defendants

 **\*3** It is well settled that "[t]he ADA does not provide for individual liability." *Hodges*, 2011 WL 5554866, at \*8 (citing *Herzog v. McLane Northeast*, 999 F. Supp. 274, 276 (2001)). As such, the claims against individuals in this action are dismissed.

### C. ADA and RA Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of

2018 WL 1406629

the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under the ADA, Plaintiff must therefore show that "(1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (3) such exclusion, denial or discrimination was by reason of his disability." Hodges v. Wright, No. 9:10-cv-0531, 2011 WL 5554866, *8 (N.D.N.Y. Sept. 29, 2011) (citing Goonewardena v. New York, 475 F. Supp. 2d 310, 324 (S.D.N.Y. 2007)). Claims under Title II of the ADA and the Rehabilitation Act of 1973, 29 U.S.C. § 794, are treated identically. See Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

Further, in order to recover damages under Title II the ADA and the RA, the plaintiff must show that the discrimination was intentional. See Frank v. Sachem Sch. Dist., 84 F. Supp. 3d 172, 186-87 (E.D.N.Y. 2015) ("[I]t is well settled that monetary damages are only available under Title II of the ADA where the [p]laintiff is able to demonstrate intentional discrimination") (citing Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 275 (2d Cir. 2009)) (other citations omitted). To prove intentional discrimination under Title II, "a plaintiff must allege facts showing that a policymaker acted with ill will or personal animosity toward him because of his disability or that the policy maker acted with 'deliberate indifference' to his rights under the ADA." Id. at 187 (citation omitted); see also Garcia v. SUNY Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 115 (2d Cir. 2001). Deliberate indifference does not require personal animosity or ill will. See Loeffler, 582 F.3d at 275. Rather, a plaintiff can demonstrate deliberate indifference in the Title II context where an official with authority to address the alleged discrimination and to institute corrective measures on the plaintiff's behalf had actual knowledge of ongoing discrimination against the plaintiff but failed to respond adequately. See Gershanow v. County of Rockland, No. 11-CV-8174, 2014 WL 1099821, *4 (S.D.N.Y. Mar. 20, 2014) (citation omitted); see also Loeffler, 582 F.3d at 275 (applying the same standard to claims for money damages under the RA) (citations omitted).

In the present matter, the Court finds that Plaintiff has failed to plausibly allege intentional discrimination under the ADA or RA. Plaintiff's amended complaint alleges that he was struck in the arm by a nonoperational door while exiting IHP. See Dkt. No. 11 at ¶¶ 7-8. The only allegations regarding the conduct of any specific individuals that could possibly relate to the existence of intentional discrimination are as follows:

> **\*4** Said occurrence was caused by reason of the deliberate indifference and/or recklessness and/or carelessness of Defendants in, inter alia, failing to repair the entrance and exiting doors of the facility, despite repeated verbal and visual notice of the malfunctioning doors by Plaintiff. The doors, purportedly for handicap access, were broken for approximately 10 months prior to the Plaintiff's aforesaid injury and IHP officials and employees had ample notice of the nonoperational doors, yet failed to repair and/or provide alternative ingress or egress. In point of fact, approximately one week prior to the incident, Plaintiff made a complaint to "Tim" who is the head of Physical Therapy at IHP and he e-mailed the maintenance department regarding the malfunctioning doors. Further, immediately after the incident, Plaintiff spoke with Charles Lester, the Building Manager at IHP, and Mr. Lester acknowledged that the doors had been "broken" and were "malfunctioning" for "approximately five months." He stated, among other things, that it takes a "long time" for the State to approve repairs. Such statements and conduct demonstrate, inter alia, knowledge and deliberate indifference. Defendants had knowledge that the building was accessed by the public, including persons with special needs and/or in need of accommodation and failed to ensure their safety, access, and were deliberately indifferent as well as in violation of the law. As a place of public accommodation, the government is obligated to not only provide access to the handicap[ped]

Case 9:21-cv-00251-DNH-TWD    Document 37    Filed 05/22/23    Page 136 of 229

Vassenelli v. State University of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1406629

but to ensure that access is both effective and safe.

Dkt. No. 11 at ¶ 9.

As Defendants correctly contend, Plaintiff fails to allege that someone with authority to address the broken door (the alleged discrimination) knew of this issue and failed to adequately respond. Rather, Plaintiff alleges that when he brought the issue to the attention of "Tim," he immediately emailed maintenance to alert them of the issue. This occurred one week prior to Plaintiff's alleged injury. Nothing in the amended complaint plausibly suggests either the evidence of ill will or animus, or the existence of deliberate indifference. *See Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 930-31 (7th Cir. 2004) (noting that the plaintiff alleged that the defendant city violated the ADA by failing to repair a broken elevator or otherwise secure the plaintiff's safe egress from a city train station after a snowstorm and finding that such "[i]solated acts of negligence by a city employee do not come within the ambit of discrimination against disabled persons proscribed by the ADA"); *Midgett v. Tri-County Metro. Transp. Dist. of Or.*, 74 F. Supp. 2d 1008, 1018 (D. Or. 1999) (holding that the wheelchair-bound plaintiff was not entitled to compensatory damages in suit where he alleged the lifts on the defendant's buses occasionally malfunctioned because he did not demonstrate any discriminatory intent or, at a minimum, deliberate indifference); *Hartman v. Costa Verde Ctr.*, No. 16cv956, 2016 WL 7178964, *3 (S.D. Cal. Dec. 8, 2016) ("The linchpin for an ADA claim is discrimination, not personal injury occasioned by a lift malfunction due to an isolated mechanical malfunction").

Even under a generous reading, the amended complaint does not make any factual allegations that could reasonably give rise to an inference of deliberate indifference, let alone discriminatory animus. The amended complaint does, for example, allege that Defendants were aware of incidents prior to Plaintiff's injury where other wheelchair-bound patrons were similarly harmed or denied access. Nor does the amended complaint allege that Defendants knew that Plaintiff or other wheel-bound individuals had difficulty entering or exiting the facility until he reported that the doors were not functioning properly. Plaintiff's formulaic, conclusory allegations regarding discriminatory animus and deliberate indifference are insufficient to nudge his claims across the line from conceivable to plausible. *See MC v. Arlington Cent. Sch. Dist.*, No. 11-cv-1835, 2012 WL 3020087, *4 (S.D.N.Y. July

24, 2012); *see also Leclair v. Mass. Bay Transp. Auth.*, No. 17-cv-11111, 2018 WL 314813, *6 (D. Mass. Jan. 5, 2018).

Additionally, in this case, Plaintiff alleges that on a single occasion he had trouble with the door while exiting the building. Indeed, Plaintiff is not even seeking injunctive relief, thereby suggesting that he was not and is not being subjected to an ongoing denial of services. This one time issue is insufficient to amount to a "denial of services, programs or activities."

**\*5** It is clear why Plaintiff filed suit in the Court of Claims first regarding this same incident: Plaintiff's claim sounds in garden-variety negligence rather than being based upon a disability discrimination theory. The Court acknowledges that simply because a plaintiff suffered a physical injury does not automatically convert an ADA claim to one sounding in negligence. *See, e.g., Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 7-8 (1st Cir. 2000). Here, however, Plaintiff has failed to allege that he was denied access to services, programs or activities, as is required to plausibly allege a claim for disability discrimination.

Since Plaintiff is not seeking injunctive relief, and because he has failed to plausibly allege facts showing that a policymaker acted with ill will or personal animosity toward him because of his disability or that the policy maker acted with "deliberate indifference" to his rights under the ADA and the RA, the Court grants Defendants' motion to dismiss.

### D. State-Law Claims

The "traditional 'values of judicial economy, convenience, fairness, and comity' " weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having determined that all of the claims over which it has original jurisdiction should be dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law causes of action. *See id.* (citing 28 U.S.C. § 1367(c)(3)). As such, Plaintiff's state-law causes of action are dismissed without prejudice.

### E. Leave to Amend

Plaintiff has neither asked to file a second amended complaint nor otherwise indicated that he is in possession of facts that could cure the deficiencies identified in the Memorandum-

Case 9:21-cv-00251-DNH-TWD    Document 37    Filed 05/22/23    Page 137 of 229

Vassenelli v. State University of New York, Not Reported in Fed. Supp. (2018)
2018 WL 1406629

Decision and Order. Since Plaintiff has already had an opportunity to amend and because there is no indication that amendment would not be futile, the Court declines to now *sua sponte* grant leave to file a second amended complaint. See *M.C.*, 2012 WL 3020087, at *14 (denying leave to file a second amended complaint under similar circumstances) (citing cases).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion to dismiss is **GRANTED**; and the Court further

**ORDERS** that Defendants' request to stay this action is **DENIED as moot**; and the Court further

**ORDERS** that Plaintiff's amended complaint is **DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1406629

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3199684

United States District Court,
W.D. New York.

Thomas J. WEGA, Plaintiff,
v.
CENTER FOR DISABILITY RIGHTS, Defendant.

No. 06–CV–6375.
|
Sept. 30, 2009.

West KeySummary

1    **Civil Rights** 🔑 Particular Conditions,
Limitations, and Impairments

**Civil Rights** 🔑 Employment Qualifications,
Requirements, or Tests

Former employee, who had suffered a stroke,
was not a qualified individual with a disability
under the ADA. Although former employee
asserted that he had trouble thinking of the right
word at the right time, he could not think of
an instance when that problem had kept him
from performing the essential functions of his
job. Neither former employee's left shoulder
weakness nor the problems with his left leg
affected his ability to carry out his work-related
duties. Americans with Disabilities Act of 1990,
§ 3(2)(A) (2004), 42 U.S.C.A. § 12102(2)(A)
(2004); 29 C.F.R. 1630.2(j)(1)(i, ii); 45 C.F.R. §
84.3(j)(2)(ii).

**Attorneys and Law Firms**

Thomas C. Hartzell, Sr., Finucane & Hartzell, Pittsford, NY,
for Plaintiff.

Erin M. Sobkowski, Matthew J. Fusco, Chamberlain,
D'Amanda, Oppenheimer & Greenfield, LLP, Rochester, NY,
for Defendant.

**DECISION and ORDER**

MICHAEL A. TELESCA, District Judge.

*INTRODUCTION*

**\*1**  Plaintiff Thomas J. Wega ("plaintiff" and/or "Wega"),
brings this action pursuant to the Americans With Disabilities
Act, 42 U.S.C. § 12100, *et seq.* ("ADA") claiming that
defendant Center for Disability Rights ("CDR") unlawfully
discriminated against him on the basis of a disability.
Specifically, plaintiff alleges that he is disabled under the
ADA as a result of residual effects of a cerebral vascular
accident sustained in 1994; that CDR failed to accommodate
his condition during the time of his employment; and that he
was unlawfully terminated from his employment because of
his condition.

Defendant denies plaintiff's claims, and alleges that plaintiff
failed to request any reasonable accommodation, and that
his termination of employment was not a result of any
discriminatory animus. In addition, defendant moves for
summary judgment pursuant to Rule 56 of the Federal Rules
of Civil Procedure on grounds that plaintiff has failed to state
a cause of action for discrimination. Specifically, defendant
contends that Wega has failed to establish that he is disabled
under the terms of the ADA; has failed to establish that
he requested and was denied a reasonable accommodation
for his condition; and that CDR had reasonable business
justification for terminating Wega's employment. Plaintiff
opposes defendant's motion and cross-moves for summary
judgment arguing that he is a qualified individual with a
disability within the meaning of the ADA and that defendant
failed to accommodate plaintiff during his employment.
Moreover, plaintiff asserts that there are questions of fact as to
the scope and range of discriminatory harassment and abuse
plaintiff suffered while employed with CDR.

For the reasons set forth below, I grant defendant's motion
for summary judgment, and deny plaintiff's cross-motion for
summary judgment.

*BACKGROUND*

At the outset, this Court must review the requirements of
the Local Rules of Civil Procedure. Local Rule 56 provides:

"In any motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, there shall be annexed to the notice of motion "a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." *See* W.D.N.Y. Loc. R. Civ. P. 56.1(a). "The papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." *See id.* 56.1(b). In short, the moving party must set forth the material facts that it contends are not in dispute, whereas the non-moving party must then set forth the material facts that he contends are in dispute (i.e., material facts as to which she contends that there is a genuine issue). CDR has complied with both rules. *See* Def.'s Statement of Material Facts, Doc. # 58 ("SOMF") and Def.'s Response to Plaintiff's Statement of Material Facts Pursuant to Rule 56.1., Doc.# 78 ("Responding Statement").

**\*2** Plaintiff, however, appears to have only partially complied with the Local Rules by submitting a "Statement of Material Facts Raising Genuine Issues of Fact For Trial" ("Hybrid Statement"). [1] *See* Doc.# 74.3. Plaintiff's Hybrid Statement failed to specifically controvert the defendant's SOMF as required by Loc. R. Civ. P. 56.1(b) and (d). [2] Although plaintiff's Hybrid Statement sets forth some facts that appear to somewhat contradict defendant's SOMF and at the same time setting forth his own version of undisputed facts under 56.1(a), it nonetheless includes facts that are contained in defendant's SOMF i.e., facts about which there is no disagreement and that create no genuine issue of material fact. Consequently, plaintiff's Hybrid Statement has the effect of causing confusion and obscuring the record. Further, it fails to specifically set forth which facts create a genuine issue of material fact-as opposed to a recitation of all the alleged facts. Since plaintiff has only partially complied with Rule 56.1(b) and 56.1(d), the third paragraph of Rule 56.1 comes into play. It reads: "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted *unless* controverted by the statement required to be served by the opposing party." *See id.* R. 56.1(c) (emphasis added).

[1]     Such failure to abide by Loc. Rule 56 does not "streamline the consideration of summary judgment motions by freeing [this Court] from the need to hunt through voluminous records without guidance from the parties." *See Holtz v.*

*Rockefeller & Co., Inc.,* 258 F.3d 62, 74 (2d Cir.2001) (discussing Rule 56.1 of the Loc. Rules of Civ. Proc. for the Southern and Eastern Districts of New York which is essentially the same as Loc. Rule 56).

[2]     In this regard, Rule 56.1(d) provides that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, as required by Federal Rule of Civil Procedure 56(e)," with citations identifying "with specificity" the relevant page or paragraph of the cited authority. *See id.* R. 56.1(d).

As this Court held in *Kuchar v. Kenmore Mercy Hosp.,* 2000 WL 210199, at \*1 (W.D.N.Y.2000) "[w]hile the consequence of this miscue is minimal given the general consensus between the parties [as shown by defendant] as to the constituent facts of this case, where a discrepancy exists this Court is obligated to and will 'deem admitted' the [moving party's] version of the facts ... [although] the Court is [also] obligated to and will believe the [non-moving party's] evidence and all justifiable inferences will be drawn in his favor." [3] In view of Rule 56.1(c), the relevant facts that the court deems undisputed, based on the Amended Complaint, the parties' 56.1 Statements (as limited by invocation of the Local Rule), and other materials submitted in connection with defendant and plaintiff's motions for summary judgment, are as follows:

[3]     *See Holtz,* 258 F.3d at 73–74 ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules"); cf. *Covelli v. Nat'l Fuel Gas Distrib. Corp.,* 2001 WL 1823584, at \*1 (W.D.N.Y.2001) (holding that the district court "may, but is not required to, search the record for evidence which the party opposing summary judgment fails to point to in his Loc. Rule 56 statement. Inasmuch as the citations to the record in defendant's Statement support its factual assertions, this Court declines to search the record in an attempt to find evidence contradicting such when plaintiff has failed to do so ....") (citations omitted).

Plaintiff suffered a stroke in March 1994. *See* SOMF, ¶ 1. In October 1994, plaintiff underwent a comprehensive neuropsychological evaluation performed by Dr. Peter B. Sorman, Ph.D. ("Dr.Sorman"). *See id.,* ¶ 3. Dr. Sorman's report dated November 3, 1994 ("November 1994 Report")

found that plaintiff had "superior abilities" with respect to intellectual functioning. For instance, general intelligence and verbal intellectual capacities were in the high average range while the nonverbal intellectual capacities was in the average range. *See id.,* ¶ 4. [4] With regard to attention and coordination, plaintiff was within average range. *See id.,* ¶ 5. A sensory-perception examination revealed that all of plaintiff's sensory organs were within normal limits. *See id.* In terms of language and academic abilities the November 1994 Report showed that plaintiff had "no apparent word finding difficulties" and his academic capabilities are commensurate with his level of education. *See id.*

[4]     The November 1994 Report indicates that plaintiff had "[v]ery superior abilities ... for fund knowledge. Superior abilities ... for verbal abstract reasoning. High average functioning ... for vocabulary, mental arithmetic calculations requiring sustained mental control, knowledge of social convention, and visual sequencing of social information. Mr. W ega scored within the average range for visuospatial synthesis of complex design. Low average functioning ... for immediate auditory sequential memory digits, visual attention to relevant features in the environment[.]" *See* Affirmation of Matthew J. Fusco ("Fusco Aff."), ¶ 4, Ex. C.

**\*3** The report further found that plaintiff demonstrates "superior verbal abstraction capabilities" in terms of new learning ability. *See id.* In addition, the November 1994 Report summarized Dr. Sorman's examination of plaintiff by finding that he is "functioning in the high average range of general intelligence with a statistically significant difference noted between verbal and nonverbal intellectual capacities, the latter within average range.... Mr. Wega ... has retained very superior fund of general knowledge and high average vocabulary, mental arithmetic calculations and verbal abstraction capacities in the superior range.... Mr. Wega's overall attention and concentration abilities for structured information was found to be within average range. Overall memory functions range from average to slightly above average capacities." *See id.,* ¶ 6. Indeed, on many of the factors tested, plaintiff scored above average. *See* Fusco Aff., Ex. C.

At the time of his stroke, plaintiff was employed as the Director of Health and Safety Services for the American Red Cross ("Red Cross"). *See id.,* ¶ 7. Within months after the stroke, plaintiff returned to work but he continued to receive physical therapy for problems with his leg. *See id.,* ¶ 2. In 1998 plaintiff was terminated from his position at the Red Cross. *See id.,* ¶ 7. [5] In 1999, plaintiff was hired by the American Heart Association ("AHA") as Vice–President for Health Admissions. *See id.,* ¶ 8. However, in early 2002 plaintiff was placed on a performance improvement plan by the AHA. In seeking assistance from VESID, plaintiff received a job coach to assist him at work. Plaintiff's VESID counselor, Laura Mass referred him back to Dr. Sorman for a re-evaluation in February 2002. *See id.,* ¶ 11.

[5]     Prior to Wega's termination from the Red Cross, he sought assistance from the N.Y. State Vocational and Educational Services for Individuals with Disabilities ("VESID") concerning his problems at work.) *See id.,* ¶ 10.

Dr. Sorman's report dated February 11, 2002 ("February 2002 Report") revealed that plaintiff's vocabulary function were in the high average range in terms of his intellectual abilities. In addition, his "non-verbal reasoning was assessed at ... average capacity" and his "IQ composite ... is at the upper end of the average range." *See id.,* ¶ 12. Plaintiff also exhibits average "working memory" and he "still exhibits intellectual capacities in the average-to-above average range with well-developed verbally mediated skills." *See id.* Essentially, the February 2002 Report concluded that plaintiff's cognitive profile "remains relatively unchanged from data obtained in 1994." *See id.* The report however indicated that "[m]ulti-tasking ... may present a challenge as will issues such as organization and time management of responsibilities." *See id.* [6] One of the recommendations in the February 2002 Report was that plaintiff receive the assistance of a job coach. *See id.,* ¶ 13. In this regard, plaintiff had at least ten job coaching sessions with Ray Connor, a coach provided through VESID from mid-April through mid-May 2002. *See id.* Despite the services of the job coach, plaintiff was terminated from his employment at the AHA in either May or June 2002. *See id.,* ¶ 14.

[6]     In a letter addressed to his primary care physician, Dr. Marc Berliant, dated August 12, 2002, plaintiff described that he has "time and organizational management deficiencies" and was first demoted and then later terminated from the AHA. *See id.,* ¶ 9.

**\*4** In the fall of 2002, plaintiff applied for the position of Director of Administration at the CDR. *See id.,* ¶ 15. Plaintiff's cover letter indicated that he suffered from a stroke but had made a "remarkable recovery." *See id.,* ¶ 15. In fact, plaintiff testified at his deposition that at no time during his employment with CDR did he ever request an accommodation regarding either his physical or mental limitations as a result of his 1994 stroke. *See id.,* ¶ 16. In December 2002, CDR hired plaintiff as the Director of Administration and he held that title until April 2004. *See id.,* ¶ 18. As Director of Administration plaintiff had two main areas of responsibility, namely the finances of the organization and overall human resource guidance. *See* Affidavit of Bruce Darling ("Darling Aff."), ¶ 23. However, throughout the fall of 2003 and well into 2004 plaintiff had performance problems handling the financial responsibilities of his job as seen by his lack of knowledge of CDR's funding streams, as exhibited by his inability to complete major tasks [7] and as shown by plaintiff's failure to file the organization's taxes in 2003. [8] *See* SOMF, ¶ 17. Plaintiff's title changed in April 2004 to Director of Human Resources ("HR Director") and his financial responsibilities with respect to CDR were taken away from him. *See id.,* ¶ 18. He received no reduction in pay and still participated in the management team. *See id.* [9] In August 2004, CDR terminated plaintiff from his employment for poor performance. [10] *See id.,* ¶ 19.

[7]     One of the tasks that was not getting done was responding to Finger Lakes Developmental Disabilities Service Office, one of CDR's major funders with respect to specific concerns raised about services provided to an individual client named Joe McNulty. On August 22, 2003, Darling sent plaintiff an e-mail asking to see the McNulty letter. After numerous drafts and correspondence back and forth between plaintiff and Darling, the final version of the letter was not completed until May 2004. At this time, Darling had taken over the writing of the letter himself. *See* Darling Aff., ¶¶ 33–37.

[8]     During plaintiff's fifteen months of being responsible for the finances of CDR, it was learned that he did not take steps to make sure that CDR filed its taxes in 2003. *See* Darling Aff., ¶ 53.

[9]     As HR Director, it was plaintiff's responsibility to recruit new staff and it was within his responsibility

to supervise the various human resources aspects of processing employee paperwork for aides. This included doing their background checks, verifying their weekly payroll records, enrolling them in benefits, and dealing with any disciplinary issues. *See* Darling Aff., ¶ 55. According to Darling, at various times after plaintiff took on the task of HR Director he questioned plaintiff about HR procedures and plaintiff was not familiar with them. *See* Darling Aff., ¶ 58. It became apparent that plaintiff had simply thrown himself into the paperwork and was spending all his time filing and CDR did not need to pay someone a HR Director's salary to have them be a file clerk. *See id.,* ¶ 63.

[10]    A month later, plaintiff informed his physician, Dr. Berliant by letter that this was the third job where he was unable "to do the job consistently well enough for my employer." *See id.,* ¶ 20.

Plaintiff's counsel asked Dr. Sorman to evaluate plaintiff in 2007 and to provide an independent medical evaluation relating to his condition. *See* Hybrid Statement, Third. Dr. Sorman's August 2007 Report ("August 2007 Report") indicates that his findings are consistent with data contained in his November 1994 Report. *See* Sorman's August 2007 Report, at 5. With respect to general intelligence, plaintiff was in the high average range and his IQ was in the average range. *See id.,* at 4. The report further found that plaintiff's strengths consisted of "knowledge of vocabulary definitions and verbal abstract reasoning." *See id.* "High average knowledge was noted for: mental arithmetic calculations, fund of knowledge, and ... nonverbal reasoning." *See id.* Dr. Sorman was asked by plaintiff's counsel to give an opinion as to whether "[f]rom the time period of 12/02/02 until 08/13/04 when plaintiff was employed at the [CDR] ... he [was] 'Successfully disabled within the meaning of the [ADA], and that he suffered from three or more functional disabilities affecting a major life activity.' " *See id.,* at 5. Dr. Sorman opined that "with a reasonable degree of neuropsychological certainty, [plaintiff] has been disabled (since the onset of his stroke in March 1994), [and] ... during the time frame as well from 12/02/02 through 08/13/04." *See id.*

### DISCUSSION

#### I. *Summary Judgment Standard*

**\*5** A motion for summary judgment shall be granted if the pleadings demonstrate that "there is no genuine issue as to any

Wega v. Center for Disability Rights, Not Reported in F.Supp.2d (2009)

2009 WL 3199684, 40 NDLR P 11

material fact and that the movant is entitled to judgment as a matter of law." *See* Fed. R.Civ.P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The moving party initially bears the burden of demonstrating that no genuine issues of material fact remain. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this showing is made, the nonmoving party may not rely solely on "[c]onclusory allegations, conjecture, and speculation," *Niagara Mohawk Power Corp. v. Jones Chem. Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (internal citations and quotation marks omitted), but must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. *See* Fed.R.Civ.P. 56(e). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *See Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing Fed.R.Civ.P. 56(c)).

## II. *Timeliness of Plaintiff's Submissions*

Defendant filed its Motion for Summary Judgment on September 30, 2008 pursuant to Magistrate Judge Marion Payson's Amended scheduling Order dated March 20, 2008 ordering that all dispositive motions were to be filed no later than September 30, 2008. *See* Fusco Affidavit dated Feb. 12, 2009 ("Fusco Aff. II"), 14. Pursuant to the Local Rules, plaintiff had thirty days to respond to the summary judgment motion filed by CDR. *See* W.D.N.Y. Loc. R. Civ. P. 56.1(e). Plaintiff did not respond to CDR's motion within thirty days, nor did plaintiff file a formal motion before the Court seeking an extension of the date by which opposition papers were to be due. *See* Fusco Aff. II, ¶ 7–11. Instead, on November 5, 2008, five days after plaintiff's opposition papers were due, plaintiff filed an affidavit with the Court requesting new scheduling dates. *See id.,* ¶ 13, Ex.B. Plaintiff requested for an extension of fact discovery before Judge Payson and for an "extension of deadlines for answering Defendant's pending Motion for Summary Judgment and for submission of Plaintiff's own Motion for Summary Judgment to January 15, 2009." *See id.*

Defendant argues that to date, plaintiff's untimely request has not been granted and as such plaintiff's submissions are in violation of Local Rule 56.1 and must be denied. *See id.,* 122. Plaintiff contends that his summary judgment motion is timely under an extension application granted by this Court dated November 19, 2008. *See* Thomas Hartzell Affirmation dated January 14, 2009 ("Hartzell Aff."), Sixth and Doc.# 69. Courts in this district have stricken papers where parties have failed to follow Local Rules and recognized established deadlines. *See Lewis v. FMC Corp.,* 2008 WL 4500185, at * 1 (W.D.N.Y.2008). Here, the Court's November 19, 2008 Order states that "plaintiff's motion for an extension of time to respond to defendant's motion for summary judgment is granted." *See* Doc. # 69. However, the Order further indicated that counsel would be notified of a revised briefing schedule for defendant's summary judgment motion following Judge Payson's issuance of a decision on the discovery motions pending before her. [11] Notwithstanding this Order, and before Judge Payson issued her decision on the discovery motions, [12] plaintiff filed his motion for summary judgment on January 15, 2009. The Court finds that plaintiff has ignored the Court's orders and the established deadlines. However, based on the undisputed evidence, as reflected in the papers submitted by the parties, the Court grants summary judgment in favor of CDR, thus rendering plaintiff's non-compliance as moot.

[11]     Courts require that parties adhere to scheduling orders and Fed.R.Civ.P. 16(b) provides that when the court has filed a Rule 16 scheduling order, it may properly require that good cause be shown before it is modified. *See Covington v. Kid,* 1999 WL 9835, at *3 (S.D.N.Y.1999). In this case, plaintiff has ignored Judge Payson's Amended Scheduling Order without either offering good cause or receiving consent from the Court. The Amended Scheduling Order in this case called for all factual discovery to be completed by August 11, 2008 and all dispositive motions to be filed by September 30, 2008. *See* Fusco Aff. II, ¶ 4. However, on September 11, 2008 plaintiff filed an affidavit seeking an order extending discovery and the date by which all dispositive motion were due. *See id.* Judge Payson denied the request to extend discovery on October 29, 2008, and informed plaintiff during oral argument that if he wished to extend the time to file dispositive motions, he should file a motion before this Court. *See id.,* ¶¶ 9–11.

Wega v. Center for Disability Rights, Not Reported in F.Supp.2d (2009)

2009 WL 3199684, 40 NDLR P 11

12 Judge Payson denied plaintiff's motions for extension of time to complete discovery on August 31, 2009.

## III. *Retroactive Application of the ADA Amendments*

*6 Because plaintiff's cross-motion includes portions of the ADA Amendments Act of 2008, [Pub.L. No. 110–325](#) ("ADA Amendments"), which implies that it is plaintiff's belief that the ADA Amendments should apply to his claims, the court first examines whether the ADA Amendments would apply retroactively.[13]

13 Among other changes, the ADA Amendments significantly expand the scope of the ADA's definition of disability. The bill's "Findings" and "Purposes" sections explain that the changes are intended to reject some of the limitations imposed by the Supreme Court's holdings in *[Sutton v. United Air Lines,](#)* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), and *[Toyota Motor Mfg. v. Williams,](#)* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), which Congress felt had "narrowed the broad scope of protection intended to be afforded by the ADA." *See* ADA Amendments § 2.

When a case implicates a federal statute enacted after the events alleged in the action, the court will not apply the new statute where it would have retroactive effect (i.e., where it would increase a party's liability for past conduct or impose new duties with respect to transactions already completed) absent clear congressional intent favoring retroactivity. *See [Landgraf v. USI Film Prods.,](#)* 511 U.S. 244, 280 (1994) (case relating to the Civil Rights Act of 1991 where the Supreme Court discussed whether statutory amendments should be applied to cases arising from events predating enactment of the amendments). In *Landgraf,* the Court stated that where, as here, a statute is not explicit as to its retroactivity, a court "must determine whether the new statute would have retroactive effect" as to the case before it. *See* 511 U.S. at 280. In other words, it must ascertain whether the statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *See id.* If so, the court must apply the "traditional presumption" that the statute "does not govern absent clear congressional intent favoring such a result." *see id.*[14]

14 In *Landgraf's* companion case, *Rivers v. Roadway Express,* the Court examined a situation directly analogous to that presented by the ADA Amendments-namely, whether to retroactively apply a part of the Civil Rights Act of 1991 which Congress had enacted in response to a Supreme Court decision that had narrowed the applicability of the preexisting civil rights statute. *See* [511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994).](#) The Court held that "[e]ven when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the 'corrective' amendment must clearly appear" before the statute can be retroactively applied. *See id.* at 313.

Application of the ADA Amendments to this case would cause a retroactive effect by placing a new requirement upon defendant which could potentially increase defendant's liability for past conduct and impose new duties with respect to transactions already completed.[15] *See Landgraf,* 511 U.S. at 280. Additionally, the ADA Amendments lack clear congressional intent favoring retroactive application. To the contrary, the ADA Amendments indicate a preference for prospective application-"This Act and the amendments made by this Act shall become effective on January 1, 2009." *See* ADA Amendments, § 8; *see also [E.E.O.C. v. Agro Distrib. LLC,](#)* 555 F.3d 462, 2009 WL 95259, at *8 n. 8 (5th Cir.2009) ("Congress recently enacted the [ADA Amendments], but these changes do not apply retroactively." (citation and quotation signals omitted)). Because retroactive application of the ADA Amendments to this case would result in a retroactive effect and the ADA Amendments do not clearly favor retroactivity, the ADA Amendments shall not be applied retroactively to plaintiff's claim.[16]

15 As discussed below, there is a serious question as to whether plaintiff has shown that he is disabled within the meaning of the ADA as it stood prior to the ADA Amendments. To the extent the Court would reach a different conclusion under the amended statute, the amendments would clearly have the effect of "increas[ing] a party's liability for past conduct" by imposing on defendant the restrictions the ADA places on an employer as to its treatment of a disabled employee. Application of the ADA Amendments would therefore have a "retroactive effect," and the Court must give

effect to the presumption against application of the statute, and apply the law as it existed before the amendments.

16    For similar reasons, other courts that have addressed the retroactivity of the ADA Amendments have concluded that they do not apply retroactively. *See, e.g., Geoghan v. LIRR,* 2009 WL 982451, at *8–9 (E.D.N.Y.2009); *Kravar v. Triangle Servs.,* 2009 WL 805807, at *4 n. 3 (S.D.N.Y.2009); *Moran v. Premier Educ. Group,* 2009 WL 507505, at *7 (D.Conn.2009); *Schmitz v. Louisiana,* 2009 WL 210497 (M.D.La.2009); *Rudolph v. U.S. Enrichment Corp.,* 2009 WL 111737, at *4–6 (W.D.Ky.2009) (ADA Amendments do not apply retroactively and thus court applied the statute as it existed before the amendments).

### IV. *ADA Discrimination*

#### A. Standards

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a); *see Sutton,* 527 U.S. at 476. In ADA discrimination cases, the plaintiff has an initial burden of alleging a prima facie case. *See Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869 (2d Cir.1998). There are four elements that a plaintiff must show to make out a prima facie case of discrimination under the ADA: (1) the employer is subject to the ADA; (2) the plaintiff suffers from a disability as defined by the ADA; (3) the plaintiff is otherwise qualified to perform the tasks required of the job; and (4) the plaintiff suffered an adverse employment action as a result of his disability. *See id.* at 869–70; *see also Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001); *Cusack v. News America Marketing In–Store Servs., L.L.C.,* 2008 WL 2663001, at *4 (S.D.N.Y.2008). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the termination. *See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program,* 198 F.3d 68, 72 (2d Cir.1999). If the defendant meets its burden, it then falls to the plaintiff once again to demonstrate that the defendant's proffered explanation is a pretext for termination based on disability. *See id.*

**\*7** The ADA also prohibits an employer from failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." *See* 42 U.S.C. § 12112(b)(5)(A); *see also Lovejoy–Wilson v. NOCO Motor Fuel,* 263 F.3d 208, 216 (2d Cir.2001). Thus, a plaintiff can also make out a prima facie case of discrimination under the ADA by showing that (1) he is an individual with a disability as defined by the ADA; (2) an ADA-covered employer had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of the job sought; and (4) the employer refused to make such reasonable accommodation. *See id.* Here, defendant claims that plaintiff cannot establish a prima facie case of discrimination. *See* Def. Br. at 4. Accordingly, the Court begins by examining whether plaintiff meets the four-part test set forth in *Ryan* and *Lovejoy–Wilson.* Since there is no dispute that the CDR is an entity covered by the ADA, the Court addresses the question of whether plaintiff suffers from a disability under the meaning of the ADA.

#### B. Plaintiff has Failed to Establish a Prima Facie Case of Disability Discrimination

It is noteworthy that plaintiff failed to respond to CDR's contention that he was not disabled within the meaning of the ADA, as interpreted prior to the January 1, 2009 ADA Amendments. Plaintiff has not rebutted defendant's arguments regarding the issue of disability as it relates to the pre-ADA Amendments. I find that the plaintiff has failed to establish that he is a qualified individual with a disability under the ADA, and therefore, cannot state a prima facie case of discrimination. It is well settled under federal law that the mere presence of a medical condition or impairment suffered by a plaintiff does not establish that the plaintiff is disabled under the ADA. *See Toyota,* 534 U.S. at 195 ("[m]erely having an impairment does not make one disabled for purposes of the ADA"). Rather, to establish the existence of a disability, a plaintiff must demonstrate that he or she suffers from a physical or mental impairment that "substantially limits one or more major life activities...." 42 U.S.C. § 12102(2)(A). "Major life activities" are defined in the regulations promulgated by the EEOC as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *See* 45 C.F.R. § 84.3(j)(2) (ii).

To be "substantially impaired" from performing a major life activity, a plaintiff must have an impairment that "prevents or severely restricts the individual from doing activities

that are of central importance to most people's daily lives." *See Toyota,* 534 U.S. at 185. Moreover, "[t]he impairment's impact must also be permanent or long term." *See id.; see also* 29 C.F.R. § 1630.2(j)(1)(i)-(ii) (A major life activity is substantially limited when an individual cannot perform an activity that an average person in the general population could perform, or faces significant restrictions in the "condition, manner, or duration under which the individual can ... perform [the] activity.") Finally, the determination of whether or not a person suffers a disability under the ADA "is an individualized inquiry" that does not rest on the mere diagnosis of an impairment. *See Sutton,* 527 U.S. at 483. Instead, courts are to look to "the effect of [an] impairment on the life of the individual." *See* 29 CFR pt. 1630, App. § 1630.2(j); *see also Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 151 (2d Cir.1998) (disability determinations to be made on an individualized case-by-case basis).

 **\*8** In the instant case, plaintiff has failed to identify any major life activity that was substantially impaired by his stroke. Although plaintiff's amended complaint seems to allege that he suffers from impairments due to a stroke he suffered in 1994 that fall into three categories including physical limitations of the left side resulting in a limp, verbal communication abilities and cognitive limitations, these impairments do not in and of itself bring plaintiff within the definition of a qualified individual under the ADA. *See Mitchell v. Girl Scouts of the U.S.A.,* 2003 WL 22705121, at \*5 (S.D.N.Y.2003) (A showing of an impairment alone is insufficient to qualify as a disability) (citing to *Toyota,* 534 U.S. at 195). With respect to his left side restrictions, plaintiff testified that neither his left shoulder weakness nor the problems with his left leg affected his ability to carry out his duties at the CDR. *See* Fusco Aff., Ex. G., at 26–27. In fact, Wega testified that he never requested any accommodation from the CDR concerning either his left leg or shoulder. *See id.,* at 27. [17]

[17]    As it relates to Wega's limitations concerning walking and left side weakness, during his time working at CDR, plaintiff regularly walked at least a block, he never used a wheelchair, crutches or a walker, but did use a cane on occasion. *See* Fusco Aff., Ex. G., at 26. Courts in this district have repeatedly held that the need to walk slowly and the inability to walk long distances or for long periods of time-much less than the plaintiff can walk-do not constitute substantial limits on walking. *See, e.g.,*

*Mitchell,* 2003 WL 22705121, at \*6 (finding that inability to do a "substantial amount of walking ... while of course to an extent is limiting, does not rise to the level of a substantial limitation"); *Rosa v. Brink's, Inc.,* 103 F.Supp.2d 287, 290 (S.D.N.Y.2000) (finding inability to walk for long period of time does not amount to substantial limitation); *Butterfield v. New York State,* 1998 WL 401533, at \*9 (S.D.N.Y.1998) (finding plaintiff's trouble taking extended walks "simply does not, as a matter of law, constitute a sufficiently substantial limitation to allow his case to go to the jury on this point").

The amended complaint also states that plaintiff has "limitations of verbal communication ability." *See* Fusco Aff., Ex. A. When asked at his deposition what verbal communication problems he had, plaintiff's only response was "thinking of the right word at the right time sometimes is a difficulty for me." *See id.,* Ex. G., at 42. When asked if these limitations of verbal communications in any way kept plaintiff from performing the essential functions of his job at CDR, plaintiff responded with "I can't think of an instance at this time." *See id.* In addition, Dr. Sorman's November 1994 Report found that plaintiff had "superior abilities" with respect to intellectual functioning and that he retained very superior fund of general knowledge and high average vocabulary. *See* Fusco Aff., Ex. C. In terms of language and academic abilities the November 1994 Report also showed that plaintiff had "no apparent word finding difficulties." *See id.*

The February 2002 Report by Dr. Sorman concluded that plaintiff's cognitive profile "remains relatively unchanged from data obtained in 1994." *See id.,* Ex. D. Moreover, Dr. Sorman's August 2007 Report indicates that his findings are consistent with data contained in his November 1994 Report. Accordingly, plaintiff's complaint that his verbal communication limitations due to his stroke, which compromised his ability to maintain employment, does not establish the substantial impairment of a major life activity. The undisputed evidence, including plaintiff's testimony and the objective neurological testing reveal that any limitations on verbal communications that plaintiff suffered as a result of his stroke did not substantially impair any major life activity.

Plaintiff also claims that he is impaired due to "cognitive limitations, including memorial powers[.]" *See* Fusco Aff., Ex. A. However, plaintiff has come forward with no evidence to show that his cognitive limitations substantially limited his

2009 WL 3199684, 40 NDLR P 11

performance of any major life activity. *See Capobianco v. City of New York,* 422 F.3d 47, 57 (2d Cir.2005) (Inquiry is not just on the effect an impairment has on tasks associated with a specific job, but it must focus primarily on whether the claimant is "unable to perform the variety of tasks central to most people's daily lives") (quoting *Toyota,* 534 U.S. at 200). Here, the evidence shows that Dr. Sorman found plaintiff to be average or above average in most of the cognitive categories which could be tested. *See* Fusco Aff., Exs.C & D and Sorman's August 2007 Report. Dr. Sorman also concluded that plaintiff is "functioning in the high average range of general intelligence.... Mr. Wega ... has retained very superior fund of general knowledge ... mental arithmetic calculations and verbal abstraction capacities in the superior range.... Mr. Wega's overall attention and concentration abilities for structured information was found to be within average range. Overall memory functions range from average to slightly above average capacities." *See* Fusco Aff., Ex.C. While plaintiff may claim that his cognitive impairments made performing his job functions difficult, based on the testing by the physician, it was not impossible.

**\*9** In addition, the November 1994 Report and February 2002 Report never indicated that plaintiff could not return to work. Moreover, it was only when plaintiff's counsel requested that Dr. Sorman perform an independent medical examination did the doctor opine that plaintiff was "disabled (since the onset of his stroke in March 1994)[.]" *See Sutton,* 527 U.S. at 483 (determination of whether or not person suffers a disability under ADA "is an individualized inquiry" that does not rest on mere diagnosis of impairment). However, even the August 2007 Report did not indicate that plaintiff could not work. As a result, plaintiff has not shown how his condition substantially limits his major life activities. *See* 42 U.S.C. § 12101(2)(A). Because plaintiff has failed to establish that he is a qualified individual with a disability under the ADA, I find that he has failed to state a prima facie case of discrimination under the ADA, and therefore grant defendant's motion for summary judgment dismissing his claim under the ADA.

### C. Reasonable Accommodation
To establish a reasonable accommodation claim under the ADA, a plaintiff must show that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *See Graves v. Finch*

*Pruyn & Co., Inc.,* 457 F.3d 181, 184 (2d Cir.2006) (citations omitted). Plaintiff contends that "CDR failed to recognize [his] 'subtle deficits' and offer a reasonable accommodation." *See* Pl. Br. at 9. However, "generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *See id.* at 184 (citations and quotation marks omitted). "[A]n employer has a duty reasonably to accommodate an employee's disability [only] if ... the employer knew or reasonably should have known that the employee was disabled." *See Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 135 (2d Cir.2008).

Essential functions are defined as "the 'fundamental' job duties of the employment position the individual with a disability holds or desires ... [and] does not include the 'marginal' functions of the position." *See Mitchell v. Washinetonville Cent. Sch. Dist.,* 190 F.3d 1, 8 (2d Cir.1999) (quoting 29 C.F.R. § 1630.2(n) (1)). In determining whether a function is essential, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *See* 42 U.S.C. § 12111(8); *see also Shannon v. New York City Transit Auth.,* 332 F.3d 95, 100 (2d Cir.2003) ("In approaching this inquiry, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position") (citation and quotation marks omitted). Other evidence of whether a particular function is essential includes, inter alia, the amount of time spent on the job performing the function and the consequences of not requiring the individual to perform the function. *See* 29 C.F.R. 1630.2(n)(3); *Mitchell,* 190 F.3d at 8 n. 3.

**\*10** Even assuming, arguendo, that plaintiff is disabled within the meaning of the ADA, plaintiff's claim fails. There is no indication from the record that plaintiff requested an accommodation from CDR and that CDR denied plaintiff a reasonable accommodation. Plaintiff does not dispute that he did not request an accommodation. In fact, plaintiff's deposition testimony reveals that he never made any request for an accommodation concerning his walking or weakness on his shoulder. *See* Fusco Aff., Ex.G, at 27. In addition, plaintiff repeatedly testified that he did not ask for any accommodations from CDR relating to any residual symptoms of his stroke. *See id.,* at 56–57, 64, 93–94. Plaintiff further testified that he was not "aware of any kind of accommodation at the time [he] was hired that [he] might

need." *See id.,* at 57. Moreover, plaintiff did not inform anyone at CDR of his alleged verbal communication and cognitive limitations. Nor does he allege that they were in any way obvious. Plaintiff also failed to seek the assistance of a job coach despite the fact that he knew one was available to him through VESID.

Moreover, even if the court were to conclude that plaintiff's alleged cognitive disability was obvious, it is inaccurate to state that defendant took no steps to accommodate him. *See Brady,* 531 F.3d at 134 (The Second Court took the opportunity to refine the general rule and "held that an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious-which is to say, if the employer knew or reasonably should have known that the employee was disabled"); *Tully–Boone v. North Shore–Long Island Jewish Hosp. Sys.,* 588 F.Supp.2d 419, 425 (E.D.N.Y.2008) (subscribing to the legal position that it is unlawful for an employer to refuse to make reasonable accommodations to known physical and mental limitations) (citing *Brady,* 531 F.3d at 134)). Here, the affidavit of Darling demonstrates the he took a number of steps to train plaintiff by making task lists for him, by making out a spreadsheet for him so that he could understand how the CDR business works e.g. funding streams, and finally by reducing plaintiff's responsibilities while allowing him to still retain the title of director with a director's salary. *See* Darling Aff., ¶ 37, 39, 49–51.

In addition, plaintiff has not proffered any evidence to show that he could perform the essential functions of his job either as Director of Administration for CDR or as HR Director with or without a reasonable accommodation. Plaintiff was initially hired as Director of Administration for the CDR in December 2002. *See* SOMF, ¶ 18. The essential functions of this position include, inter alia, the oversight of both the finances of CDR and overall human resource guidance for approximately one hundred employees. *See* Darling Aff., ¶ 23. The evidence shows that throughout the fall of 2003 and well into 2004, during plaintiff's time as Director of Administration, plaintiff had performance problems handling the financial responsibilities of his job as seen by his ignorance of CDR's funding streams, as exhibited by his inability to complete major tasks such as providing reports to the Board of Directors and as shown by plaintiff's failure to file the organization's taxes in 2003. As a result of plaintiff's

inability to perform the financial aspects of his job, although it had no legal obligation to do so, defendant altered plaintiff's job functions and permitted him to focus solely on human resources responsibilities. *See Graves,* 457 F.3d at 187 (While "[t]he ADA lists reassignment to an existing, vacant position as a possible reasonable accommodation, ... the ADA does not require creating a new position for a disabled employee") (citations omitted).

**\*11** Plaintiff's title changed in April 2004 to HR Director and his financial responsibilities with respect to CDR were taken away from him. *See* SOMF, ¶ 18. However, he received no reduction in pay and still participated in the management team. *See id.* As HR Director, it was plaintiff's responsibility to recruit new staff and it was within his responsibility to supervise the various human resources aspects of processing employee paperwork for aides. This included doing their background checks, verifying their weekly payroll records, enrolling them in benefits, and dealing with any disciplinary issues. See Darling Aff., ¶ 55. Darling indicated that at various times after plaintiff took on the task of HR Director he questioned plaintiff about HR procedures and plaintiff was not familiar with them. *See* Darling Aff., ¶ 58. Plaintiff has not proffered any evidence showing that he could perform the essential functions of either a Director of Administration or HR Director with or without a reasonable accommodation, nor has plaintiff even suggested any accommodation that CDR could have provided to enable him to do so. Accordingly, defendant's motion for summary judgment is granted, plaintiff's cross-motion is denied and plaintiff's failure to accommodate claim is dismissed.

### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted and plaintiff's cross motion for summary judgment is denied. Plaintiff's Amended Complaint is dismissed with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3199684, 40 NDLR P 11

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

2016 WL 7742779
United States District Court, N.D. New York.

Curtis A. O'DONNELL, Plaintiff,

v.

KING B 100, LLC, Rensselaer Iron & Steel, Inc.,
Grimmel Industries, Inc., Georgia Recyclers,
LLC, Gary T. Grimmel, individually, and
Betty G. Grimmel, individually, Defendants.

1:14-cv-1345
|
Signed 05/03/2016

**Attorneys and Law Firms**

Sarah J. Burger, Cooper, Erving Law Firm—Saratoga Office, Saratoga Springs, NY, for Plaintiff.

Christopher E. Buckey, Erin M. Callahan, Vitaliy Volpov, Whiteman, Osterman Law Firm—Albany Office, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

*\*1* Plaintiff Curtis A. O'Donnell served as Defendants' corporate pilot from January 23, 2008 until April 20, 2013, when he was terminated. Plaintiff claims that his termination was the result of prohibited disability discrimination in violation of the Americans with Disability Act, 42 U.S.C. § 12101 ("ADA") and the New York State Human Rights Law, N.Y. Executive Law § 296 ("HRL"). *See* Second Amended Complaint ("Complaint"), dkt. # 32. Plaintiff further alleges that Defendants violated New York Labor Law ("NYLL") § 190, et seq., breached the parties' agreement by not paying him annual cost of living adjustments ("COLAs"), year-end bonuses ("YEBs"), and severance, and improperly retaliated against him under the NYLL by filing counterclaims in this action. *Id.* Defendants King B 100, LLC ("King B"), Rensselaer Iron & Steel, Inc. ("RI&S"), Grimmel Industries ("GI"), Georgia Recyclers, LLC ("GR"), Gary T. Grimmel, and Betty G. Grimmel (the "Grimmels") (collectively "Defendants") deny the allegations, and filed counterclaims for (1) breach of contract; (2) promissory estoppel; (3) unjust enrichment; and (4) intentional misrepresentation. Answer to

Second Amended Complaint and Counterclaims ("Answer"), dkt. # 33.

Defendants move for summary judgment. Dkt. # 46. Plaintiff opposes the motion and cross-moves for partial summary judgment in his favor on his NYLL claims, breach of contract, promissory estoppel, and retaliation claims, and to dismiss Defendants' counterclaims. Dkt. # 49. Defendants filed a reply, dkt. # 50–# 52, and Plaintiff filed a sur-reply. # 56. The Court has considered all of these submissions, and decides the instant motions without the need for oral argument. For the reasons that follow, Defendants' motion and Plaintiff's cross-motion are each granted in part and denied in part.

**II. STANDARD OF REVIEW**

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, *see Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011). The nonmoving party cannot defeat summary judgment by " simply show[ing] that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or by a factual argument based on " conjecture or surmise." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). In this regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

When considering cross-motions for summary judgment, the Court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)(citation omitted). " [N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it ... [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

## III. BACKGROUND [1]

[1] Unless indicated otherwise, the facts set forth above are taken from the parties' Local Rule 7.1(a) (3) Statements of Material Facts ("SOMF") that are admitted by the opposing party, properly supported by the record, or deemed admitted for failing to provide proper factual opposition. See Local Rule 7.1(a)(3). The Court will set forth only those facts that are relevant to deciding the instant motions.

### a. The Parties' Work Relationship [2]

[2] The facts in Section III(a) are taken primarily from Defendants' Statement of Material Facts ("Def. SOMF") ¶¶ 1-3, 13-57.

**\*2** Defendant King B 100, LLC ("King B") is a limited liability company incorporated in the State of New York. Defendant Gary T. Grimmel is co-owner of King B and primarily responsible for the management of King B's operations. Defendant Betty G. Grimmel is Gary Grimmel's wife and co-owner of King B.

Plaintiff Curtis O'Donnell ("Plaintiff") first became acquainted with the Grimmels in 2007 when they were looking to purchase an airplane for King B and were given Plaintiff's name as a reference. After initially contacting him regarding an airplane, the Grimmels inquired whether Plaintiff was available to work as King B's pilot. At that time, Plaintiff was employed as Shoe Show, Inc.' ("Shoe Show") corporate pilot.

In the fall of 2007, while still employed by Shoe Show, Plaintiff flew the Grimmels several times, being paid on a per-flight basis. On November 11, 2007, Plaintiff and the Grimmels met in New York to discuss the possibility of Plaintiff becoming their full-time employee. On November 15, 2007, Plaintiff sent an e-mail to Betty Grimmel outlining his proposed employment terms, which included: (A) annual salary of $135,000.00; (B) annual cost of living adjustments; (c) one-time bonus of $25,000.00; (D) a severance package if terminated without cause; (E) year-end bonus in lieu of a 401K plan or other pension plan; (F) vacation time; (G) relief pilot; and (H) transportation to and from the airplane. At that time, Plaintiff's annual salary with Shoe Show was approximately $125,000.00. Additionally, Plaintiff was living in Charlotte, North Carolina and wanted to continue residing there and be allowed to travel to and from North Carolina to

where King B's airplane was located. Plaintiff was aware that he would be serving in an on-call capacity for the Grimmels.

Betty Grimmel responded to Plaintiff's November 15, 2007 e-mail that same day, confirming that she would talk to Gary Grimmel but that it may be a few days before she got back to him. On November 27, 2007, Plaintiff sent a reminder e-mail to Betty Grimmel about his potential employment. Betty Grimmel responded via e-mail stating that they would agree to: (A) $135,000.00 annual salary; (B) one-time sign up bonus of $25,000.00 if Plaintiff agreed to stay with them for 5 years; (c) "cash bonus end of year to replace 401k"; (D) two weeks paid vacation; (E) health insurance; and (F) six month severance pay if Plaintiff was terminated without cause.

Plaintiff confirmed in a subsequent e-mail to Betty Grimmel that he would continue to reside in Charlotte and be provided with transportation or reimbursement for transportation costs to and from where he was needed and, if idle time in between trips became excessive, that he would be able to return home. Upon sending this e-mail, Plaintiff believed the parties were close to, but had not yet reached, an agreement.

Betty Grimmel responded on November 27, 2007, agreeing that Plaintiff could reside in Charlotte, would be provided transportation to and from King B's airplane, and would have the option of going home at any time he was not needed.

The next day, November 28, 2007, Plaintiff contacted Betty Grimmel again via e-mail, noting that he would be turning in his notice to Shoe Show that day but wanted to confirm that the Grimmels agreed to an annual COLA to his base salary. Betty Grimmel sent an e-mail confirming that they agreed to an annual COLA to his base salary, and Plaintiff submitted his resignation to Shoe Show that afternoon or the next day (November 29, 2007) believing that the parties had an agreement " in principle."

**\*3** Plaintiff testified that he submitted his resignation in person to Robert Tucker, Shoe Show's Chief Executive Officer, and told him about the Grimmels' offer. According to Plaintiff, he indicated to Mr. Tucker that he would be willing to stay at Shoe Show but would need an increase in salary.

On November 29, 2007, Plaintiff reported to Betty Grimmel via e-mail that he had an upcoming meeting with Mr. Tucker and Shoe Show's Chief Financial Officer, Jack Vanderpole, and that they "will likely ask me to reconsider my resignation." Plaintiff also asserted that he was "dread[ing] it

and hop[ing] to move as quickly through this part as possible." Plaintiff said he felt "good with [his] decision to leave," but he would "just have to see what the day brings."

Plaintiff testified that, during this subsequent meeting, Mr. Tucker offered to match the Grimmels' $135,000.00 salary and agreed to relieve Plaintiff from having to be at Shoe Show's offices when he was not flying. Plaintiff testified that, at some point, Mr. Tucker also told Plaintiff that he would increase his salary to $250,000.00. Plaintiff contends that he did not accept this offer, and subsequently never revisited it, because he was concerned that the 250,000.00 salary would increase his alimony and/or child support payments, and because he otherwise considered the offer "unrealistic."

Plaintiff testified that he accepted Mr. Tucker's offer to match the Grimmel's proposed $135,000.00 annual salary (instead of the $250,000.00 annual salary), to relieve him from office duty, and to pay him a $25,000.00 bonus. Plaintiff thereafter communicated to the Grimmels that he was going to continue to work for Shoe Show, but offered to help them find a pilot. Plaintiff also continued to fly the Grimmels on a per-flight basis, and at some point indicated that if they wanted to make him another offer for employment he would consider it.

On January 3, 2008, Plaintiff e-mailed Betty Grimmel noting that he felt that he had made the wrong decision in accepting Mr. Tucker's offer, but stated that "his offer is impossible to ignore ... and if we were talking about only *minor* differences, [Plaintiff] would have no problem accepting less money." Plaintiff also told Betty Grimmel that Mr. Tucker's offer was "way over the top" but that "kind of opportunity does not come along very often." In the same e-mail, Plaintiff stated that he would prefer to work with the Grimmels but did not think it would be wise to consider much less than Mr. Tucker's offer, and that "it really comes down to what Mr. Tucker has offered as compared to what you might offer. But I will say that you wouldn't have to beat his offer and I'm tempted enough that you may not even have to match his offer."

The parties agree that, in the January 3, 2008 e-mail, Plaintiff was referring to Mr. Tucker's offer to increase his salary to $250,000.00, an offer which Plaintiff never accepted and never intended to accept. Plaintiff testified that he told Betty Grimmel about the $250,000.00 offer because he felt it was a standing offer, although not a formal one, but never told her that it was an offer he had already decided not to accept or that he accepted Mr. Tucker's offer to increase his salary only to $135,000.00. In his January 3, 2008 e-mail, Plaintiff also

relayed to Betty Grimmel that the Grimmels did not need to offer him $250,000.00 for an annual salary but that if they were willing to offer something near that number, he would be willing to consider working for them.

**\*4** On January 4, 2008, Betty Grimmel wrote to Plaintiff stating that they both knew that "Mr. Tucker's offer is crazy" and that Plaintiff "would be crazy to turn it down," and asked Plaintiff to help them advertise for a pilot. Plaintiff responded to Betty Grimmel stating, in part: "As for Mr. Tuckers [ *sic* ] offer, your [*sic*] right it is crazy, but based on my feelings about you and Gary, you don't have to match his offer ... just food for thought." That same day, Plaintiff also provided Betty Grimmel with a draft advertisement for a pilot, which provided, in part, that the "schedule will include mostly weekend flying" and "the [a]pplicant must anticipate being away from home on holidays, but may have long periods [of] duty free time."

On January 8, 2008, Betty Grimmel sent Plaintiff an e-mail offering him: (A) $150,000.00 salary for the first year, with a $25,000.00 sign-up bonus; and (B) $175,000.00 annual salary for the second year, "plus everything else we included ins. yr end bonus etc."

On January 11, 2008, Plaintiff rejected the offer and responded to Betty Grimmel with the following counter-proposal: (A) $150,000.00 salary for the first year, with a $25,000.00 sign-up bonus; (B) $175,000.00 for the second year; and (c) $25,000.00 annually in "Soft Money" which would be used towards Plaintiff's purchase of the Grimmels' boat and two jet skis.

Plaintiff's January 11, 2008 counter-proposal was rejected by the Grimmels on January 13, 2008 when Betty Grimmel e-mailed Plaintiff stating: "Gary will not go any higher. We are staying at our 175,000 offer. You were with Mr. Tucker for 5 yr and was getting 115 then went to 125. We are adding 50,000 to that price. Mr. Tucker only went to 250,000 because he was going to lose you. I will understand if you don't want to take our offer ..." The parties agree that Betty Grimmel did not state in the January 13, 2008 email that the Grimmels would agree to, among other things, pay cost of living adjustments or year-end bonuses. Def. SOMF ¶ 55; Pl. Resp. SOMF ¶ 55. Plaintiff contends, however, that he had subsequent conversations with the Grimmels regarding the costs of living adjustments and year-end bonuses which "the parties agreed to in or about March 2009, and January 2010." Pl. Resp. SOMF 56. While Betty Grimmel stated at

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

her deposition that she thought there was an agreement for year-end bonuses and annual cost-of-living adjustments, B. Grimmel Dep. pp. 69–70, Gary Grimmel stated in his affidavit that "[w]e never reached an agreement to pay Plaintiff any cost of living adjustments nor year-end bonuses, although we paid Plaintiff "Christmas" bonuses at the end of the year." G. Grimmel, ¶ 23.

There is no dispute that the parties agreed that Plaintiff would be paid the equivalent of six months' salary if he was terminated without cause, although Defendants contend this agreement was limited to the first five years of employment, *see* G. Grimmel Dep. pp 34-36; G. Grimmel Aff., ¶ 23, whereas Plaintiff contends there was no temporal limitation. *See* O'Donnell Aff., ¶ 11. There is also no dispute that the parties agreed that Plaintiff could continue to reside in North Carolina, and that the Defendants would pay Plaintiff's cost of traveling to and from the location of Defendants' airplane.

**b. Plaintiff's Employment and Motorcycle Accident**

Plaintiff started working as Defendants' pilot on January 23, 2008. In this position, Plaintiff was expected to be on call to pilot Gary and Betty Grimmel when needed. Def. SOMF ¶ 25. The amount of advance notice the Grimmels gave Plaintiff when they needed to fly varied, but Plaintiff knew that he was required to work around Gary Grimmel's schedule. *Id.* ¶ 70.

On March 27, 2013, a car pulled into Plaintiff's path causing him to " lay his motorcycle down," resulting in soreness and swelling in his knees and shoulders. Def. SOMF ¶¶ 81, 86. Plaintiff sent Betty Grimmel a text message telling her about the accident, stating that he was a little banged up, "but not bad" and only had a few scrapes. *Id.* ¶ 82. That same day, Plaintiff went to the emergency room at Carolinas Medical Center-Northeast in Concord, North Carolina, where x-rays were taken of his hand and knee. *Id.* ¶ 83. Plaintiff testified that, at that time, his pain was minimal, his x-rays came back negative, he was not given any prescriptions by his treating physician, and was otherwise released with no work-restrictions. *Id.* ¶ 84. Plaintiff did not tell the Grimmels that he went to the emergency room. *Id.* ¶ 85.

**\*5** On March 27, 2013, Plaintiff filled a prescription for 30 doses of hydrocodone/acetaminophen. *Id.* ¶ 91.[3] Plaintiff also filled a prescription for 50 doses of hydrocodone/acetaminophen on April 19, 2013. *Id.* ¶ 92. Hydrocodone/acetaminophen contains a narcotic and is prescribed to relieve moderate to severe pain. *Id.* ¶ 93.

The Federal Aviation Administration ("FAA") advises pilots not to fly while on narcotic pain relievers, including hydrocodone, as they may cause "sedation (drowsiness) or impair cognitive function, seriously degrading pilot performance." *Id.* ¶ 94. Plaintiff contends, however, that he never ingested this medication, and that he has never flown under the influence of any drug or substance prohibited by the FAA. O'Donnell Aff. ¶ 22.

3    It is unclear from the instant record where this prescription came from.

Following his accident, Plaintiff suffered soreness and swelling in his knees and soreness in his shoulders. On the April 1, 2013, Plaintiff went to Charlotte Medical Clinic Main in Charlotte, North Carolina to be examined by his flight surgeon to determine whether there was any reason that he would be ineligible to fly. *Id.* ¶¶ 86-87. Plaintiff's shoulder and cervical spine were examined by Michele L. Dyer, NP, and both were found to be unremarkable. *Id.* ¶ 88. Plaintiff testified that at this appointment it was recommended that he not fly for a day or so to allow the swelling to go down and for his condition to improve, but that he was still eligible to fly. *Id.* ¶ 89. The April 1, 2013 Medical Office Visit Notes indicate that Plaintiff was prescribed Medrol Dosepak to take 1-2 tablets up to 3 times a day, as needed, and hydrocodone. The Notes state that Plaintiff "is an airline pilot and recommended no flying [f]irst 2 days of dosepak. He will not use other NSAID on Dosepak verbalizes understanding. He may continue hydrocodone as needed." *Id.* ¶ 95.

Plaintiff filed his prescription for the Medrol Dosepak on Wednesday, April 3, 2013, but contends that he never took either of the medications prescribed by Dr. Dyer. *Id.* ¶ 96. There is no dispute that Plaintiff did not tell the Grimmels he was prescribed these medications, and he is " unsure" whether he told them that he was not supposed to fly for the first two days while on Medrol Dosepak—which he contends is irrelevant because he never took the medication. *Id.* ¶¶ 99-100. Plaintiff concedes, however, that he did not tell the Grimmels that his flight surgeon recommended that he not fly for a day of so after the April 1, 2013 medical examination. *Id.* ¶ 101.

Plaintiff flew the Grimmels on Thursday, April 4, 2013 from Tampa International Airport to Palm Beach International Airport, and again on Saturday, April 6, 2013 from Palm Beach to Tampa. *Id.* ¶ 97.

Case 9:21-cv-00251-DNH-TWD    Document 37    Filed 05/22/23    Page 152 of 229

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

On Thursday, April 11, 2013, Plaintiff went to OrthoCarolina in Charlotte, North Carolina and saw Richard Mostak, M.D., due to continued discomfort in his right knee and shoulders. *Id.* ¶ 102. Plaintiff did not tell the Grimmels about this consultation. *Id.* ¶ 107. Plaintiff advised Dr. Mostak that he had some general pain and soreness and swelling in his knee and shoulders when pressure was applied to them. *Id.* ¶ 103. Plaintiff testified that the only impact that his injury had on him during this time was that he could not walk fast; other than that he was fine. *Id.* ¶ 104. Plaintiff testified that he was able to drive a car, he continued assisting his friend with excavating and grading property, and he did not otherwise alter his routine. *Id.* ¶ 105. The orthopedic physician did not give Plaintiff a diagnosis, but recommended a MRI on his right knee and shoulder. *Id.* ¶ 106. The Grimmels assert that Plaintiff did not tell them that it was recommended he have a MRI; Plaintiff contends that he does not recall whether he told them about having an MRI. *Id.* ¶ 108; Pl. Resp. SOMF ¶ 108.

### c. Plaintiff's Discharge

**\*6** On Monday, April 15, 2013, Betty Grimmel sent Plaintiff a text message notifying him that they might need to fly to Phoenix, Arizona that weekend. Def. SOMF ¶ 119. Also on April 15, 2013, Plaintiff began receiving treatment on his shoulder from a chiropractor, but Gary Grimmel was unaware of the treatment. *Id.* ¶¶ 115-16.

On Wednesday, April 17, 2013, Plaintiff had the MRIs completed and was scheduled to hear the results on Friday, April 19, 2013. *Id.* ¶ 109.

On April 18, 2013, at approximately 12:57 p.m., Betty Grimmel sent Plaintiff a text message confirming that they would need him to come to Tampa to meet them the next night, April 19, 2013, to pilot the plane. *Id.* ¶ 120. Plaintiff then spoke with Betty Grimmel on the phone about the trip. *Id.* ¶ 121. During this call, Betty Grimmel contends that Plaintiff did not tell her that he had an April 19th doctor's appointment or that he was receiving physical therapy for his shoulder; Plaintiff contends that he is " unsure" if he told her about the April 19, 2013 doctor's appointment. *Compare* Def. SOMF *with* Pl. Respon. SOMF ¶ 122 (and respective citations to the record).

At approximately 7:00 p.m. on April 18, 2013, Betty Grimmel advised Plaintiff that they need him for a 6:00 p.m. or 7:00 p.m. flight departure on April 19, 2013. Def. SOMF ¶ 123. There is no dispute that, at this time, Plaintiff did not tell Betty Grimmel about his doctor's appointment the next day. *Id.* ¶

124. Between 7:57 p.m. and 8:18 p.m., Plaintiff sent Betty Grimmel a text message stating: "if we were to go to phx tomorrow, and I tell you this only for planning, don't have the winds for sat yet, but long range forecast show it to be about the same, the trip, if we could do it without a stop, would take 7:20 ... We will have to stop of course so plan on it being closer to 8 hours." *Id.* ¶ 125. Then, at some point between 8:21 p.m. and 8:42 p.m., Plaintiff advised Betty Grimmel that he would not be available for the trip because he had "a doctors [ *sic* ] apt in the morning related to [his] motorcycle accident at 10 [a.m.]." *Id.* ¶ 126. Betty Grimmel responded to Plaintiff asking, "can u do appointment when u get back." *Id.* ¶ 127. Plaintiff replied:

> To [*sic*] late to cancel it, and it's the followup to MRI I had done yesterday. I'll go to airport and stand by for all the flights, may just get on an earlier one but I can't book it its [ *sic* ] listed as sold out I can fly into Orlando, land at 2;40 rent a car and drive down, should be able to be there before 6 ...

*Id.* ¶ 128.

Betty Grimmel responded stating: "Hold off 1 min," and Plaintiff responded: "Ok." He then sent a text message to Betty Grimmel stating: "Early flight is now sold out on us air, only option now is that flight gets in at 6:02 pm or go to Orlando," and: "Sorry Betty, I can get there somehow if Gary wants to go in our plane." *Id.* ¶ 129. Betty Grimmel then told Plaintiff that they would fly by commercial airline to Phoenix, *id.* ¶ 130, something Gary Grimmel did not want to do. *Id.* ¶ 134.

As a manager of King B, and without any input or guidance from others, Gary Grimmel decided on April 19, 2013 [4] to terminate Plaintiff's employment. *Id.* ¶¶ 135-136; G. Grimmel Aff., ¶¶ 31-37. Gary Grimmel "viewed Plaintiff's asserted unavailability and his failure to even attempt to reschedule his personal appointment as him being uncooperative, unaccommodating, insubordinate and, ultimately, as failing to meet his job duties and responsibilities for which he was being well-compensated." G. Grimmel Aff., ¶ 36. He called Plaintiff on April 20, 2013, and the first words he said to Plaintiff were: "Curt, it's become obvious that you have had too much time off, you feel your needs are more important than mine,

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

therefore it's time we part ways." Def. SOMF ¶ 137-138. After Gary Grimmel notified Plaintiff that he was discharged, Plaintiff told Gary Grimmel that his doctor's appointment was important to him to find out what was going on with his knee, and that he had a torn meniscus. *Id.* ¶¶ 139-140. Plaintiff concedes, however, that this information was inconsequential because, as Plaintiff testified, "at that point [Gary Grimmel] had already fired me." *Id.* ¶ 141.

4   Defendants' SOMF indicates the decision was made on April 29, 2013 but, in the context of the other undisputed facts, this is clearly a typographical error.

**\*7** On April 20, 2013, after Plaintiff's employment was terminated, he sent a text message to Betty Grimmel asking if was possible to save his job, and indicting that he had no intention of making Gary Grimmel think he was "being uncooperative." *Id.* ¶ 142. Plaintiff sent another text message to Betty Grimmel on April 20, 2013 stating: "Gary was also mad at me about not telling him how injured I am from my accident. I didn't know the extent of those injuries until that follow-up visit yesterday, when they told me the results of the MRI ..." *Id.* ¶ 143; *see also Id.* ¶¶ 110-14. 5

5   At his April 19, 2013 appointment, Plaintiff advised Dr. Mostak that his knee was feeling better since the accident. The results of Plaintiff's shoulder MRI came back negative and the MRI for his right knee indicated Plaintiff had a torn meniscus. Plaintiff was not required to have, and has not undergone, surgery for his knee. For treatment, Dr. Mostak stated that they would just observe it "and see how it does." Plaintiff was not placed on any physical limitations by his physician.

When asked at his deposition why he fired Plaintiff, Gary Grimmel stated: " Because I couldn't trust him anymore as a pilot.... He didn't tell us the truth about his injuries." G. Grimmel Dep. p. 37. When question further, Gary Grimmel stated: "He said [he had] a couple of scratches and bruises and he had to lay his motorcycle down," but when question if he knew what Plaintiff's actual injuries were, he stated: " [T]hey were severe enough that he had to have an MRI," but also stated that he had "no clue" as to the extent of those injuries. *Id.* Gary Grimmel stated in an affidavit that the lack of trust he referred to at his deposition was based upon Plaintiff's concealment of his medical treatment, facts that Gary Grimmel learned of only after he discharged

Plaintiff. G. Grimmel Aff., ¶¶ 38-42. 6   At her deposition, Betty Grimmel stated that she believed that Gary Grimmel discharged Plaintiff "because he didn't trust Curt. Because Curt didn't tell us that he was having an MRI.... When you have a single pilot, you have to trust your pilot.... He didn't tell us that he went for an MRI, correct. And we were going on a long flight with one pilot and neither of us fly." Def. SOMF ¶¶ 187-88.

6   Gary Grimmel stated in his affidavit:

It was only after I told [Plaintiff] that I thought it was time for us to part ways that he told me that he did not cancel his April 19th appointment because it was important for him to find out what was going on with his MRI on his knee.

I had no idea that Plaintiff was having any type of knee problems. However, the way that he talked about his knee injury and doctor's appointment on April 20th—after I told him of my decision to terminate his employment—made it appear as though he had been injured since his motorcycle accident, he had concealed this fact from us, and he flew us several times when he likely should not have. By the time I found out about Plaintiffs knee pain and his blatant dishonesty, I had already made and informed him of my decision to terminate his employment. The trust that had been broken as a result of Plaintiff concealing his injuries and treatment, however, confirmed that Plaintiff could never work as our pilot.

Plaintiff's concealment of his knee injury was disturbing. I still do not know what the ultimate diagnoses of his alleged motorcycle accident injuries was or whether he should have flown following his accident. But I was troubled then, and continue to be troubled today, by the fact that Plaintiff concealed from us that: (A) he went to the emergency room after his accident; (B) he was suffering ongoing knee pain; and (C) he was examined by his flight doctor to see whether he was eligible to fly. I also was troubled to learn during the course of this lawsuit that Plaintiff, in fact, was told not to fly for a day or more and that he did not think he was required to or deemed it important enough to inform us of this information while he was still employed and flying us in the King B aircraft as a single pilot.

Since this litigation has started, it has also been brought to my attention that Plaintiff was having shoulder-related pain as a result of his accident and received occupational therapy treatment for his shoulder starting in April. Again, I had no idea that Plaintiff was experiencing any such pain to the extent that he was receiving treatment. Similarly, we have now learned that Plaintiff was taking a steroid and hydrocodone following his accident. Plaintiff never informed us of those facts.

As an employer, it is imperative for me to be able to trust my employees. There is, of course, a much deeper trust I must have for our single pilot given he is solely responsible for my safety and Mrs. Grimmel's safety. I learned after terminating Plaintiff's employment that Plaintiff was not open or honest with us about his accident, his alleged injuries or the prescriptions he was taking.... Simply stated, Plaintiff's breach of trust regarding his medical condition while flying us could not be remedied....

G. Grimmel Aff., ¶¶ 38-42.

**\*8** Prior to Plaintiff's termination on April 20, 2013, Defendants never cited him for being unaccommodating or insubordinate. Pl. Resp. SOMF ¶ 27.

### d. Plaintiff's Compensation

In 2008, Plaintiff made approximately $136,923.29 in reported gross wages; in 2009, Plaintiff made approximately $175,961.34 in reported gross wages; in 2010, Plaintiff made approximately $174,999.76 in reported gross wages; in 2011, Plaintiff made approximately $174,999.76 in reported gross wages; and in 2012, Plaintiff made approximately $174,999.76 in reported gross wages. Def. SOMF ¶¶ 60-64. Plaintiff was paid a $25,000.00 sign-up bonus, and received "Christmas bonuses" which were " at least $1,000.00, possibly $2,000.00. *Id.* ¶¶ 65-66. Plaintiff was not paid any severance following his discharge. Pl. SOMF ¶ 216.

### e. Facts Relating to Defendants' Counterclaims

Defendants contend that from approximately 2008 through April 20, 2013, King B either paid or reimbursed Plaintiff at least $53,076.29 for commercial flights for which Plaintiff alleged he incurred charges. Defendants further contend upon information and belief that, because Plaintiff's wife was employed by U.S. Airways, Plaintiff was able to fly free of charge on all or a portion of the flights for which he sought and received reimbursement or payment from King B totaling $53,076.29. Thus, Defendants contend, that because " Plaintiff failed to disclose to Defendants the fact that he could fly free of charge and continued either to collect reimbursements from Defendants to cover the cost of his commercial flights or to induce Defendants to cover the cost of such flights by alleging that the flight expenses were reasonable and necessary within the meaning of the parties' agreement," Plaintiff breached his promise to seek reimbursement only for necessary charges; was unjustly enriched; and damaged King B because it detrimentally relied upon Plaintiff's representations.

Plaintiff counters that while he was previously married to Suzanne O'Donnell from approximately 1995 to 2009, a U.S. Airways flight attendant who received flight privileges for personal and family use, " [t]here was no agreement between O'Donnell and the Grimmels that O'Donnell would use his wife's employer's benefits." Pl. SOMF ¶ 233;[7] *see* Def. Respon. SOMF ¶ 233 (denying this allegation). Plaintiff further contends that he never received reimbursements for any travel expenses incurred while working for Defendants. Pl. SOMF ¶ 234. Defendants deny this allegation. Def. Respon. SOMF ¶ 234.

[7]       Plaintiff further contends that "[s]uch an agreement is impermissible because U.S. Airways forbids employee benefits to be used for business purposes.

Finally, Plaintiff asserts that "[a]t no time prior to the filing of the counterclaim was O'Donnell asked to pay any money back for travel expenses to the Grimmels. In fact, prior to the filing of the Counterclaims, no issue was ever raised to O'Donnell regarding his travel expense or the charging on the American Express card." Pl. Respon. SOMF ¶ 235. Defendants contend, however, that while Plaintiff was not asked to pay any money back for travel expenses charge on King B's American Express credit card, " [t]he record does not support the assertion that Plaintiff was not asked to pay back the money initially paid to Suzanne O'Donnell for Plaintiff's travel expenses." Def. Respon. SOMF ¶ 235.

## IV. DISCUSSION

### a. ADA and HRL Disability Claims[8]

[8]       Because the Court dismisses the ADA and HRL claims on the merits, it need not decide whether

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)
2016 WL 7742779, 2016 A.D. Cases 504,191

the Defendants operated as a single integrated enterprise such to meet the minimum employee thresholds of the ADA and the HRL.

**\*9** To succeed on his ADA and HRL claims, Plaintiff must establish that he: (1) suffered from, had a record of, or was regarded as suffering from a disability within the meaning of the ADA and/or the HRL; (2) was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) suffered an adverse employment action. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 56 (2d Cir. 2005) (ADA claim); *Kaufman v. Columbia Memorial Hospital*, 2 F. Supp.3d 265, 277 (N.D.N.Y. 2014) (applying same standard to HRL claim). The ADA defines "disability" as: (a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such impairment; or (c) being regarded as having such impairment. *See* 42 U.S.C.§ 12102(1). Under the HRL, "disability" is defined as: (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function; (b) a record of such impairment; or ( c) a condition regarded as such an impairment. *See* Executive Law § 292(21).

The mere presence of a medical condition does not establish that a plaintiff is disabled. *Shaughnessy v. Xerox Corp.*, 2015 WL 1431687,\*3 (W.D.N.Y. Mar. 27, 2015) (plaintiff's sprained ankle did not constitute a disability); *see also* 29 C.F.R. § 1630.2(G)(ii) ("not every impairment will constitute a disability within the meaning of this section"). In addition, it is well settled that temporary impairments with little or no long-term permanent impact are not disabilities under the ADA. *Shaughnessy*, 2015 WL 1431687, \*3 (citing *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 646 (2d Cir. 1998)) (superseded on other grounds). Similarly, temporary conditions with no long-lasting or permanent consequences are not protected under the HRL. *See Guary v. Upstate Nat'l Bank*, 618 F. Supp.2d 272, 275 (W.D.N.Y. 2009) (holding that plaintiff, who broke her ankle resulting in a single, twelve-week disability leave with no alleged physical limitations thereafter, was not disabled under ADA or "the parallel New York statute"); *Simmons v. Woodycrest Center Human Development, Inc., et al.*, 2011 WL 855942 (S.D.N.Y. Mar. 9, 2011) (holding that plaintiff, who suffered from high blood pressure but was otherwise not in an acute state of ill health, was not disabled under the HRL). As such, courts routinely dismiss disability discrimination claims by plaintiffs who allege only minor or transitory injuries. *See Dudley v. New York City Housing Authority*, 2014 WL 5003799, \*34

(S.D.N.Y. Sept. 30, 2014) (plaintiff's injury during recovery from surgery for torn meniscus did not qualify as an ADA disability); *Anderson v. National Grid, PLC*, 93 F. Supp.3d 120 (E.D.N.Y. 2015) (dismissing ADA claim based upon spondylolisthesis, a condition causing back pain); *see also* 42 U.S.C. § 12102(3)(B)(A transitory impairment is an impairment with an actual or expected duration of 6 months or less.).

Plaintiff has failed to establish facts from which a reasonable fact finder could conclude that he suffered from anything more than a minor or transitory injury. Indeed, viewing the facts in the light most favorable to Plaintiff, the injuries he sustained from his motorcycle accident required little or no treatment, and which, aside from limiting his ability to walk quickly following the accident, did not otherwise limit his physical abilities. Thus, Plaintiff has failed to present facts from which a reasonable fact finder could conclude that he suffered from a disability within the meaning of the ADA and/or the HRL. Plaintiff has also failed to establish that, at the time of discharge, he had a record of an ADA or HRL qualifying impairment.

Perhaps realizing these deficiencies, Plaintiff argues that there exists a question of fact as to whether Defendants regarded him as having injuries that were more than transitory and minor. *Id.* The Court disagrees.

**\*10** The injuries at issue arise from Plaintiff's March 27, 2013 motorcycle accident. Only Defendants' knowledge of, or belief about, the extent of these injuries at the time of discharge is relevant. *See Singleton v. United Parcel Service, Inc.*, 2014 WL 943129, at \*2 (D. Conn. 2014)("Being regarded as having such an impairment" means "that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both 'transitory and minor.' ") (citing 29 C.F.R. § 1630.2(g)(iii)); *Nelson v. City of New York*, 2013 WL 4437224, at \*7 (S.D.N.Y. 2013)(When an individual suffers an adverse employment action based on the employer's good faith—but incorrect—belief that an impairment is disabling, the individual is regarded as disabled.). Viewing the evidence in the light most favorable to Plaintiff, no reasonable fact finder could conclude that on April 20, 2013 when Gary Grimmel told Plaintiff that he was discharged ("Curt, it's become obvious that you have had too much time off, you feel your needs are more important than mine, therefore it's time we part ways."),

Case 9:21-cv-00251-DNH-TWD Document 37 Filed 05/22/23 Page 156 of 229
O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)
2016 WL 7742779, 2016 A.D. Cases 504,191

Defendants regarded Plaintiff as suffering from an ADA or HRL qualifying disability.

The facts, viewed in the light most favorable to Plaintiff, indicate that following the motorcycle accident, he sent Betty Grimmel a text message telling her that he was a little banged up "but not bad" and only had a few scrapes. Plaintiff did not tell the Grimmels that he went to the emergency room following this accident. [9] While Plaintiff was examined by his flight surgeon on April 1, 2013, there is no indication that Plaintiff advised Defendants of this examination. Further, there is no dispute that Plaintiff did not tell the Grimmels that he was prescribed a steroid and a narcotic on April 1, 2013, that he filled the prescription for Medrol Dosepak on April 1, 2013, [10] or that his flight surgeon recommended that he not fly for a day of so after the April 1, 2013 medical examination. Moreover, Plaintiff flew the Grimmels on April 4, 2013 and again on April 6, 2013.

[9]    And even if he had, it would not have provided probative evidence that Defendants believed Plaintiff suffered from a serious condition because the results of the emergency room medical examination were unremarkable (x-rays were negative, Plaintiff was not given any prescriptions, and was released with no work-restrictions).

[10]    Plaintiff asserts that he is "unsure" whether he told the Grimmels that he was not supposed to fly for the first two days while on Medrol Dosepek, but contends that he never took the medication. The Court accepts the representation that he never took the medication as true for purposes of this motion.

In addition, while Plaintiff consulted with an orthopedic surgeon on April 11, 2013 due to discomfort in his right knee and shoulders, he did not tell the Grimmels about this consultation. Even though Plaintiff does not recall whether he told the Grimmels that the orthopedic surgeon recommended that he obtain a MRI of his right knee and shoulders, the Grimmels deny that he advised them of this recommendation. In the face of the Grimmel's assertion to the contrary, Plaintiff's uncertainty about whether he told the Grimmels about the MRI amounts to mere speculation that he did, which is insufficient to support Plaintiff's evidentiary burden on this motion. There is also no evidence supporting an inference that Defendants were aware that Plaintiff began receiving chiropractic treatment on his shoulders on April 15, 2013. Thus, when Betty Grimmel sent Plaintiff a text message on

April 15, 2013 notifying him that they might need him to fly to Phoenix, Arizona for the following weekend, the Grimmels knew only that Plaintiff had been in motorcycle accident that caused him a few scrapes and which did not prevent him from piloting the Grimmels' airplane. There is no evidence demonstrating that, at this point in time, Plaintiff provided Defendants any indication that he was receiving ongoing medical treatment, that he was scheduled to have an MRI on April 17, 2013, or that he exhibited any symptoms of a serious medical condition.

**11  Plaintiff had the MRIs completed on April 17, 2013, and was scheduled to hear the results on Friday, April 19, 2013. On April 18, 2013, Betty Grimmel notified Plaintiff by text message that he was needed to fly Defendants on April 19, 2013. Betty Grimmel and Plaintiff spoke by telephone the same day about the trip. Betty Grimmel contends that Plaintiff did not tell her that he had an April 19th doctor's appointment or that he was receiving physical therapy for his shoulder; Plaintiff contends that he is "unsure" if he told her about the doctor's appointment. Again, Plaintiff's uncertainty about what he told Betty Grimmel is insufficient to support his evidentiary burden on this motion. Further, even assuming that Plaintiff mentioned his MRI follow-up appointment during this telephone conversation, the record reflects that Plaintiff thereafter maintained his of ability to fly the airplane, and the Grimmels' persisted in their desire for him to do so.

On April 18, 2013, at approximately 7:00 p.m. (after the telephone conversation referenced above), Betty Grimmel advised Plaintiff that they did in fact need him to come to work on April 19, 2013 for a 6:00 p.m. or 7:00 p.m. flight departure. There is no dispute that, thereafter, Plaintiff sent Betty Grimmel a text message discussing the weather forecast for the April 19, 2013 trip thereby indicating his intention to perform his duties for the flight. It was not until some time later on April 18, 2013 that Plaintiff advised Betty Grimmel that he would not be available for the trip because he had "a doctors [ sic] apt in the morning related to [his] motorcycle accident at 10 [a.m.]." Betty Grimmel responded by asking Plaintiff if he could reschedule the appointment—thereby signifying her desire to have Plaintiff pilot the airplane the following day. Plaintiff replied that he thought it was too late to cancel the appointment and indicated that it was a follow-up " to [a] MRI [he] had done yesterday." However, even after mentioning the MRI, Plaintiff indicated (in the same correspondence and in a later correspondence that same evening) that he would be able to pilot the plane on April

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

19, 2013, although he might arrive later than requested. Thus, while Plaintiff had mentioned that he had received an MRI related to his motorcycle accident, he still indicated that he was physically capable of piloting the airplane.

Other than Plaintiff's April 18, 2013 statement that he had a MRI performed for injuries " related" to his motorcycle accident, there are no facts from which a reasonable fact finder could conclude that Defendants regarded Plaintiff as suffering from anything more than a transitory, minor condition. Indeed, the Grimmels were told by Plaintiff that the accident caused only scrapes, they observed Plaintiff flying their airplane after the accident, Plaintiff continued to maintain his ability to pilot the airplane even after telling Betty Grimmel about the MRI, and the record lacks evidence indicating that Plaintiff exhibited signs of anything more than a minor physical impairment or that he told Defendants that he suffered from any condition that substantially limited his physical abilities.

When boiled to the core, Plaintiff's ADA and HRL claims are based wholly on the proposition that Defendants might have mistakenly regarded Plaintiff as suffering from a qualifying disability *because* he had an MRI performed. But even viewing the facts in the light most favorable to Plaintiff, no reasonable fact finder could conclude, in this situation, that merely having an MRI performed " related to" an accident causing only minor injuries raised the specter that Plaintiff *might be* suffering from an a serious disability within the meaning of the ADA or HRL. Indeed, there is no evidence in the record that Plaintiff exhibited any outward signs of a significant illness or disability; that his injuries had worsened or his condition had deteriorated since the accident; that he was unable to perform his job duties after the accident; or that Defendants expressed reservation in his ability to pilot the aircraft even after Plaintiff told Betty Grimmel about the MRI. Rather, the undisputed evidence indicates that after Plaintiff disclosed his doctor's appointment to review his MRI, Betty Grimmel asked him to re-schedule the appointment so he could pilot the airplane on April 19, 2013. And while Plaintiff declined to re-schedule the appointment, he continued to maintain that he could pilot the airplane on the 19th although at a later time than the Grimmels wanted.

**\*12** Plaintiff has failed to offer concrete examples of something from which a reasonable inference could be drawn that, at the time of discharge, Defendants might have perceived Plaintiff as disabled within the meaning of the ADA or HRL. *See Soules v. State*, 2015 WL 5797014, at \*8 (D.

Conn. 2015), *appeal filed*, No. 15-3418 (2d Cir. Oct. 27, 2015)(granting a Fed. R. Civ. P. 12(b)(6) motion to dismiss because the plaintiff failed to allege specific facts from which the court could "infer that any Defendant regarded Plaintiff as disabled because of a knee injury."). Further, Plaintiff's speculation that Defendants *might* have suspected him of having a disabling condition is insufficient to withstand summary judgment. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 456 (2d Cir. 1999);[11] *id.* at 448;[12] *Richardson v. N.Y. Dep't. of Correctional Serv.*, 180 F.3d 426, 447 (2d Cir. 1999).[13] Based on the evidence presented, no reasonable fact finder could conclude that between Plaintiff's last contact with Betty Grimmel on April 18, 2013 and Gary Grimmel's telephone call discharging Plaintiff on April 20, 2013, the Grimmels developed a mistaken belief that Plaintiff was suffering from a disability within the meaning of the ADA or the HRL.

[11]   (Plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination.")

[12]   As indicated in <u>Bickerstaff,</u> on a motion for summary judgment the Court:

> must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. After all, an inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.

> Bickerstaff, 196 F.3d at 448 (internal quotation marks and citations omitted).

[13]   (affirming summary judgment for employer where employee offered only her own general claim of discrimination to show that the employer's legitimate reason for terminating her was pretextual).

Moreover, Plaintiff's post-discharge communications are insufficient to create a question of fact as to Defendants' mind-set at the time of discharge. The fact that the Grimmels testified at their depositions that Plaintiff was discharged because Gary Grimmel no longer trusted Plaintiff does not

2016 WL 7742779, 2016 A.D. Cases 504,191

create a genuine question of material fact as to whether the discharge was motivated by discriminatory animus. The evidence, viewed in the light most favorable to Plaintiff, indicates that at the time of discharge, the Grimmels knew only that: (1) Plaintiff had received scrapes and minor bruises from a motorcycle accident; (2) Plaintiff had flown the Grimmels after the motorcycle accident; (3) Plaintiff was expected to fly the Grimmels on April 19, 2013; and (4) despite that he represented that he was capable of doing so, Plaintiff declined to pilot Defendants' plane because he wanted to attend a doctor's appointment to learn the results of a previously undisclosed MRI. There existed no facts—other than Plaintiff's refusal to pilot Defendants' airplane because he wanted to learn the results of an MRI related to an ostensibly minor condition resulting from the motorcycle accident—from which a reasonable fact finder could conclude that the "lack of trust" arose from a belief *at the time of discharge* that Plaintiff had a more serious condition than he was letting on. Indeed, even Plaintiff has conceded that any information about his condition that he provided after being discharged was inconsequential because "at that point [Gary Grimmel] had already fired [him]." Def. SOMF ¶ 141.

Thus, Plaintiffs' ADA and HRL claims are dismissed for failing to establish a *prima facie* case of discrimination. *See Pierce v. Donahoe*, 963 F. Supp. 2d 366, 375-76 (D. Del. 2013)(granting summary judgment and dismissing plaintiffs ADA claim upon determining her employer was not "sufficiently aware of plaintiffs hearing loss such that it knew or regarded plaintiff as having a disability" when plaintiff did not inform her supervisors of her disability or make any statements suggesting more than a "hearing problem"); *Webb v. Mercy Hosp.*, 102 F.3d 958, 960 (8th Cir. 1996) (affirming dismissal of plaintiff's "regarded as" ADA claim because plaintiff "produced no evidence that her supervisors or the management at [her employer] were aware of the [disability]"); *Tabatchnik v. Cont'l Airlines*, 262 Fed.Appx. 674, 676 (5th Cir. 2008) (affirming summary judgment and dismissal of employee's ADA claim because plaintiff failed to show that employer regarded him as having an impairment based solely upon plaintiff's request for extended lunch breaks to go to doctor's appointments).

**\*13** Further, and assuming *arguendo* that Plaintiff could establish a *prima facia* case of disability discrimination, Defendants have articulated a nondiscriminatory reason for his discharge. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)(If a plaintiff demonstrates a *prima facie* case, this gives rise to a presumption of unlawful

discrimination and the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory rationale for its actions); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)(Defendant's burden of production at this stage is not a demanding one, it need only offer a basis for the employment decision in issue which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action."). Defendants contend that, as expressed by Gary Grimmel during the April 20, 2013 telephone call, Plaintiff was discharged for failing to perform his job function as required.

Plaintiff argues, however, that the Grimmels testified at their depositions (and asserted in the administrative agency) that Plaintiff was discharged because Gary Grimmel could no longer trust Plaintiff. Nonetheless, both of the asserted reasons constitute legitimate, nondiscriminatory bases for discharge, and thus shift the burden to Plaintiff to produce evidence "capable of carrying the burden of persuasion that employer's action was at least in part motivated by discrimination." *Davis v. New York City Dept. of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). Plaintiff has failed to meet this burden.

The evidence presented, even when viewed in the light most favorable to Plaintiff, does not demonstrate that either of the employer's stated reasons for discharge was false, or that discrimination was the real reason for the adverse action. The undisputed evidence indicates that Plaintiff was required to make himself available to fly in accordance with the Grimmel's needs, yet failed to do so on April 19, 2013. *See* Pl. Respon. SOMF ¶ 25 (O'Donnell understood that he would be working for Defendants in an on-call capacity); *id.* ¶ 70 (Admitting that "[t]he amount of advance notice the Grimmels gave Plaintiff when they needed to fly varied, but Plaintiff knew that he needed to work around Mr. Grimmel's schedule."); *id.* ¶ 134 (Admitting that as a result of his unavailability on April 19, 2013, "the Grimmels flew to Phoenix on a commercial airline, something Mr. Grimmel did not want to do."). Further, Plaintiff has failed to demonstrate that he kept the employer accurately apprized of his medical condition. *See* Pl. Respon. SOMF ¶ 85 (admitting that he did not tell the Grimmels that he went to the emergency room after his motorcycle accident); *id.* ¶ 99 (admitting that he did not tell the Grimmels that he was prescribed a steroid by his physician on April 1, 2013, which he had filled and picked-up from the pharmacy on April 3, 2013); *id.* ¶ 107 (admitting that he did not tell the Grimmels that he was going to see an orthopedic surgeon on April 11, 2013);

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

*Id.* ¶¶ 155-16 (admitting that on April 15, 2013, he began receiving treatment on his shoulder from a chiropractor but that Gary Grimmel was unaware of this treatment). Therefore, Plaintiff has failed to demonstrate that either of the employer's articulated reasons for discharge was false.

Moreover, for the reasons discussed above, Plaintiff has failed to produce evidence from which a reasonable fact finder could conclude that the discharge determination was motivated by a belief that Plaintiff suffered from an ADA or HRL qualifying disability. *See Sista v. CDC Ixis N. Am. Inc.,* 445 F.3d 161, 173 (2d Cir. 2006) ("Because [plaintiff] can point to no evidence from which a reasonable jury could conclude that he was terminated on account of his mental illness rather than his past behavior, we conclude that the District Court did not err in granting summary judgment and dismissing [plaintiff's] ADA claims"); *Fall v. New York State United Teachers,* 289 Fed.Appx. 419, 421-22 (2d Cir. 2008) (affirming grant of summary judgment to employer because employer showed "evidence supporting [a] legitimate basis for the termination" and plaintiff failed to meet her ensuing burden to "offer evidence that [the employer's] position was false or that discrimination was the real reason for the adverse action" other than her own conclusions). Accordingly, the ADA and HRL claims are dismissed.

### b. Breach of Contract Claims

**\*14** The parties cross-move for summary judgment on the breach of contract claims. For the reasons that follow, Defendants' motion is granted in part and denied in part, and Plaintiff's motion is denied.

Under New York law, [14] to succeed on a breach of contract claim, the Plaintiff must show: "(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Swan Media Grp., Inc. v. Staub,* 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012). While an exchange of emails may constitute a binding contract under New York law, *Rubinstein v. Clark & Green, Inc.,* 395 Fed. Appx. 786, 788 (2d. Cir. 2010)(citing *e.g.*, *Stevens v. Publicis. S.A.,* 50 A.D.3d 253, 255-56, 854 N.Y.S.2d 690, 692 (1st Dep't 2008)), "[f]or a contract to be binding, the parties' agreement must be definite enough so that the parties' intent can be ascertained with some degree of certainty." *In re Cairns & Associates, Inc.,* 372 B.R. 637, 651 (S.D.N.Y. 2007) (internal quotation marks and citation omitted). It is Plaintiff's burden to "establish[ ] all essential terms of the alleged contract, with sufficient

definiteness," and to demonstrate the existence of a meeting of the minds, including "the parties' mutual assent and mutual intent to be bound." *Id.* at 652; *May v. Wilcox,* 182 A.D.2d 939, 940 (3d Dep't 1992); *see also In re Cairns & Associates, Inc.,* 372 B.R. at 652.

14    All parties agree that New York law applies and, accordingly, the Court will apply this law to the state law claims.

### 1. Cost Of Living Adjustments and Year-End Bonuses

There is a factual dispute whether the parties came to a binding agreement to pay Plaintiff yearly Cost of Living Adjustments ("COLAs") and/or Year-End Bonuses ("YEBs"). Betty Grimmel and Plaintiff indicate that there was such an agreement, but Gary Grimmel contends there was not. Further, the record indicates that Plaintiff was not paid yearly COLAs, and, although paid Christmas bonuses, he contends these were not the year-end bonuses the parties agreed upon.

Given the factual dispute on whether an agreement was reached on the payment of COLA and YEBs, and whether the Christmas bonuses were YEBs, it will be for a jury to decide whether the parties reached a binding agreement on these issues, and, if they did, whether there was a reason the benefits were not paid in accordance with that agreement. *See Fed. Ins. Co. v. Americas Ins. Co.,* 258 A.D.2d 39, 44 (1st Dep't 1999)("the parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties."); *Restatement (Second) of Contracts § 202,* comment g (The conduct of the parties to agreement "is often the strongest evidence of their meaning."); *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 7 N.Y.3d 96, 104, 850 N.E.2d 653 (2006)(" Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned. Such abandonment may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage. However, waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection. Generally, the existence of an intent to forgo such a right is a question of fact.") (Internal quotation marks and citations omitted). Accordingly, the parties' motions on these issues are denied.

### 2. Severance Pay

**\*15** Assuming *arguendo* that the parties' severance agreement was in effect at the time of Plaintiff's discharge, the record is clear that Plaintiff was discharged for cause and, therefore, severance was not required.

In determining whether an employee was terminated for cause for purposes of entitlement to post-termination benefits, "an employer's decision ... may be set aside only where it is made in bad faith, was arbitrary or was the result of fraud." *Welland v. Citigroup Inc.*, 2003 WL 22973574, at \*11 (S.D.N.Y. Dec. 17, 2003) *aff'd*, 116 Fed.Appx. 321 (2d Cir. 2004) (dismissal of complaint in its entirety on summary judgement). As such, if a decision is reasonable, a court may not substitute its judgment for that of the employer on the disputed factual issues." *Id.; see William Stevens, Ltd. v. Kings Vill. Corp.*, 234 A.D.2d 287, 288 (2d Dep't 1996) (unless unreasonable, an agent is bound to act in accordance with the employer's direction and control.)

Plaintiff's primary duty was to be available to fly the Grimmels when required, Def. SOMF ¶ 25, yet he failed to make himself available on April 19, 2013 at the time instructed. Further, he failed to provide a compelling reason for his unavailability. Plaintiff only advised Betty Grimmel on April 18, 2013 that he had a follow-up appointment from a MRI related to his motorcycle accident which, as discussed *supra*, appeared to the Grimmels to have resulted in only minor injuries to Plaintiff. Because Betty Grimmel notified Plaintiff on April 15, 2013 that he would be probably be needed on April 19, 2013, and because Plaintiff concealed his doctors' appointments following the motorcycle accident, Defendants had no reason to believe Plaintiff's appointment could not have been rescheduled. Plaintiff's excuse—that it was too late to cancel the appointment despite that he had been given four days notice that he would probably be needed to fly the Grimmels for the upcoming weekend, and his failure to make an effort to reschedule his Friday doctor's appointment in light of the logistics of Plaintiff's travel time to the Grimmels' airplane, was reasonably interpreted as a dereliction of his duties.

Given Plaintiff's well-established duties, the decision to terminate his employment for failing to reschedule what appeared to be (and actually was) a non-emergency appointment was reasonable. *See Reilly v. Polychrome Corp.*, 872 F. Supp. 1265, 1268 (S.D.N.Y. 1995), *aff'd*, 71 F.3d 405 (2d Cir. 1995) ("[b]ecause plaintiff was not excused from compliance with the order by reason of personal emergency, his failure to report to work constituted a legitimate basis for defendants' action"); *see also Matter of Cowan*, 23 A.D. 3d 815 (3d Dep't 2005) (on-call employee who failed to respond to employer's attempts to contact him was terminated for misconduct and ineligible for unemployment benefits).

Further, even assuming that the discharge determination was because Gary Grimmel no longer trusted Plaintiff, the determination was not in bad faith or arbitrary. There is no dispute that Plaintiff concealed his medical treatment following his motorcycle accident from Gary Grimmel, including the fact that he was prescribed narcotic and steroid medications (that he admitted to filling), and that he received advice from his physician that he should not fly for a period of time. No reasonable fact finder could conclude that the determination to discharge an airline pilot under these circumstances was made in bad faith or was arbitrary. Accordingly, Defendants' motion for summary judgment on that much of the breach of contract claims address to the payment of severance is granted, and the breach of contract claims on severance payments are dismissed.

### c. **Promissory Estoppel Claim**

**\*16** Plaintiff's promissory estoppel claim fails as a matter of law. "New York law, which governs here, does not recognize promissory estoppel in the employment context." *Rojo v. Deutsche Bank*, 2010 WL 2560077, at \*7 (S.D.N.Y. 2010) *aff'd*, 487 Fed.Appx. 586 (2d Cir. 2012); accord *Lai v. Deiorio Foods Inc.*, 2016 WL 814930, at \*7 (N.D.N.Y. 2016)(" '[I]t is well established that New York law does not recognize promissory estoppel in the employment context.' ")(*citing Kramsky v. Chetrit Group, LLC*, 2011 WL 2326920, at \*4 (S.D.N.Y. 2011)).

To the extent such a claim could be asserted, it fails on the merits. A plaintiff may not maintain a promissory estoppel claim that is duplicative of a breach of contract claim. *See Soldiers', Sailors', Marines' & Airmen's Club, Inc. v. Carlton Regency Corp.*, 30 Misc. 3d 352, 364 (New York Co. Sup. Ct. 2010) (plaintiffs could only set forth promissory estoppel allegations that are not subsumed in their counterclaim for breach of contract). Plaintiff's promissory estoppel claim (Count Six) is identical to his breach of contract claims (Counts Four and Five).

Further, to succeed on such a claim, "a plaintiff must show: (1) a clear and unambiguous promise; (2) reasonable and

Case 9:21-cv-00251-DNH-TWD    Document 37    Filed 05/22/23    Page 161 of 229

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)
2016 WL 7742779, 2016 A.D. Cases 504,191

foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of his reliance." *Tri-Cty. Motors, Inc. v. American Suzuki Motor Corp.*, 494 F. Supp.2d 161, 173 (E.D.N.Y. 2007). Promissory estoppel is limited to that "class of cases in which the person to whom the promise is made, in reliance upon the promise, has suffered unconscionable injury." *Tutak v. Tutak*, 123 A.D.2d 758, 759 (2d Dep't 1986). Plaintiff's alleged injuries—failing to receive COLAs and YEBs [15]—are not unconscionable because they are expected damages of Plaintiff's contractual non-performance claim. *See Fishoff v. Coty Inc.*, 676 F. Supp.2d 209, 220 (S.D.N.Y. 2009) *aff'd*, 634 F.3d 647(2d Cir. 2011)(unconscionable injury requires more than the expected damages which naturally flow from nonperformance of alleged agreement). Moreover, Plaintiff's contention that Defendants' failure to provide him COLAs and YEBs caused him unconscionable injury because he suffered economic hardship or lost other employment opportunities fails as a matter of law. *See Banger v. Spanish Broadcasting System, Inc.*, 2007 WL 2780390, at *6 (S.D.N.Y. 2007)(dismissal of promissory estoppel claim based on economic hardship due to reliance on employer's alleged promises and employee's failure to leave to seek better employment terms). As such, Plaintiff cannot establish the unconscionable injury necessary to support his claim.

15    Because the Court has already determined that Plaintiff is not entitled to severance pay, the Court does not consider severance pay in the context of Plaintiff's promissory estoppel claim.

For these reasons, Plaintiff's motion for summary judgment on his promissory estoppel claim is denied, Defendants' motion is granted, and the claim is dismissed.

### d. NYLL Claims

### 1. Severance Pay

Because the Court has already determined that Plaintiff is not entitled to severance pay, Plaintiff has no NYLL claim arising from this benefit. *See Kannilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 Fed.Appx. 153, 158 (2d Cir. 2012)(Plaintiff cannot assert a claim for wages under the Labor Law if he does not have an enforceable contractual right to such wages.). Accordingly, Plaintiff's NYLL claim for severance pay is dismissed.

### 2. YEBs

**\*17** Plaintiff's claim that Defendants failed to pay him wages in the form of YEBs in violation of NYLL § 193(1) (Count Three) turns on the questions of whether there was an agreement to pay YEBs as part of compensation and, if there was, whether the YEBs were in fact paid. *See Ryan v. Kellogg Partners Inst. Servs.*, 19 N.Y.3d 1 (2012). Because these questions must be answered by a jury, the parties' motions relative to Count Three are denied.

### 3. COLAs

Plaintiff also claims that Defendants failed to pay him wages in the form of COLAs in violation of the NYLL (Count Two). While Plaintiff initially pled this claim generally under "NYLL article 6 §§ 190 *et seq.*," he now asserts that this claim is viable under NYLL § 191(1)(d). Pl. MOL., at 20. As Plaintiff concedes, § 191(1)(d) provides that workers shall be paid "wages in accordance with the agreed terms of employment, but not less frequently than semi-monthly, on regular pay days designated in advance by the employer." Plaintiffs claim fails because, as set forth in the Complaint, the alleged "terms of the agreement" were: "The parties also agreed that [Plaintiff's] base salary would be increased *annually* according to the cost of living index." Compl., ¶ 20 (emphasis added). Thus, even assuming the parties agreed that Plaintiff would be paid annual COLAs, the failure to pay them does not amount to a violation of NYLL § 191(1)(d). Accordingly, Count Two is dismissed.

### 4. Labor Law § 215 Retaliation

Plaintiff claims that Defendants' counterclaims constitute unlawful retaliation in violation of NYLL § 215 (Count Seven). The claim is without merit.

To establish retaliation under NYLL § 215, a plaintiff must show: (1) participation in a protected activity known to the defendant; (2) an adverse action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and adverse action. *See Ozawa v. Orsini Design Associates, Inc.*, 2015 WL 1055902, n.10 (S.D.N.Y. Mar. 11, 2015). Plaintiff cannot establish a *prima facie* retaliation claim because he has not suffered any adverse action as a result of Defendants filing the counterclaims. For a counterclaim to be actionable

O'Donnell v. King B 100, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7742779, 2016 A.D. Cases 504,191

as retaliatory, it must have some impact on Plaintiff's employment or prospective employment. *See D' Amato v. Five Start Reporting, Inc.*, 80 F. Supp. 3d 395,420(E.D.N.Y. 2015)(citing *Fei v. WestLB AG*, 2008 WL 594768, at \*3 (S.D.N.Y. Mar. 5, 2008)). Plaintiff's employment with Defendants was not impacted by Defendants' counterclaims, which were filed after his termination, and Plaintiff has failed to present sufficient facts from which a reasonable fact finder could conclude that Plaintiff's employment prospects have been negatively impacted by the counterclaims. Thus, Plaintiff's NYLL § 215 retaliation claim is dismissed.

### e. Cross-Motion for Summary Judgment on Defendants' Counterclaims

Plaintiff argues that he should be granted summary judgment dismissing Defendants' counterclaims. The Court disagrees on three of the four counterclaims, but finds that the promissory estoppel counterclaim should be dismissed.

Plaintiff argues that: (1) the parties agreed that Defendants would provide Plaintiff with the option of going home from a trip with Defendants when he was not needed; (2) Defendants would provide such transportation; (3) there was no agreement that Plaintiff would use his ex-wife Suzanne O'Donnell's U.S. Airways employee flight privileges (free or discounted flights); (4) it was "impossible" for Plaintiff to use his ex-wife's flight privileges with U.S. Airways because he was only married to her " a until sometime in 2009," and because such an agreement would be impermissible under U.S. Airways' regulations, and (5) Plaintiff never received any reimbursements for travel expenses. Pl. MOL, p. 4. Defendants contest these points, and Plaintiff has failed to present evidentiary proof establishing that no genuine question of material fact exists on the counterclaims.

 **\*18**  However, for the reasons discussed with regard to Plaintiff's promissory estoppel claim, Defendant's promissory estoppel counterclaim must also be dismissed. The promissory estoppel counterclaim is duplicative of the breach of contract counterclaim, arises in the context of an employment dispute, and does not alleged facts reasonably supporting that Defendants incurred an unconscionable injury. Accordingly, Plaintiff's motion for summary judgment dismissing Defendants' counterclaims is granted in part, dismissing the promissory estoppel counterclaim, and denied as to the other counterclaims.

## V. CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment, Dkt. # 46, is GRANTED in part and DENIED in part. The motion is granted to the extent that Plaintiff's ADA, HRL, Breach of Contract for Severance Pay, Promissory Estoppel, NYLL severance pay, NYLL COLA pay, and NYLL Retaliation claims are DISMISSED. Plaintiff's claims for Breach of Contract for the payment of COLAs and YEBs, and his NYLL claims for unpaid YEBs, remain viable.

Plaintiff's cross-motion for partial summary judgment, Dkt. # 49, is GRANTED in part and DENIED in part. The motion is granted to the extent that the promissory estoppel counterclaim is DISMISSED, and denied in all other respects.

Defendants' letter motions to strike, Dkt. ## 57 and 59, are DENIED.

The parties are to file their pretrial papers for the May 10, 2016 trial no later than 11:59 PM on May 5, 2016.

### IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2016 WL 7742779, 2016 A.D. Cases 504,191

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 903068
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ozan WILLIAMS, Plaintiff,

v.

Delta BAROMETRE, et al., Defendants.

No. 20-CV-7644 (KMK)
|
Signed 03/28/2022

**Attorneys and Law Firms**

Ozan Williams, Otisville, NY, Pro Se Plaintiff

Maria B. Hartofilis, Esq., New York State Office of the Attorney General, New York, NY, Counsel for Defendants

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

 **\*1** Ozan Williams ("Plaintiff"), proceeding pro se, brings this Action, pursuant to 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("Title II" or "ADA"), 42 U.S.C. § 12131, *et seq.*, Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, *et seq.*, against the New York State Department of Corrections and Community Supervision ("DOCCS") and DOCCS Superintendent Delta Barometre ("Barometre"; collectively, "Defendants"), alleging that Defendants were deliberately indifferent to his serious medical needs, improperly penalized him as a result of his hearing impairment, and failed to reasonably accommodate his disabilities under the ADA and RA. (*See generally* Complaint ("Compl.") (Dkt. No. 2).)[1][2] Plaintiff expressly and repeatedly states that he seeks only injunctive relief, not monetary damages.[3] Before the Court is Defendants' Motion To Dismiss the Complaint (the "Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Not. of Mot. (Dkt. No. 19).)

[1]    Because the Complaint does not use consistent pagination, and because it is broken up into a form portion as well as several attached exhibits, the Court refers simply to the ECF-stamped pages in the top-right corner.

[2]    "[T]he precise theory of the claim is not articulated with great precision," but instead "largely consists of a narrative of events," *Mulvihill v. Ontario County*, No. 13-CV-6268, 2014 WL 12902275, at \*2 (W.D.N.Y. Feb. 13, 2014), *on reconsideration in part*, 2014 WL 1843463 (W.D.N.Y. May 8, 2014), as laid out in a chronology along with several documents to substantiate it. But where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [his] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). Accordingly, the Court evaluates all possible claims the Complaint could be interpreted to raise, including the aforementioned constitutional, ADA, and RA claims.

[3]    With respect to relief, Plaintiff writes: "The plaintiff is requesting an Order to Prison Officials for action to improve his medical condition of confinement based upon medical standing. Thereby the plaintiff is seeking an injunction/ equitable relief," (Compl. 6); "This case and its addressment for resolution is not a remedy of law circumstances such as monetary damages which would be inadequate," (*id.*); "The Temporary Restraining Order is the only way to immediately address and medically correct and prevent further damage as the digress continues," (*id.* at 7); "The plaintiff has clearly shown that immediate and irreparable injury damage/loss will result to this movant before the concluding of this court case, thereby the plaintiff seeks a Temporary Restraining Order," (*id.*). Accordingly, the Court does not consider money damages in its analysis, only the injunctive relief sought.

For the reasons stated herein, the Motion is granted in part and denied in part.

I. Background

A. Factual Background
 **\*2** The following facts are drawn from Plaintiff's Complaint and the exhibits therein as well as Plaintiff's opposition papers

and the exhibits therein. [4] They are assumed to be true for the purpose of resolving the instant Motion.

[4]    In his memorandum opposing Defendants' Motion, Plaintiff makes additional factual allegations giving rise to new claims. (*See generally* Pl.'s Mem. of Law in Opp. of Def. ("Pl.'s Opp.") (Dkt. No. 21); *see also* Def.'s Reply Mem. of Law in Further Supp. of Mot. ("Def.'s Reply Mem.") 1–8 (Dkt. No. 22) (describing Plaintiff's new allegations and claims).) It is true that the Court's "mandate to read the papers of pro se litigants generously makes it appropriate to consider [a] plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997) (citing *Gil v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987)); *see also Veras v. Jacobson*, No. 18-CV-6724, 2020 WL 5659551, at *1 n.1 (S.D.N.Y. Sept. 23, 2020) ("The Court properly considers factual allegations contained in [the] [p]laintiff's opposition papers and other materials submitted by [the] [p]laintiff to the extent that those allegations are consistent with the Amended Complaint."), *reconsideration denied*, 2020 WL 6694410 (S.D.N.Y. Nov. 13, 2020); *Norman v. Mount Vernon Hosp.*, No. 17-CV-9174, 2020 WL 4432063, at *1 (S.D.N.Y. July 31, 2020) (same); *Burgess v. Goord*, 1999 WL 33458, at *1 n.1 (S.D.N.Y. Jan. 26, 1999) (same) (citing *Gadson*, 1997 WL 714878, at *1 n.2). Notwithstanding the Court's authority to consider new facts, however, such new facts must relate to the original wrongdoing alleged. *See Davila v. Lang*, 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018) ("A pro se plaintiff may not raise 'entirely new' causes of action for the first time in his opposition papers, but the Court may consider new claims appearing for the first time in briefing if 'the claims could have been asserted based on the facts alleged in the complaint.' " (italics omitted) (quoting *Vlad-Berinda v. MTA New York City Transit*, No. 14-CV-675, 2014 WL 6982929, at *5 (S.D.N.Y. 2014))) (collecting cases). In his Opposition, Plaintiff newly asserts a handful of facts regarding misbehavior reports stemming from him being out of line due to his inability to hear an order. (*See generally* Pl.'s Opp.) The Court will consider these as having salience to the original issues alleged. But the remainder —which is to say the vast majority—of new allegations Plaintiff makes are unrelated to the claims in this case: that a corrections officer— one who is neither named nor referenced in the original complaint—conducted an improper search and inappropriately seized Plaintiff's property; that Plaintiff filed a grievance about said search; and that the corrections officer is now harassing Plaintiff in retaliation for filing said grievance. (*See* Pl.'s Opp. Mem. 2–3; 12–23.) "Because [this subset of Plaintiff's] new allegations go well beyond merely elaborating on the facts alleged in the Complaint and apparently are intended to support new legal theories, the Court declines to consider them here." *Mira v. Argus Media*, No. 15-CV-9990, 2017 WL 1184302, at *3 n.4 (S.D.N.Y. Mar. 29, 2017); *see also Mathie v. Goord*, 267 F. App'x 13, 14 (2d Cir. 2008) (summary order) (affirming that a new constitutional challenge raised in opposition briefing was properly dismissed because the complaint did not "encompass that claim."); *Trombetta v. Novocin*, No. 18-CV-993, 2021 WL 6052198, at *11 (S.D.N.Y. Dec. 21, 2021) ("It is well-established that a party may not raise new claims in its opposition brief."), *reconsideration denied*, 2022 WL 280986 (S.D.N.Y. Jan. 31, 2022); *Pandozy v. Segan*, 518 F. Supp. 2d 550, 554 n.1 (S.D.N.Y. 2007) ("Although [the plaintiff] raises additional claims in his opposition papers, the Court will not consider these new claims as they were not raised in the amended complaint."), *aff'd*, 340 F. App'x 723 (2d Cir. 2009); *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-CV-10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers."). Should he choose, Plaintiff is free to file one or more separate causes of action pertaining to these allegations.

**\*3** On August 27, 2008, prior to Plaintiff's incarceration, Plaintiff was admitted to University Hospital in Staten Island. (Compl. 3; *see also id.* at 13.) Plaintiff avers that he was assaulted, sustaining injuries on his head, face, abdominal, and both wrists. (*See id.* at 3; *see also id.* at 13.) Specifically, Plaintiff asserts that he was assaulted by a police officer. (*See id.* at 3.) "While admitted [Plaintiff underwent several] examinations, [including a] CT scan." (*Id.*) Plaintiff was also provided multiple medications as treatment. (*See id.*) Lastly, "[t]here was a report made of a head assault and multiple

2022 WL 903068

contiguous axial images were obtained from the base of the skull to the vertex." (*Id.*)

Several years later in 2012, Plaintiff alleges that there was an audiologist report made concerning Plaintiff's hearing issues. (*See id.*)

The following year, in 2013, Plaintiff was incarcerated.[5] While incarcerated, on August 26, 2013, the OTO Health Hearing Aid Center ("OTO") sent Plaintiff hearing aids. (*See* Compl. at 3; *see also id.* at 23.) In the letter denoting the delivery of Plaintiff's hearing aids, OTO requested permission for Plaintiff to keep his hearing aids in his possession at all times, stating that it is "a matter of medical necessity and [required] for his personal security and quality of life." (*Id.* at 23; *see also id.* at 3.)

[5]     "The business records exception provides that a record of a 'regularly conducted activity' is admissible for the truth of the matter where the record was made contemporaneously by someone with knowledge, the record was kept in the regular course of business and as a regular practice, a qualified witness testifies to those facts, and the records are trustworthy." *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 691 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016); *see also United States v. Murgio*, No. 15-CR-769, 2017 WL 365496, at *12 (S.D.N.Y. Jan. 20, 2017) ("Federal Rule of Evidence 803(6) permits admission into evidence of 'business records' for the truth of the matters asserted.") (citing *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010)).
Because prison records meet the above-listed requirements, "[j]udicial notice may be taken of prison records pursuant to Fed. R. Evid. 803(6)." *Martinez v. New York State Dep't of Corr.*, No. 12-CV-1499, 2013 WL 5194054, at *2 n.1 (S.D.N.Y. Sept. 16, 2013); *see also Gray v. Erfe*, No. 13-CV-39, 2015 WL 3581230, at *2 n.1 (D. Conn. June 5, 2015) ("The court may take judicial notice of prison records."); *McEachin v. Selsky*, No. 04-CV-0083, 2010 WL 3259975, at *13 n.13 (N.D.N.Y. Mar. 30, 2010) ("[T]hese records to which we take judicial notice are prison records which fall into the business records exception to the hearsay rule, found in Federal Rule of Evidence 803(6)"), *report and recommendation adopted*, 2010 WL 3259982 (N.D.N.Y. Aug. 17, 2010).

Moreover, "[c]ourts may also take judicial notice of information contained on websites where 'the authenticity of the site has not been questioned.' " *Fernandez v. Zoni Language Centers, Inc.*, No. 15-CV-6066, 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016), *aff'd*, 858 F.3d 45 (2d Cir. 2017) (quoting *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002)). For that reason, courts have held that a court "will take judicial notice of the records posted by the New York State Department of Correctional Services as to [a] plaintiff." *Ligon v. Doherty*, 208 F. Supp. 2d 384, 386 (E.D.N.Y. 2002).

According to DOCCS's online records, Plaintiff's incarceration began in 2013. *See Inmate Information, Department of Corrections and Community Supervision, New York State Gov't*, http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130. The Court therefore takes judicial notice of this fact.

**\*4** On or around December 14, 2013, Plaintiff reached out to the First Deputy Superintendent and Acting Superintendent regarding his hearing aids. (*See id.* at 3; *id.* at 22.) Several days later, on December 24, 2013, Plaintiff received confirmation that "a notice of addressment for hearing aids" was received, and then forwarded to "Dr. Malvarosa, Facility Health Services Director." (*Id.* at 22.)

On April 2, 2015, Plaintiff filed a grievance "based upon the hearing aids." (*Id.* at 3.) The following day, the grievance was returned to Plaintiff. (*Id.* at 24.)

On April 12, 2015, Plaintiff wrote to Superintendent Michael Capra ("Capra"), requesting that Plaintiff's January and February 2015 disciplinary hearings be overturned because Plaintiff's hearing aids were malfunctioning. (*Id.* at 25.) Two weeks later on April 28, 2015, Capra denied Plaintiff's request, saying that an "[i]nvestigation shows that [his] hearing aids were working." (*Id.*)[6]

[6]     Neither the Complaint nor subsequent submissions include a copy of this original request. The Court is only aware of the request based on seeing Capra's letter denying the request. (*Id.*)

On November 24 and 25, 2015, Plaintiff was seen by medical staff at his Sing Sing correctional facility. (*Id.* at 28.) Per

a letter from Susanna Nayshuler ("Nayshuler"), Regional Health Services Administrator, in March 2016, Plaintiff was concerned about his hearing at the time of these November 2015 visits. (*See id.*) Nayshuler wrote that the Sing Sing medical staff had already addressed Plaintiff's concerns and claimed that an audiology specialist described Plaintiff's hearing loss as "non-significant." (*Id.*)

On March 4, 2016, the Regional Health Services Administrator "provided a notice of an investigation without medical confirmation of [P]laintiff's medical status." (*Id.* at 5.)

On April 18, 2016, Plaintiff was issued another misbehavior report. (*See id.* at 32.) [7]

[7] The Court does not have a copy of this letter but is aware of it by reference in a subsequent grievance appeal. (*See id.* (noting that Plaintiff "did not appeal his 4/18/16 Tier II misbehavior report").)

Plaintiff avers that on May 2, 2016, "a grievance determination was issued [following] a hearing investigation" and held Plaintiff at fault. (*Id.* at 5.) [8] Additionally, Plaintiff alleges that there was a "follow up" scheduled soon thereafter. (*Id.*) On May 10, 2016, Plaintiff's grievance appeal was deemed "not an appealable decision." (*Id.* at 31.)

[8] Plaintiff is not clear as to what, specifically, was addressed in this grievance.

On June 13, 2016, the Legal Aid Society wrote to the Ombudsperson for the Office of Counsel at DOCCS, Nancy Heywood ("Heywood"), on Plaintiff's behalf regarding his inability to hear and its supposed connection to his misconduct. (*See id.* at 26.) Heywood responded to this correspondence on August 25, 2016. (*See id.*) [9]

[9] The Court does not have a copy of Plaintiff's original or Heywood's August 25, 2016, response, but is aware of it by reference in a subsequent letter sent by the Legal Aid Society. (*See id.*)

On November 3, 2016, a misbehavior report detailing Plaintiff's misconduct was issued, (*see id.* at 27 (noting Plaintiff's misbehavior on November 3, 2016, at approximately 7:53 a.m.)), though Plaintiff avers that the behavior at issue, namely his "refusal of a direct order," was

solely the result of his "inability to properly hear" rather than intentional non-compliance, (*id.* at 5.)

**\*5** On December 5, 2016, Plaintiff filed a grievance in which he stated that he was told by medical personnel that he was placed on "a waiting list for hearing aids, because they were not repaired yet," (*id.*), but that he keeps getting tickets because his hearing aids have not been repaired, (*id.* at 30). Plaintiff alleges that two weeks later, on December 19, 2016, "the facility medical staff refused to have the hearing aids repaired, which [a]ffects [Plaintiff's] ability to hear and follow orders of staff." (*Id.* at 5.)

On December 19, 2016, Plaintiff also received another letter from the Legal Aid Society discussing its aforementioned correspondence with Heywood and requesting further information regarding his inability to obtain new hearing aids, including when he last contacted medical personnel, their response, and the nature of the tickets he has received due to his disability-related conduct. (*Id.* at 26.) No discussion of Plaintiff's response to this letter is detailed among the materials submitted.

On January 18, 2017, "a hearing notice was provided to plaintiff from Albany Central Office for new hearing aids." (*Id.* at 5.) On the same day, the Central Office Review Committee ("CORC") of the Inmate Grievance Program ("IGP") received Plaintiff's appeal. (*See id.* at 33.)

On January 27, 2017, Plaintiff's December 5, 2016, grievance (Grievance No. SS-57297-16), was denied by the Superintendent, stating that "[i]nvestigation reveals grievant was seen 12/20/16 by the audiologist, after which the audiologist advised grievant's primary care provider he has no hearing loss." (*Id.* at 30.) Four days later, on February 1, 2017, Plaintiff then filed an appeal seeking a second opinion and alleging that "[Dr. Serhan is telling [him] one thing and doing another]" insofar as telling him his hearing aids will be replaced but then suggesting that he does not have hearing loss." (*Id.*) This appeal was received by the CORC on March 3, 2017. (*See id.* at 36.)

At an undetermined time in early 2017, Plaintiff once again reached out to the Legal Aid Society regarding his hearing aids and treatment at Sing Sing. (*See id.* at 29.) [10] In response, the Legal Aid Society wrote to Sing Sing on Plaintiff's behalf on February 16, 2017. (*See id.*) [11] The following month, on March 13, 2017, the Legal Aid Society wrote Heywood once more. (*See id.*) In this second correspondence, the Legal Aid

Society notes that Plaintiff stated he "saw Dr. Serhan at Sing Sing Correctional Facility in December 2016 and January 2017 to have his hearing aids repaired, but they still have not been repaired," notwithstanding filing several grievances and contacting medical staff since the February 16, 2017, letter. (*Id.*) [12]

[10] The Court does not have a copy of this letter but is aware of it by reference in a subsequent letter sent by the Legal Aid Society. (*See id.*)

[11] The Court does not have a copy of this letter but is aware of it by reference in a subsequent letter sent by the Legal Aid Society. (*See id.*)

[12] The bottom of the Legal Aid Society's letter was inadvertently cut off, meaning the Court cannot ascertain who from the organization wrote to Heywood. (*See id.* at 29.)

On September 7, 2017, Karen Bellamy, an IGP Director, issued a memorandum to Plaintiff advising him that his appeal of Grievance No. SS-56508-16 was received in January of 2017, as noted above. (*Id.* at 33.) Ultimately, Plaintiff's December 5, 2016, grievance was reviewed by CORC in late 2017. (*Id.* at 32.) Following a hearing on October 25, 2017, CORC "accepted in part" the actions Plaintiff requested. (*Id.*) Specifically, CORC

 **\*6** noted that [Plaintiff] was seen by his provider 9 times between 3/2/16 and 10/5/17 for various issues, including his hearing aids. In addition, he was seen by the audiologist on 12/20/16, who determined that no follow up was needed at that time, however, he is scheduled for a follow up appointment in the near future. CORC has not been presented with evidence of improper medical misbehavior or malfeasance by staff. CORC notes that the grievant did not appeal his 4/18/16 Tier II misbehavior report and advises him that he is solely responsible for his actions while in the Department's custody.

(*Id.*)

On January 16, 2018, Shelley Mallozzi, another IGP Director, issued a second memorandum to Plaintiff advising him that his appeal of Grievance No. SS-57297-16, was received by the CORC. (*See id.* at 36; *see also id.* at 12.) [13]

[13] Two additional things occurred shortly after Plaintiff received this Memorandum, which Plaintiff notes in his filing but which do not appear to bear on the question before the Court: 1) On April 3, 2018, Plaintiff wrote to attorney Adam Perlmutter, "his appellate attorney" on his state matter, to "address[ ] ... the false advocacy of the defense, when [P]laintiff was deaf and unaware of the trial procedure in its entirety," (*id.* at 5; *see also id.* at 35); and 2) on April 10, 2018, Plaintiff created a case plan with a case officer at Sing Sing detailing Plaintiff's goals, which included obtaining new hearing aids, (*see id.* at 37–38).

On October 20, 2018, another inmate misbehavior report was issued against Plaintiff stating Plaintiff lied to an officer about being authorized to go to the law library. (*See id.* at 34; *see also id.* at 5, 12.) Once again, Plaintiff avers that the "misbehavior report was written based upon [P]laintiff['s] malfunctioning hearing aids and the misinterpreted permission given to be in the law library, this was taken as a false statement by [P]laintiff, when he never heard correctly." (*Id.* at 5.)

Plaintiff received an additional misbehavior report on March 2, 2019. (*See id.* at 40; *see also id.* at 5, 12.) Specifically, the report states that Plaintiff failed to comply with verbal orders to participate in the inmate count process. (*See id.* at 40.) This occurred once more on June 4, 2019, wherein Plaintiff was issued a misbehavior report due to his failure to comply with verbal orders to participate in the inmate count process. (*See id.*; *see also id.* at 5, 12.)

In October 2019, Plaintiff was transferred from the Sing Sing Correctional Facility to the Otisville Correctional Facility. (Pl.'s Opp. 1.) While at Otisville, on January 28, 2020, Plaintiff received a seemingly similar writeup, having been accused of being out of place. (*See id.*; *see also id.* at 9–10.) Plaintiff then appealed this decision. (*Id.* at 2; *see also id.* at 9–10.) Plaintiff avers that this decision was affirmed by Barometre on February 20, 2020. (*See id.* at 2.) However, the documents Plaintiff attached as Exhibit A to the

Complaint show that the appeal was affirmed by "[Deputy Superintendent Noeth]." (*Id.* at 10.)

On May 4, 2020, Plaintiff received a letter from DOCCS Deputy Superintendent of Programs Stevenson ("Stevenson"), who confirmed "receipt of [Plaintiff's] letter regarding a Tier II misbehavior report" he sought to have "removed from [his] record." (Compl. 42.) Stevenson confirmed that "there is nothing that can be done on [his] end. [Plaintiff] went through the proper appeal process with the Superintendent/Designee and that decision was affirmed. There is no avenue above that for a Tier II appeal." (*Id.*)

Nine days later, on May 13, 2020, DOCCS Deputy Commissioner Anne Marie McGrath ("McGrath") wrote to Plaintiff again "in reference to [his] recent correspondence regarding a misbehavior report." (*Id.* at 41.) McGrath also made clear that Plaintiff was required to go through the proper channels to appeal his grievance. (*See id.*)

### B. Procedural Background

**\*7** Plaintiff's Complaint was docketed on September 17, 2020. (Dkt. No. 2.) His request to proceed in forma pauperis was granted on October 19, 2020. (Dkt. No. 7.) On January 11, 2021, Defendants filed a letter motion in anticipation of filing a motion to dismiss. (Dkt. No. 15.) Two weeks later, the Court set a briefing schedule. (Dkt. No. 16.)

Defendants filed the instant Motion on March 1, 2021. (Not. of Mot.; Defs.' Mem. of Law in Supp. of Def.'s Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 20).) Plaintiff's response, self-styled as a "Reply to Defendants Opposition Letter," was filed on March 8, 2021. (Pl.'s Opp.) Defendants filed a Reply on April 20, 2021. (Def.'s Reply Mem.; Decl. of Deanna L. Collins ("Collins Decl.") (Dkt. No. 23).)

On June 15, 2021, Plaintiff submitted a letter motion requesting appointment of counsel. (Dkt. No. 27.) The following month, on July 14, 2021, the Court granted Plaintiff's request. (Dkt. No. 28.) However, despite repeated, diligent efforts by the Court as well as the Southern District of New York's Office of Pro Se litigation, Plaintiff was unable to secure counsel. Accordingly, because Plaintiff filed a brief in opposition to the Motion on his own behalf, the Court considers this Motion fully briefed.

## II. Discussion

### A. Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570. However, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally,

"[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same). But when a plaintiff proceeds pro se, as stated above, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted). Moreover, again stated *supra*, where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [his] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes*, 723 F.3d at 403 (quotation marks omitted). Notwithstanding a standard of review comparatively more lenient and favorable to pro se litigants, such treatment "does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and citation omitted)).

### B. Analysis

**\*8** Defendants move to dismiss the Complaint on several grounds. First, Defendants argue that Plaintiff's § 1983 claims against DOCCS must be dismissed under the Eleventh Amendment. (*See* Defs.' Mem. 5.) Defendants further argue that Plaintiff's § 1983 claims against Barometre fail to allege a claim. (*See id.* 5–10.) Defendants also argue that Barometre is entitled to qualified immunity against such claims. (*See id.* 10–11.) With respect to Plaintiff's claims under the ADA and RA, Defendants argue that Plaintiff lacks standing, that his claims are moot, and that he fails to state a claim. (*See id.* 11–13.)

Plaintiff does not substantively grapple with these claims in his Opposition; rather, Plaintiff recites the facts at issue, argues that he has complied with the New York Court of Claims Act, and focuses on the newly raised claims regarding his wrongful search and seizure. (*See generally* Pl.'s Opp.) Defendants therefore respond to such charges, asserting the Court should not hear them and that even if the Court were to consider them, such claims are futile. (*See* Defs.' Reply Mem. 1–8.) Moreover, Defendants assert that Plaintiff's failure to respond constitutes abandonment, meriting dismissal. (*See id.* at 8–10.) [14]

[14] It is true that "[c]ourts in this Circuit have presumed that plaintiffs have abandoned their claims when they do not oppose a motion to dismiss them." *Thurmand v. Univ. of Connecticut*, No. 18-CV-1140, 2019 WL 369279, at *3 (D. Conn. Jan. 30, 2019) (citing *Hanig v. Yorktown Central School District*, 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005)). This principle has been adopted "even in cases where the plaintiff was proceeding pro se." *McNair v. Ponte*, No. 16-CV-1722, 2019 WL 1428349, at *6 (S.D.N.Y. Mar. 29, 2019) (collecting cases). But as the Second Circuit has instructed (albeit in another context, but nonetheless awarding a pro se litigant the benefit of the doubt):

Implicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training. While the right "does not exempt a party from compliance with relevant rules of procedural and substantive law," *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981), it should not be impaired by harsh application of technical rules.

*Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (italics omitted). Thus, using the Second Circuit's pronouncement as its lodestar, "the Court nevertheless addresses the merits in light of Plaintiff's pro se status." *Bradshaw v. City of New York*, No. 15-CV-2166, 2017 WL 6387617, at *4 n.6 (E.D.N.Y. Aug. 22, 2017).

### 1. Constitutional Claims

#### a. Barometre

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under [42 U.S.C.] § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of*

*New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*9** *Id.* at 139 (alterations, citation, and italics omitted). Said otherwise, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, Plaintiff must plausibly allege that a specific individual defendant's actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at \*4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Plaintiff's Complaint does not specifically articulate the claims alleged, namely which constitutional protections Barometre may have violated. A review of the facts alleged, however, speak—albeit loosely—to allegations of Eighth and Fourteenth Amendment violations. Accordingly, the Court reviews each to determine if Plaintiff has sufficiently alleged Barometre's involvement.

### i. Eighth Amendment

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.' " *Spavone v. N.Y. State*

*Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

> A deliberate indifference claim contains two requirements. The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care. This means that the charged official [must] act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result. Officials need only be aware of the risk of harm, not intend harm. And awareness may be proven from the very fact that the risk was obvious.

*Id.* (citations and quotation marks omitted).

Applying these two requirements to the case at bar, the Second Circuit has stated that "for deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

To the extent Plaintiff alleges an Eighth Amendment violation insofar as failing to address any issues of his hearing aids, neither Plaintiff's Complaint nor his Opposition Papers nor their respective exhibits meet this burden. It is true that Plaintiff makes loose allegations that Plaintiff's harms with respect to his hearing aids remain unaddressed while at Otisville under Barometre's supervision, (*see* Pl.'s Opp. 2) ("as of this date plaintiffs hearing aid has yet to be fixed and no one has made the initiative to address [P]laintiff[']s issues"); *id.* ("Otisville is not getting the medical needs of prisoners done in a timely manner."), which the Court interprets as an ongoing or continuing harm subject to injunctive relief pursuant to the Supreme Court's *Ex Parte Young* doctrine, *see Vega v. Semple*, 963 F.3d 259, 282 (2d Cir. 2020) ("This alleged ongoing constitutional violation—deliberate indifference to serious medical needs of incarcerated persons

2022 WL 903068

—is the type of continuing violation for which a remedy may permissibly be fashioned under *Ex parte Young*."). However, the Court agrees with Defendants' contention that Plaintiff fails to allege any fact suggesting Barometre's involvement in any decisions regarding Plaintiff's hearing aids denoting non-compliance.

**\*10** As Defendants observe: Plaintiff's original hearing issues arise from an incident prior to Plaintiff's incarceration, (*see* Defs.' Mem. 6 (citing Compl. 13–21, 23).) Subsequent allegations regarding improper or contrary medical decisions with respect to his hearing aids pertain almost exclusively to decisions undertaken by staff at Downstate, (*see* Compl. 22), or Sing Sing, (*see id.* at 24–40). Barometre is the Superintendent of Otisville facility, an entirely distinct facility from either Downstate or Sing Sing.

The only particular allegations that pertain to Plaintiff's incarceration at Otisville speak to one misbehavior report that he alleges is the result of not following an order he could not hear. (*See* Pl.'s Opp. 1–2.) Again, Plaintiff alleges that Barometre was involved insofar as she affirmed the decision at issue. (*See id.* at 2 ("Plaintiff was found guilty of said charge and timely appealed such decision to defendant Barometre. On February 20, 2020, defendant [Barometre] affirmed the decision, thus disregarding plaintiffs medical issue pertaining to his hearing loss, which prevented him from hearing said staff officer's directions.").)

However, the documents Plaintiff attached as Exhibit A to the Complaint show that the appeal was affirmed by "[Deputy Superintendent Noeth]," not Barometre. (*Id.* at 10.) Barometre instead concurred with Plaintiff's grievance for sake of the new allegations not before the Court. (*See id.* at 19.) In other words, Plaintiff confuses the grievance affirmance with which Barometre is involved.

"Where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co.*, 410 F. Supp. 3d 662, 681 (S.D.N.Y. 2019) (alterations omitted) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011)). Therefore, the Court cannot accept Plaintiff's allegation that Barometre affirmed his grievance.

Only one document seems to suggest Barometre may have been quasi-involved in this specific grievance and therefore

aware of Plaintiff's medical issues: in writing to Plaintiff about this misbehavior report, McGrath copied the Superintendent of Otisville—presumably Barometre. (Compl. 41.) But " 'mere receipt' of a letter, complaint or grievance from an inmate, and the recipient's subsequent inaction, is insufficient to establish a claim of personal involvement by a correctional supervisor." *Harris v. Westchester Cty. Dep't of Corr.*, No. 06-CV-2011, 2008 WL 953616, at \*9 (S.D.N.Y. Apr. 3, 2008) (collecting cases); *see also Alvarado v. Westchester County*, 22 F. Supp. 3d 208, 215 (S.D.N.Y. 2014) (citing *Harris*, 2008 WL 953616, at \*9). Moreover, this correspondence says not a word regarding Plaintiff's hearing; rather, it speaks generally to the grievance process and the "appropriate" grievance and appeals mechanisms. (*See* Compl. 41.) "Thus, in this case, because [P]laintiff fails to allege any conduct by [Barometre] beyond the receipt of [P]laintiff['s] letter[ ], [P]laintiff['s] claims under [§] 1983 against [Barometre sounding in deliberate indifference] must be dismissed." *Harris*, 2008 WL 953616, at \*9.[15]

15  Even assuming, arguendo, that Barometre was aware of Plaintiff's medical situation, there is no allegation that Barometre "play[ed] either a direct or supervisory role in [Plaintiff's] treatment, and therefore cannot be held liable for any deficiencies in [his] medical care." *Ocampo v. Fischer*, No. 11-CV-4583, 2018 WL 1513627, at \*5 (E.D.N.Y. Mar. 27, 2018) (quoting *De Jesus v. Albright*, No. 08-CV-5804, 2011 WL 814838, at \*6 (S.D.N.Y. Mar. 9, 2011)); *see also Cuoco v. Moritsugo*, 222 F.3d 99, 111 (2d Cir. 2000) (holding that prison warden was not liable for alleged failure to intervene because he "had [no] authority to intervene in an admittedly medical decision" made by doctors); *Brown v. McElroy*, 160 F. Supp. 2d 699, 704 (S.D.N.Y. 2001) (dismissing claims § 1983 claims against government officials arising from alleged Eighth Amendment violations where the "officials had no authority over the medical decisions concerning [the plaintiff] and that their alleged refusal to interfere in [the plaintiff's] treatment was neither prohibited by federal law nor objectively unreasonable"). What's more, even if Barometre was aware of Plaintiff's medical situation and could take action, and was also plausibly alleged to be supervising Plaintiff's treatment, " 'a prison administrator is permitted to rely upon and be guided by the opinion of medical personnel concerning the proper course of

treatment administered to prisoners,' " *Ocampo*, *2018 WL 1513627, at \*5* (quoting *De Jesus*, *2011 WL 814838, at \*6*), which would also nullify any suggestion that Barometre acted with the requisite culpable mental state—recklessness, *see Spavone*, *719 F.3d at 138*—and consequently undermine any Eighth Amendment claim.

**\*11** Accordingly, Defendants' Motion regarding Plaintiff's claims under § 1983 regarding any Eighth Amendment violation is granted, and Plaintiff's claims on these grounds are dismissed.

### ii. Fourteenth Amendment

The Court construes Plaintiff as having pled a violation of the Fourteenth Amendment, having been deprived of an interest —namely facing punishment for his reprimands—without due process of law. (*See generally* Compl., Pl.'s Opp.)

There is no question that incarceration curtails an inmate's rights. "But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, *418 U.S. 539, 555–56 (1974)*. To that point, "[p]risoners may also claim the protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law." *Id.* at 556 (collecting cases). Thus, "[t]o state a due process claim, plaintiff must plausibly allege '(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.' " *Jabot v. MHU Couns. Roszel*, No. 14-CV-3951, 2016 WL 6996173, at \*7 (S.D.N.Y. Nov. 29, 2016) (quoting *Giano v. Selsky*, *238 F.3d 223, 225 (2d Cir. 2001)*). And as relevant here, "[p]rison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz v. McBride*, *380 F.3d 649, 654 (2d Cir. 2004)* (quoting *Sandin v. Conner*, *515 U.S. 472, 484 (1995)*).

In the first instance, the Court does not find that Plaintiff's liberty interest has been infringed upon.

> The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. [D]ue process required that he be granted a hearing on whatever charges had been made against him.

*Freeman v. Rideout*, *808 F.2d 949, 951 (2d Cir. 1986)*. Said more succinctly, "[a] prisoner does have a due process right to a hearing before he may be deprived of a liberty interest on the basis of a misbehavior report." *Boddie v. Schnieder*, *105 F.3d 857, 862 (2d Cir. 1997)* (citing *Freeman*, *808 F.2d at 951*). Plaintiff does not allege that he was never given a hearing to challenge his misconduct reports, meaning he cannot be said to have been deprived of his due process rights for sake of failing to receive a hearing.

Due process protections also attach to the information provided pursuant to the hearing.

> As the Supreme Court has held, due process requires that in a disciplinary hearing resulting in imposition of loss of good time credits or solitary confinement, an inmate must be afforded advance written notice of the charges against him and a written statement of fact findings supporting the disposition and reasons for the disciplinary action taken.

*Kalwasinski v. Morse*, *201 F.3d 103, 108 (2d Cir. 1999)*. Plaintiff does not allege that he was not given such information. In fact, Plaintiff fails to "allege *any* facts" whatsoever with respect to "the hearing[s] ... following the misbehavior reports"—including the specific punishment that befell him at the hearing as a result of the misbehavior report —let alone that they were "unfair." *Boddie*, *105 F.3d at 862* (emphasis added). Accordingly, Plaintiff cannot be said to have been deprived of his due process rights insofar as the substance of his hearings are concerned.

**\*12** The same is appropriately said with respect to the misbehavior reports themselves, which must adequately detail the wrongdoing at issue as well as "the date, time and place of the incident." *Dawkins v. Gonyea*, *646 F. Supp. 2d 594, 608 (S.D.N.Y. 2009)* (emphasis omitted) (quoting 7

2022 WL 903068

N.Y.C.R.R. § 251–3.1(c)(3)). Plaintiff does not allege that any such report was deficient in failing to provide this information. In sum, the Court agrees with Defendants that Plaintiff fails to allege any facts showing that he was deprived of his due process rights. (*See* Defs.' Mem. 9.)

Moreover, Plaintiff fails to allege Barometre's involvement so as to give rise to constitutional claims against her. "Interestingly, '[c]ourts within the Second Circuit are split over whether ... an allegation [that a defendant affirmed a disciplinary proceeding] is sufficient to establish personal liability for supervisory officials.' " *Samuels v. Fischer*, 168 F. Supp. 3d 625, 643 (S.D.N.Y. 2016) (alterations in original) (quoting *Scott v. Frederick*, No. 13-CV-605, 2015 WL 127864, at *17 (N.D.N.Y. Jan. 8, 2015)). Even if the Court were to afford Plaintiff the benefit of the doubt, Plaintiff's exhibits undermine his claim.

As detailed above, Plaintiff was written up several times for being out of place, allegedly as a result of his inability to hear orders dictating his actions. (*See generally* Compl.) Only one such report was issued while Plaintiff was incarcerated at Otisville, the facility Barometre runs: a report issued on January 28, 2020. (*See* Pl.'s Opp. 1; *see also id.* at 9, 10.) Plaintiff appealed this decision. (*Id.* at 2; *see also id.* at 9, 10.) Plaintiff avers that this decision was affirmed by Barometre on February 20, 2020. (*Id.* at 2.) And, once again noted above, Plaintiff's allegation as to Barometre's involvement in his hearings "is contradicted by a document attached to the complaint," meaning "the allegation is not accepted as true." *Nat'l Credit Union*, 410 F. Supp. 3d at 681 (S.D.N.Y. 2019) (quoting *Amidax*, 671 F.3d at 147). Therefore, the Court cannot accept Plaintiff's allegation that Barometre was even involved in the grievance of appellate process.

Absent that connection, Barometre is only implicated via her supervisor role broadly, but "mere linkage in the prison chain of command is insufficient to implicate a commissioner of corrections or a prison superintendent in a § 1983 claim." *Styles v. Goord*, 431 F. App'x. 31, 33 (2d Cir. 2011) (summary order) (quoting *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003)). Accordingly, Defendants' Motion regarding Plaintiff's claims under § 1983 regarding any Fourteenth Amendment violation is granted, and Plaintiff's claim on these grounds is dismissed. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (dismissing claims against DOCS Commissioner where his personal involvement was limited to receiving two letters from plaintiff); *A'Gard v. Perez*, 919 F. Supp. 2d 394, 407 (S.D.N.Y. 2013) ("Because there

was no due process violation in the plaintiff's discipline, the claims against [defendant prison supervisor involved in the disciplinary hearing] must also be dismissed."); *id.* ("Because [two prison supervisor defendants] were not personally involved in the plaintiff's discipline, the claims against these two defendants are dismissed for lack of personal involvement."); *cf. Feick v. Fleener*, 653 F.2d 69, 75 (2d Cir. 1981) ("Since the documents upon which appellants based their claim show on their face absence of any grounds for relief, dismissal was proper.").

### b. DOCCS

**\*13** The Eleventh Amendment of the United States Constitution states: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "This withdrawal of jurisdiction effectively confers an immunity from suit." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993). "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to 'state agents and state instrumentalities' that are, effectively, arms of a state." *Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)). Additionally, § 1983 does not override a state's Eleventh Amendment immunity. *See Quern v. Jordan*, 440 U.S. 332, 340–42 (1979). The Second Circuit has echoed this holding. *See Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) ("[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." (quoting *Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006))).

There exist "only three exceptions to this rule": a State's waiver of the defense, congressional abrogation of the immunity, and claims seeking prospective injunctive relief. *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 243 (E.D.N.Y. 2015). "New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983." *Dubarry v. Capra*, No. 21-CV-5487, 2021 WL 3604756, at *1 (S.D.N.Y. Aug. 13, 2021) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977)); *see also Sabino v. Dep't of Corr. & Cmty. Supervision*, No. 19-

CV-7268, 2019 WL 3858622, at *1 (S.D.N.Y. Aug. 16, 2019) (same).

The final exception, a claim seeking prospective relief, emanates from the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123 (1908). *See In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007). In *Ex parte Young*, the Supreme Court held that individual state officials— as separate from the state itself—could be enjoined from enforcing violations of the law prospectively. *See* 209 U.S. at 142–168. "[T]he [*Ex Parte Young*] doctrine remains a landmark of American constitutional jurisprudence that operates to end ongoing violations of federal law and vindicate the overriding 'federal interest in assuring the supremacy of that law.' " *In re Deposit Ins. Agency*, 482 F.3d at 618 (citing *Green v. Mansour*, 474 U.S. 64, 68 (1985)). But this doctrine, "regarded as carving out a necessary exception to Eleventh Amendment immunity, ... is narrow," applying only for "prospective relief" and "against state officers." *P.R. Aqueduct & Sewer Auth.*, 506 U.S. at 146. In other words,

> a plaintiff seeking prospective relief from the state must name as defendant a state official rather than the state or a state agency directly, even though in reality the suit is against the state and any funds required to be expended by an award of prospective relief will come from the state's treasury.

*Santiago v. New York State Dep't of Corr. Servs.*, 945 F.2d 25, 32 (2d Cir. 1991); *see also Palmer v. New York State Off. of Ct. Admin.*, 526 F. App'x 97, 99 (2d Cir. 2013) (summary order) ("[The plaintiff's] claim for prospective injunctive relief... fails because she neglected to name a state official acting in his or her official capacity as a defendant. [The Plaintiff] was required to do so in order to attempt to avail herself of the exception to Eleventh Amendment immunity under *Ex parte Young*" (citing *Santiago*, 945 F.2d at 32)); *cf. State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (stating that the *Ex parte Young* exception required a plaintiff sue "*a state official* acting in his official capacity— notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law." (emphasis added) (quoting *In re Deposit Ins. Agency*, 482 F.3d at 617)); *Burgio & Campofelice, Inc. v. N.Y. State Dep't of Lab.*, 107 F.3d 1000, 1006 (2d Cir. 1997) ("[t]he best explanation

of *Ex parte Young* and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against *state officers* who are threatening to violate the federal Constitution or laws." (emphasis added)).

**\*14** "DOCCS, as an arm of the state, stands in the same position as the State of New York." *White v. New York*, No. 19-CV-0543, 2019 WL 2578270, at *1 (S.D.N.Y. June 24, 2019). Accordingly, *Ex Parte Young* does not apply, and Plaintiff's constitutional claims against DOCCS are barred by the Eleventh Amendment. *See Santiago*, 945 F.2d at 32 (dismissing claims for injunctive relief against DOCCS because it did not abide by *Ex parte Young* exception's requirement that the claims be directed at an official); *Marino v. City Univ. of New York*, 18 F. Supp. 3d 320, 329 (E.D.N.Y. 2014) (dismissing constitutional claims for injunctive relief against City University as an "arm[ ] of the state" because the Eleventh Amendment applied but the *Ex parte Young* exception did not); *Grossman v. Suffolk Cty. Dist. Att'y's Off.*, 777 F. Supp. 1101, 1103 (E.D.N.Y. 1991) (dismissing a claim for injunctive relief because "a plaintiff seeking prospective relief from a state must name as a defendant a state official rather than a state or a state agency"); *accord Brown v. Newberger*, 291 F.3d 89, 92 (1st Cir. 2002) (holding that the plaintiff's claims, seeking injunctive relief "under 42 U.S.C. § 1983 fail because a state and its agencies are not 'persons.' [And because] [the plaintiffs] sued only state agencies, not officials, there is no basis for invoking *Ex parte Young*"); *Stevens v. Gay*, 864 F.2d 113, 115 (11th Cir. 1989) (holding that in a § 1983 action, "[t]he Eleventh Amendment bars this action against the Georgia Department of Correction and Board of Corrections ... regardless of whether the plaintiff seeks money damages or prospective injunctive relief"). Therefore, Defendants' Motion pertaining to Plaintiff's claims against DOCCS under § 1983 arising from alleged constitutional violations is granted, and Plaintiff's claims in this realm are dismissed. [16]

16   Defendants also argue that Barometre is entitled to qualified immunity. (*See* Defs.' Mem. 10–11; Defs.'s Reply Mem. 8.) The Court will not opine on whether he is entitled to qualified immunity, however, because Plaintiff has not plausibly pled that he is entitled to relief in his constitutional claims. *See Posr v. City of New York*, No. 10-CV-2551, 2013 WL 2419142, at *10 n.8 (S.D.N.Y. June 4, 2013) ("Because [the defendant] did not violate [the] [p]laintiff's [constitutional] rights,

there is no need to consider if [the defendant] is entitled to qualified immunity."), *aff'd sub nom.* *Posr v. Ueberbacher*, 569 F. App'x 32 (2d Cir. 2014).

2. ADA and RA Claims

In broad strokes, Defendants argue that Plaintiff's claims are barred by applicable statutes of limitations and speak inappropriately only to past events, thereby vitiating standing. (*See* Defs.' Mem. 12–13.) [17] In their reply brief, Defendants also argue that Plaintiff fails to state a claim against Barometre for sake of her lack of involvement and fails to state a claim against DOCCS because "there are no allegations of any DOCCS policy that precludes him from getting his hearing aids repaired and/or their needed batteries." (Defs.' Reply Mem. 4.) [18] [19]

[17]  Defendants also assert that that no employee of DOCCS, including Barometre, were "motivated in their actions by any discriminatory animus or ill will due to Plaintiff's disability," thereby foreclosing an ADA or RA claim. (Defs.' Reply Mem. 4.) The Court wishes to flag for Defendants apposite Second Circuit precedent, to which this Court is bound, that expressly holds: "While claims for damages under Title II require proof of discriminatory animus, claims for injunctive relief demand no such showing. Because [P]laintiff[ ] seek[s] injunctive rather than monetary relief, [he] *need not establish discriminatory animus* to succeed on [his] claim." *Davis v. Shah*, 821 F.3d 231, 260 n.19 (2d Cir. 2016) (citation omitted) (emphasis added).

[18]  Plaintiff fails to articulate whether he is suing Barometre in her individual or official capacity. "[T]he statutory language of the ADA provides only for 'public entity' liability" and, therefore, "precludes ADA claims against state officials in their individual capacities." *Randolph v. Rodgers*, 253 F.3d 342, 348 (8th Cir. 2001). However, the Second Circuit has previously held that "there is no basis for holding that the ADA or Rehabilitation Act intended to create the kind of comprehensive enforcement scheme that would preclude prospective injunctive relief against a state official in her official capacity." *Henrietta D.*

*v. Bloomberg*, 331 F.3d 261, 289 (2d Cir. 2003). Indeed, "an individual sued for injunctive relief in his or her official capacity is effectively a 'public entity' subject to liability under the ADA because the government is the real party in interest in an official capacity suit." *Monroe v. Gerbing*, No. 16-CV-2818, 2017 WL 6614625, at *15 (S.D.N.Y. Dec. 27, 2017). Accordingly, the Court cannot simply dismiss Plaintiff's claims against under the ADA or RA against Barometre specifically in her official capacity.

[19]  As noted above, Defendants allege Plaintiff lacks standing to assert his claims. (Defs.' Mem. 12–13.) While standing is a universal concern, Defendants specifically make this argument when discussing Plaintiff's ADA and RA claims, so the Court responds in kind.

A plaintiff seeking injunctive relief must plead that he or she "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotations omitted) (holding that while plaintiff had standing to pursue monetary damages for prior wrongdoing, he lacked standing to pursue injunctive relief); *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects."). Plaintiff alleges, albeit loosely, that issues with his hearing aids remain unaddressed. (*See* Pl.'s Opp. 2 (alleging that, "as of this date plaintiffs hearing aid has yet to be fixed and no one has made the initiative to address [P]laintiff[']s issues"); *id.* ("Otisville is not getting the medical needs of prisoners done in a timely manner.").)

Plaintiff remains incarcerated and obviously remains subject to corrections officers' audible orders in his day-to-day life. Indeed, it would be untenable to argue that Plaintiff was immune from such orders, as corrections officers receive "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986) (quoting *Bell*

*v. Wolfish*, 441 U.S. 520, 547 (1979)). In other words, Plaintiff plausibly alleges facts "that might give rise to the fear of a repeat encounter with [corrections] officers." *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004). Coupling this potential for "continuing, present adverse effects," *O'Shea*, 414 U.S. at 496, with the comparatively lesser requirements to plead standing at the Motion to Dismiss stage, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation" (italics omitted)), the Court finds that, at this early stage in the litigation, Plaintiff has alleged sufficient facts to establish standing for his claims for prospective injunctive relief.

**\*15** In relevant part, Title II provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "The Supreme Court has held that Title II extends to inmates in state prisons." *Monroe*, 2017 WL 6614625, at \*14 (citing *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998)). Similarly, § 504 of the Rehabilitation Act protects a "qualified individual with a disability" from exclusion of participation, denial of benefits, or subjection to discrimination based on the individual's disability "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Once again, § 504 has also "been held to apply to state prisoners." *Monroe*, 2017 WL 6614625, at \*14 (citing *Keitt v. New York City*, 882 F. Supp. 2d 412, 425 (S.D.N.Y. 2011)).

As the above-recited language makes clear, the ADA and the RA are "nearly identical." *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012). There are two main differences between the statutes. First, the scope of the statutes is slightly different, i.e. what institutions are subject to either provision. Specifically, all public entities are subject to Title II, whereas Section 504 of the RA applies only to those institutions "receiving Federal financial assistance." *Henrietta D.*, 331 F.3d at 272 (quoting 29 U.S.C. § 794(a)); *accord Zimmerman v. Oregon Dep't of Just.*, 170 F.3d 1169, 1180 (9th Cir. 1999) ("Unlike the Rehabilitation Act, Title II applies to all public entities, whether or not they receive federal financial assistance."). Second, the statutes differ

with regard to the causation required to allege a violation. Specifically, "the reach of the Rehabilitation Act is limited to denials of benefits '*solely* by reason of ... disability,' while the ADA applies more broadly to such denials 'by reason of ... disability.' " *Schine by Short v. New York State Off. for People with Developmental Disabilities*, No. 15-CV-5870, 2017 WL 9485650, at \*4 (E.D.N.Y. Jan. 5, 2017) (quoting 29 U.S.C. § 794(a); then quoting 42 U.S.C. § 12132) (emphasis and alterations in original), *report and recommendation adopted*, 2017 WL 1232530 (E.D.N.Y. Mar. 31, 2017). Where these "subtle distinctions ... are not implicated[,] [courts] 'treat claims under the two statutes identically.' " *Wright v. N.Y.S. Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (quoting *Henrietta D.*, 331 F.3d at 272); *see also Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) (stating that, where these two differences were not implicated, the two statutes "impose identical requirements" (citing *Lincoln Cercpac v. Health & Hosps. Corp.*, 147 F.3d 165, 167 (2d Cir. 1998))); *Monroe v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, No. 16-CV-2818, 2019 WL 4688665, at \*9 (S.D.N.Y. Sept. 25, 2019) ("Section 504 of the Rehabilitation Act imposes nearly identical requirements [as Title II], and courts may conduct the analysis congruently."); *Andino v. Fischer*, 698 F. Supp. 2d 362, 378 (S.D.N.Y. 2010) ("Unless a distinction is pertinent, the Second Circuit treats claims under the two statutes identically."). Because neither distinction is afoot—prisons are subject to both the ADA and the RA, *Monroe*, 2017 WL 6614625, at \*14, and Plaintiff alleges that the only source of the discrimination is his disability, (*see generally* Compl.; Pl.'s Opp.)—the Court similarly analyzes them simultaneously here.

To state a claim under the ADA and the RA, a plaintiff must plausibly allege that: (1) he is a "qualified individual" with a disability; (2) the defendants are subject to the ADA and the RA; and (3) he was discriminated against "by reason of" his disabilities. *See Henrietta D.*, 331 F.3d at 272 (citing *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)). Given that prisons are indisputably subject to the ADA and RA, *Monroe*, 2017 WL 6614625, at \*14, the Court need only concern itself with the second and third prongs. The Court reviews each in turn.

### a. Qualified Individual

**\*16** Pursuant to this second prong, i.e. whether a plaintiff is a "qualified individual with a disability," the ADA defines "disability" to include, inter alia, "a physical or mental impairment that substantially limits one or more major life

activities." *Hamilton v. Westchester County*, 3 F.4th 86, 92 (2d Cir. 2021) (quoting *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020)). Regarding the scope of the term "disability," the Second Circuit summarized it thusly:

The definition of "disability" under the ADA was previously interpreted narrowly. In 2008, however, Congress passed the ADA Amendments Act (the "ADAAA"), which broadened the definition of "disability" under the ADA. As this Court has noted, "[t]he principal purpose of the ADAAA was to overrule the Supreme Court's arguably narrow interpretation of what constitutes an ADA-qualifying disability ... and to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one."

With this purpose in mind, the ADAAA instructs that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA," and "is not meant to be a demanding standard." Relatedly, the term "substantially limits" is to be interpreted and applied to require a lower degree of functional limitation than the standard required prior to the ADAAA.

*Hamilton*, 3 F.4th at 92 (citations omitted); *see also Doherty v. Bice*, No. 18-CV-10898, 2021 WL 4219696, at *2 (S.D.N.Y. Sept. 15, 2021) (explaining the ADAAA's role in expanding the definition of "qualified individual" for purposes of ADA claims), *objections overruled*, 2021 WL 5630816 (S.D.N.Y. Dec. 1, 2021).

In regulations promulgated by the Attorney General, "hearing impairments" are expressly named as a form of "[p]hysical or mental impairment." 28 C.F.R. § 35.108(b)(2)(i). Moreover, the regulations also defined "hearing" as a "[m]ajor life activity," *id.* § 35.108(c)(1)(i), such that hearing loss would constitute "substantial[ ] limit[ation]," 42 U.S.C. § 12102(1)(A). Finally, the Appendix to this Part of the Code of Federal Regulations, entitled *Guidance on ADA Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services*, notes that whether one is disabled "should be assessed without regard to the availability of mitigating measures, such as reasonable modification or auxiliary aids and services." 28 C.F.R. § Pt. 35, App. B. In fact, the guidance uses hearing loss as an exemplar: "For example, a person with hearing loss is substantially limited in the major life activity of hearing, even though the loss may be improved through the use of a hearing aid." *Id.* [20] In sum,

there can be no debate that Plaintiff, based on the facts alleged, is a qualified individual under the ADA.

[20]   "Because Congress explicitly authorized the Attorney General to promulgate regulations under the ADA," *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 n.5 (1st Cir. 2000) (citing 42 U.S.C. § 12134(a)); *see also Noel v. N.Y. City Taxi & Limousine Comm'n*, 687 F.3d 63, 69 (2d Cir. 2012) ("As the House Judiciary Committee Report conceded, it is 'the purpose of this section ... to direct the Attorney General to issue regulations setting forth the forms of discrimination prohibited' " (alteration in original) (quoting H.R. Rep. 101–485(III) at 52, reprinted in 1990 U.S.C.C.A.N. 445, 475)), the regulations "must [be given] legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute," *United States v. Morton*, 467 U.S. 822, 834 (1984). The Court has no reason to find such regulations improper, nor have Defendants argued otherwise.

### b. Discrimination

**\*17** With respect to the third and final prong, again, the ADA provides that "no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). The RA provides similarly. *See* 29 U.S.C. § 794(a). In light of the statutes' wording and resultant protections, ADA and RA claims must allege that the complainant "was ... discriminated against *because of* a disability." *Piedmont Behav. Health Ctr., LLC v. Stewart*, 413 F. Supp. 2d 746, 756 (S.D.W. Va. 2006) (emphasis in original). Failure to do so is "fatal." *Id.* "A plaintiff may base [his] Title II claim on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation." *Tardif v. City of New York*, 991 F.3d 394, 404 (2d Cir. 2021) (citing *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)); *accord Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 144-45 (1st Cir. 2014) (detailing the same three theories by which a Title II claim can proceed).

It is not exactly clear by which avenue Plaintiff would have the Court traverse. However, "no allegations support the

belief that Defendants acted with Plaintiff's alleged disability in mind," foreclosing Plaintiff's ability to allege a claim under a theory of disparate treatment. *Doherty v. Bice*, No. 18-CV-10898, 2020 WL 5548790, at *7 (S.D.N.Y. Sept. 16, 2020). The same cannot be said, however, under a disparate impact or a reasonable accommodation theory.

On a disparate impact theory, Plaintiff's allegations survive, albeit barely. "To establish a prima facie case under a disparate impact theory, [a] plaintiff must demonstrate '(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.' " *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (quoting *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574–75 (2d Cir. 2003)). At the summary judgment stage, a plaintiff may be "required to include statistical evidence to show disparity in outcome between groups." *B.C.*, 837 F.3d 158. But at the pleadings stage, where the Court now finds itself, "it is reasonable to expect that plaintiffs pleading disparate impact claims must [only] include at least one allegation that raises an inference of such disparity—one sufficient to put the defendants on notice regarding the basis for [the] plaintiffs' belief in a disparate effect." *See Doherty*, 2020 WL 5548790, at *7 (quoting *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 402 (S.D.N.Y. 2013)).

Construing Plaintiff's claim liberally as it must, *Sykes*, 723 F.3d at 403, the Court finds that Plaintiff has cleared this bar. A decision by a sister court in this district is instructive: in *Doherty*, 2020 WL 5548790, a state-run university, which was considered a public entity, issued no-contact orders against an individual where a fellow student accused the individual of certain conduct, thereby barring that individual from contacting the complainant. *See id.*, at *1–2. Plaintiff, who suffered from Asperberg Syndrome, had multiple no contact orders issued against him, though the university's procedures barred Plaintiff from appealing those notices. *See id.* The court found the university's facially neutral policy had a disparate impact on Plaintiff (and presumably similarly situated students), giving rise to an allegation of an ADA violation sufficient to withstand a motion to dismiss. *See id.* The same is true in this case.

The mechanism by which corrections officers give orders, namely orally and or through loud speakers, is an outwardly neutral practice, satisfying the first element. Plaintiff essentially claims that "due to [his] disability, [this practice] caused an adverse impact on Plaintiff." *Id.* While the

Complaint only mentions Plaintiff specifically, "it is a reasonable inference that [prisoners] with his particular type of disability were adversely affected" in an analogous way by Otisville's alleged practice. *Id.* While subsequent discovery may disprove Plaintiff's allegations regarding the process by which orders are given as well as the actual impact it had on Plaintiff, Defendants' Motion to Dismiss must be denied, as, "at this early stage, this claim is sufficiently pleaded." *Id.*

**\*18** Plaintiff's claim also meets this standard by the skin of its teeth on a reasonable accommodation theory. "The ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled," *Felix v. N.Y.C. Transit Auth.*, 324 F.3d 102, 107 (2d Cir. 2003), meaning that "[t]he third prong of discriminatory conduct in violation of the ADA and Rehabilitation Act may take the form of a refusal to afford a reasonable accommodation," *Schine*, 2017 WL 9485650, at *4.

In reasonable accommodation-based claims, " '[r]easonable' is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce. This requires a fact-specific, case-by-case inquiry, not only into the benefits of the accommodation but into its costs as well." *Fulton v. Goord*, 591 F.3d 37, 44 (2d Cir. 2009) (citations and quotation marks omitted).

Nonetheless, two cases decided by courts in this district persuade the Court that Plaintiff has met this burden, particularly in the initial stages of early litigation when Plaintiff's burden is least onerous. First, again in *Doherty*, Judge Román found that the university's failure to take into consideration the plaintiff's Asperger Syndrome and its correspondent failure to accommodate the plaintiff's disability within the greater no-contact order process were "sufficient to sustain a claim for a reasonable accommodation." *Doherty*, 2020 WL 5548790, at *8. Second, in *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1036–37 (S.D.N.Y. 1995), the court granted summary judgment for hearing-impaired inmates, having concluded that a prison facility's "failure to provide visual safety alarms" violated these twin statutes insofar as prisoners were discriminated against as being at higher risk in the event of fires or other emergencies.

The plausibility of Plaintiff's claims is apparent when set against the instances in which "[c]ourts [have] routinely dismiss[ed] ADA suits by disabled inmates that allege

inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." *Elbert v. N. Y. State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) (collecting cases); *cf. Pfrommer*, 148 F.3d at 82 (dismissing ADA claim arising from reasonable accommodation theory where it was "clear that the plaintiff [wa]s in essence challenging the adequacy of his [Vocational Educational Services for Individuals with Disabilities] services, not illegal disability discrimination").

For example, in *Tardif v. City of New York*, 991 F.3d 394 (2d Cir. 2021), an arrestee sued the city, its police department, and police officers because the arrestee was not timely provided her epilepsy medication during her pre-arraignment detention following her arrest. *See id.* at 398–402. But, generally speaking, "medical services ... were available to all pretrial detainees." *Id.* at 405. Thus, the core issue was whether the plaintiff "was denied medical services *because* she has a disability." *Id.* (emphasis in original). The Second Circuit related this back to prior precedent, too, noting that that court had previously "held that the Rehabilitation Act 'does not create a cause of action based on a [disability] that is directly related to providing the very services at issue.' " *Id.* at 406 (quoting *Cushing v. Moore*, 970 F.2d 1103, 1109 (2d Cir. 1992)).

**\*19** Had Plaintiff filed a claim under the ADA raising *only* the fact that he was not given adequate care, the case would fall squarely into the *Tardif* category and be correspondingly dismissed. However, because Plaintiff's claims, construed liberally, involve Otisville's policy of issuing orders audibly without any accommodation for hearing-impaired individuals, his Complaint is not such an end-run around the ADA, but rather, as alleged, a plausible instance in which Plaintiff's disability is not accommodated, leading to negative consequences in the form of disciplinary actions. In other words, Plaintiff's claim adequately alleges that via Otisville's discriminated against "*because* of his disability." *Lee v. N.Y.S. Dep't of Corr. Servs.*, No. 97-CV-7112, 1999 WL 673339, at \*14 (S.D.N.Y. Aug. 30, 1999) (emphasis added).

It may well be the case that further fact development undermines Plaintiff's allegations. Discovery may show, for example, that Defendants have made such accommodations or that this practice does not, in fact, have an adverse impact on Plaintiff. Nonetheless, at this stage, Plaintiff has sufficiently alleged a violation of the ADA and RA. Accordingly, Defendants' Motion regarding such claims is denied.

### III. Conclusion

For the foregoing reasons, Defendants' Motion is granted in part and denied in part. Specifically, Defendants' Motion is granted with respect to Plaintiff's constitutional claims, while it is denied with respect to Plaintiff's ADA and RA claims. With respect to the former, because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice. *See Terry v. Incorporated Village of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile"). Should Plaintiff choose to file an amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The amended complaint will replace, not supplement, the complaint currently before the Court. It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, the claim dismissed without prejudice may be dismissed *with* prejudice, and Plaintiff's case will go forward only on its surviving claims.

Additionally, as noted in the Court's July 17, 2021, Order, Plaintiff remains entitled to pro bono counsel should the Southern District of New York's Pro Se Office be able to secure counsel on Plaintiff's behalf. (Dkt. No. 28.)

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 903068

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1406649
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John J. BENYI, Plaintiff,

v.

NEW YORK; Binghamton Police Department; Broome
County Sheriff's Department; New York Appellate
Division Third Department; United States District
Court for the Northern District of New York; Second
Circuit Court of Appeals; Detective Sergeant Barry
Angel; and Deputy Sheriff William Guyyey, Defendants.

3:20-CV-1463 (DNH/ML)
|
Signed 03/23/2021

**Attorneys and Law Firms**

JOHN J. BENYI, Plaintiff, Pro Se, Lea County Correctional
Facility, 6900 West Millen, Hobbs, New Mexico 88244.

**ORDER and REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** The Clerk has sent this *pro se* complaint (Dkt. No. 1)
together with an amended application to proceed *in forma
pauperis* (Dkt. No. 4) filed by John J. Benyi ("Plaintiff") to
the Court for review. For the reasons discussed below, I deny
Plaintiff's amended *in forma pauperis* application (Dkt. No. 4)
without prejudice, and I recommend that Plaintiff's Complaint
(Dkt. No. 1) be dismissed in its entirety, in part (1) without
prejudice and with leave to amend, and (2) with prejudice and
without leave to amend.

**I. BACKGROUND**

On November 30, 2020, Plaintiff commenced this action
by filing a verified Complaint and a motion to proceed *in
forma pauperis.* (Dkt. Nos. 1, 2.) On December 1, 2020,
the Court denied Plaintiff's *in forma pauperis* application as
incomplete and administratively closed the case. (Dkt. No. 3.)
On December 22, 2020, Plaintiff filed an amended *in forma
pauperis* application. (Dkt. No. 4.) As a result, on January 4,
2021, the case was reopened and restored to the Court's active
docket. (Dkt. No. 5.)

Construed as liberally [1] as possible, the Complaint alleges
that Plaintiff's civil rights were violated by New York State,
the Binghamton Police Department, the Broome County
Sheriff's Department, [2] the New York Appellate Division
Third Department, the United States District Court for the
Northern District of New York, the Second Circuit Court
of Appeals, Detective Sergeant Barry Angel, [3] and Deputy
Sheriff William Guyyey [4] (collectively "Defendants"). (*See
generally* Dkt. No. 1.) More specifically, Plaintiff alleges that
on April 17, 1987, his rights were violated by Defendant
Angel—an employee of Binghamton Police Department—
who concocted a false confession to non-existent crimes.
(Dkt. No. 1, Attach. 1 at 1.) In addition, Plaintiff alleges that
Inspector Donald Conidin—an employee of the Binghamton
Police Department—removed evidence from his dresser
and that Patrolman William Grace—an employee of the
Binghamton Police Department—stole his swiss army knife,
and, on information and belief, stole his television, stereo, and
audio and video tape collection. (*Id.*)

[1]    The Court must interpret *pro se* complaints to
       raise the strongest arguments they suggest. *Soto v.
       Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting
       *Burros v. Hopkins*, 14 F.3d 787, 790 (2d Cir.
       1994)).

[2]    The Complaint lists the Broome County Sheriff's
       Department as a Defendant in this matter. (Dkt. No.
       1 at 1.) As a result, the Clerk of the Court is directed
       to amend the docket sheet accordingly.

[3]    The Complaint lists Detective Sergeant Barry
       Angel as a Defendant in this matter. (Dkt. No. 1 at
       1.) As a result, the Clerk of the Court is directed to
       amend the docket sheet accordingly.

[4]    The Complaint lists Deputy Sheriff William
       Guyyey as a Defendant in this matter. (Dkt. No. 1
       at 2.) As a result, the Clerk of the Court is directed
       to amend the docket sheet accordingly.

Plaintiff alleges that on May 30, 1987, Defendant Angel
and Defendant Guyyey—an employee of Broome County
Sheriff's Department—arranged to have him attacked by Scott
Haven, which resulted in Plaintiff suffering "serious brain
damage, ... numerous surgeries," and required Plaintiff to take
anti-seizure medications. (*Id.*)

**\*2** Plaintiff alleges that "[a]ll [three] of the cops probably perjured themselves at trial," though it is unclear which three police officers Plaintiff is referring to. (*Id.*) Plaintiff alleges that he was acquitted of all indicted charges at his criminal trial but convicted of an unindicted charge "on the say-so of a proven perjurer[,] [Defendant] Angel." (*Id.* at 2.)

Plaintiff alleges that he filed a motion pursuant to N.Y. Crim. Proc. Law § 440 but that Judge Monseratte "deliberately ignored the proven perjury and fraud." (*Id.*) In addition, Plaintiff alleges that Defendant New York Appellate Division Third Department "refused to review the case" three weeks before the chief justice was arrested by the Federal Bureau of Investigations. (*Id.*)

Plaintiff alleges that United States District Judge Hurd of Defendant United States District Court for the Northern District of New York, "accepted an unsigned, unnotarized 'affidavit' from ADA Lehman ... and used it to dismiss the case." [5] (*Id.*) In addition, Plaintiff alleges that Defendant Second Circuit Court of Appeals declared Plaintiff's case a threat to national security and took away Plaintiff's rights. (*Id.*)

> [5]   Although not set forth by Plaintiff in the Complaint, the Court notes that on January 7, 1991, Plaintiff filed a *pro se* civil rights action in the Northern District of New York, No. 6:91-CV-0018 (NPM/GJD) ("*Benyi I*"). On February 28, 1997, United States Senior District Judge Neal P. McCurn, granted the defendants' motion for summary judgment. (*Benyi I*, Dkt. No. 163.) In addition, on February 22, 1991, Plaintiff filed a *pro se* habeas corpus claim in the Northern District of New York, No. 6:91-CV-0196 (LEK/DH) ("*Benyi II*"). On September 22, 1994, then-United States Magistrate Judge David N. Hurd issued a report and recommendation, which recommended that Plaintiff's petition for writ of habeas corpus be denied. (*Benyi II*, Dkt. No. 37.) On April 17, 1996, United States District Judge Con. G. Cholakis accepted and adopted Magistrate Judge Hurd's report and recommendation and denied Plaintiff's petition for writ of habeas corpus. (*Benyi II*, Dkt. No. 43.)

Plaintiff alleges that Defendants conspired with the New York Department of Corrections to lose his legal papers when he was transferred to Arthur Kill Correctional Facility ("Arthur CF"). (*Id.*) Plaintiff alleges that "they" [6] had me attacked a second time at Arthur CF. (*Id.*)

> [6]   Plaintiff uses the term "they" frequently throughout the Complaint. (*See generally* Dkt. No. 1.) However, it is unclear to the Court who Plaintiff is referring to.

Plaintiff alleges that "they" provided false information to officials in New Mexico, which resulted in Plaintiff's arrest, his house being "invaded" three times, and threats to his wife unless Plaintiff pleaded guilty. (*Id.* 3.) Plaintiff alleges that he was arrested by his probation/parole officer for medical marijuana but that violation was dismissed. (*Id.*) Plaintiff alleges that "they" claimed that "they" found illegal porn on his computer but that Plaintiff merely searched a file sharing program for "Playboy" and none of the porn that he viewed was "labeled in any way that appeared illegal." (*Id.*)

Plaintiff alleges that "PPO Megan," "PPO Kevin," their supervisor Pollada, and Douglas and Gladys at La Posada halfway house conspired to cover up their culpability by forcing Plaintiff to plead guilty to—what appears to be a violation of the terms of Plaintiff's probation or parole—failure to program. (*Id.* at 4.) Plaintiff alleges that his failure to program was "their" fault, not his, and that these individuals threatened to arrest his "innocent caregiver," Margaret Malone. (*Id.*)

**\*3**  The Complaint does not appear to assert any causes of action. However, attached to the Complaint are excerpts from a document with information and instructions for filing a complaint pursuant to 42 U.S.C. § 1983. In addition, Plaintiff states that he filed an action against the New Mexico Probation/Parole and La Posada Halfway House alleging causes of action pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1997, and the Americans with Disabilities Act ("ADA"). [7] (Dkt. No. 1 at 7.)

> [7]   On November 30, 2020, Plaintiff commenced a *pro se* civil rights action in the District of New Mexico, No. 2:20-CV-1244 (KG/KBM) ("*Benyi III*"). On January 8, 2021, United States District Judge Kenneth J. Gonzales dismissed Plaintiff's Complaint. (*Benyi III*, Dkt. No. 4.)

For relief, Plaintiff seeks his immediate release to the care of his United States Department of Veterans Affairs ("V.A.")

2021 WL 1406649

caregiver, Margaret Malone, and his V.A. fiduciary, Dorota Montour, in California. (*Id.* at 5.)

Plaintiff also filed an amended application for leave to proceed *in forma pauperis*. (Dkt. No. 4.)

## II. PLAINTIFF'S AMENDED APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).[8] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Cash*, 2010 WL 5185047, at *1 (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

[8]     Section § 1915(g) prohibits a prisoner from proceeding *in forma pauperis* where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). The Court has reviewed Plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service. *See* http://pacer.uspci.uscourts.gov. It does not appear from that review that Plaintiff had accumulated three strikes for purposes of 28 U.S.C. § 1915(g) as of the date this action was commenced.

Upon review, the Court finds that Plaintiff has submitted a completed IFP application which has been certified by an appropriate official at his facility (Dkt. No. 4), and which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). However, Plaintiff has not filed the inmate authorization required in the Northern District pursuant to Local Rule 5.1.4(b)(1)(B). (*See generally* docket sheet; *see also* Dkt. No. 3.)[9]

[9]     The Clerk of the Court is directed to provide Plaintiff with a blank inmate authorization form.

Accordingly, Plaintiff's amended application to proceed with this action IFP is denied without prejudice.

## III. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

Ordinarily, the finding that Plaintiff does not qualify for IFP status would end the Court's discussion, and Plaintiff, in light of his *pro se* status, would likely be afforded an opportunity to either prepay the full filing fee, or submit a new, completed, and certified application for IFP. Because, however, as is discussed more completely below, I find that Plaintiff's Complaint fails to state a claim upon which relief may be granted, 28 U.S.C. § 1915 requires that the court dismiss the action "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid[.]" 28 U.S.C. § 1915(e); *see also* 28 U.S.C. 1915A(a) ("The court shall review ... as soon as practicable ... a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.").

**\*4** Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that — ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[10] Similarly, under 28 U.S.C. § 1915A, a court must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curium) (noting that Section 1915A applies to all actions brought by prisoners against governmental officials even when plaintiff paid the filing fee).

[10]     To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis in either law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Additionally, when reviewing a complaint, a court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether

the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), *rev'd on other grounds*, 682 F. App'x 30. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 "demands more than an unadorned the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed.

### A. Claims Pursuant to 42 U.S.C. § 1983

#### 1. Claims Against Defendants New York and New York Appellate Division Third Department

After carefully considering the matter, I recommend that Plaintiff's claims against Defendant New York and New York Appellate Division Third Department pursuant to 42 U.S.C. § 1983, be dismissed with prejudice because they are immune from suit.

**\*5** Defendant New York is immune from suits pursuant to 42 U.S.C. § 1983 seeking either legal or equitable relief, under the Eleventh Amendment. *Papasan v. Allain*, 478 U.S. 265, 276 (1986); *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984).

Moreover, Defendant New York State Appellate Division Third Department is merely an agency or arm of New York State. *See Ognibene v. Niagara Cnty. Sheriff's Dep't*, 03-CV-0678E, 2003 WL 2443989, at \*3 (W.D.N.Y. Dec. 1, 2003) ("To the extent the plaintiff names various state courts as defendants and seeks either legal or equitable relief against them under § 1983, they are immune from such suit under the Eleventh Amendment."). As an agency or arm of the State of New York, the court is immune from suit under the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Mercado v. Town of Goshen*, 20-CV-5399, 2020 WL 5210949, at \*3 (S.D.N.Y. Aug. 28, 2020) ("Plaintiff sues the 'Orange County Court,' which is part of the New York State Unified Court System. The Court therefore dismisses Plaintiff's § 1983 claims against this Defendant under the doctrine of Eleventh Amendment immunity and because these claims are frivolous."); *Curto v. Palisades Collection, LLC*, 07-CV-529S, 2008 WL 11357852, at \*4 (W.D.N.Y. Mar. 10, 2008) (dismissing the plaintiff's claims against the "New York State Unified Court System, 8th Judicial District Buffalo City Court" as barred by the Eleventh Amendment); *Saint-Fleur v. City of New York*, 99-CV-10433, 2000 WL 280328, \*2 (S.D.N.Y., Mar. 14, 2000) (collecting cases) ("State courts, as arms of the State, are entitled to Eleventh Amendment immunity from suit in federal court."); *Fields v. Walthers*, 94-CV-1659, 1997 WL 204308 at \*2 (N.D.N.Y. April 5, 1997) (Pooler, J.) ("For Eleventh Amendment purposes, governmental entities of the state that are considered 'arms of the state' receive Eleventh Amendment immunity.").

As a result, I recommend that Plaintiff's claims against Defendants New York and New York Appellate Division Third Department [11] be dismissed with prejudice and without leave to amend. *Johnson v. Fischer*, 19-CV-1384, 2020 WL 758964, at \*2 (N.D.N.Y. Feb. 14, 2020) (Stewart, M.J.) (recommending dismissal, without leave to amend, claims against the Appellate Division Third Department); *Dinsio v. Appellate Division, Third Dep't*, 16-CV-0324, 2017 WL 3016832, at \*12 (N.D.N.Y. July 14, 2017) (Suddaby, C.J.) (citing *Zuckerman v. Appellate Division, Second Dep't, Supreme Court of the State of N.Y.*, 421 F.2d 625, 626 (2d Cir. 1970); *Bernstein v. New York*, 591 F. Supp. 2d 448, 465 (S.D.N.Y. 2008)) ("Defendant correctly argues that, as the sole named Defendant in this case, the Eleventh Amendment

bars Plaintiff's claims because the Third Department is considered 'an arm of the state of New York.' ").

11    The Court also notes that Defendant New York Appellate Division "Third Department is also not considered a 'person' for purposes of 42 U.S.C. § 1983." *Dinsio*, 2017 WL 3016832, at *12, n.13 (citing *Zuckerman*, 421 F.2d at 626; *Ajamian v. New York*, 13-CV-1316, 2014 WL 3928448, at *6 (N.D.N.Y. Aug. 11, 2014) (D'Agostino, J.) (holding that the Third Department is not a "person" within the meaning of Section 1983)).

## 2. Claims Against Defendants Binghamton Police Department and Broome County Sheriff's Department

**\*6** After careful consideration, I recommend dismissal of Plaintiff's claims pursuant to 42 U.S.C. § 1983 against Defendants Binghamton Police Department and Broome County Sheriff's Department because they are not entities susceptible to suit.

A municipal police department is not susceptible to suit pursuant to 42 U.S.C. § 1983. *La Grande v. Town of Bethlehem Police Dep't*, 08-CV-0738, 2009 WL 2868231, at *2 (N.D.N.Y. Sept. 1, 2009) (Kahn, J.); *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002) (internal citations omitted). "Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Walker v. U.S. Marshalls*, 08-CV-0959, 2009 WL 261527, at *2 (E.D.N.Y. Feb. 4, 2009) (quoting *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002)); *see also Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 164 (D. Conn. 2005) (collecting cases).

Here, Plaintiff's claims against Defendants Binghamton Police Department and Broome County Sheriff's Department, which have no legal, separate identity apart from the City of Binghamton and Broome County, respectively, are not plausible. Therefore, I recommend dismissal of the claims against Defendants Binghamton Police Department and Broome County Sheriff's Department, with prejudice and without leave to amend. *See Jackson v. Gunsalus*, 16-CV-0647, 2016 WL 4004612, at *5 (N.D.N.Y. June 24, 2016) (Dancks, M.J.), *report and recommendation adopted*, 2016 WL 3983635 (July 25, 2016) (Sharpe, J.) (dismissing

claims against the Syracuse Police Department with prejudice and without leave to amend because the Syracuse Police Department "is not susceptible to suit under § 1983."); *Makas v. Benjamin*, 09-CV-0129, 2009 WL 3871441, at *3 (N.D.N.Y. Nov. 18, 2009) (Kahn, J.) (dismissing claims against Ulster County Sheriff's Department as it is "an administrative arm of the county," which cannot be sued under § 1983)

## 3. Claims Against Defendants United States District Court for the Northern District of New York [12] and Second Circuit Court of Appeals

12    The Court notes that it has authority to decide this matter despite the fact that it is named as a defendant. *Hansel v. U.S. Supreme Court, Second Circuit Court of Appeals*, 141 F.3d 1151 (2d Cir. 1998). Federal judges are required to disqualify themselves in any proceeding in which their impartiality might reasonably be questioned. 28 U.S.C. § 455(a). The ultimate inquiry under Section 455(a) is whether a reasonable person would conclude that the judge's impartiality could reasonably be questioned, and disqualification is not required on the basis of remote, contingent or speculative interests. *United States v. Thompson*, 76 F.3d 442, 450 (2d Cir. 1996); *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992). Plaintiff did not sue any member of this Court in an individual capacity. Here the danger of partiality, if any, is based on remote and speculative concerns because Plaintiff seeks nothing more than a series of vague declarations and has alleged no specific wrongdoing by members of this Court. Accordingly, disqualification is not required. In any event, disqualification is not possible here because it would leave Plaintiff with no judges of this Court to hear his Complaint. Thus, the rule of necessity applies and this Court may proceed to hear the case. *United States v. Will*, 449 U.S. 200 (1980); *Atkins v. United States*, 214 Ct.Cl. 186 (Ct. Cl. 1977).

**\*7** After carefully considering the matter, I recommend that Plaintiff's claims against Defendants United States District Court for the Northern District of New York and Second Circuit Court of Appeals be dismissed based on the doctrine of sovereign immunity.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994); *see also Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) ("Because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived."). "[T]he United States is immune from constitutional tort claims against the United States, its agencies, or federal employees sued in their official capacities." *Perez v. Hawk*, 302 F. Supp. 2d 9, 18 (E.D.N.Y. 2004).

As a result, I recommend that Plaintiff's § 1983 claims against the Federal defendants be dismissed for lack of subject matter jurisdiction. *See, e.g.*, *Johnson v. Wolfe*, 19-CV-7337, 2019 WL 5784704, at *3-4 (S.D.N.Y. Nov. 5, 2019) (dismissing claims against, *inter alia*, the Second Circuit Court of Appeals based on the doctrine of sovereign immunity); *Forjone v. Dep't of Motor Vehicles*, 414 F. Supp. 3d 292, 301 (N.D.N.Y. 2019) (Hurd, J.) (dismissing the plaintiff's claims against the federal defendants pursuant to, *inter alia*, 42 U.S.C. § 1983, based on the doctrine of sovereign immunity); *Olmeda v. Babbits*, 07-CV-2140, 2008 WL 282122, at *5 (S.D.N.Y. Jan. 25, 2008) (dismissing plaintiff's §§ 1983, 1985, 1986 claims against federal agencies as barred by sovereign immunity).

The Court has also considered whether the Federal Tort Claims Act ("FTCA") might provide Plaintiff a means of relief. The FTCA grants a limited waiver of sovereign immunity that applies to "claims against the United States for money damages ... for injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

"Thus, for liability to arise under the FTCA, a plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred, and his allegations, taken as true, must satisfy the necessary elements of that comparable state cause of action." *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988).

However, there is no indication that Plaintiff properly exhausted any possible claim under the FTCA, which requires a claimant to "first present[ ] the claim to the

appropriate Federal agency" and have it "denied by the agency in writing." 28 U.S.C. § 2675(a). This failure provides independent justification to dismiss any such claim against the Federal defendants, too. *See, e.g.*, *Celestine v. Mt. Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005) ("The FTCA requires that a claimant exhaust all administrative remedies before filing a complaint in federal district court.").

**\*8** Moreover, Plaintiff has improperly named the federal agencies as defendants in this action. *See, e.g.*, *Langella v. Bush*, 306 F. Supp. 2d 459, 463 (S.D.N.Y. 2004) ("Under the FTCA, suit must be brought directly against the United States, and federal agencies are immune from suit.").

As a result, I recommend that Plaintiff's claims against Defendants United States District Court for the Northern District of New York and Second Circuit Court of Appeals, be dismissed.

### 4. Claims Against Defendants Angel and Guyyey in Their Official Capacities

To the extent that Plaintiff intended to sue Defendants Angel and Guyyey in their official capacities, the Supreme Court has explained that this kind of claim is "to be treated as a suit against the entity"; i.e., the City of Binghamton and Broome County. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

In *Monell v. Dep't of Soc. Servs.*, the Supreme Court held that a municipality may be held liable under § 1983 if a plaintiff can demonstrate that the constitutional violation was caused by a municipal "policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). However, the Supreme Court has intentionally made these so-called "*Monell*" claims "hard to plead and hard to prove." *Crawley v. City of Syracuse*, 17-CV-1389, 2020 WL 6153610, at *9 (N.D.N.Y. Oct. 21, 2020) (Hurd, J.). "Unlike state tort law, a municipality cannot be held liable under § 1983 merely because it happened to employ the alleged tortfeasor." *Crawley*, 2020 WL 6153610, at *9.

Instead, "under § 1983[ ] local governments are responsible only for 'their *own* illegal acts.' " *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Thus, "to establish municipal liability under 42 U.S.C. § 1983, a plaintiff must

demonstrate that the deprivation of his constitutional right was 'caused by a governmental custom, policy or usage of the municipality.' " *Deferio v. City of Syracuse*, 770 F. App'x 587, 589 (2d Cir. 2019) (summary order) (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012)).

Through a series of decisions, the Supreme Court has recognized that *Monell* liability may be established through: (1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to "deliberate indifference" to the rights of those who come into contact with the inadequately trained or supervised municipal employees. *Deferio*, 770 F. App'x at 590 (collecting cases); *see also Benacquista v. Spratt*, 217 F. Supp. 3d 588, 599-600 (N.D.N.Y. 2016) (Hurd, J.) (recognizing same theories of liability).

The Complaint does not allege facts plausibly suggesting that the City of Binghamton or County of Broome violated Plaintiff's rights based on a custom, policy, or practice. (*See generally* Dkt. No. 1.) In fact, the Complaint is devoid of any factual assertions related to wrongdoing by these municipal entities.

**\*9** As a result, I recommend that, to the extent Plaintiff intended to assert claims against Defendants Angel and Guyyey in their official capacities, those claims be dismissed for failure to state a claim upon which relief may be granted.

### 5. Statute of Limitations

The statute of limitations for a § 1983 action accruing in New York is three years. *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009). The statute of limitations begins to run on the date that the plaintiff's claims accrues. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Federal law governs the accrual date. *Morse v. Univ. of Vt.*, 973 F.2d 122, 125 (2d Cir. 1992). Generally, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know the injury which is the basis of his action." *Covington v. New York*, 171 F.3d 117, 121 (2d Cir. 1999) (quoting *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980)); *see Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013) (per curiam) (citing *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002))

(a claim for equal protection accrues "when the plaintiff knew or should have known of the disparate treatment."). That is so even if "the full extent of the injury is not then known or predictable." *Fahs Const. Group, Inc.*, 725 F.3d at 292. "[S]tate tolling rules determine whether the limitations period has been tolled, unless state tolling rules would 'defeat the goals' of section 1983." *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 1997) (citing *Pearl*, 296 F.3d at 80).

Although the statute of limitations is an affirmative defense, where it is clear from the face of the complaint that a claim is barred by the applicable statute of limitations, the claim is subject to dismissal for failure to state a claim on 28 U.S.C. § 1915(e)(2)(B) review. *See Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (holding that a complaint can be dismissed on initial review based on a defense that appears on the face of the complaint); *Syfert v. City of Rome*, 17-CV-0578, 2018 WL 3121611, at \*3-5 (N.D.N.Y. Feb. 12, 2018) (Dancks, M.J.) (dismissing all claims barred by the statute of limitations on initial review pursuant to 28 U.S.C. § 1915(e)(2)(B)), *report and recommendation adopted by*, 2018 WL 2316681 (N.D.N.Y. May 22, 2018) (Suddaby, C.J.); *Syfert v. City of Rome*, 17-CV-0578, 2017 WL 3405521, at \*8-10 (N.D.N.Y. Aug. 7, 2017) (Dancks, M.J.) (same), *report and recommendation adopted by*, 2017 WL 5195230 (N.D.N.Y. Nov. 9, 2017) (Suddaby, C.J.); *Syfert v. City of Rome*, 15-CV-1149, 2015 WL 6819168, at \*7-8 (N.D.N.Y. 2015) (Kahn, J.) (same).

Here, drawing all reasonable inferences and construing the Complaint liberally, Plaintiff commenced this action on November 20, 2020. (Dkt. No. 1.) [13] As a result, any causes of action in Plaintiff's Complaint that accrued before November 20, 2017, are barred by the statute of limitations.

[13]    The Court notes that Plaintiff's Complaint was filed on November 30, 2020. (Dkt. No. 1.) However, pursuant to the prison mailbox rule, the Court deems Plaintiff's Complaint filed on November 20, 2020, when he gave it to prison officials. *Douglas v. Bughrara*, 11-CV-1535, 2013 WL 5347285, at \*3 (N.D.N.Y. Sept. 23, 2013) (Kahn, J.).

The only dates set forth in the Complaint are (1) an incident that occurred on April 17, 1987, (2) an incident that occurred on May 30, 1987, and (3) Plaintiff's criminal trial that took place February 1988. (Dkt. No. 1 at 2; Dkt. No. 1, Attach. 1 at 1.) The Court also notes that Defendant New York Appellate Division Third Department denied Plaintiff's appeal on July

20, 1989. *People v. Benyi*, 152 A.D.2d 864 (N.Y. App. Div. 3d Dep't 1989). Moreover, on October 19, 1989, the New York Court of Appeals denied Plaintiff leave to appeal. *People v. Benyi*, 74 N.Y.2d 894 (N.Y. 1989). As set forth in note 5 *supra*, on February 22, 1991, Plaintiff filed a writ of habeas corpus claim in Defendant United States District Court for the Northern District of New York, which was dismissed on April 17, 1996. (*Benyi II*, Dkt. No. 43.) Any causes of action related to incidents that occurred on these dates, which occurred approximately twenty years before November 20, 2017, are barred by the statute of limitations.

**\*10** Moreover, I find that Plaintiff's allegations do not amount to a "continuing violation." The continuing violation doctrine, where applicable, is an "exception to the normal knew-or-should-have-known accrual date" if there is evidence of an ongoing discriminatory policy or practice. *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)). The continuing violation doctrine does not apply to "discrete acts," even where those discrete acts are a part of a "serial violation," but applies solely to claims that "by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez*, 802 F.3d at 220 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111 (2002)). When the doctrine applies, the limitations period begins to run when the defendant has engaged in "enough activity to make out an actionable ... claim," as long as the plaintiff has alleged some non-time-barred acts which contributed to the alleged violation. *Id.* (quoting *Morgan*, 536 U.S. at 117; *Harris*, 186 F.3d at 250). A continuing violation cannot "be established merely because the claimant continues to feel the effects of a time-barred discriminatory act." *Harris*, 186 F.3d at 250 (citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997)).

The continuing violation doctrine is generally disfavored in this Circuit. *See Town of Ramapo v. Town of Clarkstown*, 16-CV-2004, *2017 WL 782500*, at *5 (S.D.N.Y. Feb. 27, 2017); *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 292 (S.D.N.Y. 2011) (quoting *Trinidad v. N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006)) ("[C]ourts in the Second Circuit 'have been loath to apply [the continuing violation doctrine] absent a showing of compelling circumstances.' ").

According to Plaintiff, "[o]n April 17, 1987, Detective Sgt. Barry Angel did concoct a proven false 'confession' to proven non-existent crimes." (Dkt. No. 1, Attach. 1 at 1.) Thus, to the extent that Plaintiff asserts causes of action related to this alleged wrong, the claims, if any, would have accrued in 1987, or, at the very latest, February 1988, when the "crime lab examiner and pathologist testified for the DEFENSE" and Plaintiff was acquitted of all indicted charges. (Dkt. No. 1 at 3; Dkt. No. 1, Attach. 1 at 1.)

In addition, Plaintiff alleges that "[o]n May 30, 1987, 3 days after the crime lab report was issued proving the confession was a fraud, Det. Angel and Deputy Sheriff William Guyyey arranged to have [Plaintiff] attacked." (Dkt. 1, Attach. 1 at 1.) Plaintiff does not assert any allegations plausibly suggesting that he lacked a complete and present cause of action after the alleged attack on May 30, 1987. (*See generally* Dkt. No. 1.)

The other allegations in Plaintiff's Complaint appear to have occurred several years, possibly decades, apart. (Dkt. 1, Attach. 1.) As a result, I find no compelling circumstances present to warrant applying the continuing violation doctrine.

Under New York law, "the doctrine of fraudulent concealment prevents a party from fraudulently concealing wrongdoing until after the tolling of the statute of limitations." *Aiken v. Nixon*, 236 F. Supp. 2d 211, 240 (N.D.N.Y. 2002) (McAvoy, J.). "To invoke the doctrine of fraudulent concealment properly [for purposes of seeking an equitable tolling of the statute of limitations], a plaintiff must establish three elements, including: (1) wrongful concealment by defendants [of their actions], (2) which prevented plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing the discovery of the claim." *New York Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 278 (S.D.N.Y. 2013) (citing *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998); *Butala v. Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996)). "The relevant question is not the intention underlying defendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." *Veltri v. Bldg. Serv. 32b-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004) (citing *Pearl*, 296 F.3d at 82; *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990)).

**\*11** Here, the Court finds Plaintiff has not plausibly alleged any of the three elements to invoke this doctrine.

Further, although not raised by Plaintiff, having carefully reviewed the Complaint, the Court discerns no basis to invoke equitable tolling or equitable estoppel in order to salvage

what are otherwise patently untimely claims. Under New York law, equitable tolling applies "where a plaintiff has been prevented in some extraordinary way from exercising rights," such that "it would have been impossible for a reasonably prudent person to learn about his or her cause of action." *Pearl*, 296 F.3d at 85. In a related but slightly different vein, equitable estoppel is available "where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay bringing the lawsuit." *Dillman v. Combustion Eng'g, Inc.*, 784 F.3d 76, 85 (2d Cir. 1986); *see also Abbas*, 480 F.3d at 642 (stating that equitable estoppel applies when a "plaintiff was induced by fraud, misrepresentation or deception to refrain from filing a timely action"). Under either doctrine, "[d]ue diligence on the part of the plaintiff in bringing an action ... is an essential element of equitable relief." *Abbas*, 480 F.3d at 642 (quoting *Doe v. Holy See (State of Vatican City)*, 17 A.D. 3d 793, 796 (N.Y. App. Div. 3d Dep't 2005)).

As a result, the Court finds Plaintiff is not entitled to tolling and, thus, his claims, which are based on events that occurred before November 20, 2017, are time barred.

Therefore, I recommend dismissing Plaintiff's claims pursuant to 42 U.S.C. § 1983, as untimely.

### B. Claims Pursuant to 28 U.S.C. § 1997

Plaintiff refers to 28 U.S.C. § 1997 [14] as a basis for claims that he asserted in another lawsuit against the New Mexico Probation/Parole and LaPosada Halfway House. (Dkt. No. 1 at 7.)

[14]     Although Plaintiff cites to 28 U.S.C. § 1997, there is no such section of the United States Code.

To the extent that Plaintiff intended to assert claims here pursuant to 42 U.S.C. § 1997, which deals with suits by prisoners regarding prison conditions, I recommend that those claims be dismissed.

The statute provides in 42 U.S.C. § 1997j, "[t]he provisions of this subchapter shall in no way expand or restrict the authority of parties other than the United States to enforce the legal rights which they may have pursuant to existing law with regard to institutionalized persons." 42 U.S.C. § 1997j (2006). "This clause precludes recognition of a private cause of action under 42 U.S.C. § 1997." *Kerchee v. Smith*, 11-CV-0459, 2011 WL 5143135, at *2, n.9 (W.D. Okla. Sept. 30, 2011); *accord Chichakli v. Samuels*, 15-CV-0687,

2016 WL 11447755, at *5, n.12 (W.D. Okla. Mar. 10, 2016) ("The PLRA does not provide any private right of action."); *Woodstock v. Shaffer*, 15-CV-0041, 2015 WL 13614123, at *5 (D. Colo. Sept. 24, 2015) (citing 42 U.S.C. § 1997(a)(c)) (holding that the Civil Rights of Institutionalized Persons Act "does not provide for an individual right of action."); *see McRorie v. Shimoda*, 795 F.2d 780, 782 n. 3 (9th Cir. 1986) (stating that 42 U.S.C. § 1997j "precludes a private cause of action" under 42 U.S.C. §§ 1997-1997j); *Callahan v. Southwestern Medical Ctr.*, 03-CV-1434, 2005 WL 1238770, at *6 (W.D. Okla. Apr. 29, 2005) (stating that "[c]ourts have consistently found" that the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997a "does not provide for a[n] individual right of action" (citations omitted)), *report and recommendation adopted by*, 2005 WL 1656917 (W.D. Okla. July 7, 2005), *aff'd*, 178 F. App'x 837, 840 (10th Cir. May 8, 2006).

### C. Claims Pursuant to the ADA

**\*12** Plaintiff refers to the ADA as a basis for claims that he asserted in another lawsuit against the New Mexico Probation/Parole and LaPosada Halfway House. (Dkt. No. 1 at 7.)

To the extent that Plaintiff intended to assert claims here pursuant to the ADA, I recommend that those claims be dismissed.

#### 1. Statute of Limitations

"[T]he ADA's statute of limitations is three years." *De La Rosa v. Lewis Foods of 42nd Street, LLC*, 124 F. Supp. 3d 290, 299, n.14 (S.D.N.Y. 2015). For the reasons set forth *supra*, in Part III.A.5. of this Order and Report Recommendation, I recommend that Plaintiff's claims pursuant to the ADA be dismissed as time barred.

#### 2. Failure to State A Claim

In the alternative, I recommend that Plaintiff's ADA claims be dismissed for failure to state a claim upon which relief may be granted.

Although the Compliant is sparse, and largely incomprehensible, it states that Plaintiff is a "71-year old, 100% disabled veteran of the United States Navy." (Dkt. No.

1, Attach. 1 at 1.) The Complaint provides no allegations of discrimination based on his disability. (*See generally* Dkt. 1.) However, construing the Complaint liberally, as the Court must, Plaintiff failed to allege facts plausibly suggesting claims pursuant to Title II or Title III of the ADA. [15]

[15]    Based on the facts alleged, Plaintiff could not proceed with a claim under Title I of the ADA, which addresses employment discrimination, because he has neither alleged that he was employed by Defendants, nor alleged that he exhausted administrative remedies by filing a charge with the Equal Employment Opportunity Commission before pursuing litigation in federal court. 42 U.S.C. § 12117; *see Mary Jo C. v. New York State Local Retirement Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) (quoting *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 360, n.1 (2001)) (" 'Title I of the ADA expressly deals with th[e] subject' of employment discrimination."). Moreover, Title IV of the ADA does not appear to be applicable to Plaintiff's claims because Title IV prohibits disability discrimination in telecommunications. *Genco v. Sargent & Collins LLP*, 18-CV-0107, 2018 WL 3827742, at *3, n.5 (W.D.N.Y. June 4, 2018). Finally, Title V of the ADA, sometimes referred to as the "retaliation provision," also does not appear applicable because Plaintiff does not allege that he engaged in activity protected by the ADA, that Defendants were aware of that activity, or any causal connection between the allegedly adverse actions that Defendant took against him and the protected activity. *Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) (Hurd, J.); *see also Constantine v. Merola*, 2020 WL 8450544, at *5 (N.D.N.Y. Nov. 6, 2020) (Lovric, M.J.) (recommending dismissal of the plaintiff's ADA Title V claims where the complaint failed to allege that the plaintiff "engaged in any protected activity, that any [d]efendant knew that [p]laintiff was involved in the protected activity, or that any adverse decision or course of action taken by [d]efendants was causally connected to that protected activity."), *report and recommendation adopted by* 2021 WL 392487 (N.D.N.Y. Feb. 4, 2021) (Hurd, J.).

### i. Title II of the ADA

**\*13**  Title II of the ADA "proscribes discrimination against the disabled in access to public services." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citing *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84-85 (2d Cir. 2004), *corrected*, 511 F.3d 238 (2d Cir. 2004)). The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA is applicable to inmates in state correctional facilities. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998); *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).

Here, the Compliant is devoid of any factual allegations plausibly suggesting that Plaintiff was unable to access programs due to his disability, how his disability prevented him from accessing those programs, or what accommodations he sought and was denied by Defendants. (*See generally* Dkt. 1.) Courts "routinely dismiss ADA suits by disabled inmates that ... do not allege that the inmate was treated differently because of his or her disability." *Elbert v. New York State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010).

In addition, other than a conclusory assertion that he is disabled, Plaintiff does not assert facts plausibly alleging that he is a qualified individual under the ADA. *See Schlosser v. Walker*, 20-CV-0433, 2020 WL 7324679, at *3 (D. Conn. Dec. 11, 2020) (holding that the plaintiff's allegation that he suffers from "a serious mental illness" was insufficient to allege that he was a qualified individual pursuant to the ADA); *Burdick v. Town of Schroeppel*, 16-CV-1393, 2017 WL 5509355, at *13 (N.D.N.Y. Jan. 31, 2017) (Dancks, M.J.) ("A plaintiff's complaint must plead facts plausibly suggesting that his alleged disability can meet all of the elements contained in the ADA's definition of disability."); *see also Hale v. King*, 642 F.3d 492, 500 (5th Cir. 2011) (holding that, "[t]o establish a claim under [42 U.S.C. § 12102(1)(A)], a plaintiff must allege that he (1) has a[n] ... impairment that (2) substantially limits (3) a major life activity," and dismissing plaintiff's complaint where it failed to allege, *inter alia,* "that his conditions substantially limited him in his performance of a life activity"); *Cox v. Civista Med. Ctr.*, 16 F. App'x 185, 186 (4th Cir. 2001) (affirming district court's dismissal of the plaintiff's complaint because it failed to "demonstrate a disability" under 42 U.S.C. § 12102(1)

(A) or (B)); *Ajuluchuku v. Macy's,* 12-CV-1855, 2012 WL 5464467, at *3 (E.D. Cal. Nov. 7, 2012) (dismissing the plaintiff's amended complaint because it did "not allege facts establishing any of [the] elements [of 42 U.S.C. § 12102(1)]); *Thompson v. New York City Dep't of Probation,* 03-CV-4182, 2003 WL 22953165, at *3 n.5 (S.D.N.Y. Dec. 12, 2003) ("Under the ADA definition of 'disability,' merely pleading a physical impairment without specifying that it 'substantially limits' a 'major life activity' may be insufficient to state a claim for relief.").

As a result, in the alternative, I recommend that Plaintiff's ADA claims under Title II be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *See Hill v. LaClair,* 20-CV-0441, 2020 WL 2404771, at *8 (N.D.N.Y. May 11, 2020) (Hurd, J.) (dismissing ADA Title II claims "pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted."). [16]

[16]    In the alternative, to the extent that Plaintiff attempts to assert ADA Title II claims against Defendants Angel and Guyyey in their individual capacities, I recommend that those claims be dismissed because "individuals cannot be held liable under the ADA." *Netti v. Ayers,* 17-CV-0976, 2017 WL 7542494, at *18 (N.D.N.Y. Oct. 5, 2017) (Baxter, M.J.) (citing *Baross v. Greenlawn,* 16-CV-4805, 2017 WL 2124424, at *4 (E.D.N.Y May 15, 2017)), *report and recommendation adopted by* 2018 WL 813509 (N.D.N.Y. Feb. 9, 2018) (Suddaby, C.J.); *accord Rosenfield v. New York State Div. of Veterans' Affairs,* 18-CV-1299, 2019 WL 4621962, at *10 (N.D.N.Y. Sept. 24, 2019) (Suddaby, C.J.); *see Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir. 2001) (holding that Title II of the ADA does not provide for suits against individuals); *Fox v. State Univ. of N.Y.,* 497 F. Supp. 2d 446, 449 (E.D.N.Y. 2007) ("[T]here is no individual liability under Title I or Title II of the ADA, or the ADEA."); *Sutherland v. New York State Dep't of Law,* 96-CV-6935, 1999 WL 314186, at *7 (S.D.N.Y. May 19, 1999) ("Individual defendants may not be held personally liable for alleged violations of the ADA.").

**ii. Title III of the ADA**

**\*14** Title III of the ADA prevents discrimination based on a disability in places of public accommodation. 42 U.S.C. § 12182. However, Title III "expressly does not apply to public entities, including local governments." *Bloom v. Bexar Cnty.,* 130 F.3d 722, 726 (5th Cir. 1997); *see Morales v. New York,* 22 F. Supp. 3d 256, 266-67 (S.D.N.Y. 2014) ("Title III is not applicable to public entities."). Instead, "[a] claim under Title III of the [ADA] can only be asserted against a private entity engaged in the provision of public accommodations, such as an inn, hotel or private school." *Morales,* 22 F. Supp. 3d at 266 (citing 42 U.S.C. §§ 12181(7); 12182); *see also Booker v. City of New York,* 17-CV-7035, 2018 WL 4616048, at *5, n.3 (S.D.N.Y. Sept. 26, 2018) (holding that a claim pursuant to Title III of the ADA cannot be asserted against the City of New York or its employees in their official capacities because they are not private entities engaged in the provision of public accommodations).

Here, Defendants are public entities, which are thus, not amenable to a Title III ADA claim. *See Maioriello v. New York State Office for People with Dev. Disabilities,* 14-CV-0214, 2015 WL 5749879, at *16 (N.D.N.Y. Sept. 30, 2015) (Suddaby, C.J.) (dismissing the plaintiff's claims to the extent that they were based on a violation of Title III because the New York State Office for People with Developmental Disabilities is a public entity). [17]

[17]    To the extent that Plaintiff intended to assert a Title III claim against Defendants Angel and Guyyey in their individual capacities, Title III provides a private right of action for injunctive relief but no right of action for monetary relief. 42 U.S.C. § 12188; *see Krist v. Kolombos Rest. Inc.,* 688 F.3d 89, 94 (2d Cir. 2012) (holding that Title III of the ADA "authorizes private actions only for injunctive relief, not monetary damages."); *Powell,* 364 F.3d at 86 ("Monetary relief ... is not available to private individuals under Title III of the ADA."); *see also Ervine v. Deser View Reg'l Med. Ctr. Holdings, LLC,* 753 F.3d 862, 867 (9th Cir. 2014) ("Damages are not an available remedy to individuals under Title III of the ADA; individuals may receive only injunctive relief."). As a result, those claims should also be dismissed.

Moreover, for the reasons set forth *supra,* in Part III.C.2.i. of this Order and Report-Recommendation, Plaintiff failed to allege that he was a qualified individual pursuant to the ADA.

In addition, "Title[ ] ... III of the ADA prohibit[s] discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations." *Powell*, 364 F.3d at 85, opinion corrected, 511 F.3d 238 (2d Cir. 2004) (citations omitted). To adequately plead a claim pursuant to Title III of the ADA for failure to provide reasonable accommodations, a plaintiff must allege facts establishing that the defendant's "failure to make 'reasonable modifications' to their policies, practices, and procedures deprived plaintiff of the ability to access the 'goods, services, facilities, privileges, advantages, or accommodations' available to those lacking [the] plaintiff's disabilities." *Andersen v. N. Shore Long Island Jewish Healthcare Sys. Zucker Hillside Hosp.*, 12-CV-1049, 2013 WL 784391, at *9 (E.D.N.Y. Jan. 23, 2013) (quoting 42 U.S.C. 12182(b)(2)(A)(i)-(ii) (additional citation omitted)), *report and recommendation adopted* as modified, 2013 WL 784344 (E.D.N.Y. Mar. 1, 2013).

Here, the Complaint is devoid of factual allegations concerning "policies, practices, [or] procedures" by Defendants that deprived Plaintiff of ability to access goods, services, or privileges available to those without Plaintiff's disabilities. *Doe v. NYSARC Tr. Serv., Inc.*, 20-CV-801, 2020 WL 5757478, at *8 (N.D.N.Y. Sept. 28, 2020) (Hummel, M.J.), *report and recommendation adopted by*, 2020 WL 7040982 (N.D.N.Y. Dec. 1, 2020) (Sannes, J.).

**\*15** As a result, I recommend that, in the alternative, to the extent that Plaintiff intended to assert claims pursuant to Title III of the ADA, those claims be dismissed for failure to state a claim.

### D. Relief Sought by Plaintiff is Inappropriate

The only relief that Plaintiff appears to seek is his immediate release to his V.A. caregiver and fiduciary in California. (Dkt. No. 1 at 5.) However, the Supreme Court has held that a challenge by a prisoner to the fact or duration of his confinement and seeking an immediate or earlier release from that confinement must be pursued through a habeas corpus proceeding rather than in an ordinary civil rights action. *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973); *see Garcia v. Westchester Cnty. District Attorney Office*, 21-CV-0348, 2021 WL 411546, at *3 (S.D.N.Y. Feb. 4, 2021) ("A plaintiff may not challenge the validity of his confinement or seek release from custody in a civil action under § 1983, but must instead bring a petition for a writ of habeas corpus to seek such

relief."); *Martinez v. Hynes*, 20-CV-4325, 2021 WL 242232, at *2 (E.D.N.Y. Jan. 22, 2021) ("Prisoners have other ways of challenging convictions they believe to be unconstitutional, first through direct appeal and then through a writ of habeas corpus pursuant to 28 U.S.C. § 2254); *London v. Nassau Cnty. District Attorney's Office*, 20-CV-3988, 20-CV-3989, 20-CV-3990, 2020 WL 7699644, at *9, n.6 (E.D.N.Y. Dec. 28, 2020) (abstaining from adjudicating the plaintiff's remaining claims seeking injunctive relief because habeas corpus relief is the exclusive remedy in federal court for a state prisoner seeking release from custody).

In this case, the Complaint and attached exhibits do not reflect that Plaintiff has complied with the exhaustion requirements for filing a habeas petition pursuant to 28 U.S.C. § 2254. As a result, in the alternative, to the extent that Plaintiff's Complaint could be construed as a habeas petition, I recommend that it be dismissed for failure to exhaust the available state court remedies. *Patterson v. New York*, 2020 WL 7646739, at *3 (N.D.N.Y. Dec. 23, 2020) (D'Agostino, J.) (dismissing the plaintiff's complaint to the extent that it could be construed as a habeas petition where the plaintiff failed to allege that he complied with the exhaustion requirements for filing a habeas corpus petition and holding that a plaintiff may not challenge the legality of his conviction through a section 1983 action and may only obtain that relief by bringing a petition for a writ of habeas corpus).

### V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-

CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [18]

[18]     See also *Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp.*, 550 U.S. at 544.

**\*16** With respect to Plaintiff's claims pursuant to 42 U.S.C. § 1983, I recommend that the claims against Defendants New York, Binghamton Police Department, Broome County Sheriff's Department, New York State Appellate Division Third Department, United States District Court for the Northern District of New York, and Second Circuit Court of Appeals, be dismissed with prejudice and without leave to amend. *See Forjone*, 414 F. Supp. 3d at 303-04 (dismissing with prejudice the plaintiff's claims against the state and federal defendants based on the doctrine of sovereign immunity because "[p]ermitting amendment would be unproductive in this instance."); *Johnson*, 2020 WL 758964, at *2 (recommending dismissal, without leave to amend, the plaintiff's claims against the Appellate Division Third Department); *Jackson*, 2016 WL 4004612, at *5 (dismissing claims against the Syracuse Police Department with prejudice and without leave to amend because the Syracuse Police Department "is not susceptible to suit under § 1983."). However, to the extent that Plaintiff attempted to assert claims against Defendants Angel and Guyyey—in their individual or official capacities —I am unable to conclude with complete certainty that if permitted leave to amend the complaint, Plaintiff could not assert a plausible claim pursuant to 42 U.S.C. § 1983.

Moreover, generally, a district court should not dismiss claims as time barred without providing a *pro se* plaintiff with "notice and opportunity to be heard" as to whether there might be a meritorious tolling argument or other reason why the complaint might be considered. *Abbas*, 480 F.3d at 640. Therefore, I recommend that Plaintiff's time barred claims pursuant to 42 U.S.C. § 1983 and the ADA be dismissed with leave to amend. [19]

[19]     To the extent that Plaintiff seeks monetary damages against Defendants Angel and Guyyey in their

individual capacities pursuant to the ADA I recommend that those claims be dismissed with prejudice and without leave to amend.

In addition, I recommend that to the extent that Plaintiff intended to assert claims pursuant to 42 U.S.C. § 1997, those claims be dismissed with prejudice and without leave to amend because permitting amendment would be unproductive.

If Plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**ACCORDINGLY**, it is

**ORDERED** that the amended application to proceed *in forma pauperis* (Dkt. No. 4) is **DENIED WITHOUT PREJUDICE**; and it is further [20]

[20]     If Plaintiff wishes to proceed with this action, he must either (i) pay the $402.00 filing fee, or (ii) submit a renewed IFP application detailing his current financial condition complete with the required inmate authorization form, within thirty

(30) days from the date of the filing of Court's Decision and Order. Failure to comply with this directive will result in the issuance of a report and recommendation to the assigned district judge that the action be dismissed.

**\*17  ORDERED** that the Clerk of the Court shall provide Plaintiff with a blank inmate authorization form; and it is further

**ORDERED** that the Clerk of the Court shall amend the docket so as to **ADD** as Defendants the additional entities and individuals identified in the Complaint (i.e. the Broome County Sheriff's Department, Detective Sergeant Barry Angel, and Deputy Sheriff William Guyyey); and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's (1) claims pursuant to 42 U.S.C. § 1983 against Defendants New York, Binghamton Police Department, Broome County Sheriff's Department, New York State Appellate Division Third Department, United States District Court for the Northern District of New York, and Second Circuit Court of Appeals; and (2) claims pursuant to 42 U.S.C. § 1997, for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b); and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's (1) claims pursuant to 42 U.S.C. § 1983 against Defendants Angel and Guyyey; and (2) claims pursuant to the ADA, for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [21]

[21]      The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [22]  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

[22]      If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2021 WL 1406649

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Verbitsky v. Montalbano, E.D.N.Y., July 29, 2009

2009 WL 799951
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Herminio ESPINAL, Plaintiff,

v.

NYS DEPARTMENT OF CORRECTIONAL
SERVICES; Glenn S. Goord, Commissioner;
Lester N. Wright; J.T. Smith; Dr.
Gregoire; Dr. Genovese, Defendants.

No. 9:06CV596.
|
March 24, 2009.

West KeySummary

1    Prisons 🔑 Particular Conditions and
     Treatments

     Sentencing and Punishment 🔑 Medical
     Care and Treatment

     Prison doctors' refusal to prescribe the type or
     amount of medication that a prisoner desired did
     not constitute subjective deliberate indifference
     to the prisoner's serious medical needs in
     violation of the Eighth Amendment. The prisoner
     was seen by prison medical staff on several
     occasions and given medications recommended
     by a pain clinic and specialists who examined the
     prisoner. According to medical records, stronger
     medications were not prescribed for medical
     reasons. Specifically, prison doctors determined
     that the prisoner was addicted to Valium and MS
     Contin and the prisoner exhibited drug seeking
     behavior. Medical staff observed the prisoner
     sleeping through the night and carrying out
     daily activities without apparent pain. U.S.C.A.
     Const.Amend. 8; 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Herminio Espinal, Wallkill, NY, pro se.

David L. Cochran, New York State Attorney General, Albany,
NY, for Defendants.

MEMORANDUM OPINION

LYLE E. STROM, Senior District Judge.

**\*1** This matter is before the Court on defendants' motion
for summary judgment (Filing No. 44). Upon review of the
motion, the memoranda and evidentiary submissions of the
parties, and the applicable law, the Court finds that the motion
should be granted with respect to plaintiff's federal claims.

**I. INTRODUCTION**

Plaintiff Herminio Espinal ("Espinal") is a prisoner in the
custody of the New York State Department of Correctional
Services ("DOCS"). Espinal brings this action pursuant to
42 U.S.C. § 1983, alleging he received inadequate medical
care while incarcerated at Five Points Correctional Facility
("Five Points") and Shawangunk Correctional Facility
("Shawangunk") from July of 2004 to the present, in violation
of the Eighth Amendment. In addition, Espinal asserts a
claim under Title II of the Americans with Disabilities
Act ("ADA"), 42 U.S.C. § 12131 et seq., and a claim for
negligence under New York state law.

**II. BACKGROUND**

In November of 1974, Espinal was convicted of murder and
sentenced to a term of imprisonment of twenty-five years to
life (Filing No. 1, ¶ 10; Filing No. 44–6, ¶ 1). Espinal was
subsequently placed in DOCS custody and has since resided
in several different correctional facilities (Filing No. 1, ¶¶ 10,
13, 16, 19, 21).

In 1980, Espinal briefly escaped from DOCS custody (Filing
No. 1, ¶ 11; Filing No. 44–6, ¶ 2). During his recapture,
Espinal was shot in the spine (Filing No. 1, ¶ 11; Filing
No. 44–6, ¶ 3). As a result of the spinal injury, Espinal
is a paraplegic, confined to a wheelchair, and suffers from

2009 WL 799951

neuropathic pain syndrome (Filing No. 1, ¶ 12; Filing No. 44–6, ¶¶ 4–5).

According to Espinal, he suffers "excruciating and unbearable pain" due to his injuries (Filing No. 47, ¶ 5). Throughout Espinal's incarceration, the prison medical staff has prescribed a variety of medicines in an attempt to alleviate Espinal's pain (Filing No. 1, ¶¶ 13, 14, 16, 18; Filing No. 44–6, ¶ 6; Filing No. 44–4, exh. A). Espinal contends that the majority of these medications were ineffective, but his pain was effectively managed when he received both Valium and MS Contin from June of 1995 to July of 2004 (Filing No. 1, ¶¶ 14–16, 18; Filing No. 47, ¶¶ 12–13). Valium and MS Contin were recommended by specialists who examined Espinal from 1995–1998 (Filing No. 47, ¶¶ 10, 14–16, 19, exh. A at 13–16). One of the specialists reported in March of 1996 that Espinal had "legitimate reason for pain" and responded best to MS Contin (Filing No. 47, exh. A at 15). Espinal received Valium and MS Contin from 1995 until he was transferred from Shawangunk to Five Points on July 27, 2004 (Filing No. 47, ¶ 20).

Espinal was seen by defendant Dr. Gregoire at Five Points (Filing No. 1, ¶ 8). According to medical records dated August 3, 2004, Dr. Gregoire determined Espinal was addicted to Valium and MS Contin, noted that in spite of complaints of pain Espinal was "animated in his conversation—moving easily both in his bed and in wheelchair—gesturing [ ] arms [and] head," and concluded that Espinal would be able to manage his pain without narcotics (Filing No. 44–3, ¶¶ 8–9; Filing No. 44–4, exh. A at 37–40). Dr. Gregoire discontinued Espinal's prescription for Valium, tapered and then discontinued MS Contin, and gave Espinal alternative medications [1] (*Id.*).

---

[1] Espinal received Clonidine, Percogesic (a non-narcotic pain medication), Baclofen, and Neurontin (a medication used to treat neuropathic pain) (Filing No. 44–4, exh. A at 37–40; Filing No. 44–3, ¶ 8).

**\*2** Subsequently, Espinal issued several complaints. Espinal complained that he lost bladder control once his prescription for Valium was discontinued (Filing No. 47, ¶ 31). Espinal was given a catheter and leg bag for his bladder condition (*Id.* at ¶ 33). In addition, Espinal complained of pain and often requested Valium and MS Contin (*Id.* at ¶¶ 29, 46; *see, e.g.,* Filing No. 44–4, exh. A at 31–32, 41, 44). Dr. Gregoire refused to prescribe Valium or MS Contin but

continued to prescribe alternative medications, some of which Espinal voluntarily refused (*See* Filing No. 44–4, exh. A; Filing No. 44–3, ¶¶ 9–12, 14–15). Medical staff noted in Espinal's medical records that Espinal exhibited drug seeking behavior, maintained excellent hygiene and grooming despite complaints of pain, and was observed by medical staff sleeping through the night and engaged in activities without apparent pain (*See, e.g.,* Filing No. 44–4, exh. A at 30–33, 44; Filing No. 44–3, ¶¶ 9, 14).

Espinal was seen by the pain clinic in September of 2004 (Filing No. 44–4, exh. A at 41). The pain clinic recommended Espinal receive a Clonidine patch, which was ordered (*Id.;* Filing No. 44–3, ¶ 11). Espinal was again seen by the pain clinic in December of 2004 (Filing No. 44–4, exh. A at 45; Filing No. 44–3, ¶ 15). According to the medical records, the pain clinic recommended Clonidine pills, which Espinal refused, and stated there was no need for Espinal to return to the clinic (*Id.*). Espinal was seen by a physiatrist in July of 2005; the consultation note stated that "chronic narcotics in neuropathic pain are rarely if ever indicated." (Filing No. 44–3, ¶ 16; Filing No. 44–4, exh. A at 48).

In September of 2005, Espinal was transferred to Shawangunk where Espinal was seen by defendant Dr. Genovese (Filing No. 1, ¶ 9; Filing No. 44–3, ¶ 17). As of September of 2005, Espinal was receiving Neurontin (Filing No. 44–4, exh. A at 47; Filing No. 44–3, ¶ 18). Espinal requested Valium and narcotics; Dr. Genovese reviewed the July 2005 physiatrist consultation note with Espinal and refused to prescribe Valium or narcotics (Filing No. 44–3, ¶¶ 17–19, Filing No. 44–4, exh. A at 48–49). Dr. Genovese offered Espinal non-narcotic medications, which he declined (Filing No. 44–3, ¶ 19).

Espinal complained of pain on several occasions and requested Valium and morphine (MS Contin) (*See, e.g.,* Filing No. 44–4, exh. A at 3, 53, 61, 70). Dr. Genovese refused to prescribe Valium and initially refused to prescribe MS Contin (MS Contin was later prescribed), but Dr. Genovese continued to prescribe alternative medications (*See* Filing No. 44–4, exh. A; *see* Filing No. 44–3, ¶¶ 22–25, 30). Medical staff noted in Espinal's medical records that Espinal maintained good grooming, was observed engaged in activities without distress despite complaints of pain, and exhibited drug seeking behavior (*See, e.g.,* Filing No. 44–4, exh. A at 11, 17, 53; Filing No. 44–3, ¶¶ 26, 33–34).

2009 WL 799951

**\*3** Espinal was seen by a neurologist in December of 2005 (Filing No. 44–3, ¶ 22; Filing No. 47, exh. A at 18). The neurologist recommended Espinal's existing prescriptions for Neurontin and Klonopin be increased and stated that if the increased medication did not help, to begin Nortriptyline and Valium (Filing No. 44–3, ¶ 22; Filing No. 47, exh. A at 18). Espinal did not want to take Nortriptyline (Filing No. 44–3, ¶ 22). Dr. Genovese ordered physical therapy for Espinal in October of 2006 (*Id.* at ¶ 27). Espinal was seen by a physiatrist in November of 2006 (*Id.* at ¶ 28). The physiatrist stated Klonopin, which Espinal received, is preferred to Valium for neuropathic pain and recommended MS Contin; MS Contin was prescribed in December of 2006 (*Id.* at ¶¶ 28–30). Espinal wanted a stronger dose of MS Contin than what was prescribed (*Id.* at ¶ 30). Espinal's MS Contin prescription was given cautiously because morphine is known to cause respiratory depression, and Espinal has severe emphysema [2] (*Id* . at ¶¶ 31, 33). As of August 30, 2007, Espinal continued to refuse non-narcotic medication and sought higher drug doses (*Id.* at ¶¶ 34–35). Dr. Genovese contends Espinal is receiving adequate treatment (*Id.* at ¶ 34).

[2]     This lawsuit does not include any claims regarding Espinal's respitory condition (Filing No. 44–5, Espinal Depo., at 75–76).

### III. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A fact is material when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Court must view the evidence in a light most favorable to the nonmoving party, with all reasonable inferences drawn in that party's favor. *See Matsushita Elec. Indus.,* 475 U.S. at 587. However, when a motion for summary judgment is properly made and supported, the nonmoving party may not rest on the mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. Fed.R.Civ.P. 56(e)(2). "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

In addition, because Espinal is a *pro se* litigant, the Court must construe Espinal's complaint and brief liberally, reading the submissions "to raise the strongest arguments they suggest." *Bertin v. United States,* 478 F.3d 489, 491 (2d Cir.2007).

### IV. DISCUSSION

#### A. Espinal's § 1983 Claim Relating to Inadequate Medical Treatment

**\*4** Espinal claims the actions of defendants Goord, Wright, Smith, Gregoire, and Genovese "in formulating, instituting and implementing a policy of not prescribing appropriate narcotic medicines for the effective management of deliberate pain" constitute cruel and unusual punishment in violation of the Eighth Amendment (Filing No. 1, ¶ 27). Defendants Goord, Wright, and Smith contend they are entitled to summary judgment because they were not personally involved in any alleged constitutional violation, and all of the individual defendants contend Espinal's § 1983 claim should be dismissed because Espinal does not have a right to choose the proper course of treatment.

The Court finds Espinal's claim is deficient on the merits, and therefore, the Court does not address the issue of personal involvement.

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The standard of deliberate indifference includes a subjective prong and an objective prong. *Id.* "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' Second, the defendant 'must act with a sufficiently culpable state of mind.' " *Id.* (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)) (internal citations omitted). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer*

*v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Here, Espinal has failed to offer sufficient evidence from which a reasonable jury could find the subjective prong is satisfied. Espinal does not allege that defendants refused to prescribe medication for his pain. Indeed, the medical records show that prison doctors prescribed Espinal a variety of medications in varying doses. The gravamen of Espinal's claim is that defendants prescribed non-narcotic medication or mild medication (due to the type or dose of the medication) for Espinal's pain when Espinal should have received stronger medication.

"It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703; *see also Veloz v. New York,* 339 F.Supp.2d 505, 525 (S.D.N.Y.2004), *aff'd,* 178 Fed. Appx. 39 (2d Cir.2006) (unpublished) ("The Eighth Amendment is not implicated by prisoners' complaints over the adequacy of the care they received when those claims amount to a disagreement over the appropriateness of a particular prescription plan."); *Whitcomb v. Todd,* No. 9:04–CV–223, 2008 WL 4104455, at *10 (N.D.N.Y. Sept.3, 2008) (disagreements over medications is not an adequate ground for a § 1983 claim). Even conduct that constitutes medical malpractice does not give rise to an Eighth Amendment claim unless the malpractice involved culpable recklessness. *Chance,* 143 F.3d at 703.

**\*5** The fact that prison doctors did not prescribe the type or amount of medication Espinal desired does not amount to subjective deliberate indifference. Espinal was seen by prison medical staff on several occasions and given medications recommended by the pain clinic and some of the specialists who examined Espinal. According to the medical records, stronger medications were not prescribed for medical reasons. Specifically, prison doctors determined Espinal was addicted to Valium and MS Contin,[3] medical staff observed Espinal sleeping through the night and carrying out daily activities without apparent pain, both Dr. Gregoire and Dr. Genovese noted Espinal exhibited drug seeking behavior, and Dr. Genovese prescribed MS Contin in cautious amounts due to Espinal's respiratory condition.

3    Espinal did not dispute this fact during his deposition (Filing No. 44–5, Espinal Depo., at 38–39, 52).

In an attempt to show that defendants' decision was the product of deliberate indifference rather than medical judgment, Espinal relies on defendants' Rule 7.1(a)(3) statements, wherein the defendants state that Dr. Gregoire informed Espinal that Dr. Gregoire could no longer prescribe MS Contin because of new DOCS policies concerning medication, and Dr. Genovese informed Espinal that MS Contin and Valium were no longer prescribed due to DOCS regulations (Filing No. 44–6, ¶¶ 8, 11). Based on these statements, Espinal claims there is sufficient evidence to create a genuine dispute as to whether defendants' failure to prescribe stronger medication was the result of medical judgment or simple compliance with prison regulations indicating deliberate indifference. The Court disagrees. Foremost, there is no evidence regarding the content of these "policies and regulations." Moreover, these statements are not supported by the record before the Court. *See Shomo v. N.Y. Dep't. of Corr. Servs.,* No. 9:04–CV–0910, 2007 WL 2580509, at *2 (N.D.N.Y. Sept.4, 2007) ("... the facts set forth in a movant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record ..."). Defendants cite to the complaint as support for these statements, but there is no reference to these policies and regulations in the medical records, nor is there any dispute among the parties that Dr. Genovese did prescribe Espinal MS Contin. Defendants' 7.1(a)(3) statements do not create a genuine dispute of material fact.

Based on the foregoing, defendants Goord, Wright, Smith, Gregoire, and Genovese are entitled to summary judgment on Espinal's § 1983 claim.[4]

4    To the extent Espinal's § 1983 claim is also asserted against DOCS, DOCS is entitled to summary judgment in accordance with the Court's discussion and on the basis of immunity under the Eleventh Amendment. *See Martin v. N.Y. State Dep't. of Corr. Servs.,* 224 F.Supp.2d 434, 441 (N.D.N.Y.2002).

### B. Espinal's Claim under Title II of the ADA

Espinal claims he is unable to participate in program activities due to his pain, and DOCS's "policies" of not prescribing appropriate medication for Espinal's pain denies Espinal a reasonable accommodation in violation of the ADA. DOCS

2009 WL 799951

contends it is entitled to summary judgment because Espinal's claim is barred by the Eleventh Amendment, and Espinal has failed to prove DOCS acted with discriminatory animus towards Espinal's disability. Aside from the constitutional issues raised by Espinal's claim, the Court finds the claim is deficient on the merits.

**\*6** Title II of the ADA provides in part: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II of the ADA applies to prisoners in correctional facilities. *See Pa. Dep't of Corrs. v. Yeskey,* 524 U.S. 206, 209–10, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998).

"To state a claim under Title II of the ADA, a prisoner must show that i) he or she is a qualified individual with a disability; ii) that was excluded from participation in, or denied the benefits of some service, program, or activity by reason of the disability; and iii) the entity providing the service, program, or activity is a public entity." *Beckford v. Portuondo,* 151 F.Supp.2d 204, 220 (N.D.N.Y.2001).

Here, Espinal has not offered sufficient evidence that he was excluded from participation in activities by reason of his disability. The medical records indicate Espinal was denied stronger medication for medical reasons not associated with his disability, *see supra. See Shomo,* 2007 WL 2580509, at \*14 ("... it is not a violation of the ADA to deny an inmate's request for reasonable accommodations because of a reason *other than his disability.*"). Accordingly, DOCS's motion for summary judgment on Espinal's ADA claim will be granted.[5]

[5] To the extent Espinal's ADA claim is also asserted against defendants other than DOCS, the remaining defendants are similarly entitled to summary judgment. To the extent the individual defendants are sued in their individual capacity, they are not liable under the ADA. *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001). To the extent the individuals are sued in their official capacity, they are entitled to summary judgment in accordance with the Court's discussion.

### *C. Espinal's Negligence Claim*
Espinal's state law negligence claim was asserted pursuant to the Court's supplemental jurisdiction. Because the Court has dismissed Espinal's federal claims, the Court declines to exercise jurisdiction over Espinal's state law claim, and it will be dismissed without prejudice.

### V. CONCLUSION

Summary judgment will be granted to all defendants on Espinal's § 1983 and ADA claims. Espinal's negligence claim will be dismissed without prejudice. A separate order will be entered in accordance with this memorandum opinion.

DATED this 23rd day of March, 2009.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 799951

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Blandon v. Aitchison, Not Reported in Fed. Supp. (2019)

2019 WL 1206370

2019 WL 1206370
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Moise BLANDON, Plaintiff,

v.

Michael AITCHISON, ICP Supervisor; Michael Capra, Superintendent; S. Cousins, Lieutenant; Sylvester Johnson, Sergeant; Ronald Lerouge, Correction Officer; Quadrena T. Quick, IGP Supervisor, Defendants.

No. 17-CV-65 (KMK)
|
Signed 03/14/2019

**Attorneys and Law Firms**

Moise Blandon, Ossining, NY, Pro Se Plaintiff.

Bruce J. Turkle, Esq., New York State Office of the Attorney General, New York, NY, Counsel for Defendants.

OPINION AND ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

*1 Pro se Plaintiff Moise Blandon ("Plaintiff"), currently incarcerated at Sing Sing Correctional Facility, filed the instant Amended Complaint ("Amended Complaint"), pursuant to 42 U.S.C. § 1983, against Superintendent Michael Capra ("Capra"), Intermediate Care Program ("ICP") Supervisor Michael Aitchison ("Aitchison"), Lieutenant S. Cousins ("Cousins"), Correction Officer Lerouge R. ("Lerouge"), Sergeant Sylvester Johnson ("Johnson"), and Inmate Grievance Program ("IGP") Supervisor Quadrena T. Quick ("Quick") (collectively, "Defendants") (Am. Compl. (Dkt. No. 52).) Plaintiff alleges that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments, as well as under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 et seq., when they allegedly failed to protect him from an HIV and Hepatitis C-infected inmate, "Ebanks," who entered Plaintiff's cell and bit his face, and when they subsequently prevented him from timely filing an inmate grievance relating to the incident in order to exhaust his administrative remedies. (See generally Am. Compl.)

Before the Court is Defendants' Motion To Dismiss the Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6). (See Not. of Mot. (Dkt. No. 67); Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") (Dkt. No. 68).) Defendants argue that Plaintiff's Amended Complaint fails to allege the personal involvement of Capra, Aitchison, and Cousins in any constitutional violation, and fails to state a claim as to all Defendants. (See generally Defs.' Mem.) For the following reasons, Defendants' Motion is granted in part and denied in part.

I. Background

A. Factual Background

The following facts are drawn from Plaintiff's Amended Complaint and are taken as true for the purpose of resolving the instant Motion. The Court assumes familiarity with the facts underlying its November 20, 2017 Opinion and Order dismissing Plaintiff's original Complaint. (See Nov. 20, 2017 Op. & Order ("Opinion") 3–5 (Dkt. No. 30).)

Plaintiff is a prisoner incarcerated at Sing Sing Correctional Facility, and, due to his intellectual disability, was, at the time of the alleged events, in the custody of the Intermediate Care Program ("ICP"), which worked with the Office of Mental Health ("OMH"). (Am. Compl. ¶¶ 7, 19; see also Opinion 3.) On June 14, 2016, while Plaintiff was confined to his cell, "Ebanks ran into [Plaintiff's] cell" and bit his face, "causing 2 by 2 inches deep teeth-punctures, bleeding, and permanent disfigurement." (Am. Compl. ¶¶ 15–16.) The attack occurred shortly after the 5:00 p.m. "Medication Run"; although inmates typically "have no free movement" during the Medication Run, Ebanks was allowed to return to his cell "unescorted." (Id. ¶ 23.) Lerouge, who was on duty at the time, allegedly "did not secure" the inmates that day, and a witness later informed Cousins that he overheard Lerouge tell Ebanks, "I know you have issues on the Unit. I'm leaving the cells open. Go handle your business." (Id. ¶¶ 22, 23.) Defendants "had prior knowledge of Ebanks being a highly volatile inmate infected with HIV" based on his prior conduct, including attacks on staff and other inmates, and because he allegedly "screams out of his cell repeatedly every day that he has HIV to threaten staff and inmates." (Id. ¶ 21.)

*2 Following the incident, Lerouge wrote an Inmate Misbehavior Report ("IMR") against Plaintiff "for fighting and violent conduct" in order "to conceal his liability for the assault and his lack of supervision and training." (Id. ¶ 25.)

Case 9:21-cv-00251-DNH-TWD    Document 37    Filed 05/22/23    Page 200 of 229
Blandon v. Aitchison, Not Reported in Fed. Supp. (2019)
2019 WL 1206370

Johnson was the area supervisor at the time, and allegedly failed to give orders to Lerouge to secure the ICP inmates in their cells or to prevent the attack, and later signed the IMR written by Lerouge. (*Id.* ¶¶ 24, 25.) Cousins ultimately reviewed the IMR and cleared Plaintiff of misconduct, but then allegedly "concealed, modified, spoiled, or destroyed the record of [a] confidential witness[ ] interview" in relation to the investigation. (*Id.* ¶ 26.)

On June 20, 2016, Plaintiff filed a grievance with Quick concerning the attack "for her to process and file." (*Id.* ¶ 27.) However, Quick "held" the grievance "until mid[-]July 2016" and then returned it to Plaintiff, "telling him it was untimely." (*Id.* ¶ 28.) Plaintiff remained unaware of the status of his grievance "until Karen Bellamy, the CORC Supervisor, sent him a letter responding to his inquiry about it." (*Id.*)

### B. Procedural Background

Plaintiff filed his original Complaint on January 3, 2017, asserting claims against Capra, Lerouge, and Johnson, as well as three John Doe Defendants. (Compl. (Dkt. No. 2.) ) The Court granted Plaintiff's request to proceed in forma pauperis on January 26, 2017. (Dkt. No. 6.) On November 20, 2017, the Court granted Defendants' Motion To Dismiss the original Complaint without prejudice. (*See generally* Opinion.) The Court dismissed Plaintiff's claims against Capra for lack of personal involvement. (*Id.* at 13–16.) The Court dismissed Plaintiff's Eighth Amendment claim against Lerouge, finding that although the Complaint "plausibly allege[d] that Defendants ... were aware that attacks on other ICP inmates were foreseeable," absent enforcement of ICP policies requiring supervision and separation of ICP inmates, Plaintiff alleged only negligence in failing to secure Ebanks in his cell, which "cannot constitute deliberate indifference." (*Id.* at 21–22.) The Court also dismissed Plaintiff's Eighth Amendment claim against Johnson, explaining that Plaintiff "provide[d] only general allegations, without any factual detail, of Johnson's purported lack of supervision, and merely labels these actions illegal or unconstitutional." (*Id.* at 23.) Finally, the Court dismissed Plaintiff's substantive due process claim as duplicative of "Plaintiff's Eighth Amendment claim for failure to protect and deliberate indifference," and dismissed any possible procedural due process claim on the basis that "Plaintiff does not possess a protected liberty interest in having Defendants follow prison policy." (*Id.* at 24–26.)

On May 18, 2018, Plaintiff filed the operative Amended Complaint, adding Defendants Cousins, Aitchison, and Quick, and asserting claims under the First, Eighth, and Fourteenth Amendments, as well as under the ADA. (*See* Am. Compl.) On August 31, 2018, Defendants filed the instant Motion to Dismiss the Amended Complaint. (Not. of Mot.; Defs.' Mem.) On November 1, 2018, after Plaintiff failed to file an opposition, Defendants filed a letter asking the Court to deem the Defendants' Motion To Dismiss fully submitted without opposition, (Dkt. No. 70), which the Court granted the same day, (Dkt. No. 71). On November 16, 2018, Plaintiff filed a letter asking the Court to decide the Motion To Dismiss without opposition, stating that "the facts in the [A]mended [C]omplaint are sufficient," (Dkt. No. 72), and the Court confirmed it would treat the Motion as fully submitted, (Dkt. No. 73).

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in

2019 WL 1206370

original) (quoting Fed. R. Civ. P. 8(a)(2) ) ); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*3** In considering Defendants' Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[ ] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012) ). Where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [his complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). However, when the complaint is pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at \*4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that the plaintiff[ ] either possessed or knew about and upon which [he or she] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000). Finally, the "failure to oppose Defendants' [M]otion [T]o [D]ismiss does not, by itself, require the dismissal of [Plaintiff's] claims." *Leach v. City of New York*, No. 12-CV-2141, 2013 WL 1683668, at \*2 (S.D.N.Y. Apr. 17, 2013). Rather, "the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law." *McCall v. Pataki*, 232 F.3d 321, 322–23 (2d Cir. 2000).

B. Analysis

1. Personal Involvement of Defendants
Capra, Aitchison, and Cousins

Defendants Capra, Aitchison, and Cousins argue that the Amended Complaint should be dismissed against them because Plaintiff does not sufficiently allege their personal involvement in any of the alleged constitutional violations. (Defs.' Mem. 5–8.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and quotation marks omitted). In other words, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "The personal involvement and liability of supervisory personnel is established when the supervisory official has 'actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act.' " *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) (quoting *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989) ).

Case 9:21-cv-00251-DNH-TWD   Document 37   Filed 05/22/23   Page 202 of 229

Blandon v. Aitchison, Not Reported in Fed. Supp. (2019)

2019 WL 1206370

**\*4** With respect to Capra, the Court found that Plaintiff's original Complaint "contain[ed] no allegations that Capra was personally involved in the alleged violations of Plaintiff's constitutional rights," (Opinion 15), as it merely alleged that Capra was "the policymaker therefrom and failed to take any proactive action to remedy the wrong," (*id.* (quoting Compl. ¶ 9) ). Aitchison and Cousins were not Defendants in the original Complaint.

Plaintiff now alleges that "Capra and Aitchison jointly govern and operate ICP at Sing Sing," and that they "conducted a background information study of Ebanks['s] medical and mental health records to determine his ICP eligibility, and the remedial planning and treatment for him." (Am. Compl. ¶¶ 19–20.) Plaintiff also alleges that Capra and Aitchison "made tours of ICP once a week" and "[w]eekly ... stopped at Ebanks['s] cell to discuss his highly volatile behavior toward himself, staff, and other inmates" throughout Plaintiff's 16 months in ICP, but failed to give orders to "remove him from ICP or to move him to a more restrictive residential mental health treatment unit." (*Id.* ¶¶ 31–33.) Plaintiff also alleges that Capra and Johnson "were acquiescent to and did not supervise and train Defendant Lerouge regarding ICP and its residents." (*Id.* ¶ 34.)

Construing Plaintiff's submission liberally, the Amended Complaint sufficiently pleads the personal involvement of Capra and Aitchison in the alleged constitutional violation. Defendants, citing *Grullon*, argue that "Plaintiff fails to allege that Capra and Aitchison ... knew that Ebanks had a propensity to assault, let alone bite, other inmates ... or ... failed to act on information indicating that the alleged assault was occurring, or might occur." (Defs.' Mem. 6.) However, Plaintiff clearly alleges that Capra and Aitchison personally "performed the screening process of Ebanks" before placing him in ICP, that they spoke to Ebanks weekly about his volatile conduct, and that Ebanks was involved in several specific incidents, including a fight with another inmate that required Ebanks to be moved to another section of ICP, that plausibly put Capra and Aitchison on notice that Ebanks posed a threat to other inmates. (Am. Compl. ¶¶ 20, 21, 31, and 32.) Plaintiff also identifies more restrictive residential mental health treatment units to which Ebanks could have been assigned by Capra and Aitchison. (*See* Am. Compl. ¶ 33.) *See also* 7 N.Y.C.R.R. 320.5 (describing the "intensive intermediate care program"). If, as Plaintiff alleges, Ebanks was indeed a known risk to other inmates and Capra and Aitchison failed to sufficiently remedy the issue, they may be liable for constitutional violations resulting

from their inaction. *See Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013) (noting supervisors may be liable where "there had been a history of previous episodes putting the defendants on notice of the problem" (citation and quotation marks omitted) ); *Mock v. Axelrod*, No. 86-CV-2768, 1988 WL 18891, at \*3 (S.D.N.Y. Feb. 23, 1988) (noting that "prison supervisors may be liable if they knew or should have known of assaults being perpetrated upon prisoners" (quotation marks omitted) ). Construing Plaintiff's Amended Complaint liberally to assert the strongest arguments it suggests, *see Sykes*, 723 F.3d at 403, the Court finds that Plaintiff has plausibly alleged Capra's and Aitchison's personal involvement in the purported constitutional violation.

**\*5** However, with respect to Cousins, Plaintiff has failed to sufficiently allege personal involvement in a constitutional violation. Plaintiff's only allegations against Cousins relate to his oversight of the investigation into Plaintiff's alleged assault. Plaintiff alleges that Cousins "found [Plaintiff] not guilty of the charges" in the IMR, but that "he concealed, modified, spoiled, or destroyed the record of the confidential witness[ ] interview" conducted pursuant to an investigation into the incident, in which a witness reported hearing Lerouge tell Ebanks that he would leave the cell doors open to allow Ebanks to "handle [his] business." (Am. Compl. ¶¶ 22, 26.) Plaintiff's allegation that Cousins destroyed the witness interview materials, without additional facts, does not demonstrate his involvement in any constitutional violation and is thus insufficient to withstand a motion to dismiss. Even assuming Plaintiff's allegation is true, Plaintiff does not explain how Cousins's concealment or destruction of witness interview materials *after* he cleared Plaintiff of misbehavior violated Plaintiff's constitutional rights. Plaintiff asserts that "[t]he law requires preservation of the record of the confidential witness' interview to meet the demands of due process," and that Cousins's conduct "prevents Blandon from proving Defendant Lerouge's liability partly." (*Id.* ¶ 26 (emphasis omitted).) The Court is not aware of any caselaw holding that concealment or destruction of a witness interview *after* completion of an inmate disciplinary hearing at which the inmate was found not guilty, standing alone, violates the Constitution. Plaintiff has identified no liberty or property interest that he was denied as a result of the alleged concealment of the confidential witness interview materials. *Zimmerman v. Burge*, No. 06-CV-176, 2008 WL 850677, at \*2 (N.D.N.Y. Mar. 28, 2008) (noting that a prisoner "cannot state a claim for procedural due process without first establishing that he has been denied a liberty or property

Case 9:21-cv-00251-DNH-TWD    Document 37    Filed 05/22/23    Page 203 of 229

Blandon v. Aitchison, Not Reported in Fed. Supp. (2019)
2019 WL 1206370

interest"). On the contrary, Plaintiff's disciplinary hearing terminated in his favor.

To the extent Plaintiff alleges that the concealment of the witness interview prevents this Court from considering it in connection with Plaintiff's claims against Lerouge, thereby violating his right of access to the Courts, Plaintiff still fails to sufficiently allege a constitutional violation. "When asserting a claim for deprivation of the right to access the courts, a plaintiff must allege facts sufficient to show that he suffered an actual injury." *McIntosh v. United States*, No. 14-CV-7889, 2016 WL 1274585, at \*23 (S.D.N.Y. Mar. 31, 2016); *see also Anderson v. Leghorn*, No. 07-CV-1184, 2011 WL 691658, at \*3 (N.D.N.Y. Jan. 24, 2011) ("To establish standing for a claim for denial of right of access to courts, an inmate must show that he has suffered an actual injury traceable to the challenged conduct of prison officials—that is, that a 'nonfrivolous legal claim had been frustrated or was being impeded' due to the actions of prison officials." (quoting *Lewis v. Casey*, 518 U.S. 343, 353 (1996) ) ), *adopted by* 2011 WL 691653 (N.D.N.Y. Feb. 18, 2011). Here, Plaintiff has not sufficiently alleged an actual injury. The Second Circuit has not formally recognized "backward-looking right of access" claims based on official action that "caused the loss or inadequate settlement of a meritorious case," but has noted that even if recognized, "such claims are available only if a judicial remedy was completely foreclosed by the false statement or nondisclosure." *Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012) (citation and quotation marks omitted). At best, Plaintiff's claim is "premature" because the destruction of the witness interview materials has not yet deprived Plaintiff of the opportunity to litigate a meritorious cause of action; indeed, the Court presumes at this stage that Plaintiff's allegation regarding what the confidential witness said about Lerouge's conduct is true and, as discussed below, denies Defendants' Motion as to Lerouge on that basis. *See Sousa*, 702 F.3d at 128–29 (holding the plaintiff failed to state a backward-looking right-of-access claim based on allegations that "the government concealed or manipulated relevant facts" where the plaintiff was sufficiently "aware of the facts giving rise to his claim" at the time he brought his lawsuit); *Braun v. Sterno*, No. 18-CV-919, 2018 WL 5778248, at \*7 (D. Conn. Nov. 2, 2018) (finding a due process claim based on denial of access to the courts "premature ... [b]ecause the court is permitting his First Amendment claim to proceed against [the defendant], [and therefore] the destruction of [evidence] has not yet deprived [the plaintiff] of any opportunity to litigate a nonfrivolous cause of action"); *Brown v. Volpe*, No. 15-CV-9004, 2017 WL 985895, at \*4 (S.D.N.Y. Mar. 13,

2017) (dismissing right-of-access claim where the plaintiff "has filed a civil action—this very action—against both [defendants]" who allegedly tampered with evidence that would support his claims against them); *McNaughton v. de Blasio*, No. 14-CV-221, 2015 WL 468890, at \*12 (S.D.N.Y. Feb. 4, 2015) ("[The] [p]laintiff has not alleged in his [a]mended [c]omplaint ... that the loss or destruction by the NYPD of any evidence has completely foreclosed his ability to bring his other constitutional claims, and the filing of the instant suit would belie any such argument."), *aff'd*, 644 F. App'x 32 (2d Cir. 2016); *Vallade v. Fischer*, No. 12-CV-231, 2014 WL 5481881, at \*16 (W.D.N.Y. Oct. 29, 2014) (holding that "even if [evidence] was willfully destroyed in an effort to cover-up [the] defendants' conduct, [the] plaintiff has not established that this caused him to lose or inadequately settle a meritorious action, since his underlying Eighth Amendment claim ... remains pending"). Therefore, Plaintiff's claims against Cousins are dismissed.

### 2. Eighth Amendment

\*6 Defendants argue that the Amended Complaint fails to state a claim under the Eighth Amendment because Plaintiff fails to indicate that "the assault on him was anything other than a surprise attack" of which Defendants had no notice. (*See* Defs.' Mem. 8–13.) The Eighth Amendment, which prohibits cruel and unusual punishment, requires prison officials to "take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (same). Specifically, "[p]rison officials have a duty to protect prisoners from violence at the hands of other inmates since being violently assaulted in prison is 'simply not part of the penalty that criminal offenders pay for their offenses against society.' " *Lee v. Artuz*, No. 96-CV-8604, 2000 WL 231083, at \*4 (S.D.N.Y. Feb. 29, 2000) (quoting *Farmer*, 511 U.S. at 834). However, "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Instead, "the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Hayes*, 84 F.3d at 620; *see also Price v. Oropallo*, No. 13-CV-563, 2014 WL 4146276, at \*8 (N.D.N.Y. Aug. 19, 2014) ("Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety.").

2019 WL 1206370

To satisfy the deliberate indifference standard, a plaintiff must show that (1) "he is incarcerated under conditions posing a substantial risk of serious harm" and (2) "the defendant prison officials possessed sufficient culpable intent." *Hayes*, 84 F.3d at 620 (citing *Farmer*, 511 U.S. at 834). The first prong is objective and requires that prison officials provide inmates with "basic human needs, one of which is 'reasonable safety.' " *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) ). "The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry." *Hayes*, 84 F.3d at 620. "Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* As the Supreme Court has made clear, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Price*, 2014 WL 4146276, at *8 (explaining that to establish deliberate indifference, "a plaintiff must prove that the defendant official actually knew of and disregarded an excessive risk of harm to the plaintiff's safety"). A defendant's knowledge can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) ("Evidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." (quotation marks omitted) ).

As in their Motion To Dismiss the original Complaint, Defendants do not contest that the Amended Complaint plausibly alleges facts satisfying the objective prong of the deliberate indifference test, (*see* Opinion 18), but rather argue that Plaintiff has failed to sufficiently allege the subjective prong, because he does not allege that Defendants had knowledge of prior incidents between Ebanks and Plaintiff that would have put Defendants on notice that Ebanks "posed a substantial risk of harm to Plaintiff, or that the Defendants in fact drew that inference," (Defs.' Mem. 9).

Although Plaintiff does not allege any specific altercations between himself and Ebanks, "[a] plaintiff may also state a claim for deliberate indifference based on a failure to protect him against a general risk of harm to all inmates at the facility." *Parris*, 947 F. Supp. 2d at 363. "To do so, a plaintiff

must allege that the defendants knew of a history of prior inmate-on-inmate attacks similar to the one suffered by the plaintiff and that the measures they should have taken in response to such prior attacks would have prevented the attack on the plaintiff." *Id.*; *see also Farmer*, 511 U.S. at 843 (noting that a prison official may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the [plaintiff] was especially likely to be assaulted by the specific prisoner who eventually committed the assault"). The Amended Complaint identifies several specific incidents of Ebanks's behavior that could suggest that Ebanks at least posed a general risk to other inmates. (*See* Am. Compl. ¶ 21.) These include references to the fact that Ebanks regularly screamed out his HIV-positive status in his cell "to threaten staff and inmates," that he was on "keeplock" status for assaulting another inmate, that he once set fire to his cell, that he once threw feces at ICP corrections officers, and that he was moved to D-Company South, the same area where Plaintiff is housed, because of a fight with another inmate. (*Id.*) Plaintiff also alleges that Capra and Aitchison performed the screening process that led to Ebanks's designation to ICP, and that Capra, Aitchison, and Johnson regularly discussed Ebanks's "volatile behavior" with Ebanks. (*Id.* ¶¶ 20, 32.)

 *7 However, in order to find that a plaintiff has sufficiently pled a claim for deliberate indifference based on a failure to protect him against a general risk of harm to all inmates, courts typically require specific allegations of a pattern of analogous inmate-on-inmate attacks that would make the attack suffered by the plaintiff foreseeable. *See, e.g., Hosannah v. Nassau Cty. Criminal Supreme Court Sergeant Officer(s)*, No. 16-CV-1045, 2017 WL 3207966, at *12 (E.D.N.Y. July 5, 2017)*, adopted sub nom. Hosanna v. Sposato*, 2017 WL 3207750 (E.D.N.Y. July 26, 2017) (dismissing deliberate indifference claim where plaintiff did not "plead facts sufficient to suggest ... that there were other attacks against prisoners who held the same 'escape risk' status as [the] [p]laintiff"); *Parris*, 947 F. Supp. 2d at 363 (dismissing deliberate indifference claim where the plaintiff "fail[ed] to allege that there is a history of serious inmate-on-inmate assaults in the six block yard [where the plaintiff was attacked], that the defendants knew of any such history, or that such prior assaults were similar enough to the attack he suffered that remedial actions would have prevented that attack").

The Court need not decide this issue with respect to Capra, Aitchison, or Johnson because Plaintiff has not sufficiently

Case 9:21-cv-00251-DNH-TWD    Document 37    Filed 05/22/23    Page 205 of 229

Blandon v. Aitchison, Not Reported in Fed. Supp. (2019)

2019 WL 1206370

alleged that they disregarded any alleged risk of serious harm. In fact, Plaintiff's allegations demonstrate that Sing Sing frequently addressed Ebanks's violent behavior and had policies in place to protect other inmates, and that the attack on Plaintiff only occurred because Lerouge allegedly acted in direct violation of existing policy. Plaintiff alleges no facts supporting an inference that Capra, Aitchison, or Johnson were aware of and either ignored or encouraged Lerouge's alleged misconduct, save for one conclusory allegation that "Capra, Aitchison, and Johnson were acquiescent to and did not supervise and train Defendant Lerouge regarding ICP and its residents." (*See* Am. Compl. ¶¶ 20, 21, 23, 31, 32, 34.) Plaintiff acknowledges that Ebanks was on "keeplock" status at the time of the assault, a restricted status which "isolates unruly prisoners to their[ ] cells and prevents personal encounters with ICP's residents." (Opinion 4 (quoting Compl. ¶ 13).) He also had been moved to D-Company South after an altercation with another inmate. (Am. Compl. ¶ 21.) Sing Sing also allegedly did not allow inmates "free movement" during the Medication Run, and the attack on Plaintiff only occurred because "Lerouge did not secure D-Company inmates or Ebanks to their cells" in spite of ICP policy and Ebanks's keeplock status. (*Id.* ¶ 23.) At most, the general failure to place Ebanks in a more restricted environment to prevent injury to any other inmates constitutes negligence, which is insufficient to state a claim. *See Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) ("Deliberate indifference requires 'more than mere negligence.' " (quoting *Farmer*, 511 U.S. at 835) ); *Wilkins v. Poole*, 706 F. Supp. 2d 314, 319 (W.D.N.Y. 2010) (finding that the plaintiff failed to state a claim because, "even assuming arguendo that the defendants were equally aware of the general dangers of prison life," the plaintiff failed to allege "that the defendants were aware of specific deficiencies in [prison] policies and failed to act" (italics omitted) ); *Cardew v. Fleetwood*, No. 98-CV-4704, 2001 WL 533728, at *3 (S.D.N.Y. May 17, 2001) (dismissing deliberate indifference claim where the defendant failed to secure an inmate on keeplock status because the conduct "was at most negligent"). Absent allegations that Capra, Aitchison, or Johnson knew of Lerouge's plan to leave the cells open and failed to intervene, Plaintiff has failed to allege that they "possessed sufficient culpable intent." *Hayes*, 84 F.3d at 620.

Plaintiff's conclusory allegation that Capra, Aitchison, and Johnson failed to supervise and train Lerouge also fails to state an Eighth Amendment claim against them. (*See* Am. Compl. ¶ 34.) Although grossly negligent supervision can support § 1983 liability, "one phrase of boilerplate ... is insufficient to plead a deliberate-indifference claim under a failure-to-train or failure-to-supervise theory." *Stephens v. Venettozzi*, No. 13-CV-5779, 2016 WL 929268, at *22 (S.D.N.Y. Feb. 24, 2016) (dismissing failure to protect claim based on failure-to-supervise theory where the plaintiff "d[id] not ... describe the nature of the training or supervision that [the defendant] provided to the officers who allegedly violated his rights, explain why that training or supervision was deficient, or provide any facts directly connecting the actions of [the defendant's] subordinates to a failure of training or supervision"), *adopted by* 2016 WL 4272376 (S.D.N.Y. Aug. 5, 2016); *see also Randle v. Alexander*, 960 F. Supp. 2d 457, 478 (S.D.N.Y. 2013) (dismissing § 1983 claim for failure to supervise where the "allegations constitute nothing more than recitations of the applicable standard without supporting factual context"). Plaintiff does assert that "[t]he policies and laws governing ICP require strict training for at least eight (8) hours several times a year of all staff interacting with ICP and its residents," (Am. Compl. ¶ 35), but does not allege that Lerouge did not receive that training or specify how his training was deficient. Nor does Plaintiff explain how Lerouge's deficient training caused Plaintiff's injury; on the contrary, Plaintiff alleges that Lerouge *intentionally* acted in violation of established prison policy for the purpose of allowing Ebanks to attack other inmates. *See Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007) (noting that in order to establish deliberate indifference on a failure to train or supervise theory, a plaintiff must allege that the defendant's "inadequate supervision actually caused or was the moving force behind the alleged violations" (citations omitted) ); *Stephens*, 2016 WL 929268, at *22 (dismissing deliberate indifference claim where the "[p]laintiff does not, for example, describe the nature of the training or supervision that [the supervisor] provided to the officers who allegedly violated his rights, explain why that training or supervision was deficient, or provide any facts directly connecting the actions of [the supervisor]'s subordinates to a failure of training or supervision"); *Randle*, 960 F. Supp. 2d at 479 (dismissing deliberate indifference claim against supervisor on failure-to-train and failure-to-supervise theories where it was "implausible" that the supervisor would have been aware of a practice of encouraging inmate-on-inmate violence among a subset of prison guards, especially given guards' "alleged cover-up of the incident" involving the plaintiff). Although Plaintiff alleges that Johnson was "on the ICP Unit" that day but failed to order Lerouge to secure the ICP inmates or sufficiently supervise Lerouge in his duties to prevent the attack, (Am. Compl. ¶ 24), there are no allegations that Johnson knew or had reason to believe that Lerouge would intentionally violate ICP policy

Case 9:21-cv-00251-DNH-TWD   Document 37   Filed 05/22/23   Page 206 of 229

Blandon v. Aitchison, Not Reported in Fed. Supp. (2019)

2019 WL 1206370

the express purpose of facilitating an inmate-on-inmate attack, *see Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) (concluding that, "[t]o the extent that the [plaintiff] attempts to assert a failure-to-supervise claim ..., it lacks any hint that the [supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [the plaintiff's] constitutional rights"); *Fortunato v. Bernstein*, No. 12-CV-1630, 2015 WL 5813376, at *6 (S.D.N.Y. Sept. 1, 2015) ("Supervisory status, without more, is not sufficient to subject a defendant to [§] 1983 liability." (quotation marks omitted) ). Plaintiff therefore fails to state an Eighth Amendment claim against Capra, Aitchison, or Johnson.

 **\*8** On the other hand, with respect to Lerouge, Plaintiff has sufficiently pleaded an Eighth Amendment claim. Defendants argue that the Amended Complaint "still fails to allege that Lerouge was present during the alleged assault, and merely repeats the allegation that immediately preceding the incident, Lerouge 'did not secure D-Company inmates or Ebanks to their cells despite ICP being a high security risk area.' " (Defs.' Mem. 12–13 (quoting Am. Compl. ¶ 23).) Defendants fail to address the newly added allegation that a witness indicated he overheard Lerouge tell Ebanks shortly before the attack on Plaintiff, "I know you have issues on the Unit. I'm leaving the cells open. Go handle your business." (Am. Compl. ¶ 22.) Taking all allegations in the Amended Complaint as true, this statement plausibly demonstrates that Lerouge acted with the requisite intent to constitute deliberate indifference in violation of the Eighth Amendment. *See Graham v. Coughlin*, No. 86-CV-163, 2000 WL 1473723, at *5 (S.D.N.Y. Sept. 29, 2000) ("In situations where corrections officers have deliberately left cell[ ] doors open in order to leave a prisoner vulnerable to vicious attack, the courts rightly have expressed outrage."); *see also Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988) ("An inmate's claim based on negligence, however, 'is quite different from one involving injuries caused by another prisoner where officials simply stood by and permitted the attack to proceed.' " (alteration omitted) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986) ) ). Construing all inferences in favor of Plaintiff, Lerouge's statement suggests that he knew Ebanks would attack another inmate and left the cell doors open specifically to allow him to do so. *See Fischl v. Armitage*, 128 F.3d 50, 57–59 (2d Cir. 1997) (vacating dismissal of Eighth Amendment claim where the record supported the inference that corrections officers opened cell doors for the purpose of allowing other inmates to attack the plaintiff). Furthermore, even if Plaintiff's allegations of prior incidents involving Ebanks are not enough to establish that

Defendants were on notice of a substantial risk to Plaintiff, (*see* Am. Compl. ¶ 21), Lerouge's statement permits the inference that he was aware that Ebanks specifically intended to harm other inmates, and acted in violation of ICP policy to enable Ebanks to do so. Plaintiff therefore has sufficiently alleged that Lerouge was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... [drew] the inference." *Farmer*, 511 U.S. at 837. Defendants' Motion To Dismiss the Eighth Amendment claim against Lerouge is therefore denied. [1]

[1]     The Court declines to consider at this time whether any Defendant is protected by qualified immunity. Defendants' qualified immunity "argument," excluding the statement of the legal standard, runs to approximately half a page and fails to meaningfully apply the qualified immunity caselaw to this case, instead merely reiterating Defendants' position that Plaintiff has not sufficiently alleged personal involvement or awareness of a risk to Plaintiff on the part of Defendants, arguments the Court has already rejected with respect to Lerouge. (*See* Defs.' Mem. 18–19.)

### 3. Fourteenth Amendment

The Amended Complaint alleges a claim under the Fourteenth Amendment. (Am. Compl. ¶ 3.) However, it is unclear whether Plaintiff is claiming a violation of procedural or substantive due process, or both. To the extent that the Amended Complaint alleges a violation of substantive due process, it falls under Plaintiff's Eighth Amendment claim for failure to protect and deliberate indifference, which is addressed above. Because Plaintiff's claim "is covered by ... [the] Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998); *see also Kia P. v. McIntyre*, 235 F.3d 749, 757–58 (2d Cir. 2000) ("Where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." (alterations and quotation marks omitted) ). Because Plaintiff does not allege any separate conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," the Court concludes that Plaintiff's substantive due process claim is "subsumed

Blandon v. Aitchison, Not Reported in Fed. Supp. (2019)

2019 WL 1206370

Case 9:21-cv-00251-DNH-TWD   Document 37   Filed 05/22/23   Page 207 of 229

in [his] more particularized allegations" regarding his Eighth Amendment claim. *Velez v. Levy*, 401 F.3d 75, 93–94 (2d Cir. 2005) (quoting *Lewis*, 523 U.S. at 847 n.8).[2] Accordingly, Plaintiff's substantive due process claim is dismissed.

[2] The Second Circuit recently held that deliberate indifference claims under the Due Process Clause of the Fourteenth Amendment are analyzed differently than the same claims under the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). However, the Second Circuit limited its holding to pretrial detainees, who "have not been convicted of a crime and thus may not be punished in any manner." *Id.* at 29 (citation and quotation marks omitted); *see also id.* at 33–34 (relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), which analyzed excessive force claims by pretrial detainees under the Fourteenth Amendment); *McCray v. Lee*, No. 16-CV-1730, 2017 WL 2275024, at *4 (S.D.N.Y. May 24, 2017) ("The status of a plaintiff as either a convicted prisoner or pretrial detainee dictates whether his conditions of confinement are analyzed under the Eighth or Fourteenth Amendment.... While the decision in *Darnell* set forth a new analysis for claims brought by pretrial detainees, the analysis under the Eighth Amendment remains intact." (citation omitted) ). Plaintiff was not a pretrial detainee at the relevant time. (Am. Compl. ¶ 7.) In any event, *Darnell* maintained that "any § 1983 claim for a violation of due process requires proof of a mens rea greater than mere negligence." 849 F.3d at 36 (italics omitted). Thus, to the extent Plaintiff's substantive due process deliberate indifference claim is not subsumed by his Eighth Amendment deliberate indifference claim, it still fails, because, as explained above, Plaintiff has not plausibly alleged that Defendants, with the exception of Lerouge, acted with more than mere negligence. *See Farmer*, 511 U.S. at 834 (explaining that the defendant must act voluntarily, not accidentally, indifferent to a serious risk). With respect to Lerouge, Plaintiff's substantive due process claim is clearly subsumed within his Eighth Amendment claim, which the Court has already ruled is sufficiently pleaded.

*9 To the extent the Amended Complaint alleges a procedural due process claim, it is most plausibly based on Quick's delay in processing Plaintiff's grievance. (Am. Compl. ¶¶ 28–29.) "[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (quotation marks omitted). "It is well-established that prison grievance procedures do not create a due-process-protected liberty interest." *Mimms v. Carr*, No. 09-CV-5740, 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011), *aff'd*, 548 F. App'x 29 (2d Cir. 2013); *see also Kotler v. Boley*, No. 17-CV-239, 2018 WL 4682026, at *5 (S.D.N.Y. Sept. 28, 2018) (dismissing "[the] [p]laintiff's claim that [the] [d]efendant ... violated his right to due process by interfering with the grievance process and making it extremely difficult for [the] [p]laintiff to file a grievance in this matter," because "inmates do not have a protected liberty interest in the processing of their prison grievances" (alterations and quotation marks omitted) ); *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment."). Nor does Plaintiff possess a protected liberty interest in having Defendants follow prison policy, as discussed in the Court's Opinion. (*See* Opinion 26.) *See also Holland v. City of New York*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016) ("An alleged violation of a prison policy, directive, or regulation, in and of itself, does not give rise to a federal claim, because 'federal constitutional standards rather than state law define the requirements of procedural due process.' " (alterations omitted) (quoting *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990) ) ); *Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002) ("[T]he law is settled that the failure to follow a DOC[C]S Directive or prison regulation does not give rise to a federal constitutional claim."). Accordingly, Plaintiff's Fourteenth Amendment claim is dismissed.

4. First Amendment

Plaintiff's Amended Complaint asserts a First Amendment claim for denial of the right to petition the government. (Am. Compl. ¶ 3.) The First Amendment claim appears to be based on Quick's failure to process Plaintiff's grievance, thereby preventing him from exhausting his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") and denying him the ability to bring a § 1983

Case 9:21-cv-00251-DNH-TWD   Document 37   Filed 05/22/23   Page 208 of 229

Blandon v. Aitchison, Not Reported in Fed. Supp. (2019)

2019 WL 1206370

suit. *See* 42 U.S.C. § 1997e(a). "The Second Circuit has held that the filing of a prison grievance is protected activity insomuch as that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.' " *Rickett v. Orsino*, No. 10-CV-5152, 2013 WL 1176059, at *20 (S.D.N.Y. Feb. 20, 2013) (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ), *adopted by* 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013); *see also McCloud v. Kane*, 491 F. Supp. 2d 312, 317 (E.D.N.Y. 2007) ("The Second Circuit has held that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances and is actionable under [§] 1983." (citing *Graham*, 89 F.3d at 80) ). However, "[t]o the extent Plaintiff alleges a stand-alone claim involving interference with his access to [prison] grievance procedures, such a claim is not cognizable under [§] 1983." *Rickett*, 2013 WL 1176059, at *20; *see also Mimms*, 2011 WL 2360059, at *10 (collecting cases); *Johnson v. Barney*, No. 04-CV-10204, 2007 WL 900977, at *1 (S.D.N.Y. Mar. 22, 2007) ("While a prisoner's right to meaningful access to the courts is clearly protected by the First Amendment right to petition the government, the same cannot be said for a prison grievance system." (citation omitted) ). Although "[t]he First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances ... inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures [do] not give rise to a cognizable § 1983 claim." *Harris v. Westchester Cty. Dep't of Corr.*, No. 06-CV-2011, 2008 WL 953616, at *5 (S.D.N.Y. Apr. 3, 2008) (quotation marks omitted). "[I]n the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is the course taken by [P]laintiff here: directly petitioning the government for redress of his claims." *Id.*; *see also Harnage v. Faneuff*, No. 15-CV-1033, 2017 WL 6629297, at *10 (D. Conn. Nov. 29, 2017) ("[A]lthough the plaintiff alleges that the defendants interfered with his ability to utilize the prison grievance procedures, such interference does not necessarily prevent a prisoner from filing a lawsuit. Failure to exhaust administrative remedies is an affirmative defense that can be waived." (citing *Jones v. Bock*, 549 U.S. 199, 212 (2007) ) ).

*10 Plaintiff alleges that he filed a grievance with Quick, and that it was ignored and ultimately returned to him as untimely. Although this may violate prison grievance procedures, Plaintiff has not been prevented from petitioning the government for redress, as evidenced by the existence of this lawsuit. [3] Accordingly, Plaintiff's First Amendment claim is dismissed.

[3]     Although Defendants have raised failure to exhaust administrative remedies as a defense, and may do so again at the summary judgment stage, this defense only prevails on a motion to dismiss if failure to exhaust is "clear on the face" of the Amended Complaint. *Brinson v. Kirby Forensic Psych. Ctr.*, No. 16-CV-1625, 2018 WL 4680021, at *6 (S.D.N.Y. Sept. 28, 2018) (citations omitted). Here, the Court cannot say that it is apparent from the Amended Complaint that this defense will prevail as a matter of law. There is an exception to the PLRA exhaustion requirement where grievance procedures were effectively made unavailable by prison officials. *See Ross v. Blake*, 136 S. Ct. 1850, 1860 (2016) (noting that an administrative procedure may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation"); *Brownell v. Krom*, 446 F.3d 305, 311–12 (2d Cir. 2006) (noting that when a plaintiff seeks to counter a failure-to-exhaust defense, courts must ask "whether administrative remedies were in fact 'available' to the prisoner ... whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense ... [and] whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements" (quotation marks omitted) ); *see also Albritton v. Morris*, No. 13-CV-3708, 2018 WL 1609526, at *12 (S.D.N.Y. Mar. 29, 2018) (same). Should Defendants again raise failure to exhaust as an affirmative defense, Plaintiff is free to argue that Quick prevented him from properly exhausting his administrative remedies. *See Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *8 (S.D.N.Y. Sept. 28, 2018) (denying summary judgment based on failure to exhaust where the plaintiff "alleged that he gave his grievance to an officer ... and his grievance was never filed"); *Harnage*, 2017 WL 6629297, at *10 ("[I]f the defendants' actions

Case 9:21-cv-00251-DNH-TWD    Document 37    Filed 05/22/23    Page 209 of 229

Blandon v. Aitchison, Not Reported in Fed. Supp. (2019)

2019 WL 1206370

rendered the grievance procedures unavailable, the failure to exhaust institutional remedies can be excused." (citing *Ross*, 136 S. Ct. at 1860) ).

### 5. ADA Claim

Plaintiff also alleges that Defendants "interfered with [Plaintiff's] residential mental health care" in violation of the ADA because "their conduct causing [Plaintiff's] injuries caused him to downward spiral, suffer shock, and deep depression in fear of HIV infection and permanent disfigurement of his face." (Am. Compl. ¶ 37.) [4]

4    Plaintiff alleges violations of "the Mental Health and Americans w/ Disabilities Acts ('MHSA' & 'ADA') among other Health and Mental Health Acts of Congress." (Am. Compl. ¶ 3, 37.) It is not clear what statutes Plaintiff seeks to invoke other than the ADA. To the extent Plaintiff seeks to bring claims under New York Mental Hygiene Law, *see Manhattan State Citizens' Grp., Inc. v. Bass*, 524 F. Supp. 1270, 1272 (S.D.N.Y. 1981) (noting that the New York Mental Health Act is "codified in the Mental Hygiene Law"), this statute does not confer a private right of action, *see McWilliams v. Catholic Diocese of Rochester*, 536 N.Y.S.2d 285, 286 (App. Div. 1988) ("The Mental Hygiene Law is a regulatory statute.... No private cause of action is authorized for violations of the Mental Hygiene Law." (citation omitted) ); *see also Lombardo v. Holanchock*, No. 07-CV-8674, 2008 WL 2543573, at *10 (S.D.N.Y. June 25, 2008) (same); *Lombardo v. Stone*, No. 99-CV-4603, 2001 WL 940559, at *5 (S.D.N.Y. Aug. 20, 2001) (same).

**\*11** First, "[i]nsofar as [Plaintiff] is suing the individual [D]efendants in their individual capacities, ... the ADA ... [does not] provide[ ] for individual capacity suits against state officials." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *see also Montalvo v. Lamy*, 139 F. Supp. 3d 597, 610 (W.D.N.Y. 2015) ("Under ... the ADA ..., individuals may not be sued in their individual or personal capacity." (alteration omitted) ). Because Plaintiff is expressly suing all Defendants "in their individual capacity," (Am. Compl. ¶ 14), his claim for violation of the ADA must be dismissed.

Second, to the extent Plaintiff's Amended Complaint, construed liberally, can be read as seeking prospective

injunctive relief against Defendants, (*see* Am. Compl. 8 (seeking "such other and further relief as this Court deem just and proper") ), such a claim can proceed against Defendants in their official capacities only, *see Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). [5] However, even if Plaintiff seeks such relief, his claim still fails. "To state a claim under Title II of the ADA, a prisoner must show: (1) he or she is a qualified individual with a disability; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity [that] provides the service, program, or activity is a public entity." *Hallett v. New York State Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 198 (S.D.N.Y. 2000) (citation and quotation marks omitted).

5    "Whether individuals can be sued *for damages* under the ADA or Rehabilitation Act in their *official capacities*, however, is unsettled in th[e] [Southern] District." *Jones v. Ng*, No. 14-CV-1350, 2015 WL 998467, at *10 n.20 (S.D.N.Y. Mar. 5, 2015) (emphases added). Assuming that such a claim can be brought, and even if Plaintiff brought such a claim, the claim would still fail because a plaintiff cannot recover damages against a state (or state agency or official) unless "the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability." *Garcia*, 280 F.3d at 112; *accord Johnson v. Goord*, No. 01-CV-9587, 2004 WL 2199500, at *5 (S.D.N.Y. Sept. 29, 2004) (dismissing official capacity claims "under [§] 504 of the Rehabilitation Act and Title II of the ADA ... because those laws do not provide for money damages against the state or state officials in their official capacities, absent a showing that any violation was motivated by discriminatory animus or ill will based on the disability" (citing, inter alia, *Garcia*, 280 F.3d at 108, 111–12) ). Here, the Amended Complaint does not allege that Defendants acted with discriminatory animus or ill will based on any qualifying disability. (*See generally* Am. Compl.)

Even assuming Plaintiff is a "qualified individual" with a disability, and that Defendants' conduct denied Plaintiff the benefits of his mental health treatment program, Plaintiff has nowhere alleged that his mistreatment was "by reason of his ... disability." *Id.* Accordingly, Plaintiff's ADA claim fails. *See Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998) (affirming

2019 WL 1206370

summary judgment dismissing ADA claims that "do not draw their substance from any allegedly discriminatory animus against the disabled"); *see also Schnauder v. Gibens*, 679 F. App'x 8, 11 (2d Cir. 2017) (affirming dismissal of ADA claim because the plaintiff's purported disability "was not the reason he was unable to access medical services"); *Alster v. Goord*, 745 F. Supp. 2d 317, 340 (S.D.N.Y. 2010) (finding that the plaintiff failed to demonstrate that his alleged mistreatment by the defendants "occurred because of his disability" (quotation marks omitted) ).

### III. Conclusion

**\*12** For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part. Defendants' Motion is denied with respect to Plaintiff's Eighth Amendment claims against Defendant Lerouge. Plaintiff's claims against Capra, Aitchison, Johnson, Cousins, and Quick are dismissed. Plaintiff's claims against Lerouge under the First and Fourteenth Amendments, as well as under the ADA,

are also dismissed. Because this is the second adjudication of Plaintiff's claims on the merits and he has failed to state a claim, the dismissal is with prejudice. Even pro se plaintiffs are not entitled to file an amended complaint if the complaint "contains substantive problems such that an amended pleading would be futile." *Lastra v. Barnes & Noble Bookstore*, No. 11-CV-2173, 2012 WL 12876, at \*9 (S.D.N.Y. Jan. 3, 2012), *aff'd*, 523 F. App'x 32 (2d Cir. 2013). Because the Court finds that further amendment would be futile, Plaintiff's claims are dismissed with prejudice.

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 67), to terminate Defendants Capra, Aitchison, Johnson, Cousins, and Quick from the docket, and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1206370

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment

Distinguished by  Dallio v. Hebert,  N.D.N.Y.,  July 28, 2009

2002 WL 338375

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Edward MCKENNA, Plaintiff,

v.

Lester K. WRIGHT, Associate Commissioner/Chief Medical Officer Docs, John P. Keane, Superintendant, Woodbourne Correctional Fac., T .J. Miller, Deputy Supt. for Admin., Woodbourne Corr., Facility, Frank Lancellotti, Physician, Mervat Makram, Physician, Health Care Unit, Woodbourne Correctional Facility; and All Unnamed Persons, Individuals, Officers, Civilians, Individually and in Their Official Capacities, Defendants.

No. 01 CIV. 6571(WK).

|

March 4, 2002.

**Attorneys and Law Firms**

Edward McKenna, Woodbourne Correctional Facility, Woodbourne, for Plaintiff: (pro se).

John E. Knudsen, Assistant Attorney General, State of New York, Office of the Attorney General, New York, for Defendant.

**MEMORANDUM & ORDER**

KNAPP, Senior District J.

 *1  On July 17, 2001, Plaintiff Edward McKenna ("Plaintiff"), proceeding *pro se,* filed a Complaint against Defendants Lester Wright, John Keane, T.J. Miller, Frank Lancellotti, and Mervat Makram ("Defendants") alleging violations of his rights under the Eighth and Fourteenth Amendments to the Constitution. Plaintiff's action is predicated upon Defendants' alleged failure to provide him with adequate medical treatment after he was diagnosed with Hepatitis C in 1999. He asserts that Defendants either failed to treat or delayed the treatment of his Hepatitis C between 1999 and 2000 and that he consequently developed cirrhosis of the liver. He also alleges that Defendants continue to provide him with inadequate medical care even to this day.

Plaintiff now moves us for a preliminary injunction which would (a) require Defendants to arrange for him to receive an examination and a plan of treatment for his Hepatitis C condition from a qualified specialist and (b) require Defendants to carry out any plan of treatment recommended by that specialist. For the reasons set forth below, we deny Plaintiff's motion for a preliminary injunction.

**BACKGROUND**

Plaintiff is an inmate at the Woodbourne Correctional Facility ("Woodbourne"). He has been consulting with Woodbourne's physicians and receiving treatment from them for various ailments and pains since 1998. On July 1, 1999, he was allegedly informed that he had some form of Hepatitis by Dr. Frank Lancellotti ("Dr.Lancellotti"). On July 19, 1999, following a blood test, Plaintiff was further informed that he had Hepatitis C by Dr. Mervat Makram ("Dr.Makram"). [1] Both Dr. Lancellotti and Dr. Makram are physicians working at Woodbourne.

[1]    Hepatitis C is a condition which results in the inflamation of the liver. *See* STEDMAN'S MEDICAL DICTIONARY 808 (27th Ed.2000). The ensuing liver cell damage causes, *inter alia,* the retention of bilirubin (a type of bile pigment) as well as a rise in the level of particular enzymes. *See id.* at 202, 808. Of the various forms of hepatitis, Hepatitis C has the highest likelihood of becoming a chronic condition and at least 20% of Hepatitis C patients eventually develop cirrhosis. *See* THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 382–383 (17th ed.1999).

Although there is some dispute as to when Dr. Lancellotti subsequently discussed Plaintiff's condition with him, Plaintiff alleges that he was again diagnosed with Hepatitis C on September 16, 1999 and that he was asked whether or not he wanted treatment for his condition. Plaintiff purportedly requested treatment for his Hepatitis C condition at that time because he had been experiencing stomach pain. [2] *See* Compl. ¶ 22.

[2]    Although Plaintiff claims that Dr. Lancellotti informed him of this diagnosis on September 16, 1999, the Department of Correctional

Services' ("DOCS") Ambulatory Health Record entry for September 16 (which Plaintiff attached to his Complaint, along with numerous other exhibits) does not show any such discussion. *See* Compl., Exh. G at 6. Rather, the Ambulatory Health Record entry for February 24, 2000 evidences a somewhat similar discussion. *See* Compl., Exh. E at 6. The February 24th entry states that Plaintiff's release was set for September 28, 2000, and that Plaintiff did not qualify for Hepatitis C treatment. *See id.* The February 24th entry also states that, regardless of his release date, Plaintiff did not want treatment for his Hepatitis C condition. *See id.* Plaintiff disputes the February 24th entry in virtually its entirety. He contends that he had this discussion with Dr. Lancellotti on September 16, 1999, and that he *did* request treatment for his Hepatitis C condition on that September date. He asserts that his records have been improperly altered and has filed various grievances regarding these discrepancies.

In responding to this request for treatment, Dr. Lancellotti allegedly inquired as to when Plaintiff was set to appear before the Parole Board. When Plaintiff explained that he would appear before the Board around September 2000, Dr. Lancellotti purportedly informed him that, pursuant to medical protocols, he could not receive treatment for Hepatitis C.

More specifically, Dr. Lancellotti allegedly refused to provide Plaintiff with medical treatment for his Hepatitis C condition in accordance with the Department of Correctional Services' ("DOCS") Hepatitis C Primary Care Practice Guideline ("Hepatitis C Guideline"). DOCS' Hepatitis C Guideline, developed by various physicians and nurses and revised on December 17, 1999, and December 13, 2000, outlines, *inter alia,* a number of criteria which should be considered by physicians in determining whether Hepatitis C treatment is appropriate for an inmate.

**\*2** According to the Hepatitis C Guideline which was supposedly in effect at the time Plaintiff was diagnosed with Hepatitis C, one such criterion was whether or not it was anticipated that the inmate would remain incarcerated for at least 12 months from the time treatment would begin. *See* Compl., Exh. A at 4. Where an inmate's remaining period of incarceration was anticipated to be less than 12 months and the inmate would therefore be unable to "predictably complete a course of treatment," the relevant Hepatitis C Guideline criterion provided that he "should receive a baseline evaluation and be referred to medical follow-up and treatment upon release." *Id.* Plaintiff asserts that Dr. Lancellotti refused to provide him with medical treatment for his Hepatitis C condition because he was eligible for parole release in less than one year from the time of their alleged discussion about treatment. [3]

[3]  According to the more recent Hepatitis C Guideline, the relevant criterion is now whether or not Plaintiff's anticipated period of incarceration is at least 15 months (which includes time for a 12 month course of treatment). *See* Wright Aff., Exh. A at 4.

On August 29, 2000, Plaintiff appeared before the Parole Board. The Board denied his release and informed him that he could return in two years. Thereafter, although Woodbourne's physicians had been treating Plaintiff's general medical condition and stomach pains in the interim between September 1999 and December 2000 (albeit not to Plaintiff's satisfaction), Plaintiff met with Dr. Lancellotti on December 11, 2000 and specifically discussed his Hepatitis C condition with him. At that time, Plaintiff purportedly requested treatment for his Hepatitis C condition because of his continuing stomach pains and breathing problems. *See* Compl. ¶ 25.

In response to Plaintiff's request, Dr. Lancellotti allegedly informed Plaintiff that he had to attend an Alcohol and Substance Abuse Treatment ("ASAT") program before he could receive any such treatment. One of the criterion outlined in the Hepatitis C Guideline for determining whether Hepatitis C treatment is appropriate is whether or not the inmate had successfully completed an ASAT program. *See* Compl., Exh. A at 4; Wright Aff., Exh. A at 4. Plaintiff contends that he is unemployed at the prison because he holds the status of being medically unassignable to work and suggests that this status somehow makes him ineligible to attend an ASAT program. *See* Compl. ¶ 25; Pl.'s Reply Brief at 6 n. 7.

Despite his alleged discussion with Plaintiff about the ASAT program, Dr. Lancellotti notified Plaintiff that he would be sent to the Albany Medical Center for the very stomach pains which had originally led him to request treatment for his Hepatitis C condition in September 1999 and December 2000. On January 10, 2001, Plaintiff traveled to the Albany Medical Center for a computerized axial tomography scan.

When Plaintiff subsequently inquired as to the results of the CAT scan, Dr. Lancellotti notified him that he had been diagnosed with cirrhosis of the liver. [4] After being informed of this diagnosis, Plaintiff allegedly told Dr. Lancellotti that he would never have developed cirrhosis had he been provided treatment for his Hepatitis C at an earlier date. [5]

[4]    Cirrhosis is a liver disease characterized by, *inter alia,* diffuse damage to liver cells and interference with blood flow in the liver. *See* STEDMAN'S MEDICAL DICTIONARY 355 (27th ed.2000). The condition is the end stage of many forms of liver injury. *See* THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 373 (17th ed.1999). Cirrhosis results in a number of major complications, including portal hypertension with variceal bleeding, ascites, or liver failure leading to renal failure and coma. *See id.*

[5]    Plaintiff also alleges that DOCS' medical records had shown for years that his liver enzymes were very high. He argues that this fact alone would have alerted any competent physician of the need for follow-up tests for Hepatitis A, B, and C. Plaintiff asserts that had he been diagnosed with Hepatitis C in 1997 or 1998 on the basis of these medical records and received timely treatment, he would never have developed cirrhosis of the liver.

**\*3** On February 2, 2001, Dr. Lancellotti notified Plaintiff that he would be referring him to an outside specialist. Accordingly, on March 19, 2001, Plaintiff consulted with Dr. Benedict Maliakkal ("Dr.Maliakkal") at the Coxsackie Regional Medical Unit regarding the stomach pain which had originally led him to request treatment for his Hepatitis C condition. Following this consultation, Dr. Maliakkal diagnosed him with cirrhosis secondary to Hepatitis C. On April 23, 2001, Dr. Maliakkal operated on Plaintiff in order to, in part, further evaluate his medical condition. After this operation, Dr. Maliakkal issued a report in which he recommended that Plaintiff (1) should continue on his current medication ("Inderal with or without ISMO") and (2) follow-up with him to discuss the management of his Hepatitis C condition through treatment with such therapies as Interferon and Ribavirin.

Plaintiff was never allowed to follow-up with Dr. Maliakkal regarding the possibility of treatment with Interferon and Ribavirin. Although Dr. Makram apparently requested such a follow-up consultation, Plaintiff was subsequently diagnosed with "decompensated" liver cirrhosis. [6] As a result, on June 1 and June 7, 2001, Dr. Lester Wright ("Dr.Wright"), the Deputy Commissioner and Chief Medical Officer of DOCS, as well as Dr. Robert Hentschel ("Dr.Hentschel"), decided that the treatment of Plaintiff's Hepatitis C with such therapies as Interferon and Ribavirin would be inappropriate because, according to both the Hepatitis C Guideline and medical literature on the subject, an individual with decompensated cirrhosis should not receive treatment for Hepatitis C with these therapies as such treatment would be potentially life threatening.

[6]    Decompensated cirrhosis is a type of cirrhosis accompanied, *inter alia,* by ascites. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 334 (28th ed.1994). In other words, it results, among other things, in the accumulation of serous fluid in the peritoneal cavity. *See* STEDMAN'S MEDICAL DICTIONARY 154 (27th ed.2000). Ascites usually appear in advanced stages of cirrhosis. *See* THE SLOANE–DORLAND ANNOTATED MEDICAL–LEGAL DICTIONARY 146 (1987). The prognosis for patients with cirrhosis is usually poor if major complications such as ascites are present. *See* THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 374 (17th ed.1999). According to a statement issued by the National Institutes of Health in 1997 on the management of Hepatitis C, patients with decompensated cirrhosis should not be treated with currently available therapy for Hepatitis C. *See* Wright Aff., Exh. B at 2.

Having determined that treating Plaintiff's Hepatitis C with Interferon and Ribavirin would be inappropriate given the threat it would pose to his health in light of his related decompensated liver cirrhosis, Dr. Hentschel and Dr. Wright denied Plaintiff a follow-up consultation with Dr. Maliakkal to discuss treatment with such therapies. On July 25, 2001, Dr. Makram explained this decision to Plaintiff. On August 3 and October 5, 2001, the decision was further explained to Plaintiff by Dr. Wright.

After unsuccessfully seeking to obtain both his desired treatment as well as redress for Defendants' alleged failure to provide him with adequate medical care through internal grievance procedures, Plaintiff brought this action in July 2001 against Defendants under 42 U.S.C. § 1983 for the

2002 WL 338375

alleged deprivation of his constitutional rights under the Eighth and Fourteenth Amendments to the Constitution. Plaintiff now moves for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). Having never been allowed a follow-up examination with Dr. Maliakkal to discuss the treatment of his Hepatitis C with Interferon and Ribavirin, Plaintiff asks us to order Defendants to (a) arrange for Plaintiff to receive an examination and plan of treatment from Dr. Maliakkal and (b) carry out whatever plan of treatment Dr. Maliakkal may eventually recommend.

## DISCUSSION

**\*4** A preliminary injunction constitutes an extraordinary remedy which should not be routinely granted. *Medical Society of the State of New York v. Toia* (2d Cir.1977) 560 F.2d 535, 538. A party seeking a preliminary injunction must ordinarily " 'establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." ' *Espinal v. Goord* (S.D.N.Y.2002) 180 F.Supp.2d 532, 536.

However, a heightened standard must be applied where, as here, the injunction which Plaintiff seeks is mandatory in nature. *See Norcom Electronics Corp. v. Cim USA, Inc.* (S.D.N.Y.2000) 104 F.Supp.2d 198, 207. A mandatory injunction is one which would "alter the status quo by commanding some positive act." *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.* (2d Cir.1995) 60 F.3d 27, 34. In this instance, Plaintiff asks us to order Defendants to provide him with a treatment which the defendant physicians have already rejected on the basis of their medical judgment. Since such an injunction would alter the current status quo by commanding a positive act, it is a "mandatory" injunction and therefore should only issue "upon a clear showing that the moving party is entitled to the relief requested" or "where extreme or very serious damage will result from a denial of preliminary relief." *Id.* In other words, under this more stringent standard for mandatory injunctions, Plaintiff must demonstrate that he has a clear or substantial likelihood of success on the merits. *See Jolly v. Coughlin* (2d Cir.1996) 76 F.3d 468, 473–474; *S.E.C. v. Unifund SAL* (2d Cir.1990) 910 F.2d 1028, 1040; *Espinal,* 180 F.Supp.2d at 536; *Padberg v. McGrath–McKechnie* (E.D.N.Y.2000) 108 F.Supp.2d 177, 183.

## I. Irreparable Harm

Plaintiff asserts that he has been deprived of his Eighth and Fourteenth Amendment rights through Defendants' deliberate indifference in failing to provide him with adequate medical treatment. Generally, an alleged violation of constitutional rights, such as those encompassed by the Eighth Amendment, creates a presumption of irreparable harm. *See Jolly,* 76 F.3d at 482. *See also Mitchell v. Cuomo* (2d Cir.1984) 784 F.2d 804, 806 (holding that where an alleged deprivation of a constitutional right is involved, no further showing of irreparable harm is necessary); *Zolonowski v. County of Erie* (W.D.N.Y.1996) 944 F.Supp. 1096, 1109 (holding that a presumption of irreparable harm was established where Eighth Amendment rights were allegedly violated).

However, since the movant must show that the alleged irreparable harm is imminent, and not remote or speculative, we cannot rest a finding of irreparable harm solely on past conduct, even where a plaintiff has alleged that such conduct violated the Eighth Amendment. *Garcia v. Arevalo* (S.D.N.Y. June 27, 1994) 1994 WL 383238, *2. *See also Flack v. Friends of Queen Catherine Inc.* (S.D.N.Y.2001) 139 F.Supp.2d 526, 540 (holding that a presumption created in the context of a preliminary injunction only applies to prospective violations of the law). Here, Plaintiff's action is premised on two separate sets of allegations. On the one hand, Plaintiff alleges that Defendants either delayed or altogether failed in providing him with treatment for his Hepatitis C condition between 1999 and 2000. However, Plaintiff acknowledges that, at the very least, Defendants began providing him with some form of care around December 2000 for the stomach pains which had originally led him to request treatment for his Hepatitis C condition. Despite this acknowledgment, Plaintiff asserts that even the treatment he has since received violates his constitutional rights.

**\*5** While Plaintiff's first set of allegations with respect to Defendants' past misconduct between 1999 and 2000 cannot support a finding of irreparable harm (and therefore does not warrant injunctive relief), his latter set of allegations regarding his continued deprivation of rights under the Eighth Amendment stemming from Defendants' ongoing medical treatment of his medical condition raises a presumption of irreparable harm.[7] We therefore find that Plaintiff's latter set of allegations satisfies his burden to demonstrate irreparable harm.

7    To the extent that Plaintiff also alleges that any failure to diagnose him with Hepatitis C in 1997 and 1998 violated his constitutional rights, such past alleged misconduct would similarly fail to support the requisite showing of irreparable harm necessary to warrant injunctive relief on the basis of these allegations.

## II. Likelihood Of Success On The Merits

Since Plaintiff seeks a mandatory injunction, he must demonstrate that he has a clear or substantial likelihood of success on the merits of his action. *See Tom Doherty Associates, Inc.,* 60 F.3d at 34; *Jolly,* 76 F.3d at 473–474; *Unifund SAL,* 910 F.2d at 1028; *Espinal,* 180 F.Supp.2d at 536; *Padberg,* 108 F.Supp.2d at 183. As Plaintiff cannot show irreparable harm with respect to his allegations relating to Defendants' past conduct between 1999 and 2000 and a preliminary injunction would therefore be unwarranted on the basis of such assertions, we do not address whether Plaintiff has any likelihood of succeeding on the merits of those allegations which relate to past misconduct. Instead, we focus on the set of allegations which have raised a presumption of irreparable harm in this instance. Therefore, we must determine whether Plaintiff has demonstrated a clear or substantial likelihood of succeeding on the merits of his action based on his allegations with respect to his ongoing medical treatment. With these considerations in mind, we turn to the merits of Plaintiff's two causes of action.

### A. Plaintiff's First Cause Of Action

Plaintiff brought his action pursuant to 42 U.S.C. § 1983. "In an action brought under 42 U.S.C. § 1983, the plaintiff must establish that a person acting under color of state law deprived him or her of a federal constitutional right." *Vento v. Lord* (S.D.N.Y. July 31, 1997) 1997 WL 431140, *3. "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James* (2d Cir.1993) 13 F.3d 515, 519, *cert. denied* (1994) 512 U.S. 1240. Here, Plaintiff asserts that he is being deprived of his constitutional rights because Defendants are failing to provide him with adequate medical care.

"A claim under § 1983 for inadequate medical treatment is governed by the standards of the Eighth and Fourteenth Amendments to the Constitution." *Wise v. Halko* (S.D.N.Y. Sept. 12, 1997) 1997 WL 570544, *2. In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove "deliberate indifference to serious medical needs." *Estelle v. Gamble* (1976) 429 U.S. 97, 106. [8] *See also Chance v. Armstrong* (2d Cir.1998) 143 F.3d 698, 702.

8    Although a state prisoner's claim for inadequate medical treatment primarily involves violations of the Eighth Amendment's prohibition on cruel and unusual punishment, the Fourteenth Amendment is also implicated because the prohibition against such conduct is made applicable to the states by the Fourteenth Amendment. *See Estelle,* 429 U.S. at 101.

"The standard of deliberate indifference includes both subjective and objective components." *Chance,* 143 F.3d at 702. "First, the alleged medical need must be, in objective terms, 'sufficiently serious.' " *Davidson v. Scully* (S.D.N.Y. Aug. 22, 2001) 2001 WL 963965, *2. "Second, to satisfy the subjective prong, the defendant mut act with 'a sufficiently culpable state of mind' that amounts to 'deliberate indifference' to the serious medical need." *Id.* at *3. *See also Gill v. Jones* (S.D.N.Y. Nov. 1, 2001) 2001 WL 1346012, *7 ("This is a two prong test requiring both a sufficiently serious medical condition as well as deliberate indifference by the Defendants").

#### 1. Serious Medical Condition

**\*6** A condition will be considered sufficiently serious under the Eighth Amendment if it is a " 'condition of urgency, one that may produce death, degeneration, or extreme pain." ' *See Morales v. Mackalm* (2d Cir.2002) 278 F.3d 126, 132. Given the nature of Plaintiff's Hepatitis C symptoms, as well as the defendant physicians' determination that his condition has reached an advanced stage, *see* Pl.'s Aff. in supp. of Mot. for Prelim. Inj., Exh. at 19, Plaintiff has established a sufficiently serious medical condition under the Eighth Amendment. *See Campbell v. Young* (W.D.Va. March 22, 2001) 2001 WL 418725, *3 ("Here, there is no question that Campbell suffers from a serious medical condition, namely, Hepatitis C and the associated pain and symptoms"); *Carbonell v. Goord* (S.D.N.Y. June 13, 2000) 2000 WL 760751, *9 (holding that Hepatitis C can constitute an objectively serious condition).

#### 2. Deliberate Indifference

"Deliberate indifference 'requires more than negligence." ' *Veloz v. New York* (S.D.N.Y.1999) 35 F.Supp.2d 305, 311. However, "while 'mere medical malpractice' is not

tantamount to deliberate indifference, certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm." ' *Hathway v. Coughlin* (2d Cir.1996) 99 F.3d 550, 553. In essence, "a prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety." ' *Hathway v. Coughlin* (2d Cir.1994) 37 F.3d 63, 66, *cert. denied* (1995) 513 U.S. 1154.

Although Plaintiff has shown that he suffers from a sufficiently serious medical condition, he cannot demonstrate that he has a clear or substantial likelihood of succeeding on the merits of his Eighth Amendment claim because he is unable to show that Defendants acted with the requisite deliberate indifference with respect to his ongoing medical treatment. Instead of illustrating that Defendants acted with deliberate indifference to his serious medical condition, Plaintiff's moving papers and accompanying exhibits, as well as Defendants' opposition papers and affidavits, show that the defendant physicians provided adequate medical care in light of the difficult circumstances presented by Plaintiff's related Hepatitis C and decompensated cirrhosis conditions.

Rather than acting with deliberate indifference and turning a blind eye to Plaintiff's Hepatitis C condition, the physicians examined his medical condition and determined, pursuant to their medical judgment, that treating Plaintiff's Hepatitis C with such therapies as Interferon and Ribavirin would endanger Plaintiff's health rather than improve it given the advanced state of his cirrhosis. In essence, rather than knowing of and disregarding an excessive risk to Plaintiff's health and safety in refusing to treat him with Interferon and Ribavirin, the physicians acted pursuant to their medical judgment (as based on the Hepatitis C Guideline and current medical literature on the relevant subject matter) to protect Plaintiff's health. Such conduct does not constitute deliberate indifference. *See Hassan v. Khanyile* (S.D.N.Y. May 21, 1998) 1998 WL 264834, *2 (denying a preliminary injunction where the defendant physician acted in the plaintiff's best medical interests in discontinuing the treatment of his Hepatitis C with Interferon); *Johnson v. Raba* (N.D.Ill. Sept. 24, 1997) 1997 WL 610403, *4 (holding that the defendant physician did not act with deliberate indifference where he refused to treat the plaintiff with the semiexperimental drug Interferon); *Dias v. Vose* (D.Mass.1994) 865 F.Supp. 53, 58, *aff'd* (1st Cir.1995) 50 F.3d 1 (holding that physician's refusal

to authorize treatment with the highly experimental drug Interferon did not rise to the level of an Eighth Amendment violation). *See also Ortiz v. Makram* (S.D.N.Y. Dec. 21, 2000) 2000 WL 1876667, *7 (holding that Dr. Lancellotti's treatment decisions did not evidence deliberate indifference where he did not disregard a risk to plaintiff).

**\*7** Moreover, although Plaintiff disagrees with the physicians' treatment decisions as well as their decompensated cirrhosis diagnosis and claims that he is entitled to consult with a specialist regarding a different diagnosis and treatment plan, such disagreements and allegations do not amount to Eighth Amendment violations. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 702. Indeed, "[t]here is no right to the treatment of one's choice." *Wise,* 1997 WL 570544 at *3. Nor does a prisoner have a categorical right to be treated by a specialist. *Johnson,* 1997 WL 610403 at *4. Hence, "disagreements over medications, diagnostic techniques..., forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." *Sonds v. St. Barnabas Hospital Correctional Health Services* (S.D .N.Y. May 21, 2001) 151 F.Supp.2d 303, 312. *See also Hodge v. Coughlin* (S.D.N.Y. Sept. 22, 1994) 1994 WL 519902, *11, *aff'd* (2d Cir.1995) 52 F.3d 310 (holding that "an allegation of 'misdiagnosis or faulty [medical] judgment' ' does not state a claim under the Eighth Amendment).

Accordingly, while Plaintiff may have engaged in his own medical research, determined for himself that a different course of treatment would be appropriate, and may now contend that the defendant physicians misdiagnosed the nature of his cirrhosis, that their treatment decision with respect to his Hepatitis C is therefore incorrect, and that the defendant physicians should have permitted him a follow-up consultation with a specialist, these allegations do not rise to the level of Eighth Amendment violations. *See McKinnis v. Williams* (S.D.N.Y. Aug. 1, 2001) 2001 WL 873078, *4 (holding that, to the extent the plaintiff contested the diagnosis and treatment he received, such allegations were insufficient to state a valid claim of medical mistreatment under the Eighth Amendment); *Brown v. Selwin* (S.D.N.Y. Sept. 24, 1999) 1999 WL 756404, *6–*7 (holding that plaintiff's disagreement with defendant's medical judgment with respect to treatment and diagnosis were insufficient to constitute

an Eighth Amendment violation); *Rios v. Sandl* (E.D.Pa. Dec. 31, 1998) 1998 WL961896, *4, *6–*7 (recognizing that a physician's decision to withhold Interferon treatment for the plaintiff's Hepatitis condition did not constitute an Eighth Amendment violation where the physician felt such treatment was inappropriate); *Allen v. Sanders* (N.D. Tex. June 4, 1998) 1998 WL 318841, *6 (holding that physician's refusal to treat plaintiff's Hepatitis with Interferon did not evidence deliberate indifference where plaintiff failed to show that the physician did not make the decision in his best medical judgment); *Dias,* 865 F.Supp. at 58 (holding that a prisoner's disagreement with a physician's refusal to authorize Interferon treatment for his Hepatitis C condition did not rise to the level of an Eighth Amendment violation); *Bouchard v. Magnusson* (D.Me.1989) 715 F.Supp. 1146, 1147–1149 (holding that officials' refusal to allow plaintiff to consult with a different doctor or to permit him to follow up with a specialist he had already been referred to was not an Eighth Amendment violation). *See also Bartlett v. Correctional Med. Serv., Inc.* (10th Cir.1997) 124 F.3d 216 (table), 1997 WL 572834, *1 (holding that plaintiff's disagreement with his physicians' refusal to treat his Hepatitis C with Interferon did not state a claim under the Eighth Amendment). As such, Plaintiff has failed to demonstrate that he has a clear likelihood of succeeding on the merits of these allegations. [9]

[9]
In his motion for a preliminary injunction, Plaintiff appears to contend for the first time that the defendant physicians violated the consent decree entered by Judge Ward in *Milburn v. Coughlin,* No. 79 Civ. 5077 (S.D.N.Y.) by refusing to allow him to follow-up with Dr. Maliakkal. *See* Pl.'s Aff. in supp. of Mot. for Prelim. Inj. at 2–3 n. 1. In 1980, Judge Ward certified a class of present and future Green Haven Correctional Facility ("Green Haven") inmates challenging the constitutionality of health care services. *See Shariff v. Artuz* (S.D.N.Y. Aug. 28, 2000) 2000 WL 1219381, *4 n. 5. The parties in that lawsuit entered into a series of agreements culminating in a 1991 modified consent decree. *Id.* The various *Milburn* consent decrees govern the provision of health care services at Green Haven. *Candelaria v. Coughlin* (S.D .N.Y. Dec. 19, 1994) 1994 WL 707004, *7. Plaintiff cannot support his claim on the basis of the consent decrees entered in *Milburn.* First, Plaintiff is not an inmate at Green Haven; rather, he is an inmate at Woodbourne and has therefore failed to show how the *Milburn* consent decree, which governs the

provision of health care services at Green Haven, applies to him. *See Candelaria,* 1994 WL 707004 at *7—*8 (holding that inmate who was incarcerated at the Clinton Correctional Facility could not obtain injunctive relief on the basis of the *Milburn* consent decree which governed the provision of health care services at Green Haven); *Cole v. Scully* (S.D.N.Y. April 18, 1995) 1995 WL 231250, n. 5 (refusing to consider plaintiff's allegations that correction officers' conduct violated the *Milburn* consent decree where the plaintiff had failed to show how the *Milburn* decree was relevant to the action). Moreover, even if the *Milburn* consent decree did somehow apply to this action, we could not consider a claim premised on its violation since Judge Ward retains supervision over the consent decree. *See Vasquez v. Artuz* (S.D.N.Y. June 28, 1999) 1999 WL 440631, *1 n. 1 ("Vasquez's *Milburn* consent decree violation claim is also not properly before this Court, and should be filed with Judge Ward in this district, who retains supervision over the decree"); *Kaminsky v. Rosenblum* (S.D.N.Y.1990) 737 F.Supp. 1309, 1317 n. 6, *appeal dismissed* (2d Cir.1991) 929 F.2d 922 (holding that the issue of whether the *Milburn* consent decree was violated "is not, and cannot be, before this Court. Violations of the *Milburn* decree can be remedied only by bringing the alleged violations to the attention of the able District Judge [Ward] who retains supervision over that decree").

**\*8** Plaintiff attempts to distinguish this case from those legal decisions which are based solely on a plaintiff's disagreement with his prison physicians' treatment decision by arguing that the defendant physicians' medical judgment also contradicts Dr. Maliakkal's medical recommendation. Even assuming *arguendo* that the defendant physicians' refusal to treat Plaintiff with such therapies as Interferon and Ribavirin in light of his decompensated cirrhosis condition explicitly contradicts Dr. Maliakkal's recommendation that Plaintiff be allowed a follow-up visit to discuss the treatment of his Hepatitis C with these therapies, such a disagreement between the medical judgments of the defendant physicians and Dr. Maliakkal does not rise to the level of an Eighth Amendment violation.

"Not every physician will treat every ailment in exactly the same manner." *Douglas v. Stanwick* (N.D.N.Y.2000) 93 F.Supp.2d 320, 325. The mere fact that the defendant

McKenna v. Wright, Not Reported in F.Supp.2d (2002)

2002 WL 338375

physicians may have made a different medical decision with respect to Plaintiff's treatment than that purportedly recommended by Dr. Maliakkal does not indicate that they acted for culpable reasons. While a plaintiff may be able to state an Eighth Amendment claim where a doctor acts without medical justification, "no claim is stated when a *doctor* disagrees with the professional judgment of another doctor." *White v. Napolean* (3d Cir.1990) 897 F.2d 103, 110. Hence, courts have repeatedly held that "a dispute between two doctors as to the proper course of medical treatment will not give rise to an Eighth Amendment violation." *Hodge,* 1994 WL 519902 at *11; *Miller v. Fisher* (N.D.N.Y. Oct. 26, 1993) 1993 WL 438761, *3 (Mag. J. Hurd), *approved* (N.D.N.Y. Mar. 23, 1995) 1995 WL 131561, *1 (J. Scullin). *See Webb v. Jackson* (S.D.N.Y. Mar. 16, 1994) 1994 WL 86390, *3, *aff'd* (2d Cir.1995) 47 F.3d 1158 ("It is well established that a mere differences [sic] in opinion, whether between doctors or laymen, based on medical care does not give rise to an Eighth Amendment violation of inadequate medical treatment pursuant to section 1983"). *See also Sanchez v. Vild* (9th Cir.1989) 891 F.2d 240, 241; *Culp v. Koenigsmann* (S.D.N.Y. July 19, 2000) 2000 WL 995495, *9; *Douglas v. Stanwick* (S.D.N.Y.2000) 93 F.Supp.2d 320, 325; *Mercer,* 1998 WL 85734 at *6; *Gardner v. Zaunbrecher* (S.D.N.Y. Sept. 4, 1996) 1996 WL 507072, *2.

In this instance, Defendants evaluated Plaintiff's medical condition and determined, pursuant to their medical judgment, that the treatment of Plaintiff's Hepatitis C with such therapies as Interferon and Ribavirin would be inappropriate given the risk such a treatment would pose to Plaintiff's health in light of his closely related decompensated cirrhosis condition. Even assuming that their decision represented a medical judgment which disagreed in substance with Dr. Maliakkal's medical recommendation, such a disagreement among Plaintiff's physicians would not constitute deliberate indifference under these circumstances. *See Douglas,* 93 F.Supp.2d at 325 (holding that physician's decision to countermand a different doctor's treatment decision, made on the basis of her medical judgment, did not constitute deliberate indifference); *Mercer,* 1998 WL 85734 at *6 (holding that mere fact that physician's treatment choice was different than treatment recommended by specialist did not give rise to a violation of the plaintiff's Eighth Amendment constitutional rights); *Gardner,* 1996 WL 507072 at *2 (holding that disagreements among the prisoner's physicians did not constitute deliberate indifference). Accordingly, Plaintiff cannot demonstrate a likelihood of succeeding on the merits of his claim on the basis of the supposed disagreement over treatment between Dr. Maliakkal and the defendant physicians.

**B. Plaintiff's Second Cause Of Action**

**\*9** In his second cause of action under 42 U.S.C. § 1983, Plaintiff alleges that Defendants "deprived, with deliberate indifference, plaintiff of rights secured to him by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution by refusing to provide him with necessary medical assessment, treatment and care." Compl. ¶ 47. We now address each of the claims raised by this cause of action respectively.

**1. Due Process Claim**

We are hard pressed to differentiate between Plaintiff's second cause of action for deprivation of due process stemming from Defendants' "deliberate indifference" in providing him with "necessary medical assessment, treatment and care" and Plaintiff's first cause of action under the Eighth and Fourteenth Amendments. Both are based on the same exact allegations and seek relief from Defendants' alleged deliberate indifference in providing Plaintiff with inadequate medical care.

"Constitutional due process mandates...[the] provision of adequate medical care to persons in official custody." *Hatian Centers Council, Inc. v. Sale* (E.D.N.Y.1993) 823 F.Supp. 1028, 1043. The Due Process Clause of the Fourteenth Amendment directly protects *pretrial detainees* from the provision of inadequate medical care by the state. *See Sulkowska v. City of New York* (S.D.N.Y.2001) 129 F.Supp.2d 274, 291–292, n. 29. In contrast, incarcerated prisoners are protected from cruel and unusual punishment in the form of inadequate medical care by the Eighth Amendment, as applied to the state by the Fourteenth Amendment. *See Estelle,* 429 U.S. at 101–105. As such, Plaintiff's attempt to assert a Section 1983 cause of action for inadequate medical care directly under the Fourteenth Amendment on the basis of the same allegations as his first Section 1983 cause of action for inadequate medical care under the Eighth and Fourteenth Amendments is redundant. Moreover, since Plaintiff is not a pre-trial detainee, is it unclear whether or not he could assert such an action directly under the Fourteenth Amendment's Due Process clause for the deprivation of his substantive due process rights as opposed to asserting the action under the Eighth Amendment as it is applied to the state through the Fourteenth Amendment. *See Howard v. Goord* (E.D.N.Y. June 6, 2001) 2001 WL 739244, *2 n. 1.

Where a *pro se* incarcerated prisoner has asserted separate claims for deliberate indifference to medical needs under both the Eighth Amendment's prohibition against cruel and unusual punishment as well as the Fourteenth Amendment's Due Process Clause, we construe such claims as if they were brought for the deprivation of Eighth Amendment rights. *See id. See also Amaker v. Haponik* (S.D .N.Y. Mar. 31, 2000) 2000 WL 343772, *6 ("It is well established that 'if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process' "). Since we have determined that Plaintiff cannot demonstrate a clear or substantial likelihood of success on the merits of his Eighth Amendment claim, we now similarly hold that he cannot demonstrate a clear or substantial likelihood of succeeding on the merits of this aspect of his second cause of action.

2. Equal Protection Claim

 *10 In his second cause of action, Plaintiff also asserts a Section 1983 claim for the deprivation of his rights under the Equal Protection Clause of the Fourteenth Amendment stemming from Defendants' refusal to "provide him with necessary medical assessment, treatment and care." Compl. ¶ 47. Unfortunately, given the opaque nature of Plaintiff's moving papers, it is unclear whether or not Plaintiff grounds his motion for a preliminary injunction solely on his Eighth Amendment claim or whether he also bases his motion on the alleged violation of his equal protection rights. While Plaintiff's *pro se* moving papers do not substantively contend that he is entitled to injunctive relief because of the Equal Protection Clause or that he is likely to succeed on the merits of his equal protection claim, a footnote in his Reply brief in support of a preliminary injunction suggests that he may be partly relying on his equal protection claim in seeking injunctive relief. *See* Pl.'s Reply Brief at 6 n. 7.

In essence, Plaintiff appears to contend, *inter alia,* that the restrictions on treatment in the Hepatitis C Guideline violate his equal protection rights. As the defendant physicians have determined that Plaintiff should not be treated with Interferon and Ribavirin on the basis of both the relevant medical literature on the subject *as well as* the Hepatitis C Guideline's proviso that treatment for Hepatitis C is contraindicated for persons with decompensated cirrhosis, *see* Wright Aff. ¶ 8, we will address the issue of whether or not Plaintiff has a clear

likelihood of succeeding on the merits of his equal protection claim.

Plaintiff's Complaint and moving papers are not a model of clarity with respect to this claim. Although his Complaint is replete with allegations of how he has been denied adequate medical care, it contains no allegations pertaining to how he has been deprived of his equal protection rights beyond his conclusory sentence setting forth his equal protection claim. *See* Compl. ¶ 47.

The only substantive factual allegations which pertain to this claim can be found in the grievance which Plaintiff filed with the prison authorities regarding his medical treatment. That grievance was attached as an exhibit to the Complaint. *See* Compl., Exh. I at 1, 6, 8–9. In his grievance, Plaintiff argued that he had been deprived of his rights under the Equal Protection Clause because inmates with HIV or AIDS were generally allowed unconditional treatment for their disease whereas, pursuant to the Hepatitis C Guideline generally, inmates with Hepatitis C were not. *See* Compl., Exh. I at 6. *See also* Pl.'s Reply Brief at 6 n. 7. Plaintiff also asserted that the Hepatitis C Guideline's provision recommending treatment for only those inmates with Hepatitis C whose anticipated incarceration would last at least 12 months was discriminatory "in its application" because it had the effect of providing incarcerated inmates with Hepatitis C less favorable treatment than that available to non-inmates, such as parolees, with Hepatitis C. *See* Compl., Exhibit I at 8–9.

 *11 "The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.' " *Plyler v. Doe* (1982) 457 U.S. 202, 216. The Second Circuit has explained that "[t]here are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause" and has identified at least three such methods. *Brown v. City of Oneonta* (2d Cir.2000) 221 F.3d 329, 337. First, a plaintiff can point to a law or policy that expressly classifies persons on the basis of various protected categories. *See Hayden v. County of Nassau* (2d Cir.1999) 180 F.3d 42, 48. Second, a plaintiff can identify a facially neutral law or policy that has been applied in an unlawfully discriminatory manner. *Pyke v. Cuomo* (2d Cir.2001) 258 F.3d 107, 110. Finally, a plaintiff can also "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Brown,* 221 F.3d at 337.

Although the true nature of Plaintiff's equal protection claim is somewhat unclear, we construe his equal protection

allegations with respect to the Hepatitis C Guideline's adverse effect as an equal protection claim premised on allegations that a policy has an adverse impact and that it was motivated by discriminatory animus.[10] In sum, Plaintiff claims that both the application of the general restrictions in the Guideline as well as the application of the specific provision addressing an inmate's anticipated period of incarceration has an adverse effect because inmates with Hepatitis C receive less favorable treatment options as a result of the Guideline than do inmates with HIV or AIDS or non-inmates with Hepatitis C (such as parolees).[11]

[10]  Since the Hepatitis C Guideline explicitly applies to the treatment of inmates with Hepatitis C, *see* Wright Aff., Exh. A, and is not actually applicable to the treatment of either HIV or AIDS or to the treatment of non-inmates, such as parolees, with Hepatitis C, we cannot construe Plaintiff's allegations as stating a challenge to a facially neutral policy that has actually been applied in an unlawfully discriminatory manner.

[11]  In his Reply brief, Plaintiff asserts for the first time that the Hepatitis C Guideline's ASAT provision violates his equal protection rights. *See* Pl.'s Reply Brief at 6 n. 7. Among the criteria which are outlined in the Hepatitis C Guideline as considerations for Hepatitis C treatment are whether those inmates with a history of substance abuse have successfully completed an ASAT program. *See* Wright Aff., Exh. A at 4. According to Plaintiff, only inmates who are employed are eligible to attend an ASAT program; since Plaintiff is medically unemployed due to breathing problems, he asserts that the ASAT provision violates his equal protection rights because that treatment consideration is applied more favorably to employed inmates with Hepatitis C than to unemployed inmates with Hepatitis C. *See* Pl.'s Reply Brief at 6 n. 7. As an initial matter, we hold that since Plaintiff only raised this equal protection allegation for the first time in his Reply brief, we need not address this argument. *See Carbonell v. Acrish* (S.D.N.Y.2001) 154 F.Supp.2d 552, 560–561 (refusing to consider an equal protection challenge raised by the plaintiff for the first time in his reply brief). *See also Mitchell v. Northern Westchester Hospital* (S.D.N.Y.2001) 171 F.Supp.2d 274, 277 n. 1.; *Higgins v. Coombe*

(S.D.N.Y. June 16, 1997) 1997 WL 328623, *12. However, even assuming *arguendo* that we did consider this new challenge and that the ASAT provision violated the Equal Protection Clause, such allegations could not support a preliminary injunction under these circumstances. Whether or not Defendants delayed Plaintiff's treatment or refused to treat him altogether in the past on the basis of the ASAT provision, that provision is not the basis of his ongoing medical treatment. Rather, the physicians have refused to treat Plaintiff's Hepatitis C with Interferon and Ribavirin because both the relevant medical literature on the subject and another provision in the Hepatitis C Guideline provide that such treatment is inappropriate where the patient has decompensated cirrhosis in light of the risk such treatment would pose to the patient's life. *See* Wright Aff. ¶ 8. *See also* Pl.'s Aff. in supp. of Mot. for Prelim. Inj., Exh. at 23 (Dr. Hentschel's recommendation that such Interferon and Ribavirin therapy be denied because the patient was cirrhotic). Since any purported past reliance on the ASAT provision in the Guideline is not the reason why Plaintiff is allegedly suffering irreparable harm stemming from the physician's current treatment decisions, Defendants' past conduct in allegedly refusing to treat Plaintiff's Hepatitis C on the basis of the ASAT provision cannot establish the requisite irreparable harm necessary to support a preliminary injunction.

As the Second Circuit has recently clarified, a plaintiff who alleges that the application of a facially neutral statute or policy has an adverse effect "is not obligated to show a better treated, similarly situated group of individuals" in order to establish a claim of equal protection. *Pyke,* 258 F.3d at 110. However, although Plaintiff may not be required to show a similarly situated group of individuals who were more favorably treated in order to support his equal protection claim, he must still establish purposeful discrimination. While Plaintiff has alleged both that the restrictions in the Hepatitis C Guideline in general and particular provisions in the Guideline have an adverse impact on the treatment provided to inmates with Hepatitis C, "a policy does not deny equal protection merely because it is known to affect a particular class adversely." *Johnson v. Wing* (2d Cir.1999) 178 F.3d 611, 615, *cert. denied* (2000) 528 U.S. 1162. Rather, as a general matter, a policy violates the Equal Protection Clause only where its adverse effect reflects purposeful discrimination. *Id.* In this context, "[a] plaintiff need not show that a

discriminatory reason was the sole reason for the disparate treatment, just that it was a substantial or motivating one." *Querry v. Messar* (S.D.N.Y.1998) 14 F.Supp.2d 437, 446.

**\*12** "Discriminatory purpose 'implies that the decisionmaker...selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its *adverse effects* upon an identifiable group." ' *Hayden,* 180 F .3d at 50. Although Plaintiff has asserted allegations of adverse impact, his Complaint, moving papers, and accompanying exhibits are devoid of any factual allegations that the Hepatitis C Guideline was implemented because of the alleged adverse effects it had on the medical treatment provided to inmates with Hepatitis C. Given the absence of such factual allegations, Plaintiff cannot show that he has a likelihood of succeeding on the merits of his equal protection claim. *See Hayden,* 180 F.3d at 50–51 (affirming dismissal of equal protection claim where plaintiff's allegations were insufficient to establish that county officials had acted because of a desire to adversely affect the plaintiffs); *Johnson,* 178 F.3d at 616 (affirming summary judgment in favor of the defendants on plaintiff's equal protection claim where nothing in plaintiff's allegations supported the finding of a discriminatory purpose); *Lee v. State of New York Dept. of Correctional Services* (S.D.N.Y. Aug. 30, 1999) 1999 WL 673339, \*12 (dismissing plaintiff's equal protection claim where plaintiff had failed to set forth any allegations suggesting that DOCS officials had some discriminatory purpose behind their actions). [12]

[12]   Even had we construed Plaintiff's equal protection claim as a challenge against a policy which expressly distinguished between groups on the basis of some protected category, Plaintiff would still be unable to show that he has a clear likelihood of succeeding on the merits of this claim. Since inmates with Hepatitis C, without more, do not fall within the type of express protected classification in *Brown* for which a plaintiff is not required to establish a similarly situated group, Plaintiff would need to show that inmates with Hepatitis C were treated differently than similarly situated individuals. *See Gagliardi v. Village of Pawling* (2d Cir.1994) 18 F.3d 188, 193; *Caracciola v. City of New York* (S.D.N.Y. Mar. 17, 1999) 1999 WL 144481, \*6. As Plaintiff compares the treatment provided to inmates with Hepatitis C to that provided to non-inmates with hepatitis or inmates with HIV or AIDS, he would be unable to establish

that he was being treated differently than similarly situated individuals. *See Hrbek v. Farrier* (8th Cir.1986) 787 F.2d 414 (holding that inmates are not similarly situated to non-inmates); *Daleure v. Kentucky* (W.D.Ky.2000) 119 F.Supp.2d 683, 691 (same); *Allen,* 1998 WL 318841 at \*2–\*3 (concluding that inmate with hepatitis failed to state an equal protection claim based on discriminatory treatment because he was not similarly situated to an inmate with HIV).

3. Retaliation Claim

Although he did not assert allegations or a cause of action under Section 1983 for retaliation in his Complaint, Plaintiff alleges for the first time in his motion for a preliminary injunction that Defendants are refusing to allow him to consult with Dr. Maliakkal or to receive treatment with Interferon or Ribavirin in retaliation for his having filed a prior, unrelated Section 1983 action against prison officials. *See* Pl.'s Aff. in supp. of Mot. for Prelim. Inj. at 8 ("Finally, the Court should be aware that plaintiff is being denied medical treatment in retaliation for a prior Civil Rights Action which is pending before this Court"). *See also* Pl .'s Reply Brief at 7–8.

"It is well-established that prison officials may not retaliate against inmates for exercising their constitutional rights." *Rivera v. Goord* (S.D.N.Y.2000) 119 F.Supp.2d 327, 339. To state a retaliation claim under Section 1983, "a plaintiff must show that (1) his actions were protected by the Constitution or federal law; and (2) the defendant's conduct complained of was in response to that protected activity." *Friedl v. City of New York* (2d Cir.2000) 210 F.3d 79, 85. "Because claims of retaliation are easily fabricated, 'courts must examine prisoners' claims of retaliation with skepticism and particular care...requiring detailed fact pleading...." *Rivera,* 119 F.Supp.2d at 339. *See also Dawes v. Walker* (2d Cir.2001) 239 F .3d 489, 491 ("courts must approach prisoner claims of retaliation with skepticism and particular care"); *Bartley v. Artuz* (S.D.N.Y. Oct. 19, 1999) 1999 WL 942425, \*8 ("The standard for pleading retaliation is high because, as the Second Circuit recognized, retaliation claims by prisoners are 'prone to abuse' as [v]irtually every prisoner can assert such a claim as to every decision which he or she dislikes").

**\*13** At the outset, we hold that since Plaintiff never asserted either a cause of action for retaliation or even allegations in support thereof in his Complaint, we need not consider his retaliation arguments. *See Mitchell v. Northern*

*Westchester Hospital* (S.D.N.Y.2001) 171 F.Supp.2d 274, 277 n. 1 (refusing to consider claims raised by plaintiff for first time in opposition to motion for summary judgment where such claims were not pleaded in the complaint); *Higgins v. Coombe* (S.D.N.Y. June 16, 1997) 1997 WL 328623, *12 (refusing to consider allegations of retaliatory transfer raised by *pro se* plaintiff for the first time in his response to defendants' motion to dismiss since they were not pleaded in the complaint and were therefore beyond the scope of the instant action). *See also Carbonell v. Acrish* (S.D.N.Y.2001) 154 F.Supp.2d 552, 560–561.

However, even if we were to address Plaintiff's retaliation contentions, we would still find that Plaintiff's allegations are insufficient to support a preliminary injunction in this instance. Here, Plaintiff's allegations of retaliation are wholly conclusory and unsupported by detailed fact pleading. The nature of his retaliation allegations is unsurprising since these allegations are raised as cursory arguments in the course of Plaintiff's moving papers. Since Plaintiff's retaliation allegations are wholly conclusory, Plaintiff cannot demonstrate that he has a clear likelihood of succeeding on the merits of the retaliation claim set forth in his motion for a preliminary injunction. *See Gill v. Mooney* (2d Cir.1987) 824 F.2d 192, 194–195 (affirming dismissal of claim which alleged retaliation in wholly conclusory terms); *Washington v. Coughlin* (N.D.N.Y. Sept. 23, 1998) 1998 WL 661532, *3 (dismissing retaliation claim where it was unsupported and wholly conclusory); *Benitez v. Beneway* (S.D.N.Y. Aug.

15, 1995) 1995 WL 489694, *5 (dismissing retaliation claim where underlying allegations were conclusory). [13]

[13]    Since Plaintiff has not requested a hearing with respect to his motion and since the affidavits, exhibits, and moving papers submitted to us themselves demonstrate that Plaintiff does not have a clear or substantial likelihood of succeeding on the merits of his various claims, we have not held an evidentiary hearing on Plaintiff's motion for a preliminary injunction. *See LaRouche v. Webster* (S.D.N.Y.1983) 566 F.Supp. 415, 419 n. 5 ("There is no doubt that a preliminary injunction may be 'denied without a hearing...when the written evidence shows the lack of a right so clearly that receiving further evidence would be manifestly pointless' ").

CONCLUSION

For the foregoing reasons, we DENY Plaintiff's motion for a preliminary injunction.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 338375

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Lara v. Bloomberg, S.D.N.Y., January 8, 2008

2004 WL 628784
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

William PABON and Felix Manuel
Ruiz, a/k/a Pedro Ruiz, Plaintiffs,
v.
Dr. Lester WRIGHT, Dr. Norman Selwin, Dr.
John Charles Bendheim, Dr. Vincent Marrone,
Dr. Henry Manis, Dr. Andrew Miller, Dr. Charles
Rush, Dr. Bharat Dasani, Dr. Ravi Hotchandani,
Dr. Robert Rosenzweig, Dr. Koenigsmann, Dr.
Chakorvorty, Dr. Phillip Marrone, Jacqueline
A. Bodzak, and Catherine Metzler, Defendants.

No. 99 Civ.2196(WHP).
|
March 29, 2004.

**Synopsis**
**Background:** Two pro se state prisoners sued prison
physicians and private consulting physicians, alleging that
they violated Eighth Amendment by providing inadequate
treatment for prisoners' Hepatitis C. Physicians moved for
summary judgment.

**[Holding:]** The District Court, Pauley, held that prisoners'
allegations did not evince deliberate indifference to their
conditions.

Motion granted.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (2)

[1]  **Prisons** ⚷ Particular Conditions and
Treatments

**Sentencing and Punishment** ⚷ Medical care
and treatment

State prisoners' allegations that physicians failed
to advise them of risks associated with use of
Interferon to treat Hepatitis C, and improperly
"forced" them to undergo liver biopsies before
beginning Interferon treatment, did not evince
deliberate indifference to prisoners' conditions,
as required to support claims for violation of
Eighth Amendment; allegations amounted to
claims for mere negligence or, at most, medical
malpractice. U.S.C.A. Const.Amend. 8.

30 Cases that cite this headnote

[2]  **Prisons** ⚷ Particular Conditions and
Treatments

**Sentencing and Punishment** ⚷ Medical care
and treatment

State prisoners' allegations that physicians
delayed treatment of their Hepatitis C by
requiring them to undergo prerequisite liver
biopsies did not evince deliberate indifference
to prisoners' conditions, as required to support
claims for violation of Eighth Amendment;
evidence of minimal delays in treatment
suggested at most several acts of negligence.
U.S.C.A. Const.Amend. 8.

27 Cases that cite this headnote

**Attorneys and Law Firms**

Mr. William Pabon, Green Haven Correctional Facility,
Drawer B, Stormville, NY, Legal Mail, Plaintiff pro se.

Mr. Felix Manuel Ruiz, Greenhaven Correctional Facility,
Drawer B, Stormville, NY, Legal Mail, Plaintiff pro se.

Jerry Slater, Donald Nowve, Assistant Attorney General for
the State of New York, New York, NY, for State defendants.

Michael F. Madden, Wayne L. Gladstone, Martin, Clearwater
& Bell, New York, NY, for defendants Drs. Robert
Rosenzweig, Vincent Marrone, Bharat Dasani, and Ravi
Hotchandani.

*ORDER*

PAULEY, J.

**\*1** Plaintiffs *pro se* William Pabon and Felix Manuel Ruiz (collectively, "plaintiffs") bring this action against defendants Dr. Lester Wright, Dr. Norman Selwin, Dr. John Charles Bendheim, Dr. Henry Manis, Dr. Andrew Miller, Dr. Charles Rush, Dr. Koenigsmann, Dr. Chakorvorty, Dr. Phillip Marrone, Jacqueline A. Bodzk and Catherine Metzler (collectively, the "State Defendants"), and defendants Dr. Bharat Dasani, Dr. Ravi Hotchandani, Dr. Vincent Marrone, and Dr. Robert Rosenzweig (collectively, the "Private Physician Defendants"), pursuant to 42 U.S.C. § 1983, alleging that defendants violated their Eighth and Fourteenth Amendment [1] rights through inadequate treatment of their Hepatitis C conditions. Currently before this Court are defendants' motions for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, defendants' motions are granted.

[1]   Plaintiffs' claim that defendants' indifference to their medical needs violated their Fourteenth Amendment rights. The only relevance of plaintiffs' Fourteenth Amendment claim is that the Due Process clause "makes the Eighth Amendment's bar on cruel and unusual punishments applicable to the states." *Johnson v. Wright,* 234 F.Supp.2d 352, 358 (S.D.N.Y.2002) (citing *Estelle v. Gamble,* 429 U.S. 97, 101, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Accordingly, this Court treats plaintiffs' pleadings as substantively raising only a claim under the Eighth Amendment. *See Estelle,* 429 U.S. at 101.

*BACKGROUND*

Unless otherwise noted, the following facts are undisputed, and are derived from the parties' 56.1 statements, affidavits, and other submissions. Plaintiffs are inmates at Green Haven Correctional Facility ("Green Haven"). The State Defendants are medical professionals and consultants at Green Haven. The Private Physician Defendants are affiliated with Dutchess Gastroenterologists, P.C., and examined plaintiffs in a consulting capacity upon referrals from the State Defendants at Green Haven.

A. *Pabon*

On October 25, 1996, a blood test performed at Green Haven indicated that Pabon may have contracted Hepatitis C, a chronic viral liver disease that can result in inflamation, scarring, and ultimately cirrhosis of the liver. In May 1997, Pabon was referred to Dutchess Gastroenterologists for further testing and treatment for Hepatitis C, and for a possible liver biopsy. On May 21, 1997, Dr. Rosenzweig saw Pabon at Dutchess Gastroenterologists for an evaluation at the request of Green Haven's medical staff. The consultation request from Green Haven indicated that Pabon had a history of Hepatitis C, with mildly elevated findings on liver function tests. Dr. Rosenzweig recommended that Pabon submit to additional tests to confirm the initial diagnosis of Hepatitis C and to screen for HIV. Pabon contends that Dr. Rosenzweig "forced [him] to undergo numerous diagnostic tests." (Pabon 56.1 ¶ 7.) Dr. Rosenzweig also advised that Pabon should return for a follow-up evaluation in two months.

Pabon's tests confirmed the Hepatitis C diagnosis, and he returned to Dutchess Gastroenterologists for evaluation on July 30, 1997. Dr. Hotchandani provided Pabon with information on Hepatitis C and Interferon, a medication for the treatment of Hepatitis C. Additionally, Dr. Hotchandani discussed with Pabon the need for a liver biopsy to assess the state of his liver as a prerequisite to beginning Interferon treatment. On October 9, 1997, Pabon underwent a liver biopsy in order to be eligible for Interferon treatment, and to screen for other liver diseases. (Affidavit of Michael T. Lofredo, Esq., dated January 9, 2003 ("Lofredo Aff.") Ex. E: Letter from Pabon to Dr. Marrone, dated September 15, 1997.) Pabon contends that he was "forced" to undergo the liver biopsy. (Pabon 56.1 ¶ 7.)

**\*2** Dr. Dasani of Dutchess Gastroenterologists evaluated Pabon on November 12, 1997, and explained that Pabon's liver biopsy showed mild Hepatitis C. While Dr. Dasani does not recall a specific conversation with Pabon informing him of the side effects, risks, and complications associated with Interferon, he notes that it is his custom and practice to do so with all patients being treated with Interferon. (Affidavit of Michael T. Loffredo, Esq., dated Jan. 9, 2003 ("Loffredo Aff.") Ex. H: Responses to Plaintiffs' Second Stage Interrogatories, dated Apr. 23, 2002, ¶¶ 3–4.) Pabon claims that he was never informed about Interferon's potential side effects. (Pabon 56.1 ¶ 9.) Dr. Dasani prescribed Interferon for Pabon, ordered a blood count test, and advised that Pabon should return for a follow-up evaluation in two weeks. A few days later, Pabon began receiving Interferon injections at Green Haven.

2004 WL 628784

On December 3, 1997, Dr. Dasani examined Pabon again at Dutchess Gastroenterologists for complaints of gastric pain. Dr. Dasani conducted a physical examination and diagnosed Pabon with dyspepsia with abdominal pain. Dr. Dasani recommended Pabon for an EGD and advised that Pabon should take Zantac with the Interferon.

Pabon returned to Dutchess Gastroenterologists on February 10, 1998, with complaints of continuing gastric pain. Dr. Rosenzweig performed an endoscopy on Pabon which revealed mild erythema without erosions or ulcers. Pabon was still on his Interferon treatment at that time.

On October 28, 1998, Dr. Rush, the consulting infectious disease specialist for Green Haven, examined Pabon, and recommended the addition of Ribavarin, another drug for the treatment of Hepatitis C, because he believed Pabon's response to the Interferon was not complete. As a result, on November 4, 1998, Ribavarin was added to the melange of drugs administered to Pabon at Green Haven. On March 31, 1999, Dr. Rush conducted further testing on Pabon, and the results indicated Pabon's Hepatitis C was successfully being suppressed. In October 1999, Dr. Rush recommended the discontinuance of Interferon and Ribavarin because Pabon had a complete response to the drug therapy. On November 17, 1999, Pabon's Hepatitis C drug therapy was discontinued. Since that time, Dr. Rush has tested Pabon several times, reported that Pabon's Hepatitis C is likely cured, and recommended yearly monitoring for any reoccurrence of the condition.

Pabon contends that he experienced "dizziness, vomiting, pain in his abdominal area, severe headaches and other ailments as a result of undergoing the liver biopsy," (Pabon 56.1 ¶ 14), and that he suffered "severe and chronic depression, pain, suicidal tendencies, exacerbation of existing mental conditions, neuropathy, ejaculation problems, and marital problems," due to his Interferon treatment. (Pabon 56.1 ¶ 15.)

B. *Ruiz*

Coincidentally, Ruiz was also diagnosed with Hepatitis C in May 1997. As with Pabon, the Green Haven physicians referred Ruiz to Dutchess Gastroenterologists to confirm the presence of Hepatitis C and to determine whether he was medically fit for Interferon treatment. Dr. Rosenzweig of Dutchess Gastroenterologists saw Ruiz once on July 16, 1997, when he was referred by Green Haven with a history of

Hepatitis C and mildly elevated findings on liver function tests. Dr. Rosenzweig recommended that Ruiz have blood tests to detect other liver diseases and to screen for HIV. Dr. Rosenzweig also recommended Ruiz undergo a liver biopsy to determine whether a prescription of Interferon would be appropriate.

**\*3** On December 10, 1997, Ruiz returned to Dutchess Gastroenterologists, where Dr. Hotchandi examined him and recommended that he undergo a liver biopsy to assess the state of his liver before beginning on Interferon. Ruiz underwent a liver biopsy on April 1, 1998 at St. Francis Hospital, and began Interferon treatments on July 1, 1998.

On October 21, 1998, Dr. Rush of Green Haven examined Ruiz and recommended that Ruiz begin dual drug therapy with Ribavarin and Interferon to better treat his Hepatitis C. In November 1998, the Green Haven physicians began Ruiz on a treatment of Ribavarin and Interferon. On December 16, 1998, Dr. Rush examined Ruiz and noted that he was reacting positively to the dual therapy. On February 17, March 31, and October 20, 1999, Dr. Rush examined Ruiz again and recorded further decreases in his Hepatitis viral load. Ruiz completed one year of Ribavarin and Interferon treatment on November 18, 1999. Ruiz was examined by Dr. Rush on December 15, 1999, and July 26, 2000, and was recommended for routine monitoring of his condition. On April 25, 2001, Dr. Rush examined Ruiz a final time and noted that Ruiz's Hepatitis C viral load was at maximum suppression. On June 19, 2001 and November 2, 2002, Green Haven administered liver function tests to Ruiz, which indicated normal liver function.

While Ruiz was on dual drug therapy, he complained of weight loss and foot pain. The Green Haven physicians prescribed him analgesic medications and Ensure, a dietary supplement, to treat those conditions.

Ruiz contends that he experienced "dizziness, vomiting, pain in his abdominal area, severe headaches and other ailments as a result of undergoing the liver biopsy," (Ruiz 56.1 ¶ 12), and that he suffered "severe and chronic depression, pain, suicidal tendencies, exacerbation of existing mental conditions, neuropathy, ejaculation problems, and marital problems," due to his Interferon treatment. (Ruiz 56.1 ¶ 13.)

*DISCUSSION*

Case 9:21-cv-00251-DNH-TWD   Document 37   Filed 05/22/23   Page 226 of 229
Pabon v. Wright, Not Reported in F.Supp.2d (2004)
2004 WL 628784

## I. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997). The movant may meet this burden by demonstrating a lack of evidence to support the nonmovant's case on a material issue on which the nonmovant has the burden of proof. *Celotex,* 477 U.S. at 323.

**\*4** To defeat a summary judgment motion, the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Indeed, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord Matsushita Elec.,* 475 U.S. at 587. In evaluating the record to determine whether there is a genuine issue as to any material fact, the "evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Liberty Lobby,* 477 U.S. at 255. Although the same standards apply when a *pro se* litigant is involved, such a litigant is given "special latitude in responding to a summary judgment motion." *Gonzalez v. Long,* 889 F.Supp. 639, 642 (E.D.N.Y.1995); *see also Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) ("special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment").

## II. *Eighth Amendment*

Plaintiffs argue that the State Defendants and Private Physician Defendants who evaluated them failed to adequately treat their Hepatitis C in violation of the Eighth Amendment. "To establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)

(quoting *Estelle V. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); *accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "The standard of deliberate indifference includes both subjective and objective components," and plaintiffs must satisfy both conditions in order to be successful against the defendants. *Chance,* 143 F.3d at 702; *accord Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). First, each plaintiff must show that "his medical condition is objectively a serious one." *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citing *Estelle,* 429 U.S. at 104). Second, each plaintiff "must show, for each defendant, that the defendant acted with deliberate indifference to [his] medical needs." *Brock,* 315 F.3d at 162 (citing *Estelle,* 429 U.S. at 104).

### A. *Serious Medical Condition*

Under the objective prong of the analysis, a prisoner must demonstrate that the alleged medical need is "sufficiently serious." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (*"Hathaway I"* ); *accord Brock,* 315 F.3d at 162. A condition constitutes a serious medical need under the Eighth Amendment if it is a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Morales v. Macklam,* 278 F.3d 126, 132 (2d Cir.2002). An inmate is not required "to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do[es] [this Court] require a showing that his or her condition will degenerate into a life threatening one." *Brock,* 215 F.3d at 163.

**\*5** It is well-established that Hepatitis C qualifies as a serious condition for purposes of an Eighth Amendment analysis. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002) (holding that Hepatitis C constitutes an objectively serious medical condition); *McKenna v. Wright,* 01 Civ. 6571(WK), 2002 WL 338375, at \*8 (S.D.N.Y. Mar. 4, 2002) (same) (citing cases); *Carbonell v. Goord,* 99 Civ. 3208(AJP), 2000 WL 760751, at \*9 (S . D.N.Y. June 13, 2000) (same). Accordingly, as it is undisputed that plaintiffs each carried Hepatitis C, and that this action arises from defendants' treatment of that virus, plaintiffs have demonstrated a sufficiently serious medical need under the Eighth Amendment.

### B. *Deliberate Indifference*

The subjective component of "the deliberate indifference standard requires the plaintiff[s] to prove that the [defendants] knew of and disregarded ... [their] serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer,* 511 U.S. at 837);

accord *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ( *"Hathaway II"* ). In order to be found "sufficiently culpable," the defendant must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer,* 511 U.S. at 837. Proof of deliberate indifference may be found where a defendant "intentionally den[ies] or delay[s] access to medical care or intentionally interfer[es] with the treatment once prescribed." *Estelle,* 429 U.S. at 104–05; *accord Farmer,* 511 U.S. at 847 (deliberate indifference standard satisfied where "the official has actual knowledge that the prisoner faced a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it").

Deliberate indifference requires intentional or criminally reckless conduct; negligent conduct is insufficient to satisfy the standard. *Farmer,* 511 U.S. at 835–40; *Hathway II,* 99 F.3d at 553 (deliberate indifference may be shown through "culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' "). Thus, "[b]ecause the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under [S]ection 1983." *Johnson v. Newport Lorillard,* 01 Civ. 9587(SAS), 2003 WL 169797, at *2 (S.D.N.Y. Jan. 23, 2003); *accord Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of mistreatment under the Eighth Amendment."); *Chance,* 143 F.3d at 703 ("Negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim."); *Hathway II,* 99 F.3d at 553 ("[M]ere medical malpractice is not tantamount to deliberate indifference.").

 *6 Moreover, it is well-established that "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)); *accord McKenna v. Wright,* 01 Civ. 6571(WK), 2002 WL 338375, at *7 (S.D.N.Y. Mar. 4, 2002). While an incarcerated person is entitled to receive adequate medical care, he is not required to receive the same standard of medical care found in outside hospitals. *Archer v. Dutcher,* 733 F.2d

14, 17 (2d Cir.1984); *see also United States ex. rel. Hyde v. McGinnis,* 429 F.2d 864, 867–68 (2d Cir.1970) (an inmate is not entitled to the "type or scope of medical care which he personally desires"). "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Chance,* 143 F.3d at 703.

Plaintiffs' action is predicated upon: (i) defendants' alleged failure to provide them with adequate medical treatment after they were each diagnosed with Hepatitis C by improperly conditioning the prescription of Interferon on their consent to a liver biopsy; (ii) defendants' alleged failure to inform them of Interferon's risks and side effects; and (iii) defendants' allegedly unreasonable delay in treating them. Even resolving all doubts in favor of plaintiffs, their allegations of defendants' medical indifference to their Hepatitis C conditions do not rise to the level of "deliberate indifference."

### i. Interferon

[1] Plaintiffs' claims that the defendants failed to advise them of Interferon's risks and improperly "forced" them to undergo a liver biopsy as a prerequisite to beginning Interferon treatment, amount to claims for mere negligence or, at most, medical malpractice. As noted, it is axiomatic that claims for negligence or negligence amounting to medical malpractice do not satisfy the "deliberate indifference" standard. *See, e.g., Estelle,* 429 U.S. at 105 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Hernandez,* 341 F.3d at 144 (" 'Deliberate indifference' describes a mental state more blameworthy than negligence."); *Chance,* 143 F.3d at 703 (same); *McKenna,* 2002 WL 338375, at *6 (finding defendant's medical judgment did not constitute deliberate indifference to plaintiff's Hepatitis C condition). Indeed, "[d]isagreements over medications, diagnostic techniques ... forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a [Section] 1983 claim. These issues implicate[ ] medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." *Estelle,* 429 U.S. at 107; *accord Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000).

 *7 Essentially, plaintiffs' complaints about defendants' treatment of their Hepatitis C with Interferon, and the "forceable" liver biopsy and blood tests they underwent, evince a difference in opinion as to how defendants should have treated their Hepatitis C. It is undisputed that defendants examined plaintiffs numerous times over several years,

2004 WL 628784

administered diagnostic tests, and prescribed medications to treat plaintiffs' Hepatitis C. Indeed, the treatment prescribed by defendants was adequate as it successfully suppressed Hepatitis C in both plaintiffs. *Chance,* 143 F.3d at 703 (so long as the treatment administered is adequate, differences in opinion over the proper treatment does not create an Eighth Amendment claim).

Instead of turning a blind eye to plaintiffs' Hepatis C condition, the defendants evaluated plaintiffs, and conducted diagnostic tests to evaluate the proper treatment for plaintiffs. Defendants determined, in their medical judgment, that a liver biopsy would be necessary to evaluate whether plaintiffs were good candidates for Interferon treatment. (Expert Affirmation of Ivan Kahn, M.D., dated Oct. 10, 2002 ("Kahn Aff.") ¶¶ 13–16, Ex. A; Affirmation of Vincent Marrone, M.D. ("Marrone Aff.") ¶ 6.) That the defendants "forced" plaintiffs to submit to a biopsy and Interferon treatment, as plaintiffs contend, is of no moment since those complaints amount to nothing more than a claim for negligence or a question about defendants' medical judgements, which are insufficient to constitute deliberate indifference under the Eighth Amendment. *Estelle,* 429 U.S. at 107; Hathaway II, 99 F.3d at 553. Similarly, even accepting as true plaintiffs' contention that defendants failed to inform plaintiffs of Interferon's side effects and risks, those contentions also only amount to negligent conduct. *Chance,* 143 F.3d at 703; Hathaway II, 99 F.3d at 553. Indeed, the record is devoid of even an inference of intentional or criminally reckless conduct by the defendants. *Hathaway II,* 99 F.3d at 553. "In essence, rather than knowing of and disregarding an excessive risk to [p]laintiff[s'] health and safety ..., the physicians acted pursuant to their medical judgment to protect [p]laintiff[s'] health. Such conduct does not constitute deliberate indifference." *McKenna v. Wright,* 01 Civ. 6571(WK), 2002 WL 338375, at *8 (S.D.N.Y. Mar. 4, 2002); *accord Estelle,* 429 U .S. at 107 (holding plaintiff's claims of deliberate indifference against defendant physician insufficient where plaintiff was seen by medical personnel repeatedly over several months).

### ii. *Delay*

**[2]**   Plaintiffs also argue that defendants were deliberately indifferent to their medical needs by: (i) failing to promptly treat their Hepatitis C condition; and (ii) delaying their prescriptions for Interferon treatment by requiring them to undergo a prerequisite liver biopsy. Accepting plaintiffs' contentions as true, their argument that defendants delayed in administering medical treatment is insufficient to satisfy the "deliberate indifference" standard.

**\*8**   Viewing the facts in the light most favorable to plaintiffs and drawing every reasonable inference in their favor, the evidence as to minimal delays in defendants' treatment of plaintiffs' Hepatitis C suggests at most several acts of negligence, insufficient to support an Eighth Amendment violation. *Farmer,* 511 U.S. at 835; Hernandez v. Keane, 341 F.3d 137, 146 (2d Cir.2003). "[A] delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas v. Nassau County Correctional Ctr.,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (quoting *Chance,* 143 F.3d at 703). Further, "a delay in treatment does not necessarily invoke the Eighth Amendment. The Second Circuit has 'reserved such a classification for cases in which, for example, officials deliberately delayed medical care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." " *Espinal v. Coughlin,* 98 Civ. 2579(RPP), 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002) (no deliberate indifference of treatment for ruptured ACL, a common knee injury, where surgery was delayed for three years) (quotation omitted); *accord Hathaway I,* 37 F.3d at 68–69 (finding an inference of deliberate indifference to plaintiff's chronic hip pain where defendant knowingly withheld for two years relevant information that plaintiff had broken pins in his hip from an earlier surgery).

Here, there is no evidence that defendants consciously disregarded a substantial risk of serious harm through deliberate delay of treatment. For example, defendants evaluated Pabon and Ruiz every two to three months, prescribed them Interferon, evaluated their respective responses to the medication, and prescribed Ribavarin to successfully treat their Hepatitis C. As noted, the treatments defendants prescribed were successful. Defendants treated both Pabon and Ruiz for other ailments allegedly related to their Hepatitis C treatment as well. Both plaintiffs continue to be monitored for any relapse of their conditions. The delays plaintiffs complain of amount to, at most, negligence, and are not actionable under the Eighth Amendment. *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *see also Walker v.. Kubicz,* 996 F.Supp. 336, 341 (S.D.N.Y.1998) (failure to promptly treat pneumonia not deliberate indifference where defendants made a preliminary diagnosis, prescribed a course of

2004 WL 628784

treatment, and advised plaintiff to return for a follow-up examination).

Plaintiffs also complain that defendants delayed in prescribing them Interferon by conditioning any prescription on their submission to a liver biopsy. As noted, that defendants conditioned any prescription of Interferon on a "compulsory" liver biopsy, as plaintiffs contend, relates to medical judgments defendants made to ensure that Interferon treatment was appropriate for plaintiffs. (Kahn Aff. ¶¶ 13–16, Ex. A.; Marrone Aff. ¶ 6.) Allegations of negligent medical judgments amounting to medical malpractice do not meet the deliberate indifference standard necessary to sustain an Eighth Amendment action. *Estelle,* 499 U.S. at 105–07; *Hodge v. Coughlin,* 92 Civ. 0622(LAP), 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994), *aff'd* 52 F.3d 310 (2d Cir.1995); *McKenna,* 2002 WL 338375, at *7. If anything,

defendants' conduct "demonstrates a routine performance of routine medical responsibilities, not deliberate indifference to medical needs." *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Accordingly, plaintiffs cannot sustain an Eighth Amendment claim against any of the defendants.

## *CONCLUSION*

**\*9** For the reasons set forth above, defendants' motions for summary judgment are granted. The Clerk of the Court is directed to mark this action closed.

## All Citations

Not Reported in F.Supp.2d, 2004 WL 628784

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.